IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01870-RM-GPG

**G.A. RESORT CONDOMINIUM ASSOCIATION, INC.**,
Colorado Nonprofit Corporation,

*Plaintiff*

v.

**ILG, LLC**, a Delaware limited liability company
**CHICAGO TITLE TIMESHARE LAND TRUST, INC.**,
a Florida corporation, as Trustee for **HPC TRUST**,
**GRAND ASPEN LODGING, LLC**, a Delaware limited liability company,
**HPC DEVELOPER, LLC**, a Delaware limited liability company,
**HPC OWNERS' ASSOCIATION, INC.**, a Florida non-profit,
**HV GLOBAL GROUP, INC.**, a Delaware corporation,
**HV GLOBAL MANAGEMENT CORPORATION**, a Florida corporation,
**HV GLOBAL MARKETING CORPORATION**, a Florida corporation,
**HYATT HOTELS CORPORATION**, a Delaware corporation, and
**MARRIOTT VACATIONS WORLDWIDE CORPORATION**,
a Delaware corporation,

*Defendants*

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, G.A. Resort Condominium Association, Inc. ("Association"), a Colorado nonprofit corporation, by and through undersigned counsel, states and alleges as follows for its Complaint and Jury demand against Defendants:

## INTRODUCTION

1.     This lawsuit responds to Defendants having deliberately dismantled both the Hyatt Grand Aspen fractional timeshare program and the Hyatt Residence Club into which more than 560 Association members ("Owners") bought.[1] Defendants grabbed an opportunity to reap millions beyond the premium prices that Owners paid by unlawfully shifting from a deed-based to a points-based timeshare program. That this shift required Defendants to breach fiduciary duties, violate contractual obligations, and employ fraudulent means did not deter them. Defendants proceeded anyway, raking in huge profits at Owners' expense.

2.     Each fractional timeshare interest ("fractional") at the Hyatt Grand Aspen that Owners bought came with a deed and rights to two and half weeks a year at the Hyatt Grand Aspen. These weeks came in either full or half weeks. Single-night purchases were not permitted. One week was fixed—in a particular unit at a particular time of the year.

3.     Owners paid a premium for purchasing these fractionals, gaining access to a luxury property in the heart of Aspen and at the base of Aspen Mountain.

4.     Buying a Hyatt Grand Aspen fractional also meant joining the Hyatt Residence Club network. The Hyatt Grand Aspen was a crown jewel among the Hyatt Residence Club resorts. A Resort Agreement affiliated the Hyatt Grand Aspen with other Hyatt Residence Club locations as a "component resort." An internal exchange program allows Owners to convert some of their Hyatt Grand Aspen time to time at other Hyatt Residence Club resorts.

5.     Owners therefore were convinced that they were buying not only a luxury

---

[1] As used herein, the term "Owners" does not include the 200 or so fractionals wrongfully transferred to a trust as part of the Portfolio Club, or fractionals owned by Defendants or their officers, agents, or affiliated entities.

fractional interest but also the benefits inherent in membership in a network of resorts. This network was supposed to be both robust and expanding but ended up being complex and diminished by Defendants' wrongful conduct.

6.      At least three defendants—the Hyatt Grand Aspen developer (Grand Aspen Lodging), the operator of the Hyatt Residence Club exchange program (HV Global Group), and the management company at the property (HV Global Management Corporation)—became the plaintiff Association's and Owners' fiduciaries by virtue of their near complete control over Owners' separately deeded property interests. But rather than fulfilling their duty to operate the Hyatt Grand Aspen and the larger Hyatt Residence Club network for the benefit of Owners, these entities conspired with the other Defendants and otherwise acted unlawfully to abandon the offering they sold to Owners, and reap ill-gotten gains at Owners' expense.

7.      Most dramatically, in 2017, Defendants extracted fractional interests from the original Hyatt Grand Aspen program and, using these properties, imposed a new, points-based program on the Aspen resort and other Hyatt Residence Club resorts. This was not a typical program orchestrating exchanges among resorts. Instead, with the shift to the points-based program, Defendants created a one-sided arrangement that favored members of the new points-based program, the Hyatt Residence Club Portfolio program ("Portfolio Club").[2] A so-called HPC Exchange Agreement, to which no Owner consented, allowed this new program to exploit the Hyatt Grand Aspen and allow Portfolio Club points members to stay there at a much lower price point than what Owners paid, and for as little as a single night. Defendants did not attempt to

_____

[2] This club is sometimes called in governing documents the HPC Trust Club, sometimes HPC Club, and sometimes the Hyatt Residence Club Portfolio.

obtain consent because they knew that Plaintiff and Owners would refuse.

8.      As part of the scheme to unleash their new points-based Portfolio Club, Defendants took actions such as the following:

a.      Defendants conspired to keep about 20 percent of the fractionals at the Hyatt Grand Aspen unsold as developer inventory; transferred those unsold fractionals, which fell into off-season spring and fall periods, into a trust to be used by the Portfolio Club; and then started selling points arising from those properties as "Vacation Ownership Interests" to Portfolio Club members. These wrongful acts alone translated into at least $30 million profit made on the backs of Owners.

b.      Defendants stopped expanding the Hyatt Residence Club and instead allowed it to shrink, prioritizing selling points through the Portfolio Club. They are dedicating new resorts primarily to points purchasers. Owners cannot book stays at the Hyatt Residence Club if they do not have the currency of the day, which are points, and even with points it is challenging. Owners also have diminished access to other fractionals within the Hyatt Residence Club because of conditions Defendants have created allowing Hyatt Residence Club fractionals to be transferred into the Portfolio Club. These conditions include the conversion of fractionals into points;[3] the developer Grand Aspen Lodging (an alter ego of its parent—first Hyatt, then ILG, and now Marriott) exercising its right of first refusal on resales; the developer transferring its own fractionals into the Portfolio Trust; and foreclosures. These actions further reduce

_____

[3] Faced with less availability at their home resorts and a diminished network of Hyatt Residence Club fractionals available for exchanges, many Hyatt Residence Club members have, pursuant to the Portfolio Club sales and marketing program pushed by Defendants, converted their fractional purchases into Portfolio Club points.

Owners' chances of reserving time at the Hyatt Residence Club resorts, including at their home resort, the Hyatt Grand Aspen.

       c.      Defendants kept the number of points required in the new program to access Hyatt Grand Aspen lower than justified to entice individuals to buy into the Portfolio Club, while increasing points required to stay at sister clubs, and marketing the general opportunity to stay at the Hyatt Grand Aspen to Portfolio Club members.

      9.      Defendants' misconduct has substantially harmed Plaintiff and its member Owners. Prices are far below the level they should be at because no rational buyer on the resale market would pay the premium prices that Owners paid, given that cheaper and more flexible access can be obtained through the Portfolio Club. Related harms include but are not limited to damage to the Hyatt Grand Aspen's reputation as a premier vacation location; loss of inventory at the Hyatt Grand Aspen that Owners previously used to reserve their float week periods, and inability to reserve weeks adjacent to their fixed weeks; loss of available inventory in the Hyatt Residence Club network for internal exchanges; an increase in maintenance costs at the Hyatt Grand Aspen because of greater turnover and wear and tear; market confusion; and a drying up of the marketplace of potential buyers. All those harms, moreover, have further diminished the value of Owners' properties.

      10.     The offering for which Owners paid premium prices is no longer viable as a result of the breaches of fiduciary duties and other wrongful conduct alleged herein.

      11.     Defendants placed Hyatt Grand Aspen fractionals into a trust and subjected Owners and Plaintiff to the Portfolio Club despite advance knowledge that doing so, along with their other misconduct, would cause the harms detailed herein.

12.     In addition to bringing various contractual and tort causes of action, Plaintiff brings this action for breach of fiduciary duty, constructive fraud, aiding and abetting, unjust enrichment, accounting, and statutory violations, including of the Colorado Organized Crime Control Act ("COCCA"). In addition, it would be inequitable to compel Plaintiff and Owners to remain bound to an ongoing contractual relationship with parties that have repeatedly violated their contractual and fiduciary duties—indeed, have committed total and material breaches through their fiduciary breaches, have committed fraud, and have conspired against Owners. Therefore, Plaintiff requests declaratory relief severing any further relationship between Plaintiff and Defendants, including a judicial declaration that the Management Agreement, Resort Agreement, the transfer of unsold Hyatt Grand Aspen fractionals to the Portfolio Trust, and the HPC Exchange Agreement (as it relates to the Hyatt Grand Aspen) are rescinded in their entirety, effective immediately.

## JURISDICTION AND VENUE

13.     Plaintiff filed this action in the District Court of Colorado, Pitkin County, which had jurisdiction over the subject matter at issue because this is a civil action for damages and/or equitable relief. Colo. Const. Art. VI, § 9(1). The Court also had jurisdiction pursuant to C.R.S. § 13-1-124(a), (b) and (c) because this lawsuit arises from Defendants' transaction of business within Colorado and their commission of tortious acts within Colorado. Defendants ILG, LLC, Chicago Title Timeshare Land Trust, Inc, Grand Aspen Lodging, LLC, HPC Developer, LLC, HPC Owners' Association, Inc, HV Global Group, Inc, HV Global Marketing Corporation, Hyatt Corporation, Hyatt Hotels Corporation, HV Global Management Corporation, and Marriott Vacations Worldwide Corporation removed the action pursuant to 28 U.S.C. §§ 1332(a), 1367,

1441, and 1446.[4]

14.     Venue is proper as the case was removed from the District Court of Pitkin County, Colorado and the District Court of Pitkin County, Colorado is in the District of Colorado. The case was thus properly removed to this Court. 28 U.S.C. § 1391.

## PARTIES

### A.     Plaintiff

15.     Plaintiff G.A. Resort Condominium Association, Inc. ("**Plaintiff**" or "**Association**") is a Colorado nonprofit corporation. The Association was organized for the purpose of managing the condominium and timeshare ownership plan at the Hyatt Grand Aspen known as G.A. Resort Condominiums, in accordance with the Declaration of Condominium for G.A. Resort Condominiums ("Declaration"). Plaintiff brings this suit in its own name, but also seeks damages on behalf of Owners on some causes of action pursuant to C.R.S. § 38-33.3-302(1) of the Colorado Common Interest Ownership Act.

### B.     Defendants

16.     Chicago Title Timeshare Land Trust, Inc. ("**Portfolio Trustee**") is a Florida corporation with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204. The Portfolio Trustee is the trustee for the HPC Trust ("**Portfolio Trust**"), a Florida vacation club land trust created on June 15, 2017 to receive real property from HPC Developer to be converted to points sold in the Portfolio Club. The Portfolio Trustee received Hyatt Grand Aspen fractionals by contribution deed from HPC Developer in June 2017, as well as other real

---

[4] Defendants also suggested that the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1453 could provide an alternative ground.

property that month and subsequently. The Portfolio Trustee holds legal and equitable title to property in the Portfolio Trust for the use and benefit of the Portfolio Club Owners. The Portfolio Trustee's duties arise under, *inter alia*, Fl. Stat. Ann. §§ 721.53, 736.08125, 736.08163, 736.1013, and 736.1015. Fla. Stat. Ann. § 736.08163.

17.     Defendant **Grand Aspen Lodging, LLC** (sometimes "**Developer**" or "**Declarant**") is a Delaware limited liability company with its principal place of business at 6262 Sunset Drive, Miami, Florida 33143. As more fully alleged herein, Grand Aspen Lodging is the developer of the Hyatt Grand Aspen and a wholly owned subsidiary of Grand Aspen Holdings. Hyatt Grand Aspen was wholly owned by Hyatt (through various subsidiaries such as Grand Aspen Lodging) until ILG acquired Hyatt's vacation ownership operations in 2014.

18.     Defendant HPC Developer, LLC ("**HPC Developer**") is a Delaware limited liability company with a principal place of business at 9002 San Marco Court, Orlando, Florida 32819. HPC Developer is a wholly owned subsidiary of S.O.I. Acquisition Corp., itself a wholly owned subsidiary of ILG, LLC. As more fully alleged herein, the HPC Developer purchased 414 biennial fractionals at the Hyatt Grand Aspen through a Special Warranty Deed from Grand Aspen Lodging (the Developer), and transferred them to the Portfolio Trustee in June 2017, and also created the operating plan for the Portfolio Club.

19.     Defendant HPC Owners' Association, Inc. ("**Portfolio Association**"), is a Florida not-for-profit organization incorporated on June 15, 2017, located at 9002 San Marco Court, Orlando, Florida 32819. The Portfolio Association signed the Declaration and the HPC Exchange Agreement that implements the Portfolio Club at the Hyatt Grand Aspen. ILG created the Portfolio Association as the entity responsible for managing and operating the new Portfolio Club

and properties put into the Portfolio Trust for use in that Club; the Portfolio Association assigned those duties to HV Global Management.

20.     Defendant HV Global Group, Inc. ("**HVGG**") is a Delaware corporation, with a principal place of business at 6262 Sunset Drive, Miami, Florida 33143. The sole shareholder of HVGG is HTS-BC, LLC, a Delaware limited liability company, which is a wholly-owned subsidiary of S.O.I. Acquisition Corp. HVGG independently owns and manages the Hyatt Residence Club and, as of 2017, the HPC Exchange Program, which implements the Portfolio Club at resorts such as Hyatt Grand Aspen. HVGG uses the Hyatt Vacation Ownership name and other Hyatt names and marks under license from an affiliate of Hyatt Hotels Corporation. Following Marriott Vacation Worldwide's acquisition of ILG in 2018, HVGG became an indirect subsidiary of Marriott. HVGG was formerly known as Hyatt Residential Group, Inc. which in turn was formerly known as Hyatt Vacation Ownership, Inc. ("HVOI"). HVOI was a party to agreements relevant to the original purchases of Hyatt Grand Aspen fractionals, such as a contract with the Association in 2005 called the Hyatt Vacation Club Resort Agreement.  Hyatt, ILG, and now Marriott still use the names HVOI and Hyatt Vacation Ownership to describe the work of this entity.[5] HVO was registered as a business in 2014 in Colorado.[6]

21.     Defendant HV Global Management Corporation ("**Management Company**") is a Florida corporation and has its principal place of business at 6262 Sunset Drive, Miami, Florida 33143. The Management Company manages and operates the Hyatt Grand Aspen property

---

[5] *See, e.g.*, https://mvw.ilg.com/hyatt-vacation-ownership.html (listing an email address ending in HVOI and describing HVO's work). Marriott's SEC filings have described HVGG as still doing business as HVO.

[6] On the Colorado Secretary of State website, HV Global Management Corporation and HV Global Marketing Corporation are listed as the Registrant/True Name for HVO.

through a management contract with the Association that has been in place since the project's inception. The Management Company also manages and operates the Portfolio Club. The Management Company was known as the Hyatt Residential Management Corporation between March 2011 and October 2014, and before as the Hyatt Vacation Management Corporation (sometimes called "HVMC"). The Management Company is a wholly-owned subsidiary of S.O.I. Acquisitions.

22.     Defendant HV Global Marketing Corporation ("**HV Global Marketing**"), until 2014 known as Hyatt Residential Marketing Corporation and also known as Key West Vacation Marketing Company, provides hotel and resort marketing services. HV Global Marketing is a Florida corporation with its principal place of business at 6262 Sunset Drive, Miami, Florida, 33143. HV Global Marketing operates as a subsidiary of HVGG. It was founded in 1993.

23.     Defendant **Hyatt Hotels Corporation**, a Delaware corporation, formerly known as Global Hyatt Corporation, has its principal executive offices at 150 North Riverside Plaza, 8th Floor, Chicago, Illinois 60606. Hyatt Hotels Corporation has a portfolio of 14 premier brands; an affiliate of Hyatt Hotels Corporation licenses the Hyatt names and marks to HVGG, which owns and manages the Hyatt Residence Club and the Portfolio Club. As of June 2018, the Corporation's portfolio included more than 750 properties in more than 55 countries. A company form 10-K SEC filing for fiscal year 2013 lists Aspen as a "key location." Hyatt Hotels Corporation and its various subsidiaries before the 2014 ILG acquisition are occasionally collectively referred to herein as "Hyatt."

24.     Defendant **ILG, LLC** ("**ILG**") is a Delaware limited liability company with its principal place of business at 6262 Sunset Drive, Miami, Florida 33143. The acronym ILG stands

for Interval Leisure Group. Along with its parent company, subsidiaries and affiliates, ILG, which was ILG, Inc. until November 2018, acquired the Hyatt Residential Group (currently known as HVGG) in October 2014. Defendant Marriott Vacations Worldwide acquired ILG in 2018.

25.     Defendant Marriott Vacations Worldwide Corporation ("**Marriott**"), is a publicly traded Delaware corporation with its principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida 32821. Marriott is a global vacation company that offers vacation ownership, exchange, rental, and resort and property management, along with related businesses, products and services. Marriott is the parent and/or an affiliate company of the other Defendants. Marriott bought ILG for $4.7 billion in 2018. Marriott now owns, for example, HVGG (through ILG), Grand Aspen Holding, Grand Aspen Lodging, HPC Developer, Interval Acquisition Corporation, the Management Company, and the Portfolio Association.

26.     Collectively, these entities are sometimes referred to as "Defendants."

**C.     Alter Ego Status of Defendants**

27.     For example, on information and belief, Developer Grand Aspen Lodging, HVGG, and Management Company are, and at all relevant times were, controlled, dominated, and operated by Marriott (or, at the relevant times mentioned herein, ILG and Hyatt Hotels Corporation), in that, among other facts, (i) the activities and business of Developer, HVGG, and Management Company are an integral part of the business of Marriott, ILG, and Hyatt, including by the incorporation of the financial results of Developer, HVGG, and Management Company into the financial results of Marriott, ILG, and Hyatt, as well as by the fact that Developer, HVGG, and Management Company (and/or their respective parents) each guarantees hundreds

11

of millions of dollars in Senior Notes issued by Marriott and due in 2023 and 2026; [7] (ii)

Developer, HVGG, and Management Company each empowered Marriott executives[8] to act as

the respective entity's executive officers and directors, its "true and lawful attorneys-in-fact and

agents," with respect to certain SEC filings, such as the S4 pertaining to the Senior Notes, and

other matters; (iii) Marriott (and, previously, ILG and Hyatt) wholly owns all the capital stock of

Developer, HVGG, and Management Company; (iv) Lisa Trosset, a Hyatt and ILG executive at

the time, signed several critical documents related to the creation of the Trust, HPC Developer,

and unlawful transfers, including the Special Warranty Deed, while ostensibly representing the

Developer and the board of directors of the Hyatt Grand Aspen; and (v) Richard Hayward, a

Senior Vice President at Marriott, is tasked with managing the Hyatt Residence Club.

### D.    Members of the COCCA Enterprise Not Named as Defendants

27.    Grand Aspen Holdings, LLC ("**Grand Aspen Holdings**") is a Delaware limited

liability company with its headquarters at 6262 Sunset Drive, Miami, Florida 33143. Grand

Aspen Holdings is a development company and a wholly owned subsidiary of S.O.I. Acquisition

---

[7] *See* Form S-4, Registration Statement, Marriott Ownership Resorts, Inc., and ILG, LLC, with Marriott Vacations Worldwide Corporation as guarantor (filed May 8, 2019).

[8] Grand Aspen Lodging identified the following persons as its true and lawful attorneys-in-fact and agent: Ralph Lee Cunningham (CEO, President, and Director); Joseph J. Bramuchi (Treasurer, Vice President), and Director. Grand Aspen Lodging identified Grand Aspen Holdings as a sole member. Grand Aspen Holdings identified as its true and lawful attorneys-in-fact and agent: Cunningham (CEO, President), Bramuchi (Treasurer, Vice President), Jeanette E. Marbert (President and CEO), and S.O.I Acquisition Corp as a sole member. S.O.I. identified as its true and lawful attorneys-in-fact and agents Marbert, John. E. Geller, Jr., and James H. Hunter, IV. HVGG and the Management Company identified the following persons as its true and lawful attorneys-in-fact and agent: Cunningham (CEO, President, and Director); Bramuchi (Treasurer, Vice President, and Director); Geller (Director), and Hunter (Director). Geller is Marriott's executive vice president and chief financial and administrative officer. Hunter is an executive vice president and general counsel for Marriott and a member of its executive committee.

Corp., and the sole member of Grand Aspen Lodging, LLC. At one point, Grand Aspen Holdings had four members—including Grand Aspen Affiliates and HTS-Aspen, LLC. HTS-Aspen is an indirect wholly owned subsidiary of Defendant Hyatt Hotels Corporation. In 2012, Hyatt bought out the other partners holding interests in the fractionals.

28.     H Group Holding, Inc. ("**H Group**") was a Delaware holding company that had its principal place of business at 71 S. Wacker Dr., Suite 4700, Chicago, Illinois 60606. H Group owned the Hyatt Corporation. H Group Holding's registration with the Illinois Secretary of State was withdrawn in October 2010.

29.     **Hyatt Corporation**, a Delaware corporation, has its principal offices at 150 N. Riverside Plaza, Chicago, Illinois 60606. Hyatt Corporation is a subsidiary of Hyatt Hotels Corporation.

30.     S.O.I. Acquisition Corporation ("**S.O.I. Acquisition**") is a Florida corporation and was incorporated in 2014 and has its principal place of business at 6262 Sunset Drive, Miami, Florida 33143. S.O.I. Acquisition is a subsidiary of Interval Acquisition Corp.

31.     **Interval Acquisition Corp**. is a Delaware corporation with its principal place of business at 6262 Sunset Drive, Miami, Florida 33143, and is a wholly owned subsidiary of ILG.

32.     Collectively, Defendants and these non-party entities are sometimes called the "COCCA Enterprise."

## GENERAL ALLEGATIONS

33.     As soon as the Hyatt Grand Aspen launched in 2005, fractionals began selling at a rapid clip. More than 560 purchasers acquired more than 850 fractionals, mostly in the first few years.

34.     Owners were sold on the chance to own luxury real estate in the highly desirable city of Aspen, Colorado, at the base of Aspen Mountain. A leather-bound marketing book for the Hyatt Grand Aspen waxed poetic about the exclusive, high-end, homelike nature of the property: "And now, Hyatt invites you to make Aspen your second home with an elegant fractional ownership residence located right in the heart of the city." Various amenities were touted as well—from an outdoor pool and hot tubs to a skating rink and plans for a bar and lounge in the common area.

35.     Fractionals were available in undivided 1/20th fee ownership increments. These interests gave purchasers the right to one fixed week in a dedicated unit at the Hyatt Grand Aspen, plus the right to reserve a full float week and a split float week, adding up to about 10 float days.

36.     Each fractional therefore gave rights to fewer than three weeks a year, yet the early purchasers paid top dollar to obtain what they thought were secure rights to use and enjoy the Hyatt Grand Aspen.[9] The amount paid generally reflected which fixed week was acquired, as some were far more desirable than others, and generally reflected the number of bedrooms, which ranged from one to four. Near the upper limit, on December 1, 2005, an Owner purchased a fractional for $412,000 with a dedicated week starting in mid-February. Another Owner purchased two sequential fractionals at the end of the year for $498,950 each.

---

[9] *See, e.g.*, the Special Warranty Deed provided to purchasers (stating that each purchaser was obtaining an undivided 1/20 fee ownership interest per fractional, "perpetual use" of the particular unit for the particular week purchased, plus a floating week and a floating split week); Sample Purchase Contract 2009 (same), Ex. J; earlier versions mentioned "forever"; Declaration § 12.16(b) (explaining the right to float weeks), Ex. A; *id.* § 1.5, 15.1 (noting that the provisions of the Declaration are servitudes running with the land); Resort Agreement § 4.4, 4.6 (promising that Owners would enjoy the rights to their interests in accordance with the deed, the Resort and Club Documents, and applicable law), Ex. F.

37.     Prices stayed high with initial resales. For example, one Owner paid an original purchaser more than a million dollars in March 2006 for two sequential fixed weeks.

38.     Despite strong initial sales, the Developer held onto approximately 20 percent of the residential fractionals—more than 200 fractionals out of the 1060 available—and all of its ten commercial units.

39.     Along with the 53 residential units to be sold in these 1/20th fractionals,[10] the Hyatt Grand Aspen had commercial units. The Declaration provided to the Owners in the original Public Offering Statement only mentioned a single commercial unit, not the 10 listed in the later recorded Declaration. Ex. A (original Hyatt Grand Aspen Public Offering Statement). The Developer still owns all of the commercial units. The Management Company operates in a portion of the commercial units.

40.     A first large group of deeds appears to have been signed more than two weeks before the Declaration was recorded on December 19, 2005. Hyatt's Lisa Trosset signed deeds on behalf of the Developer, Grand Aspen Lodging.

41.     Trosset continued to sign documents for Defendants, including the Developer and HPC Developer, over the years while serving on the board of directors of the Hyatt Grand Aspen, as alleged herein.

42.     The governing documents made clear that buying a fractional at the Hyatt Grand Aspen translated into the vacation opportunities of being able to exchange time with the other Hyatt Residence Club resorts around the country; taking advantage of an external program called

---

[10] The Developer converted some larger residential units into smaller ones, increasing the number of units from the original 50 to 53.

Interval International; and converting fractionals into points through the World of Hyatt Program

(formerly called the Gold Passport Program).

43.     However, Plaintiff and Owners were led to believe that the offering would not be

materially changed, including by a new timeshare plan mixing with and gaining priority over

their own. The governing documents discussed a single timeshare program at the Hyatt Grand

Aspen. The purchase contracts contained an implied covenant of good faith and fair dealing that

the Developer would sell a sufficient number of fractionals to make the offering viable, and would

not act in a manner so as to undermine the essential benefits of the contract, such as by transferring

its unsold fractionals ultimately into a land trust for use by others who paid far less for the

privilege of use.

### A.     Defendants  Imposed the Portfolio Club on the Hyatt Grand Aspen

44.     In October 2014, ILG, through its wholly owned subsidiary S.O.I. Acquisition,

acquired Hyatt Hotels Corporation's subsidiaries engaged in the shared ownership industry,

including Hyatt Residence Club, and the Developer's inventory of more than 200 unsold

fractionals as part of a $190 million deal.

45.     Hyatt Hotels Corporation conducted the sale through its wholly-owned subsidiary

Hyatt Corporation, as well as through HTS-Aspen, an indirect wholly-owned subsidiary.[11]

46.     ILG valued the Hyatt Grand Aspen fractionals not only as a place to send members

of a new points-based program but also because they would provide a so-called "halo" effect for

any new program. The halo effect means that dangling the possibility of staying at the luxurious

---

[11] S.O.I. Acquisition obtained an exclusive license to use the Hyatt brand in connection with the
shared ownership business through an arrangement with Hyatt Franchising, L.L.C., an indirect
wholly-owned subsidiary of the Hyatt Hotels Corporation.

Hyatt Grand Aspen would allow the points program to sell more points to more members and at higher prices.

47.      ILG knew but did not care that associating the Hyatt Grand aspen with a lower-tier program would have the opposite impact—a so-called horn effect—on the Hyatt Grand Aspen, meaning that the value of the Hyatt Grand Aspen fractionals would decrease.

48.      While both Hyatt Hotels Corporation and ILG promised in a joint press release on October 1, 2014, that after the acquisition Hyatt Residence Club "owners will continue to receive all privileges currently associated with their membership," ILG's priority was clear: points-based profit through the Portfolio Club. An ILG staffing announcement in 2016, for example, described the Hyatt Residence Club as "a flexible *points-based program* with more than 30,000 members who have access to 16 HRC resorts" (emphasis added).

49.      As with the Developer before it, ILG made no real effort to sell the remaining developer fractionals.

50.      Indeed, on information and belief, both Hyatt and then ILG actively thwarted efforts by brokers to sell fractionals, even those whom they had hired and who had a sales space at the Hyatt Grand Aspen. An ILG salesperson could not get assistance from ILG (which owned the Hyatt Residence Club) or the Developer.

51.      A business center now occupies the former sales space at the Hyatt Grand Aspen.

52.      Owners also were thwarted until recently by Hyatt representatives on the Association board of directors, including a director, Mike Kinnett, who represented himself as working for Hyatt Vacation Ownership (which appears to be the current program manager, HVGG), from using a website called ABC Owners. A Hyatt Grand Aspen fractional owner

designed this website to allow Aspen Owners to seek additional time from, or swap fractionals with or rent fractionals to other Owners.

53.     ILG's next step was designing and implementing the Portfolio Club—the new, points-based program that was foisted onto the Residence Club resorts. This plot proceeded in several steps, along with the roll-out of new agreements, documents, and entities.

### 1.     The Portfolio Club Offering Plan and Related Documents

54.     The operating document for the Portfolio Club and its exchange programs, called the HPC Vacation Ownership Plan, Ownership Information ("HPC Plan"), Ex. B ("HPC Vacation Ownership Plan") runs 358 pages, with various parts, and is nearly incomprehensible without substantial scrutiny and background knowledge about how timeshares work.

55.     A version of this document dated April 2018 was eventually provided, on demand, at the end of 2018 to an independent member of the Hyatt Grand Aspen board of directors.

56.     This massive document includes an HPC Vacation Ownership Plan Multisite Public Offering Statement, which is almost 50 pages and has almost 150 pages of exhibits;[12] a management agreement for the HPC Vacation Ownership Plan, through which the Trust Association assigned its duties to HV Global Management; an HVGG Exchange Program

---

[12] To give a sense of the complexity, Exhibit 1 to the offering statement is the HPC Vacation Trust Agreement, which has, as its own exhibits, the Articles of Incorporation of HPC Owners Association, Inc., the Bylaws for the HPC Owners Association, Inc., the Declaration of Vacation Ownership Plan for HPC Club, and the Trustee Fee Compensation Schedule. Exhibit 2 is the "Reservation Rules and Regulations for the HPC Club Vacation Ownership Plan," which has, as its own exhibits, a Club Fee and Transaction Fee Chart and a Membership Tier Level Chart. Exhibit 3 is a Trust Association Multisite Timeshare Plan Budget. Exhibit 4 is a Receipt for Timeshare Documents. Exhibit 5 is a Description of Exhibits Not Delivered to Purchasers. Exhibit 6 is the Rules and Regulations of the HPC Vacation Ownership Plan. Exhibit 7 is a Tabular Description of Component Sites. Finally, Exhibit 8 is a Tabular Description of Component Site Recreational Facilities.

Disclosure Guide; and a Club to Club Exchange Agreement (the "HPC Exchange Agreement"), which is the document that affiliated the HPC Vacation Ownership Plan with the Hyatt Residence Club network, including the Hyatt Grand Aspen.

57.     Members of the Portfolio Club receive a deed conveying a Vacation Ownership Interest in a Trust Association. Unlike at the Hyatt Grand Aspen, these members do not directly own a specific interest in any single unit. Instead, they join a multisite timeshare plan. An HPC Vacation Ownership Plan Colorado Disclosure Statement that HPC Developer submitted to Colorado in 2017 explained some of the mechanics, describing the alchemy of committing properties into the trust and emerging with interests that give use rights in the property and ownership in a trust association. Ex. C (HPC Developer Colorado  Disclosure Document). The document also noted that exchanges with the Hyatt Residence Club would be "based on a conversion ratio that establishes the number of HPC Points as compared to the number of Hyatt Residence Club Points . . . which conversion ratio is determined by HVGG in its sole discretion. . . . There are no other limitations based on seasonality, unit size or levels of occupancy."

58.     Owners of Vacation Ownership interests pay annual assessments and club dues.

59.     The Public Offering Statement contained in the HPC Plan makes clear that HVGG had the power to run the new reservation system and decide how Residence Club members' interests can be converted into points to be used in the plan.

60.     The HPC Exchange Agreement included in the HPC Plan is dated June 15, 2017. Through this document, HVGG, as program manager of the Hyatt Residence Club, entered into an agreement with the new entity initially managing the Portfolio Club, the Portfolio Association (HPC Owners' Association). The HPC Exchange Agreement establishes ground rules for

managing the relationships between these programs.

61.     The HPC Exchange Agreement gives, for example, Portfolio Club members rights to Portfolio Trust inventory at Hyatt Residence Club properties—including for stays as short as a single night. Under this agreement, an Owner who is also a member of the Portfolio Club may convert his or her fractionals into Portfolio Club points for a given year—but HVGG decides who is eligible to do so. Pursuant to this agreement, HVGG also coordinates the inventory shared by the clubs, in essence thwarting original Hyatt Grand Aspen legacy owners from reserving prime interval usage dates.

62.     The HPC Exchange Agreement permits Portfolio Club members to convert their points into so-called legacy points and to use those points to reserve time in the Hyatt Grand Aspen float week periods that previously had only been available to Hyatt Residence Club members.

63.     The Management Agreement is also dated June 15, 2017, that transferred the HPC Owners' Association's duties to manage the Portfolio Club to HV Global Management—the same management company supposedly managing the Hyatt Grand Aspen in good faith.

### 2.     The Transfer of 20 Percent of Hyatt Grand Aspen's Fractionals into the Portfolio Trust Dedicated to the Portfolio Club

64.     In 2017, ILG took formal steps to force the merger of the Portfolio Club with the Hyatt Residence Club, and the Hyatt Grand Aspen in particular. With no press release or other notice, ILG entered into a series of contracts that prop up the Portfolio Club by exploiting Hyatt Grand Aspen fractionals. These documents included a trust agreement, a Declaration, and a deed of sale excising the Developer's fractionals from Hyatt Grand Aspen.

65.     On June 15, 2017, the Portfolio Trust and HPC Owners' Association entered into an HPC Trust Agreement, recorded on June 23, 2017, that established the Trust. They

simultaneously recorded a Declaration.

66. That same day, the Developer sold its inventory of Hyatt Grand Aspen fractionals to another ILG subsidiary, the HPC Developer, for $10,003,854.

67. Lisa Trosset, a Hyatt, ILG, and now Marriott executive, was on the Association board at the time owing a fiduciary duty to the Board and the Owners. She signed the Special Warranty Deed on the Developer's behalf and many other documents relating to the creation of the Trust, HPC Developer, and the transfers.[13] Incredibly, Trosset never advised the other Association board members or Owners about this act, the Portfolio Club, or the use of the Hyatt Grand Aspen fractionals in that program. None of the Board minutes from this or any other period mention the developer intervals being transferred, the creation of the Portfolio Trust, or the rollout of the Portfolio Club and the affiliation of it with the Residence Club through the HPC Exchange Agreement.

68. Soon after, at the end of June 2017, the HPC Developer laid the contractual groundwork for the new points-based Portfolio Club, including by placing those Hyatt Grand Aspen fractionals into the Portfolio Trust through a contribution deed. Ex. H (Contribution Deed). Defendants converted the Hyatt Grand Aspen fractionals from 1/20th fee ownership interests into 1/40th fee ownership interests, increasing them from 207 to 414 fractionals because the latter was better suited to the new Portfolio Club.

69. On June 30, 2017, through a "Trust Developer's Notice of Addition and Notice of

---

[13] For example, she signed and submitted an Application for Initial Registration and Certification as a Subdivision Developer (for the Year 2017) for HPC Developer, to the Colorado Department of Regulatory Agencies in order to operate the Vacation Ownership Plan.

Activation of Trust Property to HPC Trust (Grand Aspen-Timeshare Interests)," the HPC Developer effectuated the contribution of the Aspen fractionals to the Portfolio Trust and "activated" them for use by the Vacation Ownership Plan.[14] Ex. I (HPC Developer records, p. 84).

70.     Through these steps, ILG gained 2,075,900 points from the Grand Aspen Hyatt fractionals to sell through the Portfolio Club.

71.     These 207—now 414—fractionals constituted a substantial portion of the property at the Hyatt Grand Aspen and are now dedicated to the use of thousands of Portfolio Club points members.

72.     Ten additional sets of intervals, primarily in Florida and Texas, that had been contributed to the Portfolio Trust were "activated" on the same day as the Hyatt Grand Aspen fractionals. Trosset signed all of the conveyances into the Portfolio Trust that year as Vice President of HPC Developer—again, while serving simultaneously on the Hyatt Grand Aspen board.

73.     Despite all this activity, based on months or years of planning, no notice was given to Hyatt Grand Aspen Owners or the Association.[15]

### 3.     *Revised Hyatt Residence Club Rules*

---

[14] The Portfolio Club's multisite offering statement required this step; without it, the properties in the trust that had not yet been activated were not yet part of the Portfolio Club.

[15] Industry commentators started paying attention. In August 2017, for example, the Timeshare Guru blog noted that "The Hyatt Residence Club is in the process of transforming its program into a strictly points based program.  The name of the new program is the Hyatt Residence Club Portfolio Program. . . .  The Hyatt Residence Club is going under a large transformation on how they sell and market the Hyatt Residence Club. Instead of the hybrid system where you previously owned a deeded week that could be used or converted into points, the new system will be strictly points." http://www.thetimeshareguru.com/hyatt-residence-portfolio-program.html (last checked August 23, 2019).

74.     In early 2017, HVGG revised and released a new version of the Hyatt Residence Club Rules and Regulations ("2017 Club Rules"). Ex. D (2017 Club Rules). The Club Rules provide specific rules and regulations for the Residence Club program as a whole. A version had been included in the Public Offering Statement that Owners who bought from the Developer received, and perhaps other purchasers as well. *See* original Hyatt Grand Aspen Public Offering Statement. The email providing the 2017 revisions from the Hyatt Residence Club merely stated: "2017 Club Rules Now Available! As we head into 2017, we are pleased to provide you with the 2017 Hyatt Residence Club Rules along with updated Resort Seasons Calendar and Club Points Charts." An Owner asked HVGG what changes had been made and was told that merely the points system at two other resorts had been affected.

75.     Despite that upbeat, single-line email, which lulled and mislead Owners into thinking that nothing had changed, and certainly nothing meaningful, the 2017 version dramatically changed the document. The 2017 Club Rules:

a.     Buried an announcement of the imposition of the new Portfolio Club on pages 24 to 25 of the 28-page single-spaced document, calling it the "Hyatt Residence Club External Exchange Program." § 5.2.[16]

b.     Materially expanded HVGG's powers to associate the Club with other vacation ownership plans, basically and unlawfully purporting to give carte blanche permission for the merger of the Portfolio Club with the Residence Club. § 5.2(b).

---

[16] The use of the term "external" to describe the merger seems unique to this document. Defendants possibly included it in this document to try to twist the new program into conformity with the permission granted in the governing documents to add "external exchange programs" to the Residence Club.

c.    Declared that the "[Portfolio] Association, HVGG, and their respective subsidiaries and affiliates are separate and distinct entities," and purported to limit responsibility for representations about the fate of the Residence Club "to those made in written materials furnished by Hyatt Residence Club." *Id.* § 5.2(b).

d.    Placed additional complex restrictions on Owners' ability to reserve float weeks during certain time periods. *See* § 3.2(a)-(c)(2). At the same time, the 2017 Club Rules gave HVGG new powers over reservations, including to obtain priority for itself on request lists and waitlists, to the detriment of Owners and others. *See* § 5.3(c).

### 4.    *Belated Developer "Approval" of the Portfolio Club Having Grabbed Hyatt Grand Aspen Fractionals*

76.    More than a year later, the Developer acted to retroactively "approve" the HPC Developer's addition of Hyatt Grand Aspen fractionals into the Portfolio Club. This instrument was recorded on September 20, 2018. Ex. E (HPC Developer Approval).

77.    The version of the Hyatt Grand Aspen Declaration that the Developer included in the Public Offering Statement as part of the purchase documents was dated 2004. Yet, as part of this 2018 approval, the Developer invoked a paragraph that had been inserted into Declaration revised and recorded in 2005 without Owners' knowledge. Ex. F (2005 Recorded Hyatt Grand Aspen Declaration). The Developer did not provide the revised and recorded Declaration, which contained additional meaningful changes, to many purchasers after it was recorded.

78.    The new paragraph added to Article XVIII of the recorded Declaration begins with what appears to be protective language favorable to Plaintiff and Owners, but then purports to open the door to significant changes made or approved by the Developer (Grand Aspen Lodging). It reads as follows:

24

No timeshare plans, fractional plans, exchange programs or clubs, or travel or vacation clubs comprised of a trust, corporation, cooperative, limited liability company, partnership, equity plan, non-equity plan, membership program, or any such other similar programs, structures, schemes, devices or plans of any kind (a) *shall be created, established, operated or maintained with respect to the Property or the Timeshare Interests*, (b) shall *acquire* or accommodate the Units or *Timeshare Interests*, and (c) shall be permitted to *incorporate a Timeshare Interest* into such entity, program, structure, scheme, device or plan, except by the *Declarant* or except with the *prior written authorization from the Declarant*, which authorization may be given or withheld in the Declarant's sole and absolute discretion, *and which authorization shall be evidenced by a written instrument executed by the Declarant, recorded in the Records, and containing a reference to this Declaration and this section*. [Emphases added]

79.     Even if binding—*see* the Fifth Cause of Action *infra*—this provision does not aid Defendants, because the 2018 retroactive Developer "approval" itself was ineffective, occurring long after the fractionals were "activated" in June 2017 to be used by the Portfolio Club.

80.     Additionally, the new paragraph does not provide authority for the transfer of the intervals or for imposing a new program on the property. Instead, the paragraph merely requires that, if such authority exists, and if a new program sought to absorb Hyatt Grand Aspen interests, the Developer would have to give its approval. In other words, this paragraph merely specifies a final step of Developer approval, all other requirements being satisfied, ensuring that the Developer had proprietary control over the uses of the property.

81.     Finally, the Developer's 2018 "approval" did not seek to authorize the second step in Defendants' June 2017 scheme relating to the Hyatt Grand Aspen, which was the HPC Developer's transfer of the Hyatt Grand Aspen fractionals into the Portfolio Trust by contribution deed. (The Developer took the first step when it sold its Hyatt Grand Aspen fractionals to the HPC Developer.) Instead, the Developer only "approved" the third step: the inclusion of the Hyatt Grand Aspen fractionals, already in the Portfolio Trust, into the Portfolio Club program. The added paragraph in Article XVIII of the recorded Declaration, however, clearly required the

Developer to specifically authorize the second step contributing the fractionals to the Portfolio Trust. It stated that: "No . . . plans of any kind . . . (b) *shall acquire . . . the . . . Timeshare Interests*, . . . except by the Declarant or except with the *prior* written authorization from the Declarant . . . ." (emphases added). Neither of those conditions was met. Therefore, HPC Developer's June 2017 transfer of fractionals to the Portfolio Trust through the contribution deed was never properly authorized.

82.     In combination with and in addition to the other allegations made herein, this invalidity requires an injunction prohibiting the Portfolio Club from using its Hyatt Grand Aspen fractionals and requires rescission of the sale of fractionals to the Portfolio Trust.

83.     ILG continues to add fractionals from other Residence Club resorts to the Portfolio Trust through purchases, exercising rights of first refusal, foreclosures, and conversions (through which Residence Club owners convert their fractional interests into points).

### *5.     Admissions During Sales Presentations for the Portfolio Club*

84.     A sales pitch for the Portfolio Club in January 2018 at a sales center in Bonita Springs, Florida, confirmed that the Portfolio Club was ILG's new priority. ILG spent significant resources on the venue—a large office, open cubicles for the presentation, money given to attendees to eat dinner at a local Hyatt, mockups of new buildings, and more. The presentation confirmed that ILG is *deliberately* diminishing, indeed destroying, the legacy Hyatt Residence Club by stripping it of fractionals. In its place, ILG is funneling its efforts and resources into building up the points-based Portfolio Club.

85.     The presenters at the sale pitch included a sales executive, a sales manager, and the Director of Sales and Marketing. One admitted that the Residence Club model was not working.

She also noted that the Hyatt Grand Aspen is a fish out of water, as a very high-end property within the Hyatt Residence Club. Another admitted that "astute people can see the way it is going," and, perhaps most shockingly, stated that sales representatives are told to avoid using the "D" words— depleting, diminishing, and so on—to describe plans for the legacy Hyatt Residence Club program. The third presenter similarly called the Hyatt Residence Club a diminishing club, with the Portfolio Club as ILG's new direction. The handouts conceded that fractionals are no longer being sold at the Residence Club.

86.     Similar sales pitches have been made around the country, containing both frank and misleading information.

**B.     Entities that Owed Direct Fiduciary Duties to the Plaintiff Association and its Owners Breached Those Duties, with Participation with the Other Defendants**

87.     Owners purchased their fractionals having faith in Hyatt's reputation for high-quality, customer-centric standards and fair dealing.

88.     Plaintiff and Owners were owed fiduciary duties by, at a minimum, the developer (Grand Aspen Lodging), the operator (HVGG) of the internal exchange program and manager of the reservation system, and the Management Company (HV Global Management Corporation). Specifically:

a.     The Management Company became a fiduciary under agency principles when the Association assigned all of its powers and duties to it in a management contract. *See* Condominium Association Management Contract ("Management Agreement"),[17] § 6. Ex. G

---

[17] Ed Crovo, a director on the Association board and its Secretary and Treasurer, signed the Management Agreement for the Association; Crovo was at the time the Vice President of Operations for Hyatt. John Burlingame, another Hyatt Vice President, signed the agreement for

(Hyatt Grand Aspen Management Agreement as provided in 2009). These delegated duties include by operation of the law the Association's fiduciary duties to Owners. The Management Company additionally assumed fiduciary duties to Plaintiff and Owners by exercising a high degree of control over operations at the Hyatt Grand Aspen and Owners' separately deeded property interests. This Management Agreement has been renewed automatically over the years, most recently in March 2019.

      b.     HVGG is a fiduciary to Plaintiff and Owners as the program manager, exercising a high degree of control over their property and acting as their agent. HVGG controls, for example, the complex reservations systems that Owners use to access their allotted time at the Hyatt Grand Aspen and exchanges with other Hyatt Residence Club resorts, and controls the number of points allocated to Hyatt Grand Aspen fractionals that Owners can convert into time at other properties. *See, e.g.*, Hyatt Vacation Club Resort Agreement ("Resort Agreement"),[18] p.1, § 2.2, § 3.1(a), § 3.2(a), § 5.1. *See* Ex. F, 2005 Recorded Declaration Exhibit B (Resort Agreement). In addition, HVGG had the power to reject any other management company retained by the Association. *Id.* at § 4.6. HVGG had to make decisions in "good faith." Resort Agreement, § 6.3.

      c.     The Developer became a fiduciary by creating and exercising control over the Hyatt Grand Aspen in various ways. The Developer (i) wielded formal control over the board until 2012, Declaration § 9.7; (ii) inserted provisions into the Declaration that gave it perpetual

---

the Management Company. Both Crovo and Burlingame served Hyatt in management positions for years, including Crovo as Chief Operating Officer of Hyatt Vacation Ownership.

[18] Once again, Ed Crovo, a Hyatt executive, signed for the Association, and Burlingame signed for Hyatt. David Parker signed for the Developer; Parker also was serving as a director on the Association board.

powers, such as the right to amend the document unilaterally while restricting the Plaintiff's and Owners' powers, *see, e.g.*, § 16.2, and power gained by retaining ten commercial units, § 16.1(c); (iii) gave itself broad powers over implementing the Hyatt Residence Club program at the Hyatt Grand Aspen, *id.* Art. XVIII; and (iv) exercised voting power at the property by retaining and indeed thwarting the sale of 20 percent of the residential fractionals.

      d.    The Colorado Disclosure Document included in the Public Offering Statement for the Hyatt Grand Aspen affirmed that the Developer could not, for example, profit from its relationship with the Association—a basic rule for a fiduciary. *See, e.g.*, Colorado Disclosure Document, p. 6.

      89.    Despite these fiduciary obligations, Defendants imposed the Portfolio Club and all of its attendant harm on Plaintiff and Owners without any opportunity to object. For example, the Management Company, Developer, and HVGG—the Plaintiff's and Owners' fiduciaries— knew that the Portfolio Club was coming and then that it had been implemented, built on a substantial foundation of Hyatt Grand Aspen fractionals, and withheld that the information from the Plaintiff and Owners.

      90.    Indeed, Defendants have actively participated in the implementation, including but not limited to by performing the following acts:

      a.    The Management Company has facilitated the integration of the two timeshare plans at the Hyatt Grand Aspen, including by serving as the management company for both properties (and continuing to reap high fees from managing the Hyatt Grand Aspen);

      b.    The Developer sold its fractionals to the HPC Developer, which went straight into the Portfolio Trust, and then later retroactively "approved" the Trust's use of the

fractionals (while continuing to serve on the Association board until mid-2019, when the current Board questioned the legality of such service); and

       c.    HVGG orchestrates key aspects of the Portfolio Club's rollout (while continuing to serve as program manager for the Hyatt Residence Club).

91.    Well after implementation, Owners had to hound Defendants and their hand-picked board members for meaningful information—which they still did not receive. As one Owner, now a member of the independent board of directors, wrote in a letter sent to all members in October 2018: "Last year, I made a request to the ILG representative to tell us how the new Trust used their float weeks and what weeks they did secure. I also repeatedly asked our Board to find this out. This information has never been provided." One board member responded on December 20, 2017, to an Owner inquiry stating that it was "premature" for the board to let Owners know about whether the developer fractionals, which Owners had been using for years for float weeks reservations, would still be available. It was not until mid-February 2018 that Mike Kinnett, the VP of Operations for HVO, emailed Hyatt Grand Aspen Owners to say because the developer's fractionals had been "transferred into a trust associated with the HRC Portfolio Program . . . we are unable to continue the program." That statement of course only told part of the story, and was misleading.

92.    Defendants, and in particular ILG, Marriott, HVGG, the Developer, and the Management Company, have continued to withhold the HPC Exchange Agreement from the Owners. In December 2018, one director on the Association board demanded and received the Portfolio Club's offering documents. Even as late as January 2019, a new member of the Association board demanded documents underlying the Portfolio Club from Defendants HVGG

and at a meeting in Orlando—and never received them. The Defendants to this date have never sent the Portfolio Club documents to the Owners.

### C.   The Fiduciaries and Related Entities Committed Additional Bad Acts

93.     Defendants took additional actions that undermined the Hyatt Grand Aspen fractional program while preparing the soil for the points-based Portfolio Club to take root to Owners' detriment. Some of the more egregious wrongful conduct follows.

94.     Defendants, including HVGG as alleged elsewhere herein, blocked Owners' efforts to find alternative ways to sell or rent their fractionals and efforts to purchase Developer's intervals.

95.     The Developer and related entities conspired not to sell the Developer's final 200-plus fractionals on the market, thereby retaining control at the Hyatt Grand Aspen and causing its loss in viability. As part of this control, the Developer used its voting rights to block the election of a truly independent board. Despite repeated efforts over the years, including prominently in 2015, such a board was not elected until the end of 2018—after the independent candidates that year made a massive and concerted outreach to Owners, and after some of the harmful effects of the Portfolio Club were becoming known. The Developer also continues to hold onto its commercial units, retaining a seat on the board pursuant the provisions it had inserted into the Declaration and diluting the power of the Owners and Plaintiff.[19]

96.     To take advantage of the Hyatt Grand Aspen's allure, while profiting from the points program, HVGG allocated fewer points to the Hyatt Grand Aspen than it deserves to draw

---

[19] In mid-2019, the Board objected to the Developer's presence, asserting that the governing documents did not condone it, and as of the filing of this First Amended Complaint the former Developer seat is empty.

in new points members. HVGG effectively devalued the Hyatt Grand Aspen by increasing the number of points allocated to other luxury properties, such as that in Carmel, California. As one Owner noted, that the property is "Hyatt's ticket to selling more of their low-end properties. They advertise, 'Buy in Key West, stay in Aspen'! Hyatt makes the money on sales and we pay for it."

97.     To make matters worse, Defendants, and HVGG in particular, designed a reservation system that permits the Portfolio Club to reserve prime spots ahead of Owners. As Owners learned in December 2018, Defendants, including the Portfolio Trustee, Portfolio Association, and HVGG, jumped the early January line for reserving float time in the desirable winter and summer seasons.[20] And those Defendants are reserving a disproportionately low amount of float time during the least desirable times to be in Aspen. These periods are called "Mountain" weeks, which constitute the so-called mud season (about six weeks in April and May) and the weeks after the leaves have changed color (about six weeks in October and November). Defendants are managing to reserve almost 100% of the float time associated with fractionals in the Portfolio Trust, while Owners manage to use only about 60% of their float time. An Owner was told that Hyatt was "the only one to get 3 bedrooms on points and would have first crack before splitting them up."

---

[20] On information and belief, Hyatt Grand Aspen owners were deprived of their rights to reserve during the HRPP Float Reservation window that opened at 11 a.m. Eastern Standard Time on January 5, 2019. The system crashed, with "Error 99" messages and outages across the owner universe. Many owners were unable to reserve the times they had queued up. On information and belief, the Trust was able, in contrast, to reserve all or most of its slots, and in the most desirable time periods. Michael Kinnett, VP of Operations for Hyatt Vacation Management, wrote an Owner the previous year, on January 14, 2018, misrepresenting the process the Trust used, stating that "the trust must wait until the reservation window is opened and utilize the same reservation methods as all other owners," when, instead, on information and belief, the Trust instead used a computer program to make its reservations.

98.     Defendants, including Hyatt Hotels Corporation, HVGG, the Management Company, Grand Aspen Lodging, ILG, and Marriott, also failed to provide material and/or updated documents to Owners over the years; these failures helped perpetuate Defendants' scheme because Owners were operating in the dark. For example:

a.      Defendants, with identities to be discovered but most likely including Hyatt Hotels Corporation and HVGG, did not provide in some purchase documents the Management Agreement or the Resort Agreement that affiliates the Grand Aspen Hyatt with the Residence Club. This failure was particularly egregious given that section 1.2 of the Resort Agreement asserts that by buying a unit at the Hyatt Grand Aspen, owners were consenting to the terms of the Resort Agreement—a term that in this context is unconscionable. The Resort Agreement was recorded in Pitkin County on December 19, 2005—after many of the initial sales at the Club.

b.      The Defendants, with identities to be discovered but most likely including Hyatt Hotels Corporation and HVGG, updated the Public Offering Statement offered to purchasers of Developer fractionals, but they did not replace the draft, unrecorded Declaration with the recorded version, even though the recorded version included material changes, including requiring Developer approval for certain uses of Hyatt Grand Aspen fractionals.

c.      The Defendants HVGG, Management Company, and Grand Aspen Lodging never updated the Resort Agreement, even though its application was materially changed by the imposition of the Portfolio Club on the Hyatt Residence Club.

d.      Early Owners were given a purchase contract that referred to a Hyatt Vacation Club Exchange Program Disclosure Guide, and the Public Offering Statement that they

33

received listed that guide on its table of contents, but no such guide was included.

**D.      The Harm Has Continued Following Marriott's Acquisition of ILG**

99.      Marriott Vacations Worldwide acquired ILG in September 2018. Marriott has supported and profited from the Portfolio Club and the ongoing diminishment of the Hyatt Residence Club. As a signal of its priorities, Marriott's 2018 10-K only mentions the Hyatt Residence Club program as part of its overall push toward points-based programs: "We sell the majority of our products through points-based ownership programs, including . . . the Hyatt Residence Club Portfolio Program."

100.    Defendants, including Hyatt Hotels Corporation, then ILG, and now Marriott, working through their subsidiaries, have been diminishing the Residence Club inventory while building up the Portfolio Club. While they have built new resorts and are now expanding existing resorts with property dedicated to use by Portfolio Club members, they have denied access to those resorts to non-members, have declined to build new Hyatt Residence Club resorts, and have taken every opportunity to transfer additional fractionals to the Portfolio Club, e.g., through conversions, by exercising right of first refusals and through foreclosures and transferring acquired fractionals to the Portfolio Trust.

**E.      Defendants Continue To Profit from the Wrongful Conduct**

101.    The Hyatt, ILG, and Marriott Defendants all profited by exploiting the Hyatt Grand Aspen to benefit the Portfolio Club.

102.    Hyatt Hotels Corporation enabled this scheme by making a calculated decision not to sell all of its fractional inventory. When Hyatt Hotels Corporation sold its vacation ownership operations to ILG in 2014, including the Hyatt Residence Club and Grand Aspen Lodging, it

commanded a higher price because the unsold fractionals gave ILG much needed inventory for the Portfolio Club. Hyatt Hotels Corporation continues to profit from the scheme by licensing its name, which is now part of the Portfolio Club.

103.     ILG paid approximately $10 million for the developer fractionals, and then sold those fractionals to an entity to transfer them into the Portfolio Trust. The Aspen fractionals constitute a substantial portion of the property in the Portfolio Trust. Using the properties in the Portfolio Trust, HPC Developer has sold thousands of "Vacation Ownership Interest Special Warranty Deeds" granting points-based Portfolio Club timeshare interests.  These points have use rights associated with them, allowing points owners to book Portfolio Club inventory, including Hyatt Grand Aspen intervals, and also allowing them to convert Portfolio Club points to legacy points, which means having currency for Aspen intervals not in the Portfolio Club inventory. Unlike the Hyatt Grand Aspen deeds, these deeds do not provide rights to any particular resorts or any particular weeks.

104.     About 2 million Portfolio Club points are allocated to those Aspen fractionals. Each point is selling for $20. Therefore, the Hyatt Grand Aspen fractionals have translated, or will translate, into a total of $40 million in point sales, and a profit of $30 million.

**F.     Defendants' Wrongful Conduct Continues To Cause Serious Harm to Plaintiff's and Owners' Interests**

105.     As a result of Defendants' unlawful actions, Owners and Plaintiff have suffered serious harm, including the following:

a.     The value of Owners' fractionals has plummeted, stayed depressed, and cannot recover. Although Aspen generally hit a low during the recession, values once again have

increased substantially in the city, including at other Aspen fractional resorts.[21] The Hyatt Grand Aspen values have not risen proportionately. For example, the yearly average of fractionals sold after 2011 has been anywhere between 24.6 and 52.8 percent below the original purchase price, while values of Aspen properties since 2011 has been far more robust, including for other fractionals in the area where violations such as those here have not taken place.

        b.     Fewer Residence Club fractionals are available for Owners to reserve float weeks.

        c.     When Owners cancel their float weeks at the Hyatt Grand Aspen, the canceled weeks go into the Portfolio Club, no longer available to Owners—diminishing their inventory.

        d.     Owners must spend more money on points to exchange with other locations than is justified.

        e.     Wear and tear and resulting costs have increased because of higher turnover in units, because, the Portfolio Club allows for one- or two-day stays, which is not permitted under the Hyatt Residence Club exchanges, and also because each time a member of the Portfolio Club stays at the Hyatt Grand Aspen, the Hyatt Grand Aspen receives a fee that is at most a fourth of the amount it takes to clean that unit. Marriott has acknowledged that increased fees can harm owners.[22]

---

[21] Even in 2011, the Wall Street Journal called Aspen "The Most Expensive Town in America," with a subtitle stating: "Defying the national housing slump, Aspen's prices are rising." https://www.wsj.com/articles/SB10001424052748703775704576162553297928260.

[22] *See* Marriott's SEC Form 10-Q (for the quarterly period ending September 30, 2018) ("If maintenance fees at our resorts are required to be increased, our products could become less attractive and our business could be harmed. . . . .").

f.      Additional difficulties and deliberate complexities in reserving float times;

g.      The marketplace has been muddied in that potential purchasers cannot understand the system and confuse the different products;[23] and

h.      Hyatt Grand Aspen's reputation as a premier vacation location and as part of a robust club network has become tattered.

i.      Other Residence Club properties have not provided "the same level of service, location and overall vacation experience" as the Hyatt Grand Aspen. Similarly, Interval International properties are less pleasant than anticipated. Even navigating the procedures for using the exchange programs has been challenging for years, and are only more so now.[24]

j.      Fees and costs imposed on Owners remain unacceptably high, affecting property values. For example, Hyatt Hotels Corporation inserted an above-market 15 percent management fee in the original Management Agreement.[25] Housekeeping costs and other expenses are high and increasing due to the influx of Portfolio Club members.

k.      The Association  was left virtually powerless to act because of the onerous Management and Resort Agreements,[26] and, constricted by the commercial units, which gave the

---

[23] The Portfolio Program also diminished the value of the "legacy" club by allowing legacy fractional owners to purchase points in the Portfolio Program, and combine the point value of the legacy fractional with the purchased points. As a result, a person, say, who owns a one-bedroom unit who wants more space could use points and combine the two.

[24] The World of Hyatt program at least has offered a last-ditch way to monetize the Hyatt Grand Aspen investment when reserving float weeks has proven impossible.

[25] As another example of how having the governing documents be drafted by the same entity meant that the fiduciaries have fleeced the Association and Owners, the Association collects club dues from Owners, and then then the Management Company charges its 15 percent fee on that collected money as part of the property's budget, which has added up to more $700,000 in fees paid to the Management Company over 15 years.

[26] For example and as noted, the Resort Agreement gives HVGG the power to reject any management company retained by the Association. Resort Agreement § 4.6.

Developer both board seats and board presence, thus eliminating any confidentiality of and among non-Developer board members. Both of these facts left the Association and Owners hostage to Defendants' illicit plans and profits, Defendants' systematic dismantling of the program, and the continued devaluation of their properties.

106.    Defendants have continued to be complicit in the violations alleged here by allowing the Hyatt Grand Aspen to be operated for the benefit of the competing Portfolio Club.

107.    At all times relevant herein, Defendants, and each of them, were "conscious wrongdoers" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53, or knowingly aided and abetted one or more other defendants who so qualify.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

**(Against HV Global Management, Grand Aspen Lodging, HVGG, and HV Global Marketing)**

108.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

109.    From 2005 until the present, HV Global Management (the management company for the Association), Grand Aspen Lodging (the developer and declarant), and HVGG (the owner and operator of the Hyatt Residence Club program) owed fiduciary duties to Owners and the Plaintiff, including the duties of loyalty and full disclosure.

110.    Additionally, as the agent of fiduciaries, HV Global Marketing became a fiduciary of the Plaintiff and Owners.

111.    These fiduciary duties arose from the special relationships recognized by the law among the parties under both agency and control principles.[27] The degree to which these three entities served as Plaintiff's and Owners' agents and exercised control over their property is alleged more thoroughly herein.

112.    These Defendants breached their fiduciary duties through a long-standing pattern and practice of self-dealing. The following are among the breaches of fiduciary duty more fully alleged elsewhere herein:

      a.    They ran the affairs of the Association for their own benefit.

      b.    They made critical, adverse changes to terms at the Hyatt Grand Aspen to the significant detriment of Owners and Plaintiff, including by recording a different version of the Declaration than they provided to purchasers; by imposing a new Portfolio Club at the resort; and by releasing revised Residence Club Rules with new adverse terms.

      c.    They failed to disclose such critical changes to Owners.

      d.    They conspired with the other Defendants, including HPC Developer and Portfolio Trustee, to retain and then transfer more than 200 unsold fractionals into the Portfolio Trust for use with the Portfolio Club.

      e.    They operated the Hyatt Grand Aspen to benefit the competing Portfolio Club, including by exploiting their control over the reservation system, particularly HVGG, to obtain prime float weeks at a disproportionately high success rate for the Portfolio Club members.

      f.    They interpreted ambiguous documents in their favor to permit the wrongful

---

[27] *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 1535509, at *5–6 (D. Colo. Mar. 29, 2018).

conduct alleged in this Complaint.

g.      The Management Company agreed to be a management company for a known competitor, without full disclosure or consent.

h.      HVGG agreed to be a program manager for a known competitor, without full disclosure or consent.

113.     As a proximate result of Defendants breaching their fiduciary duties as alleged herein, Plaintiff and/or Owners suffered damages in an amount to be proven at trial, including diminution in value damages. In addition, equity and good conscience require that all things of value improperly obtained by Defendants as a result of the fiduciary duty breaches alleged herein be disgorged and restored to Plaintiff and Owners and/or a constructive trust should be imposed on such funds for the benefit of Plaintiff and Owners.

114.     Further, the Court's broad equitable power[28] should be invoked to extricate the Hyatt Grand Aspen from the Portfolio Club imposed by Defendants in breach of the fiduciary duties alleged herein, and to sever any ongoing contractual or other relationship between the Parties by:

a.      Declaring that the Condominium Association Management Contract for the Hyatt Grand Aspen, or Management Agreement, is null and void and/or that it is terminated;

b.      Declaring that the Hyatt Vacation Club Resort Agreement, or Resort

---

[28] *See, e.g.*, *Eaves v. Penn*, 587 F.2d 453, 462-63 (10th Cir. 1978) (upholding rescission of changes to profit sharing plan wrongfully made by fiduciary, noting "Traditional trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty"); Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) cmt. a ("If the challenged transaction remains executory, the beneficiary may be able to obtain relief by simple repudiation or by injunction").

Agreement, is null and void and/or that it is terminated;

   c. Declaring that the HPC Exchange Agreement has no further force and effect at the Hyatt Grand Aspen;

   d. Rescinding the transfer of unsold fractionals to the Portfolio Trust, returning them to the Developer, and requiring that they be marketed consistent with the original offering;

   e. Requiring Defendants to transfer all interest in and title to the commercial units to the Association;

   f. Declaring that section 16.2 of the Declaration, which gives the Developer the perpetual power to unilaterally amend the Declaration, section 16.1(c), which gives it veto power over adverse changes to the Declaration through its retention of the majority of the commercial unit, and section 1.2 of the Resort Agreement, which states that by purchasing a fractional at the Hyatt Grand Aspen Owners were consenting to its terms, are null and void;

   g. Issuing such further Orders as may be necessary to terminate any continuing relationship between Plaintiff and Owners, on the one hand, and Defendants, on the other.

## SECOND CAUSE OF ACTION
### (Constructive Fraud)
### (Against HV Global Management, Grand Aspen Lodging, and HVGG)

115. Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

116.     HV Global Management (the management company for the Association), Grand Aspen Lodging (the developer and declarant), and HVGG (the owner and operator of the Hyatt Residence Club program), and each of them, had a duty as fiduciaries to act honestly, with full disclosure and loyalty to the Plaintiff and the Owners as their principals.

117.     Defendants, and each of them, knew that their uniform communications to Plaintiff and the Owners regarding the operation of the Hyatt Residence Club and the Portfolio Club failed to disclose material facts that they had a duty to disclose as fiduciaries and otherwise, including but not limited to the fact that the Portfolio Club was going to be unveiled and the fact the Portfolio Club was going to damage the Plaintiff's and the Owners' property values, interests and expectations.

118.     By virtue of their non-disclosure of material facts described above and herein, Defendants were able to take undue advantage of the Plaintiff and the Owners. The misrepresentations and non-disclosure of the material facts described above and elsewhere herein were material in that they were likely to have a substantial effect on how the Plaintiff and the Owners, including those deciding to purchase fractionals later in time, made decisions about the Hyatt Grand Aspen property.

119.     Based on the materiality of the concealed facts, there is a presumption of reliance on the part of Plaintiff and the Owners.

120.     Moreover, elements of constructive fraud are established as a matter of law where a fiduciary has breached its duties.

121.     As a direct and proximate result of their constructive fraud, the named Defendants, and each of them, proximately caused damage to Plaintiff and the Owners, including by damaging

the value in their fractionals, in an amount to be proven at trial. In addition, a constructive trust should be imposed on Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) § 43.

122.    As a proximate result of Defendants constructive fraud, which also qualifies as a breach of fiduciary duty, Plaintiff and/or Owners suffered damages in an amount to be proven at trial, including diminution in value damages. In addition, equity and good conscience require that all things of value improperly obtained by Defendants as a result of their constructive fraud be disgorged and restored to Plaintiff and Owners and/or a constructive trust should be imposed on such funds for the benefit of Plaintiff and Owners.

123.    Further, the Court's broad equitable power should be invoked to extricate the Hyatt Grand Aspen from the Portfolio Club imposed by Defendants in breach of the fiduciary duties alleged herein, and to sever any ongoing contractual or other relationship between the Parties by:

a.      Declaring that the Condominium Association Management Contract for the Hyatt Grand Aspen, or Management Agreement, is null and void;

b.      Declaring that the Hyatt Vacation Club Resort Agreement, or Resort Agreement, is null and void;

c.      Declaring that the HPC Exchange Agreement has no further force and effect at the Hyatt Grand Aspen;

d.      Rescinding the transfer of unsold fractionals to the Portfolio Trust, returning them to the Developer, and requiring that they be marketed consistent with the original

43

offering;

e.      Requiring Defendants to transfer all interest in and title to the commercial units to the Association;

f.      Declaring that section 16.2 of the Declaration, which gives the Developer the perpetual power to unilaterally amend the Declaration, is null and void;

g.      Issuing such further Orders as may be necessary to terminate any continuing relationship between Plaintiff and Owners, on the one hand, and Defendants, on the other.

## THIRD CAUSE OF ACTION
**(Aiding & Abetting Breaches of Fiduciary Duty and Constructive Fraud)**
**(Against All Defendants)**

124.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

125.    As described above, the Management Company, HVGG, the Developer, and HV Global Marketing owed fiduciary duties to Plaintiff and Owners.

126.    Defendants, and each of them, knowingly aided and abetted and participated in the breaches of fiduciary duties and constructive fraud committed by HV Global Management, Grand Aspen Lodging, HVGG, and HV Global Marketing, including the fiduciaries aiding and abetting in each other's wrongful conduct, by, *inter alia*, participating in, enabling, assisting, aiding, encouraging, and/or facilitating the breaches of fiduciary duties and constructive fraud alleged herein.

127.    They did so by, *inter alia*,

a.      Failing to intervene to stop the harm caused by those breaches;

b.      Helping to construct the Portfolio Club, with particular assistance from the Portfolio Association, the Portfolio Trustee, and ILG;

c.      Helping to keep the Developer fractionals unsold, with particular assistance from HV Global Marketing and HVGG,

d.      Helping to dismantle and keep dismantled the Hyatt Residence Club program at the Hyatt Grand Aspen, with particular assistance from Hyatt Hotels Corporation, ILG, Marriott, and HVGG; and

e.      Helping to affiliate the Hyatt Residence Club with the Portfolio Club.

128.    The Hyatt, ILG, and Marriott Defendants benefited from these fiduciary breaches and constructive fraud. Among other sources of profit to be determined through discovery, Hyatt Hotels Corporation profited from the sale to ILG in part based on ILG knowing Hyatt Hotels Corporation had established the conditions making the Portfolio Program possible and is making licensing fees off of the use of the Hyatt name, ILG in turn profited from being able to sell the property to Marriott, and Hyatt Hotels Corporation, ILG and Marriott have benefitted from a so-called halo effect from using the Hyatt Grand Aspen to sell more points in the new Portfolio Club, while permitting and encouraging the underlying Residence Club program to be crushed.

129.    As a proximate result of Defendants aiding and abetting breaches of fiduciary duty and constructive fraud, Plaintiff and/or Owners suffered damages in an amount to be proven at trial, including diminution in value damages. In addition, equity and good conscience require that all things of value improperly obtained by Defendants as a result of their aiding and abetting misconduct be disgorged and restored to Plaintiff and Owners and/or a constructive trust should

be imposed on such funds for the benefit of Plaintiff and Owners.

130.   Further, the Court's broad equitable power should be invoked to extricate the Hyatt Grand Aspen from the Portfolio Club imposed by Defendants in breach of the fiduciary duties alleged herein, and to sever any ongoing contractual or other relationship between the Parties by:

a.     Declaring that the Condominium Association Management Contract for the Hyatt Grand Aspen, or Management Agreement, is null and void;

b.     Declaring that the Hyatt Vacation Club Resort Agreement, or Resort Agreement, is null and void;

c.     Declaring that the HPC Exchange Agreement has no further force and effect at the Hyatt Grand Aspen;

d.     Rescinding the transfer of unsold fractionals to the Portfolio Trust, returning them to the Developer, and requiring that they be marketed consistent with the original offering;

e.     Requiring Defendants to transfer all interest in and title to the commercial units to the Association;

f.     Declaring that section 16.2 of the Declaration, which gives the Developer the perpetual power to unilaterally amend the Declaration, is null and void;

g.     Issuing such further Orders as may be necessary to terminate any continuing relationship between Plaintiff and Owners, on the one hand, and Defendants, on the other.

**FOURTH CAUSE OF ACTION**

**(Breach of Contract — Public Offering Statement and/or Declarations)**

**(Against Grand Aspen Lodging)**

131.    Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

132.    Defendants distributed a Public Offering Statement to each prospective buyer that became an accepted offer, and thus a contract, once each purchaser executed the standardized purchase contract that was included with the Public Offering Statement.

133.    Owners and Plaintiff performed all of the things required of them under this contract.

134.    Included in the Public Offering Statement was a version of the Declaration that was different from the version actually recorded in Pitkin County. Both the recorded and unrecorded versions of the Declaration barred implementation of the Portfolio Club because as a further timesharing program: Section 6.3 prohibits the partition of timeshare interests, and Section 12.5 prohibited any "use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the Property by Owners." Additionally,

135.    Defendants' transfer of unsold inventory to the Portfolio Trust and imposition of the Portfolio Club breached these provisions of said contract or in the alternative of the unrecorded or recorded Declarations, both of which contained these provisions.

136.    As a result of Grand Aspen Lodging's breach of this contract, Plaintiff and Owners were damaged in an amount according to proof. Grand Aspen Lodging's breach of the contract

was opportunistic,[29] and so equity and good conscience require that Grand Aspen Lodging disgorge all things of value improperly obtained by them as a result of their misconduct.

## **FIFTH CAUSE OF ACTION**
**(Declaratory Relief Regarding Implementation of the Portfolio Club)**
**(Against All Defendants except Hyatt Hotels Corporation and ILG)**

137.    Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

138.    Plaintiff seeks declaratory judgment pursuant to C.R.S. §§ 13- 51-105 *et seq.* and Rule 57 of the Colorado Rules of Civil Procedure.

139.    All necessary parties are before the Court pursuant to C.R.C.P. 57(j), an actual and justiciable controversy exists regarding the parties' respective rights, and a declaratory judgment will terminate the controversy giving rise to this proceeding.

140.    The actual and present controversy between the parties as to whether the Governing Documents allowed Defendants to implement the Portfolio Club at the Hyatt Grand Aspen. The Association contends Defendants lacked this power, while Defendants disagree.

141.    First, Plaintiff seeks a judicial declaration that Defendants are estopped from relying on any provisions in the recorded plan that are materially different what is contained in the Declaration actually distributed to all or most prospective purchasers. As alleged elsewhere herein on information and belief, the version of the Declaration that Defendants included in the

---

[29] *See, e.g., Earthlnfo, Inc. v. Hydrosphere Resource Consultants, Inc.*, 900 P.2d 113 (Colo. 1995); *Watson v. Cat-Three, LLC*, 254 P.3d 1189 (Colo. App. 2011); Restatement (Third) of Restitution and Unjust Enrichment, § 39 (2011).

Offering Plan and given to all or most purchasers was not the same as the Declaration that was actually recorded in Pitkin County. Specifically, the recorded version included new language in Article 18 that required Developer approval before any other timeshare plans or similar entities could be created with respect to the Hyatt Grand Aspen or its fractionals, before any such entity could acquire units or fractionals at the Hyatt Grand Aspen, and before any such entity could incorporate such interests in their programs. Defendants violated their fiduciary duties by recording a version of the Declaration that was materially different than the Declaration distributed to prospective purchasers via the Public Offering Statement.

142.    Second, Plaintiff seeks a judicial declaration that Defendants' implementation of the Portfolio Club at the Grand Hyatt Aspen and the related transfer of unsold inventory to the Portfolio Trust were ultra vires and must be dismantled. Specifically:

a.    The Governing Documents specified only a single timeshare plan and granted only narrow powers to Grand Aspen Lodging to, for example, potentially slice off whole units (not fractionals) into other programs. *See, e.g.*, Purchase Agreement, §§ 10-13; Declaration, § 1.7; pp. 7, 8, 10, 11 (defining Timeshare Plan, Timeshare Unit); *id.* at § 12.1 (limiting residential uses to those permitted by law and specified in the Declaration or reserved for the Declarant); *id.* at § 12.3-12.4 (specifying that units essentially are reserved for Owners, as are the common elements); Club Rules § 6.1 (prohibiting, *inter alia*, commercial uses of fractionals and their contribution or us in any "other different timeshare plan or vacation club"); Condo Rules (similar).

b.    Section 12.16 of the Declaration gives Grand Aspen Lodging the power to create "other timeshare plans for Units . . . that may vary from the Timeshare Plan described in this Section," but does not permit the imposition of the Portfolio Club on the Hyatt Grand Aspen.

The Portfolio Club is not based on whole "Units" but instead on the remaining fractionals in units left in the developer inventory. Moreover, the Portfolio Club was not created by Aspen Grand Lodging but instead by HVGG and other Defendants.

      c.    Similarly, while Section 14.2(d) of the Declaration allows the Declarant to withdraw any unsold unit from the timeshare plan, it does not allow Grand Aspen Lodging to take fractionals from units in which fractionals had been sold, making the transfer of these fractionals to the Portfolio Club a separate breach.[30]

      d.    While Defendants reserved the right to add on additional external exchanges, only Interval International was mentioned in the description of an external exchange, leading a reasonable person to believe that the exchanges would be so limited. *See, e.g.*, 2005 Club Rules § 5.1. And in any event, the Portfolio Club, however denominated in the revised 2017 Club Rules, is in fact another timesharing program, not an independent exchange program. As a result, the Portfolio Club is ultra vires.

143.    Third, Plaintiff requests declaratory relief in the form of all necessary orders required to sever any further contractual or other relationship between Plaintiff and Defendants. It would be inequitable to further subject Plaintiff and Owners to the onerous contractual provisions and other instruments of control that Defendants used to profit at the expense of Plaintiff and Owners through breaches of contract and fiduciary duties, acts of fraud, and conspiracy.

144.    Defendants, including Marriott, the Portfolio Trustee, the Portfolio Association,

---

[30] The Declaration permits the Declarant to "rent or lease" unsold units, which the transfer of fractionals into the Trust does not qualify as, and neither does the conversion of these fractionals into points—or the bifurcation of the points from 1/20 fractionals into 1/40 fractionals.

the Developer, the Management Company, and HVGG, are necessary defendants for the declaratory relief requested herein.

145. Accordingly, Plaintiff requests a judicial decree:

a. Declaring that the governing documents did not empower Defendants to implement the Portfolio Club;

b. Declaring that the Condominium Association Management Contract for the Hyatt Grand Aspen, or Management Agreement, is null and void;

c. Declaring that the Hyatt Vacation Club Resort Agreement, or Resort Agreement, is null and void;

d. Declaring that the HPC Exchange Agreement has no further force and effect at the Hyatt Grand Aspen;

e. Rescinding the transfer of unsold fractionals to the Portfolio Trust, returning them to the Developer, and requiring that they be marketed consistent with the original offering;

f. Requiring Defendants to transfer all interest in and title to the commercial units to the Association;

g. Declaring that section 16.2 of the Declaration, which gives the Developer the perpetual power to unilaterally amend the Declaration, is null and void; and

h. Issuing such further Orders as may be necessary to terminate any continuing relationship between Plaintiff and Owners, on the one hand, and Defendants, on the other.

**SIXTH CAUSE OF ACTION**

**(Breach of Contract — Management Agreement)**

**(Against HV Global Management)**

146.     Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

147.     Plaintiff entered into the Condominium Association Management Contract, or Management Agreement as it is referred to in this Complaint, with the predecessor in interest to Defendant HV Global Management, Hyatt Vacation Management Corporation, which for a period was also known as the Hyatt Residential Management Corporation.

148.     The Management Agreement imposed express fiduciary duties on the Management Company, stating that the Management Company "shall act in a fiduciary capacity with respect to the proper protection of and the accounting for the Association's assets." Mgmt. Agreement § 7. The Management Company breached this provision as alleged elsewhere herein, including by failing to protect the Association's assets by hiding and facilitating the transfer of the Developer fractionals to the Portfolio Trust.

149.     The Management Agreement created clear disclosure duties, including that the Management Company must "be responsible for working with [vacation] companies to stay abreast of relevant reservation and exchange procedures, Club rules and regulations, and for informing the Association, the Board and Owners of any significant changes in these procedures." *Id.* at § 6(m). The Management Company breached this provision, including by not informing the Association, the Board, or Owners of any such significant changes. The Management Company made no communications to any of these entities to which it owned fiduciary duties about the transfer of the Developer fractionals into the Trust and the effect on Owners and the Association.

150.    The Management Agreement also requires the Management Company to maintain the Hyatt Residence Clubs first-class brand standards, ¶ 34, which duty it directly breached.

151.    Management Company also materially breached the Management Agreement through its fiduciary breaches alleged in, *inter alia*, Count 1. *See, e.g.*, Restatement (Third) Of Agency § 8.01 (2006) (General Fiduciary Principle), cmt. d(1) ("Because it constitutes a material breach of the contract by the agent, an agent's breach of fiduciary duty may also privilege the principal to terminate the principal's relationship with the agent in advance of a time set for termination in any contract between them."). A serious violation of the duty of loyalty constitutes an entire breach of contract, justifying discharge of the agent. Restatement (Second) of Agency § 409 (1958). A willful violation of the duty of loyalty may constitute a material breach of the contract, even though the harm likely to arise from such breach is very small. *Id.*

152.    As a result of HV Global Management's breach of the Management Agreement, Plaintiff and Owners were damaged in an amount according to proof.

153.    In addition, the Management Agreement should be rescinded for these material breaches, in particular its breaches of fiduciary duties.

154.    This breach of the contract by HV Global Management was opportunistic, and so equity and good conscience require that Defendants disgorge all things of value improperly obtained by them as a result of their misconduct.

### SEVENTH CAUSE OF ACTION
**(Breach of Contract — Resort Agreement)**
**(Against HV Global Management, Grand Aspen Lodging, and HVGG)**

155.     Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

156.     The Hyatt Vacation Club Resort Agreement, or Resort Agreement as it is referred to herein, was entered into by the Association, Grand Aspen Lodging (the developer), HV Global Management (the management company), and HVGG (the owner and operator of the Hyatt Residence Club).

157.     Through this contract, the Developer, Management Company, and Association agreed to:

a.     "[F]ully and accurately describe the Club to Owners and prospective purchasers at the Resort," Resort Agreement § 4.1(b);

b.     "[N]ot in any way misrepresent the Club or the Resort's relationship with HVOI to Owners or prospective purchasers at the Resort," *id*.; and

c.     "Remain informed of new services and benefits provided by HVOI [now HVGG] to Owners," *id.* § 4.1(c).

158.     The Developer and Management Company breached § 4.1(b) by failing to describe the Club fully or accurately to Owners or purchasers. In particular, among other failures, they provided an unrecorded, materially different version of the Declaration in the Public Offering Statement; did not give Owners or purchasers critical documents such as the Management Agreement or Resort Agreement; never told Owners or purchasers about the impending Portfolio Club or the transfer of the Developer fractionals into the Portfolio Trust and activation for use by the Portfolio Club.

159.     The Developer and Management Company also breached § 4.1(b) by

misrepresenting the relationship with HVGG to Owners and purchasers, including by not informing purchasers of fractionals in 2017 about transfer of the Developer fractionals into the Portfolio Club, which HVGG ran, greatly expanding its powers.

160.    The Developer and Management Company either knew about the impending Portfolio Club and transfer of Developer fractionals, or they breached the requirement of § 4.1(c) that they "remain informed of new services and benefits provided by HVOI [now HVGG] to Owners," *id.* § 4.1(c).

161.    HVOI (now HVGG) in turn agreed to:

a.    "Fully and accurately describe the Resort to Club Members," *id.* at § 4.2(a);

b.    "[N]ot in any way misrepresent the Resort's relationship with HVOI to Club Members," *id.*;

c.    "Remain informed of new services and benefits at the Resort," *id.* at § 4.2(b); and

d.    "[I]mmediately notify Developer, Association and Management Company of any change in any fact or circumstance affecting the operation of the Resort or the Club with respect to the Resort," *id.* at § 4.6.

162.    HVGG breached its disclosure obligations under § 4.2(a) by failing to describe the Club fully or accurately to Owners or purchasers. In particular, among other failures, it did not give Owners critical documents such as the Management Agreement or Resort Agreement; and never told Owners about the impending Portfolio Club or the transfer of the Developer fractionals into the Portfolio Trust and activation for use by the Portfolio Club.

55

163.    HVGG breached its disclosure obligation under § 4.6 by failing to notify the Association about transfer of the fractionals into the Portfolio Trust for activation by the Portfolio Club until long after it was a fait accompli.

164.    HVGG also materially breached the Resort Agreement through its fiduciary breaches alleged in, *inter alia*, Count 1.

165.    As a result of these defendants' breach of the Resort Agreement, Plaintiff and Owners were damaged in an amount according to proof.

166.    In addition, the Resort Agreement should be rescinded for the material breaches by fiduciaries. *See, e.g.*, Restatement (Third) Of Agency § 8.01 (2006) (General Fiduciary Principle), cmt. d(1), *supra*.

167.    This breach of the contract was opportunistic, and so equity and good conscience require that Defendants disgorge all things of value improperly obtained by them as a result of their misconduct.

## EIGHTH CAUSE OF ACTION
### (Tortious Interference with Contract)
### (Against All Defendants)

168.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

169.    Defendants, in particular ILG, HPC Developer, HPC Trust, and Marriott, knew that Owners and the Association had contracts—namely, the Purchase Agreement, the Management Agreement, the Declaration, and the Resort Agreement—with HV Global Management, Grand Aspen Lodging, and HVGG.

170.    Each of Defendants HV Global Management, Grand Aspen Lodging, and HVGG knew that Owners and the Association had contracts with the other two such Defendants.

171.    Such Defendants intentionally by word or conduct interfered with those contracts by, inter alia, purchasing the developer fractionals from the Grand Aspen Lodging, creating the Portfolio Trust, transferring the fractionals to the Portfolio Trustee to be placed into the Portfolio Trust, and creating and operating a Portfolio Club that used the Portfolio Trust properties in breach of core contractual provisions and implied promises. This interference was improper, given the interests of the parties and of society.

172.    Such Defendants also interfered with additional provisions of the underlying contracts specified in the Third Cause of Action for breach of contract. For example, the 2017 Club Rules placed complicated restrictions on Owners' ability to reserve float weeks during the Home Reservation Period, violating the promise that these would be available on a first-come first served basis and available in the type of units they had purchased. *See* Declaration (defining "floating week" and "Home Resort Preference Period (Float)"); *id.* § 12.16(c); Resort Agreement, § 3.2(b).

173.    Such Defendants' interference with contract has damaged the Plaintiff and Owners in an amount to be proved at trial that is in excess of the jurisdictional limit of this Court.

### NINTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Grand Aspen Lodging and Its Alter Egos or Successors in Interest)**

174.    The Plaintiff incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

175.     A covenant of good faith and fair dealing is implied in every contract by operation of law. Pursuant to this implied covenant, Defendants could not legally interfere with the rights of Owners to receive the benefits due to them under the standardized purchase contracts and/or Public Offering Statement that became a contract upon acceptance by purchaser, or do anything inconsistent with any promises that a reasonable person in the position of the promisee would be justified in understanding were included in this contract.

176.     The Declaration that was attached to and incorporated by reference into the Public Offering Statement contained an implied promise by Grand Aspen Lodging to sell a sufficient number of Club Interests to make this fractional offering viable.[31] A reasonable purchaser would believe that Defendants would timely sell all the fractionals, or at least a sufficient number to make the Hyatt Grand Aspen viable. The Colorado Disclosure document provided with the Public Offering Statement also implied that Grand Aspen Holding would actively sell its own units. Grand Aspen Holding breached this implied promise and the implied covenant of good faith and fair dealing by retaining more than 200 unsold fractionals that Defendant Developer later sold to HPC Developer to transfer into the Portfolio Trust for use by Portfolio Club members.

177.     In addition, the Declaration that was attached to and incorporated by reference into the Public Offering Statement contained an express promise by Grand Aspen Lodging to limit the use of the Hyatt Grand Aspen to the timeshare plan specified in the Declaration and the other offering documents. Grand Aspen Holding breached this express promise and the implied covenant of good faith and fair dealing by retaining more than 200 unsold fractionals that Defendants later

---

[31] *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 285 A.D.2d 244 (NY 2001); *Reiser v. Marriott Vacations Worldwide Corp.*, 2016 WL 1720741, at *5–6 (E.D. Cal. Apr. 29, 2016).

transferred into the Portfolio Trust for use by Portfolio Club members

178.    Grand Aspen Lodging's breach of these express and implied promises has frustrated Owners' rights and reasonable expectations under the parties' contract.

179.    At all times relevant hereto, and as further alleged elsewhere herein, the Hyatt, ILG, and Marriott Defendants were the alter egos of Defendants HVGG, Management Company, and Developer, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist.

180.    As a result of these Defendants' breach of these express and implied promises in the standardized purchase contracts and/or Public Offering Statement, Plaintiff and Owners were damaged in an amount according to proof. These breaches of the contract were opportunistic, and so equity and good conscience require that Defendants disgorge all things of value improperly obtained by them as a result of their misconduct.

## TENTH CAUSE OF ACTION
### (Conspiracy)
### (Against All Defendants)

181.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

182.    Defendants, and each of them, conspired with the remaining Defendants' scheme to commit the wrongful and unlawful conduct alleged herein.

183.    The conspiring Defendants had prior notice of the remaining Defendants' wrongful and unlawful activities, but nonetheless acted affirmatively to help the other Defendants perpetrate their scheme against Owners and the Plaintiff.

59

184.    All Defendants acted and agreed on objects to be accomplished -- to operate and run the Association for wrongful financial gain, rather than for the benefit of the homeowners, and to operate and run the Hyatt Residence Club program more generally for their personal gain to the detriment of the legacy Owners -- and there was a meeting of the minds among all Defendants on that object. While each of Defendants participated in the conspiracy at different times and in different capacities, the object of the conspiracy remained the same at all relevant times.

185.    Defendants, working together, accomplished unlawful overt acts in furtherance of the wrongful and unlawful activities alleged herein.

186.    Likewise, the effects of the conspiracy were constant and injured Owners and the Plaintiff. Defendants' conspiring in the wrongful and unlawful conduct alleged herein has damaged them in an amount to be proved at trial that is in excess of the jurisdictional limit of this Court.

187.    Further, because Defendants profited at Owners' expense, they should be ordered to disgorge all benefits they received, and a constructive trust should be imposed on all ill-gotten gains for the benefit of Owners.

## ELEVENTH CAUSE OF ACTION
### (Violations of the Colorado Organized Crime Control Act, C.R.S. § 18-17-104(1)-(3))
### (Against All Defendants)

188.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

189.    The Colorado Organized Crime Control Act, or COCCA, prohibits a range of acts

arising from patterns of racketeering, as well as conspiracy to violate those provisions. C.R.S. § 18-17-104(1)-(4). Defendants and other members of the COCCA Enterprise violated those substantive prohibitions.

190.    First, the Portfolio Trust (sued in the name of its Trustee), HG, Inc., HPC Developer, HPC Owners' Association, HVGG, the Management Company, Hyatt Hotels Corporation, Interval Acquisitions Corp., ILG, Marriott, SOI Acquisitions Corp. knowingly *received*, and knowingly *used and invested*, *proceeds* from a pattern of racketeering activity in real property—namely, the Hyatt Grand Aspen and the resorts in the Residence Club—and from operating an enterprise, as discussed further *infra*.

191.    Second, the Developer and the Management Company knowingly *maintained*, both directly and indirectly, an interest in as well as control of an enterprise—the Association—through a pattern of racketeering activity. Additionally, all Defendants and other members of the COCCA Enterprise also knowingly *acquired or maintained*, indirectly or directly, *an interest in* as well as *control of* the associated-in-fact enterprise discussed *infra*—as well as control of real property, namely, the Hyatt Grand Aspen and the resorts in the Residence Club—through a pattern of racketeering activity.

192.    Third, all Defendants and other members of the COCCA Enterprise knowingly *conducted and participated in*, directly and or indirectly, the associated-in-fact enterprise through a pattern of racketeering activity when employed by or associated with such enterprise. Each Defendant and other member of the COCCA Enterprise is a subsidiary, affiliate, or otherwise formally related to the parent Hyatt, ILG, and Marriott Defendants.

193.    At all relevant times, the Association was an "enterprise" within the meaning of

C.R.S. § 18-17-103(2) and other provisions of the COCCA, C.R.S. § 18-17-101, *et seq*. ("COCCA"). As alleged above, Defendants and other members of the COCCA Enterprise used the Association as a pawn to perpetrate a pattern of criminal activity.

194.    In addition and/or in the alternative, Defendants and the other members of the COCCA Enterprise constituted an "associated-in-fact enterprise" in that they knowingly associated in fact to achieve the fraudulent and otherwise unlawful purposes alleged herein. Defendants and other members of the COCCA Enterprise knowingly participated in the operation and/or management of the enterprise(s), which had ongoing organization, formal or informal, and functioned as a continuing unit. (These enterprises are collectively referred to herein as the "COCCA Enterprise.")

195.    Through explicit and/or tacit agreements, Defendants and other members of the COCCA Enterprise agreed to function and did function as a unit and according to the specified roles alleged herein. Among other acts alleged elsewhere in this Complaint, they:

a.      Retained developer inventory at the Hyatt Grand Aspen, failing to use good faith efforts to sell the fractionals, and then transferred the remaining fractionals to a newly created Trust operating solely for the benefit of Defendants and the members of the new points program.

b.      Abused their control of the Association through membership on the Association and control of the Management Company, which was delegated the Association's powers and duties.

c.      Abused their power as the program manager of the Residence Club and the Portfolio Club, including by using their control over the reservation system to jump ahead in line and reserve the most desirable weeks for points members at the Hyatt Grand Aspen.

d.      Failed to disclose critical information to Owners and the Plaintiff about changes in their rights at the Hyatt Grand Aspen, despite specific duties to provide prompt and full disclosure.

e.      Failed to expand the Residence Club network and otherwise undermining the fractional ownership model in favor of the points model, which they perceived to be more favorable to their interests—indeed, shrinking, instead of increasing, the size of the Residence Club in favor of the Portfolio Club by 1) converting legacy Owners to points owners (which decreases the tradable inventory in the Residence Club); 2) limiting access to any new clubs that were built to points members; and 3) failing to develop new Residence Club properties.

f.      Kept the number of points required to access Hyatt Grand Aspen lower than justified to entice potential Portfolio Club points users.

g.      Subjected Owners and the Plaintiff to a new agreement affecting the Hyatt Residence Club locations—the Portfolio Club—without their consent to substantial changes in terms.

h.      Profited through licensing of the Hyatt name to the Residence Club and Portfolio Club, despite knowing of these harms.

196.    Defendants, and each of them, are "persons" within the meaning of C.R.S. § 18-17-103(4) (and other provisions of COCCA) and are distinct from the enterprise(s) they formed, managed, acquired an interest in, controlled, and/or operated to perpetrate the fraud alleged in this Complaint.

197.    Each member of the COCCA Enterprise, including each Defendant, knowingly participated in the conduct of this enterprise in furtherance of a common purpose that all members

of the COCCA Enterprise agreed upon, namely to run the affairs of the Association for private financial gain rather than for the benefit of the Hyatt Grand Aspen Owners.

198. The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of C.R.S. § 18-17-103(3). The COCCA Enterprise's conduct, including the predicate acts and pattern of racketeering activity, amount to and/or pose a threat of continued criminal conduct.

199. Defendants and other members of the COCCA Enterprise committed at least two predicate acts of racketeering activity within the meaning of C.R.S. § 18-17-103(3) (and other provisions of COCCA) that are related to the conduct of the enterprise(s).

200. Defendants and other members of the COCCA Enterprise regularly used the mails and interstate wires in furtherance of the fraud alleged herein in violation of 18 U.S.C. §§ 1341 and 1343, which are both predicate acts under COCCA. The mailings and wires in furtherance of this scheme to defraud include but are not limited to:

a. Withholding material information from Owners and the Plaintiff despite having a duty to disclose. Even when Owners emailed Defendants asking for more information, they received no response.

b. Sending communications to Owners and the Plaintiff designed to "lull" them into believing no fraud was underway, as well as to mislead them about any lost benefits, including the following:

i. Hyatt Hotels Corporation issued press releases it knew to be false about the acquisition by ILG not changing Owners' rights;

ii.      On January 4, 2017, Owners received the revised 2017 Club Rules in an email that did not mention that the Rules had been changed to accommodate the Portfolio Club. The email was sent from the address info@hyattvoi.com, and had HVGG's information at the bottom. An Owner followed up and said: "please confirm 2017 Club Rules has changes, and if it has changes, please advise what those changes are or where in the document they can be found. This is a 28 page single space document and guidance is requested/needed." In response, on January 19, 2017, Andrew Carter, the director of Association Compliance for Hyatt Vacation Ownership (who until at least September 2018 emailed from an HVOI address, andrew.carter@hyattvoi.com (HVOI being the company now known as HVGG), who sometimes writes c/o the Management Company, and who as of December 2018 sent emails relevant to the Portfolio Club as the Associate Director, Board Relations, Association Management, at Vistana), wrote a grossly incomplete response, failing to mention that the new Section 5.2 covered the still secret Portfolio Program: "The changes to the club rules," Carter wrote, "involve increases to the point values of some weeks at the Key West and Bonita Springs properties. A full breakdown of the changes will be available soon, and I will forward that to you as soon as it's available." That was the only change he mentioned and no full breakdown was ever forwarded.

iii.      HVGG, using the same email address, info@hyattvoi.com, sent regular Hyatt Grand Aspen newsletters to Owners, including on January 23, 2017, July 7, 2017, and January 2018 and September 18, 2018, that similarly failed to mention the transfer of fractionals. These newsletters cover issues such as the fate of the ice rink and changes to the business center.

iv.      A December 7, 2017, email from HVGG titled "Exciting News from

Hyatt Residence Club," which one might expect would finally explain the excision of the Developer fractionals into the Trust, was silent. It did announce a new member website and then, for the first time—and six months after the "activation" of the Developer fractionals in the Portfolio Trust and eleven months after the revised Club Rules—"announce[d] a new Club-to-Club Exchange program that expands travel options for Hyatt Residence Club members into Portfolio Program Resorts." The email provided no links to the Portfolio Club documents or explanations of the harmful impacts on Owners.

        v.       On September 4, 2018, Thorp Thomas, the senior vice president of the Management Company, sent Owners an email, via HVGG's email address, about Marriott's acquisition of ILG that failed to discuss the Portfolio Club or fate of the Developer fractionals.

        vi.     HVGG sent an email to Owners from the address hgaconcierge@hyattvoi.com on February 20, 2019, that failed to discuss the Portfolio Club or mention the transfer of the Developer fractionals.

        c.     Sending emails and meeting with each other in order to design and implement the elaborate scheme of placing the Developer fractionals at the Hyatt Grand Aspen into the Trust and then the Portfolio Club through the Special Warranty Deed, Contribution Deed, and notice of activation recorded in June 2017.

      201.    Defendants and other members of the COCCA Enterprise committed additional predicate acts relating to the use of their computers. The Colorado computer crime statute makes it a crime to access any computer, computer network, or computer system to devise or execute any scheme or artifice to defraud. C.R.S. § 18-5.5-102(b). Acts that violate this statute constitute predicate acts of racketeering activity under COCCA. Defendants and other members of the

COCCA enterprise, in the course of a fraudulent scheme, used computers to draft documents such as the Special Warranty Deed conveying the Developer fractionals to the HPC Developer, the Contribution Deed from the HPC Developer to the Portfolio Trust, the notice of activation of those fractionals in the Portfolio Club, the revised 2017 Club Rules, and related document; to search the Internet; and to send and receive e-mails about this scheme and these documents. Furthermore, they used the computer to send intrastate e-mails—both within Florida and within Colorado— which constitutes a predicate act under COCCA.

202.    Defendants and other members of the COCCA Enterprise committed additional predicate acts relating to filing false reports under C.R.S. § 18-5-114 (offering a false instrument for recording), which makes a crime where, "knowing that a written instrument relating to or affecting real or personal property or directly affecting contractual relationships contains a material false statement or material false information, and with intent to defraud, he presents or offers it to a public office or a public employee, with the knowledge or belief that it will be . . . recorded or become a part of the records of that public office . . . ," *id.* § 18-5-114(1), even without intent to defraud, *id.* § 18-5-114(3). Here, Grand Aspen Lodging recorded documents relating to the public offering at the Hyatt Grand Aspen, including Special Warranty Deeds for the sale of Hyatt Grand Aspen fractionals in 2016 that did not acknowledge the impending Portfolio Club but instead claimed that grantees were obtaining property "in accordance with the Declaration of Condominium."

203.    Defendants and other members of the COCCA Enterprise conducted the enterprise(s) and committed the aforementioned predicate acts over the course of nearly a decade

and a half, beginning on or about 2005 and continuing at least through the present. These predicate acts amount to and pose a threat of continued criminal conduct.

204.   Defendants and the other members of the COCCA Enterprise reinvested the proceeds of this scheme to defraud in the continuing enterprise.

205.   The conduct alleged in this Complaint was part of a scheme that Defendants and the other members of the COCCA Enterprise formulated to run the affairs of the Association and/or their associated-in-fact enterprise for private financial gain rather than for the benefit of the Plaintiff and Owners. Defendants and the other members of the COCCA Enterprise perpetrated this scheme with the specific intent to deceive and/or defraud the Plaintiff and Owners, and did deceive and/or defraud the Plaintiff and Owners.

206.   The Plaintiff and Owners suffered harm and/or injury to its property as a direct and proximate result of the COCCA Enterprise's wrongful conduct, including loss of inventory for float weeks, decrease in property value, and increase in wear and tear, dues, and fees. This loss or damage includes that caused by the COCCA conspirators' ongoing effort to diminish the Hyatt Grand Aspen offering while building up the Portfolio Club.

207.   Plaintiff seeks relief for these harms under C.R.S. § 18-17-106, including injunctive relief pursuant to C.R.S. § 18–17–106(1) and (6) in the form of a judicial decree:

a.   Declaring that the governing documents did not empower Defendants to implement the Portfolio Club at the Hyatt Grand Aspen;

b.   Declaring that the Condominium Association Management Contract for the Hyatt Grand Aspen, or Management Agreement, is null and void;

c.   Declaring that the Hyatt Vacation Club Resort Agreement, or Resort

Agreement, is null and void;

      d.     Declaring that the HPC Exchange Agreement has no further force and effect at the Hyatt Grand Aspen;

      e.     Rescinding the transfer of unsold fractionals to the Portfolio Trust and returning them to the Developer, *see id.* § 18-17-106(1)(a), and requiring that they be marketed consistent with the original offering, *id.* § 18-17-106(1)(b);

      f.     Requiring Defendants to transfer all interest in and title to the commercial units to the Association, *see id.* § 18-17-106(1)(a);

      g.     Declaring that section 16.2 of the Declaration, which gives the Developer the perpetual power to unilaterally amend the Declaration, is null and void; and

      h.     Ordering that Marriott and its subsidiaries refrain from wrongfully placing fractionals into the Trust for use by the Portfolio Club, *id.* § 18-17-106(1)(b); and

      i.     Issuing such further Orders as may be necessary to terminate any continuing relationship between Plaintiff and Owners, on the one hand, and Defendants, on the other.

      208.    Further, pursuant to *id.* § 18-17-106(1)(d)-(e), Plaintiff seeks an order requiring the suspension or revocation of the Colorado licenses of Developers, including licenses as subdivision developers and/or real estate companies held by HVGG, Grand Aspen Lodging, HPC Developer, HV Global Marketing, and Marriott Vacations Worldwide, as their managerial agents authorized or engaged in conduct in violation of section 18-17-104 and forfeiture is necessary to prevent further criminal activity, in the best interest of the State. Plaintiff also seeks an order pursuant to those provisions suspending or revoking the Colorado business registrations held by HVGG, HV

Global Marketing, Hyatt Hotels Corporation, HVO, Grand Aspen Lodging, and the Management Company, as their managerial agents authorized or engaged in conduct in violation of section 18-17-104 and forfeiture is necessary to prevent further criminal activity, in the best interest of the State.

209.    Plaintiff is also entitled to recover treble damages, costs of suit, and attorneys' fees.

## TWELFTH CAUSE OF ACTION
### (Conspiracy to Violate COCCA, C.R.S. § 18-17-104(4))
### (Against All Defendants)

210.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

211.    In violation of C.R.S. § 18-17-104(4), Defendants and other members of the COCCA Enterprise, by their words or actions, objectively manifested an agreement to participate, directly or indirectly, in the scheme to defraud and thereby conspired with one another and/or endeavored to commit the wrongful conduct alleged in this Complaint.

212.    Defendants and other members of the COCCA Enterprise by their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise, *i.e.*, to run the affairs of the Association for private financial gain rather than for the benefit of the members of the Association, and reinvested the proceeds of that misconduct in their common enterprise.

213.    Further, Defendants and other members of the COCCA Enterprise, by their words and/or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity. Defendants, and each of them, agreed to

commit predicate crimes, aid and abet the commission of predicate crimes by other members of the COCCA Enterprise, and/or agreed that some members of the enterprise would commit the predicate acts for the benefit of all members and/or the enterprise.

214.    Owners and the Plaintiff Association suffered harm and/or injury to their person or property as a direct and proximate result of the COCCA Enterprise's wrongful conduct.

215.    Under the provisions of COCCA, Owners are entitled to recover treble damages, costs of suit and attorneys' fees. Further, Plaintiff seeks relief for these harms under C.R.S. § 18-17-106, including injunctive relief pursuant to C.R.S. § 18–17–106(1) and (6) in the form of a judicial decree outlined in the Eleventh Cause of Action.

## THIRTEENTH CAUSE OF ACTION
### (Violation of Colorado Consumer Protection Act, C.R.S. § 6-1-105 and 6-1-703)
### (Against all Defendants)

216.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

217.    Colorado prohibits deceptive trade practices that include, in the course of one's business, misrepresenting the investment, resale or rental value of any time share, the conditions under which a purchaser may exchange the right to use accommodations or facilities in one location for the right to use accommodations or facilities in another location, and also, with respect to the sale or solicitation of any time share resale service, making false or misleading statements, including statements concerning the value of the resale time share; and the current or future costs of owning the resale time share, including assessments, maintenance fees, or taxes. C.R.S. § 6-1-703.

218.    Those who assist or aid in such violations are equally liable. C.R.S. § 6-1-703(4)(a).

219.    Moreover, Colorado has made it unlawful to "knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice" under the Consumer Protection Act. C.R.S. § 6-1-105(1)(nnn).

220.    On information and belief, fractionals were sold at the Hyatt Grand Aspen during the period when the ILG and Hyatt Defendants knew about the upcoming addition of the Portfolio Club at the Hyatt Grand Aspen and the transfer of fractionals from the Hyatt Grand Aspen into a Trust. Many such resale transactions were accompanied by sales pitches, promotional materials, and other representations that failed to acknowledge the degree to which the Residence Club offering had been decimated—and/or the merger with the Portfolio Club.

221.    A subset of Owners who bought properties after the plan for the Portfolio Club was put in motion depended on Defendants' false and misleading statements about the scope of their purchases.

222.    Additionally, a larger group of purchasers bought fractionals at the Hyatt Grand Aspen at a time when Defendants knew that the Residence Club at the Hyatt Grand Aspen had been greatly diminished.

223.    Defendants violated the Consumer Protection Act by, among other bad acts, marketing the fractional interest as an alternative to traditional timeshares, representing that future owners would be able to enjoy the same benefits and privileges as the original plan had promised, and by failing to warn purchasers of the impending Portfolio Club, which transformed the fractional ownership into a traditional timeshare.

224.    Defendants also aided and abetted other Defendants in doing so.

225.     Defendants' misrepresentations and failures to warn were willful, knowing and intentional.

226.     As a direct and proximate result of Defendants' conduct, Plaintiff and Owners have suffered and will continue to suffer injuries, damages and losses, including without limitation treble damages and attorney fees pursuant to C.R.S. § 6-1-113.

## FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against All Defendants)

227.     The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

228.     Defendants, in particular Hyatt Hotels Corporation, ILG, and Marriott, have unlawfully profited at the Plaintiff's and Owners' expense, and/or received the fruits of the wrongful conduct of other defendants.

229.     Owners and Plaintiff have conferred a benefit on Defendants, and each of them, that should be restored to Plaintiff, as it would it would be inequitable and unjust for the Defendants to be permitted to retain these things of value, even if they received the benefit without participating in the wrongdoing.[32]

230.     Those benefits include but are not limited to (i) the proceeds from the sale of points

---

[32] *See DCB Const. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 119 (Colo. 1998) (unjust enrichment does not require a promise or privity between the parties"); *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Assoc.*, 649 P.2d 1093, 1097 (Colo. 1982) ("The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.").

for unsold fractionals that should have remained with the Hyatt Residence Club, including the profits made by certain Defendants taking advantage of Hyatt Grand Aspen's *Jennifer Realty* violation; (ii) the profits gained by exploiting the Hyatt Grant Aspen name while undermining the Hyatt Residence Club program itself; (iii) the profits gained by unfairly restricting Owners' float week options; (iv) Hyatt Hotels Corporation's profit from the sale to ILG in part based on ILG knowing Hyatt Hotels Corporation had established the conditions making the Portfolio Program possible and is making licensing fees off of the use of the Hyatt name; (v) ILG's profits from being able to sell the fruits of the wrongful conduct to Marriott; (v) and Hyatt Hotels Corporation (though licensing fees), ILG, and Marriott benefitting from the halo effect of the association of the Portolio Club with the Hyatt Grand Aspen.

231.    Defendants should be compelled to disgorge to Plaintiff all improperly obtained things of value obtained by them as a result of the wrongful conduct alleged herein. A constructive trust should be imposed upon all such things of value in order to prevent the unjust enrichment of Defendants, and each of them.[33]

## FIFTEENTH CAUSE OF ACTION
### (Accounting)
### (Against all Defendants)

232.    The Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

233.    The Plaintiff has been wrongfully deprived of money, information and documents

---

[33] Restatement (Third) of Restitution and Unjust Enrichment § 55, cmt. a (2011).

relevant to their management of public resources.

234.    Defendants have improperly derived profits in connection with their control over and concealment of information from Owners and the Plaintiff.

235.    The Plaintiff has a right to an accounting for the profits improperly obtained by Defendants.

236.    Under the circumstances, it is just and equitable to require Defendants to provide an accounting.

## RESERVATION OF RIGHTS

The Plaintiff expressly reserves all rights accorded under Colorado law, including but not limited to the right to amend this pleading as may be necessary in light of new or additional factual information gathered throughout the disclosure and discovery phases of this litigation and the right to plead exemplary damages in accordance with C.R.S. § 13-21.102.

## JURY DEMAND

The Plaintiff demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against Defendants, and each of them, as follows:

a.    For the declaratory and injunctive relief identified herein;

b.    For special damages according to proof;

c.    For general damages according to proof;

d.    For restitution of all monies paid to Defendants or their assigns, according to proof;

e.    That Defendants disgorge and repay to Owners all compensation paid to them by

the Plaintiff and Owners; that the Court order an accounting of said compensation; and that a constructive trust be imposed upon said compensation for the benefit of Owners;

f.       That Defendants disgorge to Owners all profits received as a result of the conduct described herein; that the Court order an accounting of said profits and that a constructive trust be imposed upon said profits for the benefit of Owners;

g.       That damages awarded for the COCCA causes of action be trebled by the Court;

h.       That Plaintiff receives pre-judgment and post-judgment interest as allowed by law;

i.       That Plaintiff recovers its costs of the suit and attorneys' fees as allowed by law; and

j.       For all other relief allowed by law and equity.


DATED: August 23, 2019

/s/ Tyler Meade
Tyler Meade
THE MEADE FIRM, p.c.
12 Funston Ave., Suite A
San Francisco, CA 94129
Telephone: (415) 724-9600
Facsimile: (415) 510-2544
E-mail: tyler@meadefirm.com
*Attorney for Plaintiff*


/s/ Michael Reiser
Michael J. Reiser
REISER LAW, P.C.
1475 N. Broadway, Suite 300
Walnut Creek, CA 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
*Attorney for Plaintiff*

<u>/s/ Matthew Ferguson</u>
Matthew C. Ferguson, # 25687
THE MATTHEW C. FERGUSON LAW FIRM, P.C.
119 South Spring, Suite 201
Aspen, CO 81611
Telephone: (970) 925-6288
Facsimile:  (970) 925-2273
E-mail: matt@matthewfergusonlaw.com
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 23, 2019, I electronically filed the foregoing **FIRST AMENDED COMPLAINT AND JURY DEMAND and Attached Exhibits** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:


Naomi G. Beer, Esq
Robert Kaplan, Esq.
Philip R. Sellinger, Esq.
Ian S. Marx, Esq.
Todd L. Schleifstein, Esq.
Jaclyn DeMais, Esq.
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Phone: (303) 572-6500
Fax: (303) 572-6540
Emails:
BeerN@gtlaw.com
KaplanR@gtlaw.com
SellingerP@gtlaw.com
MarxI@gtlaw.com
SchleifsteinT@gtlaw.com
demaisj@gtlaw.com

*Attorneys for Defendants*


*/s/ Tyler Meade*

Tyler Meade