

# Hyatt Vacation Club
## Grand Aspen

*Public Offering Statement*



Hyatt Grand Aspen™
205 South Mill Street, Aspen, Colorado 81611 Main.970.920.3204 Fax.970.920.4555
www.hyattaspen.com



# *Table of Contents*

I.   **Hyatt Vacation Club Documents**

   a.  Hyatt Vacation Club Exchange Program Disclosure Guide

   b.  Hyatt Vacation Club Rules and Regulations

   c.  Form Receipt for Timeshare Documents

   d.  Summary of Documents Not Delivered to Purchasers

   e.  Tabular Description of Component Sites

       i.  Accommodations

      ii.  Recreational Facilities


II.  **Grand Aspen Resort Condominium Documents**

   a.  State of Colorado Disclosure Document with Condominium Association Budget

   b.  City of Aspen Disclosure Document

   c.  Declaration of Condominium for G.A. Resort Condominiums

   d.  Condominium Association Articles of Incorporation

   e.  Condominium Association Bylaws

   f.  Condominium Association Rules and Regulations

   g.  Form Special Warranty Deed

   h.  Summary of Soils Report

   i.  Preliminary Condominium Map





# Hyatt Vacation Club Documents

- Hyatt Vacation Club Exchange Program Disclosure Guide
- Hyatt Vacation Club Rules and Regulations
- Form Receipt for Timeshare Documents
- Summary of Documents Not Delivered to Purchasers
- Tabular Description of Component Sites
  - Accommodations
  - Recreational Facilities



**Hyatt Grand Aspen™**
205 South Mill Street, Aspen, Colorado 81611 Main.970.920.3204 Fax.970.920.4555
www.hyattaspen.com



# Hyatt Vacation Ownership, Inc.

## Statement of Key Operating
## Exchange Statistics
### Year Ended December 31, 2002

# Hyatt Vacation Ownership, Inc.

### Contents

**Independent Auditors' Report**                                     3

**Statistical Report**
    Statement of key operating exchange statistics            4
    Notes to statement of key operating exchange statistics   5 – 7



**GALLOGLY, FERNANDEZ & RILEY, LLP**

*Accountants & Consultants*

## Independent Auditors' Report

To the Board of Directors of
Hyatt Vacation Ownership, Inc.

We have examined the accompanying Statement of Key Operating Exchange Statistics of Hyatt Vacation Ownership, Inc. for the year ended December 31, 2002. Our examination was made in accordance with standards established by the American Institute of Certified Public Accountants and, accordingly, included such procedures as we considered necessary in the circumstances.

In our opinion, the Statement of Key Operating Exchange Statistics presents the information set forth therein as of and for the year ended December 31, 2002 in accordance with Sections 721.18(q) and (r) of the Florida Vacation Plan and Timesharing Act.

*Gallogly, Fernandez & Riley, LLP*

Certified Public Accountants

April 18, 2003



**BDO SEIDMAN ALLIANCE**

3

# Hyatt Vacation Ownership, Inc.

## Statement of Key Operating Exchange Statistics

| Year ended December 31, | 2002 |
|---|---|
| **Item** | **Amount** |
| The number of purchasers (members) currently enrolled in the exchange program | **11,360** |
| The number of time-share properties, accommodations or other facilities eligible to participate in the exchange program | **8** |
| The percentage of confirmed exchanges for the year (see note below) | **100%** |
| The number of time-share unit-weeks for which the Company has an outstanding obligation to provide an exchange to a purchaser who relinquished a time-share period during the current year (2002) in exchange for a time-share period in a future year | **28** |
| The number of exchanges confirmed by the exchange program during the year | **8,826** |

*The percentage stated above is a summary of the properly applied for exchange requests entered for available inventory with the exchange program in the period reported. The percentage does not indicate a purchaser's probability of being confirmed to any specific choice or range of choices since availability at individual locations may vary.*

*See accompanying notes.*

**4**

# Hyatt Vacation Ownership, Inc.

## Notes to Statement of Key Operating Exchange Statistics

1. **Summary of Significant Accounting Policies**

   The accompanying Statement of Key Operating Exchange Statistics of Hyatt Vacation Ownership, Inc. (the "Company") includes the exchange statistics of the Hyatt Vacation Club (the "Club") for the year ended December 31, 2002. The statistics reflected in the Statement of Key Operating Exchange Statistics have been computed and are being disclosed in accordance with Sections 721.18 (q) and (r) of the Florida Vacation Plan and Timesharing Act.

2. **Description of Company**

   The Company is a Delaware Corporation and operates as an exchange company pursuant to Section 721.18, Florida Statutes. The purpose of the Company is to offer exchange and reservation services and related vacation and travel benefits to purchasers of timeshare units at component resorts which become affiliated with the Club from time to time. At the present time, there are eight component resorts that are members of the Club.

3. **Memberships**

   Individual memberships and participation in the Club's exchange program are dependent upon the component resort maintaining a resort agreement with the Club and the member maintaining ownership at their Club resort. Club resorts are required to pay Club dues, which are assessed and included as a common expense of the resort.

4. **Membership Exchange Request**

   Reservation and exchange requests are made by submitting the request in writing or by telephone. The ability to confirm a reservation is dependent upon availability of the desired reservation, and there is no guarantee other than a Home Resort Preference Period reservation that a particular reservation request can be fulfilled. In addition, the member must be considered an active participant. An active participant is a participant whose home resort is available to participate in the program, is current with all monetary or other obligations to the home resort and who has paid the appropriate exchange fee, if any.

5

# Hyatt Vacation Ownership, Inc.

## Notes to Statement of Key Operating Exchange Statistics

Club members may only reserve time-share interests that occur during their reservation window each year. The reservation window shall mean the annually recurring 18-month period beginning one year prior to the first day of use of a Club member's time-share interest. The reservation window consists of the Home Resort Preference Period, followed by the Club Use Period, followed by the Limited Club Use Period.

The Home Resort Preference Period for a Club member's time-share interest during each reservation window begins one year prior to the first day of use of his time-share interest and lasts until the earlier of the Club member's voluntary decision to relinquish his Home Resort Preference Period rights or six months. (The Home Resort Preference Period for floating weeks at Hyatt Mountain Lodge begins on September 1st and ends on December 31st of the calendar year prior to the year of use of a Floating Week.) During the Home Resort Preference Period, a Club member may exercise his priority right to reserve the use of his time-share interest without competing with other Club members for such reservation.

The Club Use Period begins immediately upon the expiration of the Home Resort Preference Period and lasts through the first day of use of the Club member's time-share interest. (The Club Use Period for floating weeks at Hyatt Mountain Lodge begins on January 1st of the current calendar year and ends on the day prior to the first day of Week 46 in the current calendar year.) At the beginning of the Club Use Period, Club members who have failed or elected not to reserve their own time-share interest during the Home Resort Preference Period will automatically be assigned Club points that will be deposited into the Club point account. During the Club Use Period, a Club member must compete with other Club members on a first come, first served basis for a reservation for his time-share interest or any other available time-share interest.

6

# Hyatt Vacation Ownership, Inc.

## Notes to Statement of Key Operating Exchange Statistics

The Limited Club Use Period begins on the first day of use of the Club member's time-share interest and lasts for six months. During the Limited Club Use Period, a Club member may only use his Club points to reserve available Club accommodations within 60 days of the desired time-share interest. Cancellation of confirmed reservations may be made at any time up to the day before check-in.

If the Club member fails to use all or a portion of his Club points by the end of the Limited Club Use Period, the Club member's Club points will expire, and the Club member will have no remaining use rights in the Club for that year's reservation window, except for extended external exchange opportunities.

In order to increase the range of options available to Club members, the Company has arranged for an external exchange program. This program currently consists exclusively of an exchange agreement with Interval International, Inc. ("Interval"), an external exchange company, under which the Company is a "corporate member" on behalf of all Club members. The exchange agreement between Interval and the Company allows Club members to exchange to resorts that participate in the interval exchange network. The exchange agreement terminates December 31, 2007. Specific external exchange privileges for the component sites are governed by the Hyatt Vacation Club Rules and Regulations.

# HYATT VACATION CLUB

## RULES AND REGULATIONS

Each Club Member of the Hyatt Vacation Club shall be governed by and shall comply with the terms and conditions of these Hyatt Vacation Club Rules and Regulations, as amended from time to time.

## I. DEFINITIONS

The following definitions of terms used in these Rules and Regulations shall prevail unless the context requires a different meaning:

**Affiliate Resort** shall mean a resort for which HVOI has determined that membership in the Club should be made available on a voluntary basis to owners of Timeshare Interests at such resort in accordance with terms and conditions determined by HVOI in its sole discretion.

**Biennial Timeshare Interest** shall mean a Timeshare Interest concerning which the Club Member is only entitled to access the Member's Home Resort Preference Period every other calendar year.

**Borrowing** shall mean the act of a Club Member in using a portion of the Member's Club Points from the succeeding Reservation Window in a given Reservation Window.

**Club** shall mean the Hyatt Vacation Club, which is the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed through HVOI. The services to be provided by HVOI include the operation of the reservation system, through which Club Members from Club Resorts exchange and reserve the use of the accommodations at a Club Resort pursuant to the priorities, restrictions and limitations set forth in the Club Documents. The Hyatt Vacation Club is not a legal entity or association of any kind.

**Club Benefits Program** shall mean the vacation and travel benefits programs created by HVOI and made available to Club Members from time to time.

**Club Documents** shall mean only those instruments governing the use and operation of the Club, including, but not limited to, the Rules and Regulations, which are promulgated, executed or amended by HVOI from time to time.

**Club Dues** shall include the costs and expenses of the Club that are chargeable to each Club Member or Component Resort each calendar year.

**Club Member** or **Member** shall mean the owner of record of a Timeshare Interest at any Component Resort, or an owner of record of a Timeshare Interest at an Affiliate Resort who has complied with all of the terms and conditions for membership in the Club as determined by HVOI for that Affiliate Resort.

**Club Point** shall mean the symbolic unit of use comparison assigned to a Club Member's Timeshare Interest by HVOI which enables the Member to access Club services and benefits. Each Club Member shall annually be assigned an allocation of Club Points to represent the use rights in each Week or Split Week which is related to that Member's Timeshare Interest. Club Points include both Fixed Club Points and Floating Club Points. Fixed Club Points are not assigned until and unless the Member voluntarily or involuntarily enters the Club Use Period.

**Club Point Account** shall mean the record of the number of Club Points available for use by a Club Member during each Reservation Window.

**Club Point Chart** shall mean the table of Club Points required to reserve the use of a given Week or Split Week of a particular unit type during the Home Resort Preference Period (Float), the Club Use Period or the Limited Club Use Period. The Club Point Chart is amended by HVOI from time to time.

**Club Priority Period** shall mean the 60-day period immediately preceding the first day of use of a given Week, during which Club Members have only limited rights to reserve the related Unit within the Club in accordance with these Rules and Regulations.

**Club Resort** shall mean both Component Resorts and Affiliate Resorts, to the extent that owners of Timeshare Interests at such Affiliate Resorts have become Club Members. The existing Club Resorts are Hyatt Sunset Harbor, located in Key West, Florida; Hyatt Beach House, located in Key West, Florida; Hyatt Windward Pointe, located in Key West, Florida; Hyatt Coconut Plantation, located in Bonita Springs, Florida; Hyatt Mountain Lodge, located in Beaver Creek Subdivision, Avon, Colorado; Hyatt Hacienda del Mar, located in Vega Alta, Puerto Rico; Hyatt High Sierra Lodge, located in Incline Village, Nevada; Hyatt Main Street Station, located in Breckenridge, Colorado; Hyatt Pinon Pointe, located in Sedona, Arizona; and The Highlands Inn, a Hyatt Vacation Club resort, located in Carmel Highlands, California; and Hyatt Grand Aspen located in Aspen, Colorado.

**Club Use Period** shall mean both the Club Use Period (Fixed) and the Club Use Period (Float). During any overlap between the Club Use Period (Fixed) and the Club Use Period (Float), a Club Member may use Fixed Club Points and Floating Club Points on a first-in, first-out basis to reserve any available Week or Split Week within the Club.

**Club Use Period (Fixed)** shall mean the 6-month period beginning on the day after the expiration of the Home Resort Preference Period (Fixed) and ending on the day before the first day of use of a given Fixed Week. During the Club Use Period (Fixed), Club Members must compete on a first come, first served basis to reserve the use of any available Week within the Club.

**Club Use Period (Float)** shall mean the period beginning on the day after the expiration of the Home Resort Preference Period (Float) and ending on the day prior to the first day of use of the last Floating Week or the Week containing the last Floating Split Week in a given season. During the Club Use Period (Float), Club Members must compete on a first come, first served basis to reserve the use of any available Week within the Club. The Club Use Period (Float) at Hyatt Mountain Lodge and Hyatt Main Street Station begins on January 1st of the current calendar year and ends on the day prior to the first day of Week 46 in the current calendar year.

**Component Resort** shall mean a resort which has become affiliated with the Club from time to time pursuant to a Resort Agreement or otherwise, and for which membership in the Club is an appurtenance of ownership of a Timeshare Interest.

**Component Resort Operating Budget** shall mean the budget that accounts for the estimated annual common expenses and reserves of a given Component Resort, including Club Dues chargeable to that Component Resort.

**External Exchange Company** shall mean any company that provides services to the Club and to Club Members under an External Exchange Program.

**Extended External Exchange Period** shall mean the period beginning on the day of a Club Member's notification to the Club of the Member's intention to extend the Member's opportunity to make an external exchange request beyond the end of the External Exchange Period (by timely dedicating only Fixed Club Points) and ending twenty-four (24) months after the end of the External Exchange Period.

**External Exchange Period** shall mean the portion of a Reservation Window which begins at the beginning of the Home Resort Preference Period and ends at the end of the Club Use Period.

**External Exchange Program** shall mean the contractual arrangement between HVOI and an External Exchange Company or Companies under which Club Members may reserve, under certain conditions, the use of accommodations in resorts other than Club Resorts.

**Fixed Club Points** are used to reserve the use of an available Week or Split Week during the Club Use Period (Fixed) or the Limited Club Use Period (Fixed). Fixed Club Points expire at the end of the Limited Club Use Period (Fixed) unless the Club Member has timely dedicated them to the Extended External Exchange Period, during which the dedicated Club Points may only be used to effect an external exchange.

**Fixed Week** shall mean a Week within a specific Unit, the exclusive use and occupancy of which is reserved to a particular Club Member during the Home Resort Preference Period (Fixed), subject to these Rules and Regulations. A Fixed Week must be deeded directly to a Club Member (as is the case at Hyatt Sunset Harbor, Hyatt Beach House, Hyatt Windward Pointe, Hyatt Coconut Plantation, Hyatt Hacienda del Mar and Hyatt High Sierra Lodge) or the use of such Fixed Week must be conveyed to the Member as a part of the Member's Timeshare Interest (as is the case at Hyatt Mountain Lodge, Hyatt Main Street Station, Hyatt Pinon Pointe, and The Highlands Inn, a Hyatt Vacation Club resort). The Fixed Weeks at Hyatt Sunset Harbor, Hyatt Beach House, Hyatt Windward Pointe, Hyatt Coconut Plantation, Hyatt Hacienda del Mar, The Highlands Inn, a Hyatt Vacation Club resort, Hyatt Pinon Pointe, and Hyatt High Sierra Lodge are Weeks 1 through 52, inclusive. The Fixed Weeks at Hyatt Mountain Lodge and Hyatt Main Street Station are Weeks 1 through 14, inclusive, and Weeks 47 through 52, inclusive. The Fixed Weeks at Hyatt Grand Aspen will be determined at the time of sale and will generally consist of a total of twenty (20) high demand weeks in the winter and summer months (one fixed week for each 1/20th timeshare interest sold).

**Floating Club Points** are used to reserve the use of an available Week or Split Week in the Club Member's unit type during the Home Resort Preference Period (Float), or an available Week or Split Week in any available unit type during the Club Use Period (Float) or the Limited Club Use Period (Float). Floating Club Points expire at the end of the Limited Club Use Period (Float).

**Floating Split Week** shall mean a Split Week which is reserved during the Home Resort Preference Period (Float). Except the Floating Split Weeks purchased by Club Members as part of their Timeshare Interests, the Club reserves the right to limit the reservation of Split Weeks in the best interests of Club Members as a whole. The Club's discretionary right to limit or prohibit the reservation of Split Weeks shall not include any right to limit or prohibit the right to reserve those Floating Split Weeks that were purchased as part of a Club Member's Timeshare Interest.

**Floating Week** shall mean a Week within a specific unit type, the exclusive use and occupancy of which may be reserved by participating Club Members on a first come, first served basis during the Home Resort Preference Period (Float), subject to these Rules and Regulations. The right to reserve a Floating Week must be assigned to a Club Member as a part of the Member's Timeshare Interest. Currently only Hyatt Mountain Lodge, Hyatt Main Street Station and Hyatt Grand Aspen have Floating Weeks. The Floating Weeks at Hyatt Mountain Lodge and Hyatt Main Street Station are Weeks 15 through 46, inclusive.

**Guest Certificate** shall mean the certificate issued by HVOI confirming that a Club Member has reserved a Unit in the name of a friend or guest.

**Home Resort** shall mean the Club Resort in which a Club Member's Timeshare Interest is located.

**Home Resort Preference Period** shall mean both the Home Resort Preference Period (Fixed) and the Home Resort Preference Period (Float).

**Home Resort Preference Period (Fixed)** shall mean the period beginning one year prior to the first day of use of a Fixed Week and lasting six months, during which the Club Member owning such Fixed Week, or conveyed such Fixed Week as part of the Member's Timeshare Interest, shall have the exclusive right to reserve the use and occupancy of the Fixed Week or, if permitted by the Club, a Split Week contained therein.

Home Resort Preference Period (Float) shall mean the period during which a Club Member who is assigned the right to reserve the use and occupancy of an available Floating Week or Floating Split Week on a first come, first served basis as part of the Member's Timeshare Interest is permitted to make such reservation. Except as otherwise provided, the Home Resort Preference Period (Float) begins one year prior to the first day of use of a Floating Week or the Week containing a Floating Split Week and lasts six months. The Home Resort Preference Period (Float) at Hyatt Mountain Lodge and Hyatt Main Street Station begins on September 1st and ends on December 31st of the calendar year prior to the year of use of a Floating Week. A Club Member who owns a Timeshare Interest at Hyatt Grand Aspen, Hyatt Mountain Lodge, and/or Hyatt Main Street Station may reserve one whole Floating Week and one Floating Split Week during the Home Resort Preference Period (Float); however, the Member may only reserve within the Member's same Unit type during the Home Resort Preference Period (Float), and the whole Floating Week reserved by the Member during the Home Resort Preference Period (Float) may not be reserved in Mountain Season [see the Club Point Chart].

HVOI shall mean Hyatt Vacation Ownership, Inc., a Delaware corporation. HVOI is an exchange company registered pursuant to applicable law for the purpose of offering exchange and reservation services and related vacation and travel benefits to Club Members at Club Resorts.

Hyatt Gold Passport Points shall mean the symbolic unit of use comparison that enables a Club Member to access the Hyatt Gold Passport Program in accordance with the Hyatt Gold Passport Terms and Conditions Handbook.

Hyatt Gold Passport Program shall mean the vacation and travel benefits program created by the Hyatt Corporation, as more particularly described in the Hyatt Gold Passport Terms and Conditions Handbook, a current copy of which will be made available to Club Members.

Limited Club Use Period shall mean both the Limited Club Use Period (Fixed) and the Limited Club Use Period (Float). During any overlap between the Limited Club Use Period (Fixed) and the Limited Club Use Period (Float), a Club Member may use any Fixed Club Points and Floating Club Points which remain in the Member's Club Point Account to reserve any available Week or Split Week within 60 days prior to the first day of use of the desired Week or Split Week.

Limited Club Use Period (Fixed) shall mean the 6-month period beginning on the day after the expiration of the Club Use Period (Fixed), during which the Club Member has only limited rights to use Club Points to make a reservation through the Club within 60 days prior to the first day of use of an available Week or Split Week.

Limited Club Use Period (Float) shall mean the 6-month period beginning on the day after the expiration of the Club Use Period (Float), during which the Club Member has only limited rights to use Club Points to make a reservation through the Club within 60 days prior to the first day of use of an available Week or Split Week.

Lock-off Unit shall mean a Unit which may be temporarily divided into separate portions capable of being reserved as separate accommodations. Unless specifically noted otherwise, Lock-off Units shall be treated as Units.

Managing Entity shall mean the condominium or owners' association, management company or other entity responsible for operating and maintaining each Club Resort.

Principal Address shall mean the address of the first individual listed as an owner of record on the purchase contract for a Timeshare Interest owned by multiple owners, unless the owners of such Timeshare Interest deliver to Reservation Services a written notice executed by each owner of such Timeshare Interest designating another address as the Principal Address.

      **Principal Contact** shall mean the individual designated by a business entity owning a Timeshare Interest to represent them in dealing with Reservation Services.

      **Request List** shall mean the waiting list for Club Members who wish to make a reservation for use of a Week or Split Week in advance of the Club Use Period related to such Week or Split Week.

      **Reservation Services** shall mean the division of HVOI that handles and processes reservation requests and other Club Member services from time to time.

      **Reservation Window** for Fixed Weeks shall mean the annually recurring 18-month period beginning one year prior to the first day of use of the Fixed Week. Except as otherwise provided, the **Reservation Window** for Floating Weeks or Floating Split Weeks shall mean the annually recurring 18-month period beginning one year prior to the first day of use of a Floating Week or the Week containing a Floating Split Week. **Reservation Window** for Floating Weeks at Hyatt Mountain Lodge and Hyatt Main Street Station shall mean the annually recurring period beginning on September 1st of the previous year and ending 6 months after the first day of use of Week 46. The Reservation Window consists of the Home Resort Preference Period, followed by the Club Use Period, followed by the Limited Club Use Period.

      **Resort Agreement** shall mean a Hyatt Vacation Club Resort Agreement. A Resort Agreement is the contract among HVOI and the developer and/or the Managing Entity of a resort under which the accommodations and facilities of that resort are included as a part of the Hyatt Vacation Club, and such resort becomes a Component Resort.

      **Resort Documents** shall mean all of the documents, by whatever names denominated, and any amendments thereto, which create and govern the rights and relationships of the Club Members who own Timeshare Interests in a given Club Resort and which govern the use and operation of that Club Resort, exclusive of the Club Documents.

      **Rules and Regulations** shall mean these Hyatt Vacation Club Rules and Regulations governing the reservation and use of Club accommodations and facilities, which rules and regulations have been promulgated, adopted and/or amended from time to time by HVOI in its sole discretion. In this regard, HVOI will use its best efforts, in good faith and based upon all reasonably available evidence under the circumstances to further the best interests of the Club Members as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the Club.

      **Special Exchange** shall mean a reservation for accommodations at non-Club Resorts made through the Special Exchange Program.

      **Special Exchange Program** shall mean the exchange agreement between HVOI and any entity other than an External Exchange Company pursuant to which Club Members access selected non-Club Resorts.

      **Split Week** shall mean, unless specifically provided otherwise, a Week, the use of which is divided into periods of two consecutive days, three consecutive days, or four consecutive days as set forth in Section 4.6 of these Club Rules.

      **Timeshare Interest** shall mean the timeshare estate or other real or personal ownership interest in a Club Resort owned by a Club Member.

      **Unit** shall mean an accommodation of a Club Resort which is subject to ownership by one or more persons pursuant to the Resort Documents. Each Unit shall have such appurtenances as are more specifically described in the Resort Documents for the Club Resort.

      **Wait List** shall mean the waiting list for Club Members who wish to make a reservation for use of a currently unavailable Week or Split Week within the Club Use Period related to such Week or Split Week.

Week shall mean a period of seven consecutive days during which a Unit may be used pursuant to the Resort Documents for a Club Resort.

## II. OPERATION OF THE CLUB

2.1 Membership.   To participate in the Club, each Club Member must purchase a Timeshare Interest in a Club Resort.  Membership in the Club is an appurtenance to each Timeshare Interest at a Component Resort as set forth in the Resort Documents.  Upon recording of a deed to a Timeshare Interest at a Component Resort (or filing for recording in the case of Hyatt Hacienda del Mar) and fulfillment of the obligations set forth in Section 6.6 hereof, if applicable, the Club Member is entitled to enjoy the benefits of membership in the Club. Membership in the Club is not an appurtenance to Timeshare Interests at Affiliate Resorts.  In order to enjoy the benefits of membership in the Club, the owner of a Timeshare Interest at an Affiliate Resort must voluntarily elect to become a Club Member and comply with all of the terms and conditions for membership in the Club as determined by HVOI for that Affiliate Resort.   Membership in the Club with respect to a specific Timeshare Interest automatically terminates for a given Club Member in the event the Member voluntarily or involuntarily transfers that Timeshare Interest, or in the event the Member's Home Resort ceases to be a Club Resort.  HVOI in its sole discretion may elect to deny Club membership and benefits to a Managing Entity with respect to any maintenance weeks owned by the Managing Entity.  However, so long as any Managing Entity has assigned its rights in maintenance weeks in a Club Resort to the Club, pursuant to the terms of the Resort Agreement, the Club shall periodically assign the use of each Unit in such Club Resort for maintenance purposes to the Association on a "super-priority" basis pursuant to the Club Documents and the Resort Documents during the term of the Resort Agreement.

2.2 Management.  The Club shall be operated and managed by HVOI pursuant to the terms of the Club Documents.  HVOI is expressly authorized to take such actions as it deems necessary or appropriate for the operation of the Club, including, but not limited to, the implementation of all reservation system duties as outlined in these Rules and Regulations.

2.3 Club Dues and Fees.   Costs and expenses incurred by the Club in connection with the operation of the reservation system and the delivery of other Club services and benefits shall constitute common expenses of the Club and shall be charged as Club Dues to individual Club Members or each Club Resort, as more specifically provided in the Resort Documents.  The Managing Entity of each Component Resort shall have the responsibility for promulgating a Component Resort Operating Budget each calendar year in the manner required by applicable law, which budget shall include the Component Resort's share of the Club Dues as charged by HVOI in accordance with the Resort Documents.  Costs and expenses incurred by the Club which are uniform among all Component Resorts shall be charged as Club Dues to individual Club Members or each Component Resort, as more specifically provided for in the Resort Documents, by the Club based upon a reasonably prorated formula, together with a reasonable profit factor; however, costs and expenses specially or disproportionately incurred by the Club with respect to a given Component Resort or Resorts may be charged, with a reasonable profit factor, by the Club only to the affected Resort or Resorts (or Members in such Resort or Resorts) as a portion of their Club Dues.  All Club Dues owed to HVOI from an Association (either as a common expense of the Component Resort timeshare plan or as a result of its capacity as collection agent for the individual Owners) shall be charged by the managing entity of that Component Resort to the Owners annually, together with the common expenses of the Component Resort; shall be remitted to HVOI by the managing entity as collected; and in any event, shall be paid in full to HVOI by the managing entity no later than March 1st each year.

For those Component Resorts in which Club Dues are charged directly to Club Members, the Club Dues are a common expense of the Club.  Pursuant to the Resort Documents for such Component Resorts, the Association is obligated to collect and remit to HVOI the total amount of Club Dues which are charged against such Owners.  Only Club Dues which cannot be collected from individual Owners by the Managing Entity of that Component Resort are deemed by the Resort Documents for such Component Resort to be a common expense of the Component Resort timeshare plan.  For those Component Resorts in which Club Dues are charged directly to each Component Resort, the Club Dues shall be a common expense of that Component Resort.  For any Component Resort, a Club Member's

failure to pay the Member's share of the Club Dues shall not relieve the Managing Entity of that Component Resort from its obligation to pay the entire amount of the Club Dues to HVOI. All Club Dues owed to HVOI from a Component Resort shall be assessed by the Managing Entity of that Component Resort to the Owners annually together with other common expenses of that Component Resort; shall be remitted to HVOI by the Managing Entity as collected; and, in any event, shall be paid in full to HVOI by the managing entity by the date required in the Club Resort Agreement for that Component Resort. Club Members who own Timeshare Interests at Affiliate Resorts are charged Club Dues directly by HVOI or through the Managing Entity of the Affiliate Resort, depending upon the terms and conditions pursuant to which the Affiliate Resort became affiliated with the Club. Club Dues charged against Club Members who own Timeshare Interests at Affiliate Resorts shall also be paid in full to HVOI no later than March 1st of each year. A Club Member who owns a Biennial Timeshare Interest shall be responsible for one full annual Club Dues expense every calendar year regardless of the manner in which such Member is obligated to pay maintenance fees, taxes and other assessments pursuant to the documents governing the Member's Home Resort. Use of Club Points may be restricted by HVOI if the Club Member is not current in the payment of the Member's Home Resort maintenance fees and taxes, all applicable Club Dues, or Timeshare Interest mortgage payments. Except as otherwise provided in the Resort Documents, a Club Member who uses the Club to make a reservation -- other than a reservation for a Week during the applicable Home Resort Preference Period -- shall be liable for any transaction fees charged by HVOI from time to time. Unless provided otherwise in the Resort Documents, a Club Member who reserves a Unit in the name of a friend or guest shall also be liable for any Guest Certificate processing fee charged by HVOI from time to time.

## III. CLUB POINTS

3.1 Assignment of Club Points.

a. Fixed Club Points. For administrative convenience in the operation of the Club and in the determination of the respective rights of Club Members to enjoy the benefits of membership in the Club, each Member will receive an assigned number of Fixed Club Points representing the reservation power of the Member's Fixed Week in relation to the other Weeks currently existing in the Club in the event one of the following occurs: (i) the Member does not timely exercise the Member's Home Resort Preference Period (Fixed) rights during a given Reservation Window; (ii) the Member only exercises the Member's Home Resort Preference Period (Fixed) rights with respect to a portion of a Lock-off Unit; (iii) when permitted by the Club, the Member only exercises the Member's Home Resort Preference Period (Fixed) rights with respect to a Split Week; or (iv) the Member voluntarily elects to access the Club reservation system during the Home Resort Preference Period (Fixed) to reserve a Week at the same or another Club Resort, to make an exchange through the External Exchange Program or Special Exchange Program, to access the Club Benefits Program, or to access the Hyatt Gold Passport Program.

If a Club Member does not timely exercise the Member's Home Resort Preference Period (Fixed) rights, HVOI will assign and automatically deposit Fixed Club Points into the Member's Club Point Account on the earlier of the date the Club Use Period begins or the date the Member voluntarily elects to access the Club's reservation system. If the Club Member only exercises the Member's Home Resort Preference Period (Fixed) rights with respect to a portion of a Lock-off Unit or to a Split Week, the Member will automatically be assigned Fixed Club Points representing the reservation power of the unreserved portion of the Lock-off Unit or the remaining Split Week portion of the Member's Fixed Week. Club Members who own Biennial Timeshare Interests are only entitled to access the Member's Home Resort Preference Period (Fixed) every other calendar year.

**The number of Club Points assigned to represent the reservation power of a Club Member's Fixed Week is based upon such factors as relative Member demand for use of the respective Club Resorts, seasonality, and Unit type. HVOI reserves the right to reasonably revise these Club Point assignments from time to time without Club Member consent in the best interests of Members as a whole.**

b. Floating Club Points. Each Club Member who has the right to reserve a Floating Week or Floating Split Week shall annually be assigned, at the start of the Home Resort Preference Period (Float), an allocation of Floating Club Points to represent the reservation power of the Member's access to the Floating

Weeks or Floating Split Weeks at the Member's Home Resort. **The number of Floating Club Points assigned to represent the reservation power of a Club Member's access to the Floating Weeks or Floating Split Weeks at the Member's Home Resort is based upon such factors as relative Member demand for use of the respective Club Resorts, seasonality, and Unit type. HVOI reserves the right to reasonably revise these Club Point assignments from time to time without Club Member consent in the best interests of Members as a whole.**

        c.   Week 53. In those calendar years when Week 53 occurs, as defined in the Resort Documents for each Club Resort, Week 53 may be reserved for use by the person to whom such use is assigned pursuant to the Resort Documents; however, Week 53 may not be deposited with the Club, and no Club Points will be assigned to Week 53.

        3.2  Club Point Chart. The number of Club Points required to reserve the use of a given Week or Split Week within the Club during the Home Resort Preference Period (Float), the Club Use Period or the Limited Club Use Period is set forth in the Club Point Chart. **The number of Club Points required to reserve the use of a given Week or Split Week within the Club is based upon such factors as relative Club Member demand for use of the respective Club Resorts, seasonality, and Unit type. HVOI reserves the right to reasonably revise the number of Club Points required to reserve the use of the various Weeks and Split Weeks within the Club, from time to time, without Club Member consent in the best interests of Members as a whole. Pursuant to this reserved right, HVOI has the right to change the makeup of the existing seasons set forth in the Club Point Chart or create additional seasons to be set forth in a revised Club Point Chart in response to anticipated Club Member demand for a particular Club Resort, Unit type, or Week.** A Club Member who owns a Timeshare Interest at Hyatt Mountain Lodge or Hyatt Main Street Station shall have the right to reserve one whole Floating Week and one Floating Split Week during the Home Resort Preference Period (Float); however, the Member may only reserve within the Member's Unit type during the Home Resort Preference Period (Float), and the whole Floating Week reserved by the Member during the Home Resort Preference Period (Float) may not be reserved in Mountain Season [see the Club Point Chart].

        3.3  Use of Club Points. Club Members may use Club Points to reserve available Weeks or Split Weeks at Club Resorts, to arrange for an external exchange, to arrange for a Special Exchange, or to access the Club Benefits Program. Club Points are valid for immediate use as soon as the Club Points are assigned to the Club Member. **In the event that a Club Member fails to use any or all of the Member's Club Points during a given Reservation Window, the Club Points expire and the Member may not use that Reservation Window's Club Points during succeeding Reservation Windows.** Club Points assigned to the Club Member will be allocated for reservation purposes in the order that they are assigned to the Club Member, subject to the restrictions contained in these Rules and Regulations.

        3.4  Additional Club Points. If a Club Member does not have sufficient Club Points to make a desired reservation or acquire desired Club benefits during a given Reservation Window, the Member can Borrow Club Points from the succeeding Reservation Window as set forth below or, if available, the Member may purchase an additional Timeshare Interest to supplement the Member's total Club Points. Club Members will not be able to rent Club Points for one-time use from the developer of any Club Resort or from HVOI. The assignment or transfer by one Club Member of the use of the Member's Club Points to another Member is prohibited.

        3.5  Borrowing Club Points. A Club Member may Borrow all or a portion of the Member's Club Points from the succeeding Reservation Window for use in connection with the current Reservation Window, but only to reserve an available Week or Split Week within sixty (60) days prior to the first day of use of the desired Week or Split Week. The Borrowing of Club Points is also subject to the following restrictions:

        a.   A Club Member may not Borrow Club Points to make a reservation through the External Exchange Program or any Special Exchange Program.

        b.   Failure of a Club Member to use any Borrowed Club Points during a given Reservation Window will not result in the expiration of those Club Points; the unused Borrowed Club Points will carry over for use in the Reservation Window from which they were originally Borrowed.

c.      If a Club Member intends to Borrow all or a portion of the Club Points from the Member's next Reservation Window, the Member must first pay the total estimated Home Resort maintenance fees and taxes for the following Reservation Window in accordance with the Club Member's Resort Agreement, which will escrow such estimated fees and taxes for the benefit of the Home Resort Managing Entity or the Member in accordance with applicable law.

d.      HVOI reserves the right to prohibit a Club Member from Borrowing Club Points during the first two (2) years of the term of any purchase-money financing related to the Member's Timeshare Interest.

e.      A Club Member also will not be permitted to Borrow Club Points during a given Reservation Window if the Member is delinquent in the payment of the Member's Club Dues, Home Resort maintenance fees and taxes, or purchase-money note payments.

f.      HVOI reserves the right, in its sole discretion, to suspend Borrowing activity at any time, and from time to time, if HVOI, in its reasonable business judgment, determines that such suspension will result in an improvement in the quality and operation of the Club and will further the collective enjoyment of the use of the Club by present and future Club Members as a whole.

g.      A Club Member who owns a Biennial Timeshare Interest may not Borrow Club Points with respect to that Biennial Timeshare Interest.

3.6  Use of Remaining Club Points.  After a Club Member has used a portion of the Member's Club Points during a given Reservation Window, the balance of the Member's Club Points will remain in the Member's Club Point Account for the Member's use in reserving additional Weeks or Split Weeks or other Club benefits during that Reservation Window.  **Such balance will remain in the Club Point Account only until the end of the Limited Club Use Period pertaining to those particular Club Points, at which time any unused Club Points will expire unless the Club Member has timely dedicated any Fixed Club Points to the Extended External Exchange Period, during which such dedicated Fixed Club Points may only be used to effect an external exchange.**

## IV.  RESERVATION PROCEDURES AND PRIORITIES

4.1  Making a Reservation.  To reserve a Week or Split Week -- other than the Fixed Week related to a Club Member's Timeshare Interest during the Home Resort Preference Period (Fixed) -- a Member must determine if the Member has the necessary Club Points to reserve the desired Week or Split Week.  To determine the number of Club Points necessary to make a reservation, the Club Member may either call Reservation Services for reservation assistance or utilize the annual Club Point Chart provided to each Member.  Once the Club Member has determined that the Member has a sufficient number of Club Points to make the desired reservation, the Member must submit a reservation request to Reservation Services in writing or by telephone.  A reservation request will only be accepted by HVOI if the Club Member has paid all Home Resort maintenance fees, Club Dues, and ad valorem taxes.  In the event the Home Resort Managing Entity has not yet billed such maintenance fees, Club Dues, and ad valorem taxes, as a condition to acceptance by HVOI of the reservation request, the Club Member shall be required to remit in accordance with the Club Member's Resort Agreement, an amount equal to the estimated maintenance fees, Club Dues and ad valorem taxes which ultimately will become due, as determined by HVOI in its sole discretion after consultation with the Home Resort Managing Entity.  All such monies shall be held in escrow for the benefit of the Home Resort Managing Entity or the Club Member as required by applicable law and in accordance with the Club Member's Resort Agreement.  Any interest earned on such escrowed funds will be paid to the Home Resort Managing Entity and in no event will be due or payable to the Club Member.  In the event the amount remitted for the estimated maintenance fees, Club Dues and ad valorem taxes is in excess of the maintenance fees, Club Dues and ad valorem taxes actually billed, the excess amount shall be returned to the Club Member or applied to the Club Member's following year's maintenance fees and ad valorem taxes, in accordance with the Club Member's Resort Agreement.  In the event the amount remitted is less than the maintenance fees, Club

Dues and ad valorem taxes actually billed, the Club Member shall remain liable for the deficiency and in no event shall be forgiven for said deficiency.

4.2 Reservation Request Priorities.

    a.    Use of Club Points. If a Club Member desires to use the Member's Club Points to reserve a Week or Split Week -- other than the reservation of a Floating Week or Floating Split Week during the Home Resort Preference Period (Float) -- such Week or Split Week must be available during the Club Use Period or the Limited Club Use Period.

**With the exception of the priority rights the Club Member has with respect to reserving the Club Member's Fixed Week during the Home Resort Preference Period (Fixed), reservation requests for Weeks and Split Weeks will be taken on a first come, first served basis.**

If the requested Week or Split Week is available, Reservation Services will confirm the reservation. During the Home Resort Preference Period (Float), Club Members who have the right to reserve a Floating Week or Floating Split Week at their Home Resort may exercise an exclusive priority right to reserve the use of any available Floating Week or Floating Split Week in their unit type at their Home Resort on a first come, first served basis. **With the exception of the priority rights the Club Member has with respect to reserving the Club Member's Fixed Week during the Home Resort Preference Period (Fixed), HVOI cannot ensure confirmation of a reservation of any specific Week or Split Week at any specific Club Resort at any time since availability will vary. The earlier a reservation request is submitted, the better the chance that a reservation confirmation can be secured.** Club Members are encouraged to submit requests as far in advance as possible in order to obtain the best choice of accommodations.

    b.    Home Resort Preference Period (Fixed). The Home Resort Preference Period (Fixed) for Fixed Weeks during each Reservation Window begins one year prior to the first day of use of the Fixed Week and lasts until the earlier of the Member's voluntary decision to relinquish the Member's Home Resort Preference Period (Fixed) rights or the expiration of six months.

    (1)    During the Home Resort Preference Period (Fixed), a Club Member may exercise a priority right to reserve the use of the Club Member's Fixed Week in the Club Member's Unit without competing with other Members for such reservation.

    (2)    During the Home Resort Preference Period (Fixed), a Club Member owning a Timeshare Interest in a Lock-off Unit may exercise a priority right to reserve the use of either portion of the Lock-off Unit during the Member's Fixed Week. The Club Member will then be deemed to have elected to enter the Club Use Period (Fixed) with respect to the unreserved portion of the Lock-off Unit and will receive Fixed Club Points for the unreserved portion of the Lock-off Unit in accordance with the Club Point Chart.

    (3)    Subject to the discretion of the Club to limit Split Weeks in the best interests of Club Members as a whole, a Club Member may reserve the use of one Split Week portion of the Club Member's Fixed Week during the Home Resort Preference Period (Fixed). The Club Member will then be deemed to have elected to enter the Club Use Period (Fixed) with respect to the unreserved Split Week portion of the Club Member's Fixed Week and will receive Fixed Club Points for the unreserved Split Week portion of the Club Member's Fixed Week in accordance with the Club Point Chart.

    (4)    Upon receiving a confirmation of a Club Member's reservation request for a Fixed Week or Split Week during the Home Resort Preference Period (Fixed), a Member may make use of the Fixed Week or Split Week for personal use, for use by a guest, or for rental purposes.

    (5)    A Club Member relinquishes the Club Member's Home Resort Preference Period (Fixed) rights whenever the Member makes the Club Member's reservation or voluntarily elects to enter the Club Use Period (Fixed) and acquires Club Points to reserve accommodations for a different Week or

Split Week at the Member's Home Resort or at another Club Resort, to access the External Exchange Program, to access the Special Exchange Program, to access the Hyatt Gold Passport Program, or to access the Club Benefits Program.

(6)     A Club Member who requests an external exchange pursuant to the External Exchange Program is not required to enter the Club Use Period (Fixed) and relinquish the Member's Home Resort Preference Period (Fixed) rights unless and until the requested external exchange is confirmed or the expiration of the Member's Home Resort Preference Period (Fixed).

(7)     Once a Club Member has reserved the Club Member's Fixed Week during the Home Resort Preference Period (Fixed), the Member cannot cancel this reservation without relinquishing the Member's Home Resort Preference Period (Fixed) rights and entering the Club Use Period (Fixed). If a Club Member desires to reserve the Member's Fixed Week after such a cancellation, the Member must compete with other Members for such reservation on a first come, first served basis during the Club Use Period (Fixed).

(8)     If a Club Member reserves the Club Member's Fixed Week during the Home Resort Preference Period (Fixed), there will be no assignment of Club Points to the Member's Club Point Account for that Reservation Window.

(9)     If a Club Member Borrows any Club Points from the next Reservation Window, the Member's Home Resort Preference Period rights for the next Reservation Window will automatically be relinquished.

(10)    HVOI reserves the right to affiliate Club Resorts with the Club that have Home Resort Preference Periods of varying lengths.

(11)    There will be a limited number, if any, of Week 7 available at The Highlands Inn, a Hyatt Vacation Club resort, for reservation through the Club since the developer of The Highlands Inn, a Hyatt Vacation Club resort, intends to retain ownership of all or a majority of Timeshare Interest No. 7 with the right of occupancy of Fixed Week 7 for utilization as part of the Masters of Food and Wine event annually held at the adjacent hotel property.

c.     Home Resort Preference Period (Float). The Home Resort Preference Period (Float) for each Floating Week at Hyatt Mountain Lodge and Hyatt Main Street Station begins on September 1st of the calendar year prior to the year of use of such Floating Week and lasts until the earlier of the Club Member's voluntary decision to relinquish the Member's Home Resort Preference Period (Float) rights or December 31st of the calendar year prior to the year of use of such Floating Week.

(1)     During the Home Resort Preference Period (Float), Club Members having the right to reserve a Floating Week or Floating Split Week at their Home Resort may exercise an exclusive priority right to compete with other Club Members having the right to reserve a Floating Week or Floating Split Week at the same Home Resort to reserve the use of available Floating Weeks or Floating Split Weeks on a first come, first served basis, subject to any limitations imposed by the Club Documents or the Resort Documents. A Club Member who owns a Timeshare Interest at Hyatt Mountain Lodge or Hyatt Main Street Station may reserve one whole Floating Week and one Floating Split Week during the Home Resort Preference Period (Float); however, the Member may only reserve within the Member's same Unit type during the Home Resort Preference Period (Float), and the whole Floating Week reserved by the Member during the Home Resort Preference Period (Float) may not be reserved in Mountain Season [see the Club Point Chart].

(2)     During the Home Resort Preference Period (Float), a Club Member owning a Timeshare Interest in a Lock-off Unit and having the right to reserve a Floating Week or Floating Split Week at the Club Member's Home Resort may exercise a priority right to reserve the use of either portion of the Club Member's Lock-off Unit type during a Floating Week or Floating Split Week. The Club Member will then be

deemed to have elected to enter the Club Use Period (Float) with respect to the Club Member's remaining Floating Club Points.

        (3)    Subject to the discretion of the Club to limit Split Weeks in the best interests of Club Members as a whole, a Club Member may reserve the use of a Floating Split Week in the Club Member's Unit type during the Home Resort Preference Period (Float). A Club Member who owns a Timeshare Interest at Hyatt Grand Aspen, Hyatt Mountain Lodge or Hyatt Main Street Station may reserve one whole Floating Week and one Floating Split Week during the Home Resort Preference Period (Float); however, the Member may only reserve within the Member's Unit type during the Home Resort Preference Period (Float), and the whole Floating Week reserved by the Member during the Home Resort Preference Period (Float) may not be reserved in Mountain Season [see the Club Point Chart]. A Club Member who owns a Timeshare Interest at Hyatt Grand Aspen, Hyatt Mountain Lodge or Hyatt Main Street Station may only reserve one Floating Split Week during the Home Resort Preference Period (Float).

        (4)    Upon receiving a confirmation of a Club Member's reservation request for a Floating Week or Floating Split Week during the Home Resort Preference Period (Float), a Member may make use of the Floating Week or Floating Split Week for personal use, for use by a guest, or for rental purposes.

        (5)    A Club Member relinquishes the Club Member's Home Resort Preference Period (Float) rights whenever the Member voluntarily elects to enter the Club Use Period (Float) and reserve accommodations at another Club Resort, to access the External Exchange Program, to access the Special Exchange Program, or to access the Club Benefits Program.

        (6)    A Club Member who requests an external exchange pursuant to the External Exchange Program is not required to enter the Club Use Period (Float) and relinquish the Member's Home Resort Preference Period (Float) rights unless and until the requested external exchange is confirmed.

        (7)    Once a Club Member has reserved a Floating Week or Floating Split Week during the Home Resort Preference Period (Float), the Member cannot cancel this reservation without relinquishing the Member's Home Resort Preference Period (Float) rights and entering the Club Use Period (Float). If a Club Member desires to reserve a Floating Week or Floating Split Week after such a cancellation, the Member must compete with other Members for such reservation on a first come, first served basis.

        (8)    If a Club Member Borrows any Club Points from the next Reservation Window, the Member's Home Resort Preference Period rights for the next Reservation Window will automatically be relinquished.

        (9)    HVOI reserves the right to affiliate Club Resorts with the Club that have Home Resort Preference Periods of varying lengths.

        (10)    During the term of the Resort Agreements for Hyatt Grand Aspen, Hyatt Mountain Lodge and Hyatt Main Street Station, the Managing Entity of Hyatt Grand Aspen, Hyatt Mountain Lodge and Hyatt Main Street Station has a priority right to reserve one Floating Week in each Unit at Hyatt Grand Aspen, Hyatt Mountain Lodge or Hyatt Main Street Station during the Home Resort Preference Period (Float), and up to one additional Week in each Unit at Hyatt Grand Aspen, Hyatt Mountain Lodge or Hyatt Main Street Station during the Club Use Period, for maintenance purposes.

        d.    <u>Club Use Period</u>.  During the Club Use Period, a Club Member must compete with other Members on a first come, first served basis for a reservation for any available Week or Split Week. Club Members will have only limited rights to reserve Weeks or Split Weeks within the Club during the Club Priority Period described below.

        (1)    <u>Club Use Period (Fixed)</u>.  The Club Use Period (Fixed) begins on the day after the expiration of the Home Resort Preference Period (Fixed), or upon earlier relinquishment of the Home

Resort Preference Period (Fixed) rights, and ends on the day before the first day of use of a given Fixed Week. At the beginning of the Club Use Period (Fixed), Club Members who have failed or elected not to reserve their Fixed Weeks will automatically be assigned Fixed Club Points that will be deposited into their Club Point Accounts.

        (2)    <u>Club Use Period (Float)</u>. The Club Use Period (Float) begins on the day after the expiration of the Home Resort Preference Period (Float), or upon earlier relinquishment of the Home Resort Preference Period (Float) rights, and ends on the day before the first day of use of the last Floating Week or the Week containing the last Floating Split Week in a given season. The Club Use Period (Float) at Hyatt Mountain Lodge and Hyatt Main Street Station begins on January 1st of the current calendar year and ends on the day prior to the first day of Week 46 in the current calendar year.

        e.    <u>Club Priority Period</u>. If a reservation request for a given Week has not been received by Reservation Services by the beginning of the Club Priority Period (the 60-day period preceding the first day of use of every Week), Reservation Services' ability to confirm a subsequent reservation request for the Week will be limited by and subject to the following:

        (1)    Any reservations made available by HVOI to the Managing Entity for maintenance purposes; and

        (2)    Any reservation requests made by HVOI for its own purposes including for exchange, promotional use, rental or any other purpose as HVOI determines in its sole discretion.

        f.    <u>Limited Club Use Period</u>. The Limited Club Use Period (Fixed) begins on the first day after the expiration of the Club Use Period (Fixed) and lasts for six months. The Limited Club Use Period (Float) begins on the first day after the expiration of the Club Use Period (Float) and lasts for six months. During a Limited Club Use Period, a Club Member may only use the Member's Club Points to reserve available Weeks or Split Weeks within sixty (60) days prior to the first day of use of an available Week or Split Week.

        g.    <u>Overlap of Fixed and Float Use Periods</u>. During any overlap between the Club Use Period (Fixed) and the Club Use Period (Float), or between the Limited Club Use Period (Fixed) and the Limited Club Use Period (Float), a Club Member may use Fixed Club Points and Floating Club Points which remain in the Member's Club Point Account on a first-in, first-out basis to reserve any available Week or Split Week within the Club.

    4.3  <u>Request Lists and Wait Lists</u>.

        a.    <u>Request Lists</u>. All Club Member requests to reserve a Week or Split Week in advance of the Club Use Period related to the such Week or Split Week will be placed upon a Request List. The Request List will be processed at the beginning of the Club Use Period related to the Week or Split Week requested, and any unconfirmed requests will be placed on a Wait List in case of cancellations. HVOI shall have the discretion to permit Club Members to add their names to a Request List up to eighteen months prior to the first day of use of very highly demanded Weeks or Split Weeks and to administer such Request Lists in any manner that will rotate the availability of such Weeks or Split Weeks among Members as a whole.

        b.    <u>Wait Lists</u>. HVOI may maintain Wait Lists for Club Members who wish to make reservations for currently unavailable Weeks or Split Weeks after the related Request Lists have been processed. Wait List confirmations will be processed as cancellations of confirmed reservations for the Week or Split Week in question are received by the Club, subject to the Club's reservation priority rights during the Club Priority Period.

        c.    <u>Request List and Wait List Restrictions</u>. Use of Request Lists and Wait Lists are also subject to the following restrictions:

(1)     Request List and Wait List requests shall be handled in the order in which they are received and will be confirmed on a first in, first out basis.

(2)     HVOI shall have the right to shorten or extend the Request List and Wait List periods from time to time.

(3)     Club Members do not have to convert their Fixed Weeks to Club Points during the Home Resort Preference Period (Fixed) in order to access a Request or Wait List; however, a Member's Fixed Week will automatically be converted to Club Points upon the issuance of a reservation confirmation by Reservation Services from the Request or Wait List.

(4)     Club Members can access more than one Request List or Wait List at a time.  If any Request List or Wait List reservation is confirmed, the Club Member will be removed from all other pending Request Lists and Wait Lists.

(5)     The Club may limit the size and duration of a particular Request List or Wait List in order to minimize Club Member expectations and maximize satisfaction levels.

4.4  Confirmations; Accommodation Preferences.  A written confirmation will be mailed to each Club Member or Principal Contact by Reservation Services to document each confirmed reservation.  Reservation Services or the Managing Entity will assign a specific accommodation at the time of check-in.   Special accommodation assignments, such as ground level accommodations, cannot be guaranteed, but will be noted as a preference in the reservation.

4.5  Cancellations and No-Shows.  Cancellations of confirmed reservations may be made at any time up to the day before check-in.  Cancellations made more than sixty days prior to check-in will result in unrestricted restoration of the related Club Points to the Club Member's Club Point Account for further use during that Reservation Window, although the Member's related Home Resort Preference Period rights will not be restored.  A Club Member who cancels sixty (60) or fewer days prior to check-in will still be able to use the related restored Club Points to make reservations during that Reservation Window, but only to reserve Weeks or Split Weeks that are available within sixty (60) days after the date the reservation is made.  Borrowed Club Points that were used to make a cancelled reservation will be returned to the succeeding Reservation Window without penalty; however, no refund of advance payment of estimated maintenance fees and taxes will be made.  HVOI may charge a Club Member a cancellation fee to cancel a Home Resort Preference Period reservation; any reservation sixty (60) or fewer days prior to check-in; or any other confirmed reservation as HVOI may determine from time to time.  A Club Member who fails to check in on the first day of the reserved Week or Split Week must notify Reservation Services that he will be arriving late.

4.6  Split Week Options.  Club Members will be permitted to make reservations for two-day, three-day or four-day Split Weeks at Hyatt Sunset Harbor, Hyatt Beach House, Hyatt Hacienda del Mar, Hyatt Mountain Lodge, Hyatt Main Street Station, Hyatt High Sierra Lodge, Hyatt Windward Pointe, Hyatt Coconut Plantation, Hyatt Pinon Pointe, and The Highlands Inn, a Hyatt Vacation Club resort, as permitted by HVOI from time to time to further the best interests of the Members as a whole.  Split Weeks are currently not permitted at other Club Resorts.  A Split Week may only be reserved during the Reservation Window for the Week containing the Split Week.  All reservations for Split Weeks shall be subject to the reservation request priorities for the Week containing the Split Week in question.  HVOI reserves the right in its sole discretion to designate those Weeks in which Split Weeks will be permitted to be reserved from time to time.

The Split Week assignments are as follows:

| Resort ↓ | SPLIT WEEKS → | 2-DAY SPLIT WEEK | | 3-DAY SPLIT WEEK | 4-DAY SPLIT WEEK |
|---|---|---|---|---|---|
| Hyatt Grand Aspen | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Mountain Lodge | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Main Street Station | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Hacienda del Mar | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Windward Pointe | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt High Sierra Lodge | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Sunset Harbor | | Sunday and Monday nights | Tuesday and Wednesday nights | Thursday, Friday and Saturday nights | Sunday, Monday, Tuesday and Wednesday nights |
| Hyatt Beach House | | Sunday and Monday nights | Tuesday and Wednesday nights | Thursday, Friday and Saturday nights | Sunday, Monday, Tuesday and Wednesday nights |
| The Highlands Inn, a Hyatt Vacation Club (*With respect to Weeks beginning and ending on **Sunday***) | | Sunday and Monday nights | Tuesday and Wednesday nights | Thursday, Friday and Saturday nights | Sunday, Monday, Tuesday and Wednesday nights |
| The Highlands Inn, a Hyatt Vacation Club (*With respect to Weeks beginning and ending on **Saturday***) | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Coconut Plantation (*With respect to Weeks beginning and ending on **Sunday***) | | Sunday and Monday nights | Tuesday and Wednesday nights | Thursday, Friday and Saturday nights | Sunday, Monday, Tuesday and Wednesday nights |
| Hyatt Coconut Plantation (*With respect to Weeks beginning and ending on **Saturday***) | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday and Friday nights |
| Hyatt Pinon Pointe (*With respect to Weeks beginning and ending on **Friday***) | | Monday and Tuesday nights | Wednesday and Thursday nights | Friday, Saturday, and Sunday nights | Monday, Tuesday, Wednesday, and Thursday nights |
| Hyatt Pinon Pointe (*With respect to Weeks beginning and ending on **Saturday***) | | Tuesday and Wednesday nights | Thursday and Friday nights | Saturday, Sunday and Monday nights | Tuesday, Wednesday, Thursday, and Friday nights |
| Hyatt Pinon Pointe (*With respect to Weeks beginning and ending on **Sunday***) | | Sunday and Monday nights | Tuesday and Wednesday nights | Thursday, Friday, and Saturday nights | Sunday, Monday, Tuesday, and Wednesday nights |

Club Points required to reserve a Split Week are subject to reasonable change by HVOI from time to time and without Club Member consent in the best interests of Members as a whole. A Club Member who uses Club Points to reserve a Split Week may use any remaining Club Points to reserve another available Week or Split Week. As a condition to receiving a Split Week reservation confirmation, a Club Member may be required to pay an additional housekeeping fee and administrative fee to HVOI. HVOI may permit Club Members to make Split Week reservations at other Club Resorts or in increments of as little as one day pursuant to amendments to these Rules and Regulations from time to time.

## V. Other Club Options.

5.1 <u>External Exchange Program</u>. In order to increase the range of options available to Club Members, HVOI has arranged for an "External Exchange Program." This program currently consists exclusively of an exchange agreement between HVOI and Interval International, Inc., as the External Exchange Company ("Interval"), under which HVOI is a "corporate member" on behalf of all Club Members. The exchange agreement between Interval and HVOI allows Club Members to exchange to resorts that participate in the Interval exchange network. The existing exchange agreement expires on December 31, 2004, unless earlier terminated in accordance with its terms. Neither Interval nor HVOI is obligated to renew the agreement. Interval, HVOI, and their respective subsidiaries and affiliates are separate and distinct entities. Neither Interval or HVOI, nor any other subsidiary or affiliate of Interval or HVOI, has agreed or will agree to assume, guarantee or otherwise be responsible for any of the obligations, acts or omissions of the other party in connection with this offering. HVOI is not an agent for Interval and no representations or promises made by HVOI, or its agents, are binding on Interval. Interval's responsibility for representations regarding Interval's exchange program, as well as Interval's current or future services are limited to those made in written materials furnished by Interval.

a. <u>External Exchange Period</u>. All external exchange requests will be handled by HVOI. A Club Member who is interested in an external exchange will contact Reservation Services and indicate the Member's preference for an exchange. A Club Member may make an external exchange request during the External Exchange Period, which is any time during a given Reservation Window prior to the end of the Member's Club Use Period (unless the Member elects to enter the Extended External Exchange Period with respect to Fixed Weeks as provided below). Following verification of the identity of the Club Member and verification that the Member is in good standing, a Reservation Services representative and the Member will discuss the Member's specific time, destination and type of room requests along with any special requests, and these requests shall be noted by the Reservation Services representative. The Club Member will also be asked to designate more than one alternative set of exchange requests, as required by Interval from time to time, in order to increase the Member's chances of getting a desired exchange. Club Member participation in the Interval exchange program will be governed by the terms and conditions of the Interval exchange program and the following:

(1)     All rules and regulations which apply to the use of Club accommodations and facilities by Club Members shall also apply to users of such accommodations and facilities through Interval.

(2)     A Club Member will be charged Interval's published fee for each confirmed external exchange.

(3)     With the exception of Weeks or Split Weeks reserved during a Home Resort Preference Period, Club Members are prohibited from renting to a third party any accommodation reserved through the Club's reservation system, including Interval accommodations.

(4)     Availability of accommodations within the Interval system is entirely dependent upon the timeshare interests from various Interval member resorts that are deposited into the Interval system by other members of Interval from time to time. Thus, a Club Member can have no assurance that Interval will be able to provide the Member with an accommodation that meets the Member's needs and desires when the Member wants it or at a particular time. Moreover, the exchange accommodation received may or may not be comparable in size, layout, furnishings, services, or amenities to those contained in Club Resorts.

b.   Extended External Exchange Period.  If a Club Member intends to extend the Member's opportunity to make an external exchange request beyond the end of the External Exchange Period during a given Reservation Window for a Fixed Week, the Member must notify the Club of such intention no later than four (4) months prior to the expiration of the External Exchange Period.  Upon timely providing such notice to the Club, the Club Member may designate a portion of the Member's remaining Fixed Club Points for the Reservation Window in question to be deposited with Interval and will receive the right to request an external exchange from Interval in a category of "trading power" and unit type which corresponds to (or is lower than) the number of Fixed Club Points so deposited (see Interval's Disclosure Guide to Club Members).  During the Extended External Exchange Period, the Club Member will have the same amount of "trading power" within the Interval system with respect to such deposited Fixed Club Points as the Member would have if the Member had requested an external exchange through Interval during the External Exchange Period for that Reservation Window.  However, the Club Member must utilize the external exchange before the expiration of the Extended External Exchange Period.  In the event the Club Member fails to secure an external exchange confirmation with Interval and utilize such external exchange during the Extended External Exchange Period, the Member's right to make use of the Fixed Club Points deposited with Interval shall expire.  **The Extended External Exchange Period does not apply to Floating Club Points.**

c.   Anticipated Exchange Demand.  HVOI shall have the right to reserve a number of Weeks from time to time that have not been timely reserved during a Home Resort Preference Period for the purpose of depositing the reserved Weeks with Interval on behalf of Club Members based upon HVOI's determination, in its sole discretion, of anticipated Member demand to access the External Exchange Program.

5.2   Hyatt Gold Passport Program.  A Club Member who is interested in accessing the vacation and travel benefits of the Hyatt Gold Passport Program may contact Reservation Services during the Home Resort Preference Period (Fixed) to convert their Fixed Club Points into Hyatt Gold Passport Points.  The following conditions apply to the Hyatt Gold Passport Program:

a.   Reservations.  Only Fixed Club Points can be converted into Hyatt Gold Passport Points.  Club Members may only contact Reservation Services to request a conversion into Hyatt Gold Passport Points during the Home Resort Preference Period (Fixed).  Hyatt Gold Passport Points received are valid for use in the Hyatt Gold Passport Program at any time in accordance with the terms an conditions of the Hyatt Gold Passport Program.  The number of Hyatt Gold Passport Points awarded to a Club Member will be as set forth on the Hyatt Gold Passport Point Chart as established from time to time.  A Club Member who desires to request a conversion into Hyatt Gold Passport Points must convert all of the Fixed Club Points associated with a particular Fixed Week into Hyatt Gold Passport Points.  Under no circumstances will a Club Member be permitted to convert Hyatt Gold Passport Points into Club Points.  Reservations through the Hyatt Gold Passport Program are governed by the Hyatt Gold Passport Terms and Conditions Handbook and participation in the Hyatt Gold Passport Program is based on the terms and conditions of the Hyatt Gold Passport Terms and Conditions Handbook and these Club Rules, as both may be amended from time to time.  Club Members should anticipate at least ten (10) business days before being able to access their Hyatt Gold Passport Points to make a reservation through the Hyatt Gold Passport Program.

b.   Fees.  Club Members desiring to convert their Fixed Week reservation to Hyatt Gold Passport Points will be assessed a transaction fee by HVOI as established from time to time (currently $129).

c.   Rights of HVOI.  HVOI reserves the right to limit the number of Fixed Weeks that can be converted to Hyatt Gold Passport Points to no more than ten percent (10%) of the Fixed Club Points associated with any particular Fixed Week designation or Unit type at each Club Resort.  HVOI is entitled to use the Fixed Club Points that have been converted into the Hyatt Gold Passport Program to reserve any available inventory in the Club including, but not limited to, the best possible Weeks or Split Weeks that HVOI is able to reserve in order to help defray the cost of the Hyatt Gold Passport Program.  HVOI has the priority right to reserve any available inventory during the Club Use Period in order help defray the cost of the Hyatt Gold Passport Program.  Furthermore, HVOI is entitled to be placed on the Request List or Wait List for any Week, as HVOI deems

necessary in order to help defray the cost of the Hyatt Gold Passport Program. HVOI may terminate the Hyatt Gold Passport Program at any time.

        d.      Limitations on Participation. Only those Club Members who (i) are enrolled in the Hyatt Gold Passport Program; and (ii) purchased their Timeshare Interest from the original developer of a Club Resort or from an HVOI-approved reseller or broker (or inherited their Timeshare Interest from such an owner) may participate in the Hyatt Gold Passport Program. Moreover, the Fixed Club Points associated with a particular Fixed Week may only be converted to Hyatt Gold Passport Points every other calendar year. The Fixed Club Points associated with a Biennial Timeshare Interest may only be converted to Hyatt Gold Passport Points every fourth year.

        5.3  Special Exchange Programs. Club Members who do not choose to make a reservation for a Week or Split Week at a Club Resort may have the option of using their Club Points to make a Special Exchange through Special Exchange Programs established by HVOI from time to time. Any Special Exchange Programs will be governed by reservation rules and regulations similar to those governing the External Exchange Program.

        5.4  Club Benefits Program. HVOI may offer special benefits to Club Members, from time to time, through its Club Benefits Program. HVOI reserves the right to establish such rules and regulations as it deems necessary to adequately govern Club Member access to the Club Benefits Program.

## VI. MISCELLANEOUS PROVISIONS

        6.1  Personal Use; Commercial Purposes. Use of the accommodations and facilities associated with the Club is limited solely to the personal use, during their reserved period of occupancy, of Club Members, their guests, invitees, exchangers and lessees, and to the number of authorized users permitted to occupy the Unit as may be posted in the Unit or set forth in the site rules and regulations. Purchase of a Timeshare Interest or use of accommodations and facilities associated with the Club for commercial purposes, for contribution to or use in a different timeshare plan or vacation club, or for any purpose other than the personal use described above is expressly prohibited.

        6.2  Club Member Rentals. A Club Member may reserve a Week or Split Week during a Home Resort Preference Period and rent it for the Member's own account. All renters must comply with the rules and regulations of the Resort Documents affecting occupancy, and the renting Club Member will be responsible for the acts or omissions of renters or any other person or persons permitted by the Member or the renter to use the accommodation. Rental by a Club Member of accommodations reserved through the Club (other than a Week or Split Week reserved during a Home Resort Preference Period) is prohibited.

        6.3  Amendment of the Rules and Regulations. These Rules and Regulations may be amended by HVOI in its sole discretion from time to time without the consent of Club Members. In this regard, HVOI will use its best efforts, in good faith and based upon all reasonably available evidence under the circumstances, to further the best interests of the Club Members as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the Club. Notice of any amendment shall be delivered by HVOI to each Member (or to each Principal Contact) at the Member's last known mailing address, and such notice shall include an effective date for such amendments. With respect to a Timeshare Interest owned by multiple owners, notice of any amendments shall be delivered by HVOI to the Principal Address for such Timeshare Interest. Notice of amendments may be delivered by newsletter or annual mailings.

        6.4  Termination. In the event that the Resort Agreement or other instrument which affiliates a Club Resort with the Club is terminated or expires in accordance with its own terms, the terminated Club Resort will no longer be affiliated as a part of the Club. However, upon termination of such instrument, all confirmed reservations of Club Members (from the terminating Club Resort and from the non-terminating Club Resorts) will be honored at both the terminating Club Resort and at non-terminating Club Resorts.

6.5 <u>Principal Contact and Multiple Owners</u>. The owners of each Timeshare Interest owned by a business entity shall designate a Principal Contact from time to time by notifying Reservation Services of same through a written notice executed by an authorized representative of the business entity. The Principal Contact shall be the designated individual with whom Reservation Services shall deal with respect to making reservations, sending confirmations, and providing other services. Reservation Services may charge an administrative fee of $25, or such other amount as HVOI may determine from time to time, each time it is requested to change a Principal Contact designation.

With respect to a Timeshare Interest owned by multiple owners, each owner of record may contact Reservation Services for the purpose of making a reservation. Confirmations of reservations, notices, and other written materials shall be delivered to the Principal Address. Reservation Services may charge an administrative fee of $25, or such other amount as HVOI may determine from time to time, each time it is requested to change a Principal Address designation.

6.6 <u>Effect of Transfer of Club Member's Timeshare Interest</u>. If a Club Member ("Selling Member") sells, assigns, or transfers the Selling Member's Timeshare Interest to another party ("New Member"), the Selling Member will lose any and all rights to utilize the Club Points associated with such Timeshare Interest to reserve the use of a Week or to use any previously-reserved Weeks. HVOI will, within five (5) business days of receipt from a New Member of an administrative fee (currently $150) and a certified copy of the recorded deed transferring a Timeshare Interest to the New Member, change HVOI's official records to reflect such transfer of a Timeshare Interest from a Selling Member to a New Member. Upon HVOI's change in its records, the New Member will assume any existing reservations previously made by the Selling Member, unless the Club Points associated with the Timeshare Interest would not be sufficient to make such reservations. HVOI will notify the New Member of those existing reservations that are being assumed by the New Member. The New Member may cancel any reservations originally made by the Selling Member upon paying any cancellation fees required pursuant to Section 4.5 of these Club Rules. The New Member will also assume the Selling Member's Club Points remaining as of the date of HVOI's recognition of such transfer. If a Selling Member transfers a portion of a Timeshare Interest at Hyatt Mountain Lodge or Hyatt Main Street Station pursuant to the subdivision rights contained in the Resort Documents for such resorts, the Selling Member and the New Member will have the applicable Home Resort Preference Period rights for each subdivided portion of the Timeshare Interest.

## RECEIPT FOR TIMESHARE DOCUMENTS

## G.A. RESORT CONDOMINIUMS

### Hyatt Grand Aspen
### Aspen, Colorado

The undersigned acknowledges that the items listed below have been received and that applicable timeshare plans and specifications have been made available for inspection.

### DOCUMENTS FOR HYATT VACATION CLUB
450 Carillon Parkway, Suite 210, St. Petersburg, Florida 33716

☐ Multisite Public Offering Statement Text including the following attachments:

Tab 1    (A) Hyatt Vacation Club Exchange Program Disclosure Guide
            (B)  Hyatt Vacation Club Rules and Regulations

Tab 2—Form Receipt for Timeshare Documents

Tab 3—Summary of Documents Not Delivered to Purchasers

Tab 4—Tabular Description of Component Sites
            (A) Accommodations
            (B) Recreational Facilities

Tab 5—Component Site Documents. *See below.*

☐ Hyatt Vacation Club Point Chart

☐ Hyatt Gold Passport Program Incidental Benefits Acknowledgment and Disclosure Statement

☐ Interval International Buyer's Guide

☐ Interval International Membership Application

### DOCUMENTS FOR G.A. RESORT CONDOMINIUMS
Aspen, Colorado
(Component Site Documents)

☐ State of Colorado Disclosure Document with Condominium Association Budget

☐ City of Aspen Disclosure Document

☐ Declaration of Condominium for G.A. Resort Condominiums

☐ Condominium Map/Floor Plans

☐ Condominium Association Articles of Incorporation

☐ Condominium Association Bylaws

☐ Condominium Association Rules and Regulations

☐ Form Special Warranty Deed

☐ Summary Soils Report

<u>Copies of the Following Executed Documents</u> (check if applicable):

☐ Purchase Contract

☐ Estimated Closing Costs

☐ Acknowledgment of Representations

☐ Agency Disclosure

☐ Square Footage Disclosure

☐ Limited Power of Attorney

☐ Receipt for Timeshare Documents

Purchaser:_____

Name:_____

Date:_____

Purchaser:_____

Name:_____

Date:_____

Real Estate\00312 Grand Aspen Lodging, LLC\00001 Dev. Project in Aspen, CO\Purchaser Documents\Receipt for HVC Documents v2.doc

1

HYATT VACATION CLUB
DESCRIPTIVE LIST OF MULTISITE TIMESHARE PLAN
DOCUMENTS NOT DELIVERED TO PURCHASERS

The following is a summary of each document that has been filed with the appropriate state regulatory agency in the states containing each Component Site, but which is not attached as an exhibit to the Multisite Public Offering Statement for Hyatt Vacation Club delivered to purchasers.

1. Hyatt Vacation Club Resort Agreement. The Hyatt Vacation Club Resort Agreement is an agreement entered into between HVOI and the developer or managing entity of a resort under which the accommodations and facilities of that resort are included as a part of the Club, and such resort becomes a Component Resort. [1]

2. Managing Entity Affidavit. The managing Entity Affidavit is an affidavit signed by the component site managing entity which affirms that all assessments on inventory are fully paid, states the amount of delinquent assessments existing at the component site, and acknowledges the existence of the multisite vacation ownership plan.

3. Common Expenses and Ad Valorem Tax Escrow Agreement. The Common Expense and Ad Valorem Tax Escrow Agreement is and agreement between HVOI and an escrow agent for the escrow of estimated common expenses and ad valorem taxes attributable to the Club Member's Timeshare Interest which have not yet been assessed by the managing entity of the Club Member's Club Resort, and which the Club Member is required to remit to HVOI as a condition to acceptance by HVOI of a reservation request.

---

[1] The Hyatt Vacation Club Resort Agreement for Hyatt Mountain Lodge is an attachment to the Mountain Lodge Declaration and is delivered to purchasers with the other project documents in accordance with Colorado law.

## TABULAR DESCRIPTION OF COMPONENT SITE ACCOMMODATIONS

| Resort/Component Site: | I.  Sunset Harbor Resort, a Condominium[1] | II.  Beach House, a Condominium[1] | III.  Mountain Lodge, a Condominium[1] |
|---|---|---|---|
| Name of Component Site | Sunset Harbor Resort, a Condominium | Beach House, a Condominium | Mountain Lodge, a condominium |
| Address of Component Site | 200 Sunset Lane, Key West, Monroe County, Florida, 33041 | 5051 U.S. 1, Key West, Monroe County, Florida, 33040 | 63 Avondale Lane (Beaver Creek Subdivision) Avon, CO 81620 |
| Number of Units Committed as part of the Multisite Timeshare Plan | 40 | 74 | 53 |
| Number of Timeshare Interests Committed as part of the Multisite Timeshare Plan | 2,040 | 3,774 | 1,060[2] |
| Description of the Accommodations: | | | |
| a)  3 Bedroom/3 Bathroom Accommodations | n/a | n/a | Number: 2 [8] Sleeping Capacity: 8 Adults Full Kitchen: yes |
| b)  2 Bedroom/2 Bathroom Accommodations | Number: 39 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | Number: 74 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | Number: 26 Sleeping Capacity: 6 Adults Full Kitchen: yes |
| c)  1 Bedroom/2 Bathroom Accommodations | Number: 1 Sleeping Capacity: 4 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | n/a | n/a |
| d)  Studio Units | n/a | n/a | Number: 25 [9] Sleeping Capacity: 2 Adults Full Kitchen: n/a |
| Description of Accommodations Including Lock-offs: | | | |
| a)  2 Bedroom/2 Bathroom Accommodations[4] | Number: 13 Sleeping Capacity: 6 (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | n/a | n/a |
| b)  1 Bedroom/2 Bathroom Accommodations[5] | Number: 1 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | n/a | n/a |
| c)  1 Bedroom/1 Bathroom Accommodations[6] | Number: 26 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | n/a | n/a |
| d)  Studios[7] | Number: 26 Sleeping Capacity: 2 Full Kitchen: n/a | n/a | n/a |

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tableacc_cln18.doc
10/28/03 2:17 PM  db

| Resort/Component Site: | IV. | Hacienda del Mar, a Vacation Club Regime[1] | V. | High Sierra Lodge, a Leasehold Condominium[1] | VI. | MSS Vacation Club, a Condominium[1] |
|---|---|---|---|---|---|---|
| Name of Component Site | | Hacienda del Mar, a Vacation Club Regime | | High Sierra Lodge, a Leasehold Condominium | | MSS Vacation Club, a Condominium |
| Address of Component Site | | State Road 693 Vega Alta, Puerto Rico, 00646 | | 989 Incline Way Incline Village, Nevada 89451 | | 505 South Main Street Breckenridge, Colorado 80424 |
| Number of Units Committed as part of the Multisite Timeshare Plan | | 82 | | 60 | | 51 |
| Number of Timeshare Interests Committed as part of the Multisite Timeshare Plan | | 4,182 | | 3,060 | | 1,020[2] |
| **Description of the Accommodations:** | | | | | | |
| a)  3 Bedroom/3 Bathroom Accommodations | | n/a | | n/a | | Number: 1[8] Sleeping Capacity: 8 Adults Full Kitchen: yes |
| b)  2 Bedroom/2 Bathroom Accommodations | | Number: 82 Sleeping Capacity: 8 Adults (includes 4 Adults on two sleeper sofas) Full Kitchen: yes | | Number: 60 Sleeping Capacity: 8 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | | Number: 31 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes |
| c)  1 Bedroom/2 Bathroom Accommodations | | n/a | | n/a | | n/a |
| d)  Studio Units | | n/a | | n/a | | Number: 19[9] Sleeping Capacity: 4 Adults Full Kitchen: n/a |
| **Description of Accommodations Including Lock-offs:** | | | | | | |
| a)  2 Bedroom/2 Bathroom Accommodations[4] | | n/a | | n/a | | n/a |
| b)  1 Bedroom/2 Bathroom Accommodations[5] | | n/a | | n/a | | n/a |
| c)  1 Bedroom/1 Bathroom Accommodations[6] | | Number: 82 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: yes | | n/a | | n/a |
| d)  Studios[7] | | Number: 82 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: no | | n/a | | n/a |

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tableacc_cln18.doc
10/28/03 2:17 PM  db

| Resort/Component Site: | VII. Windward Pointe, a Leasehold Condominium[1] | VIII. H.I. Resort, a Leasehold Condominium[1] | IX. Coconut Plantation, a Condominium[1] |
|---|---|---|---|
| Name of Component Site | Windward Pointe, a Leasehold Condominium | H.I. Resort, a Leasehold Condominium | Coconut Plantation, a Condominium |
| Address of Component Site | 3675 S. Roosevelt Blvd. Key West, Monroe County, Florida, 33040 | 120 Highlands Drive Carmel Highlands, California 93923 | 11800 Coconut Plantation Drive Bonita Springs, Lee County, Florida, 34134 |
| Number of Units Committed as part of the Multisite Timeshare Plan | 93 | 94 | 72 |
| Number of Timeshare Interests Committed as part of the Multisite Timeshare Plan | 4,743 | 4,794 | 3,696 |
| Description of the Accommodations: | | | |
| a)  3 Bedroom/3 Bathroom Accommodations | n/a | n/a | n/a |
| b)  2 Bedroom/2 Bathroom Accommodations | Number: 93 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | Number: 5 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | Number: 72 Sleeping Capacity: 8 Adults (includes 4 Adults on two sleeper sofas) Full Kitchen: yes[3] |
| c)  1 Bedroom/2 Bathroom Accommodations | n/a | n/a | n/a |
| d)  1 Bedroom/1 Bathroom Accommodations | n/a | Number: 89 Sleeping Capacity: 4 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | n/a |
| e)  Studio Units | n/a | n/a | n/a |
| Description of Accommodations Including Lock-offs: | | | |
| a)  2 Bedroom/2 Bathroom Accommodations[4] | n/a | n/a | Number: 36 Sleeping Capacity: 8 Adults (includes 4 Adults on two sleeper sofas) Full Kitchen: yes[3] |
| b)  1 Bedroom/2 Bathroom Accommodations[5] | n/a | n/a | n/a |
| c)  1 Bedroom/1 Bathroom Accommodations[6] | n/a | n/a | Number: 36 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: yes |
| d)  Studios[7] | n/a | n/a | Number: 36 Sleeping Capacity: 4 (includes 2 Adults on a sleeper sofa) Full Kitchen: no |

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tableacc_cln18.doc
10/28/03 2:17 PM  db

| Resort/Component Site: | X. Forest Road Condominium (a/k/a Hyatt Pinon Pointe)[1] | | |
|---|---|---|---|
| Name of Component Site | Forest Road Condominium (a/k/a Hyatt Pinon Pointe) | | |
| Address of Component Site | 1 N. Highway 89A Sedona, Arizona 86336 | | |
| Number of Units Committed as part of the Multisite Timeshare Plan | 75 | | |
| Number of Timeshare Interests Committed as part of the Multisite Timeshare Plan | 3,825 | | |
| Description of the Accommodations: | | | |
| a)  3 Bedroom/3 Bathroom Accommodations | n/a | | |
| b)  2 Bedroom/2 Bathroom Accommodations | Number: 64 Sleeping Capacity: 6 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | | |
| c)  1 Bedroom/2 Bathroom Accommodations | n/a | | |
| d)  1 Bedroom/1 Bathroom Accommodations | Number: 11 Sleeping Capacity: 4 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | | |
| e)  Studio Units | n/a | | |
| Description of Accommodations Including Lock-offs: | n/a | | |
| a)  2 Bedroom/2 Bathroom Accommodations | | | |
| b)  1 Bedroom/2 Bathroom Accommodations | n/a | | |
| c)  1 Bedroom/1 Bathroom Accommodations[6] | Number: 75 Sleeping Capacity: 4 Adults (includes 2 Adults on a sleeper sofa) Full Kitchen: yes[3] | | |
| d)  Studios[7] | n/a Number: 64 Sleeping Capacity: 2 Adults Full Kitchen: no | | |

Page 4

Notes:

(1)     See section 4 of the Multisite Public Offering Statement regarding priority reservation features which may affect your ability to obtain a reservation.

(2)     The Timeshare Interests at Mountain Lodge, a Condominium and MSS Vacation Club, a Condominium consist of an undivided 1/20 interest, entitling the owner thereof to one Fixed Week, one Floating Week and one Split Floating Week, subject to the Hyatt Vacation Club Rules and Regulations.

(3)     The term "Full Kitchen" means a kitchen having a minimum of a dishwasher, range, sink, oven and a refrigerator.

(4)     Thirteen of the two-bedroom Units in Sunset Harbor Resort, a Condominium and twenty-four of the two-bedroom Units in Coconut Plantation, a Condominium do not utilize any "lock-off" feature.  None of the Units in Beach House, a Condominium, and High Sierra Lodge, a Leasehold Condominium utilize any "lock-off" feature.

(5)     The one-bedroom Unit in Sunset Harbor Resort, a Condominium does not utilize any "lock-off" feature.

(6)     Twenty six (26) of the two-bedroom Units in Sunset Harbor Resort, a Condominium, eighty-two (82) of the two-bedroom Units in Hacienda del Mar, a Vacation Club Regime, thirty-six (36) of the two-bedroom Units in Coconut Plantation, a Condominium, and sixty-four (64) of the two-bedroom Units in Forest Road Condominium (a/k/a Hyatt Pinon Pointe)  can utilize a "lock-off" feature, resulting in separate one-bedroom suites and studios.

(7)     Twenty six (26) of the two-bedroom Units in Sunset Harbor Resort, a Condominium, eighty-two (82) of the two-bedroom Units in Hacienda del Mar, a Vacation Club Regime, thirty-six (36) of the two-bedroom Units in Coconut Plantation, a Condominium, and sixty-four (64) of the two-bedroom Units in Forest Road Condominium (a/k/a Hyatt Pinon Pointe) can utilize a "lock-off" feature, resulting in separate one-bedroom suites and studios.  The studio units do not have a "full kitchen," however, the Units at Sunset Harbor, Hacienda del Mar and Coconut Plantation do contain a small microwave, a small refrigerator, toaster and coffee maker and the Units at Hacienda del Mar and Coconut Plantation also contain a sink.

(8)     In addition to the two (2) designated three-bedroom/three-bathroom accommodations in Mountain Lodge, a Condominium , and the one (1) designated three-bedroom/three-bathroom in MSS Vacation Club, a Condominium, a number of the two-bedroom Units and Studio Units can be combined when purchased to create a combined 3-Bedroom Unit in accordance with the terms of the Resort Documents for Mountain Lodge, a Condominium and MSS Vacation Club, a Condominium, respectively.

(9)     The Studios in Mountain Lodge, a Condominium and MSS Vacation Club, a Condominium do not have a "full kitchen," however, the Units do contain a microwave oven, two burner cooktop, one-half refrigerator and a dishwasher.

## TABULAR DESCRIPTION OF COMPONENT SITE
## RECREATIONAL FACILITIES

| Resort/Component Site: | I. Sunset Harbor Resort, a Condominium[1] | II. Beach House, a Condominium[1] | III. Mountain Lodge, a condominium[1] |
|---|---|---|---|
| Facilities Available for Use by Club Members | (There are no recreational or other commonly used facilities that will be used only by Owners.  All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) | (There are no recreational or other commonly used facilities that will be used only by Owners.  All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) | (There are no recreational or other commonly used facilities that will be used only by Owners.  All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) |
| (1)  Swimming Pool | • Heated outdoor swimming pool.<br><br>Fees Associated with Club Members' Use: None | • Heated outdoor swimming pool.<br><br>Fees Associated with Club Members' Use: None | • Heated outdoor lap pool;<br>• Children's wading pool.<br><br>Fees Associated with Club Members' Use: None |
| (2)  Spas | • Outdoor spa located adjacent to swimming pool.<br><br>Fees Associated with Club Members' Use: None | • Outdoor spa located adjacent to swimming pool.<br><br>Fees Associated with Club Members' Use: None | • Two outdoor spas located adjacent to the lap pool.<br><br>Fees Associated with Club Members' Use: None |
| (3)  Sun/Bathing Deck | • Deck surrounding the pool and spa.<br><br>Fees Associated with Club Members' Use: None | • Deck surrounding the pool and spa.<br><br>Fees Associated with Club Members' Use: None | |
| (4)  Additional Facilities | n/a | n/a | • Exercise room;<br>• Media room;<br>• Ski storage room with a capacity of 600 pairs of skis.<br><br>Fees Associated with Club Members' Use: None |

[1] The recreational facilities which are available for use at Sunset Harbor Resort, Beach House, Windward Pointe, Forest Road Condominium (a/k/a Hyatt Pinon Pointe), and High Sierra Lodge are located on Condominium Property.  The recreational facilities at Mountain Lodge are located on the adjacent Master Property which Mountain Lodge Owners have use rights in pursuant to the terms of the Master Declaration.  The olympic sized pool, spas, and deck at Hacienda del Mar are located on the common elements of the Hacienda del Mar property.  The other recreational facilities which Hacienda del Mar Owners are entitled to use are located on the adjacent Hotel Property.  Owners have use rights to these recreational facilities pursuant to the Deed of Constitution of Reciprocal Easements for Facilities Use, Easement for Use of Golf and Health Club Facilities, Right of Way Easement for Beach Access and Subordination of Mortgages. The recreational facilities which are available for use at Coconut Plantation are located on Condominium Property, except the Beach Facilities, which are located on Big Hickory Island, and the Tennis and Golf Facilities which are located on property adjacent to Coconut Plantation.  Owners have use rights to these recreational facilities pursuant to the terms of the Amended and Restated Declaration And General Protective Covenants For Pelican Landing, the Hotel Boat Use and Beach Access Agreement, and the Amended and Restated Residential Golf Course Access Easement Agreement.

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tablerec_cln11.doc
9/29/03 4:49 PM.rc

| Resort/Component Site: | IV. Hacienda del Mar, a Vacation Club Regime[1] | V. High Sierra Lodge, a Leasehold Condominium | VI. MSS Vacation Club, a Condominium |
|---|---|---|---|
| Facilities Available for Use by Club Members | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet dedicated to the Vacation Club Regime, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan, exchangers, hotel guests, and country club members) | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) | (There are no recreational or other commonly used facilities that will be used only by Owners.) |
| (1) Swimming Pool | • Olympic sized swimming pool;<br>• River pool.<br><br>Fees Associated with Club Members' Use: None. | • Heated swimming pool.<br><br>Fees Associated with Club Members' Use: None | n/a |
| (2) Spas | • Two spas located on the olympic pool deck area.<br><br>Fees Associated with Club Members' Use: None | • Spa located adjacent to the swimming pool.<br><br>Fees Associated with Club Members' Use: None | n/a |
| (3) Sun/Bathing Deck | • Deck surrounding the pool and spas.<br><br>Fees Associated with Club Members' Use: None | • Deck surrounding the pool and spa.<br><br>Fees Associated with Club Members' Use: None | n/a |
| (4) Additional Facilities | n/a | • A ski locker is available for each unit at the entry of each building;<br><br>• Activity building.<br><br>Fees Associated with Club Members' Use: None | n/a |

[1] The recreational facilities which are available for use at Sunset Harbor Resort, Beach House, Windward Pointe, Forest Road Condominium (a/k/a Hyatt Pinon Pointe), and High Sierra Lodge are located on Condominium Property. The recreational facilities at Mountain Lodge are located on the adjacent Master Property which Mountain Lodge Owners have use rights in pursuant to the terms of the Master Declaration. The olympic sized pool, spas, and deck at Hacienda del Mar are located on the common elements of the Hacienda del Mar property. The other recreational facilities which Hacienda del Mar Owners are entitled to use are located on the adjacent Hotel Property. Owners have use rights to these recreational facilities pursuant to the Deed of Constitution of Reciprocal Easements for Facilities Use, Easement for Use of Golf and Health Club Facilities, Right of Way Easement for Beach Access and Subordination of Mortgages. The recreational facilities which are available for use at Coconut Plantation are located on Condominium Property, except the Beach Facilities, which are located on Big Hickory Island, and the Tennis and Golf Facilities which are located on property adjacent to Coconut Plantation. Owners have use rights to these recreational facilities pursuant to the terms of the Amended and Restated Declaration And General Protective Covenants For Pelican Landing, the Hotel Boat Use and Beach Access Agreement, and the Amended and Restated Residential Golf Course Access Easement Agreement.

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tablerec_cln11.doc
9/29/03 4:49 PM.rc

| Resort/Component Site: | VII.   Windward Pointe, a Leasehold Condominium[1] | VIII.   H.I. Resort, a Leasehold Condominium[1] | IX.   Coconut Plantation, a Condominium[1] |
|---|---|---|---|
| Facilities Available for Use by Club Members. | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan and exchangers) |
| (1)   Swimming Pool | • Heated outdoor swimming pool.  Fees Associated with Club Members' Use: None | • Heated outdoor swimming pool located on the adjacent hotel property.  Fees Associated with Club Members' Use: None | • Two outdoor lagoon pools; • Adult pool; • Children's wading pool; • River pool.  All pools are heated.  Fees Associated with Club Members' Use: None |
| (2)   Spas | • Spa located adjacent to the swimming pool.  Fees Associated with Club Members' Use: None | • Two spas located on the condominium property and one spa located on the adjacent hotel property.  Fees Associated with Club Members' Use: None | • Two spas. One located adjacent to the lagoon pools and one located adjacent to the adult pool.  Fees Associated with Club Members' Use: None |
| (3)   Sun/Bathing Deck | • Deck surrounding the pool and spa.  Fees Associated with Club Members' Use: None | • Deck surrounding the pool and spas.  Fees Associated with Club Members' Use: None | • Deck surrounding the pools and spas.  Fees Associated with Club Members' Use: None |

---

[1] The recreational facilities which are available for use at Sunset Harbor Resort, Beach House, Windward Pointe, Forest Road Condominium (a/k/a Hyatt Pinon Pointe), and High Sierra Lodge are located on Condominium Property. The recreational facilities at Mountain Lodge are located on the adjacent Master Property which Mountain Lodge Owners have use rights in pursuant to the terms of the Master Declaration. The olympic sized pool, spas, and deck at Hacienda del Mar are located on the common elements of the Hacienda del Mar property. The other recreational facilities which Hacienda del Mar Owners are entitled to use are located on the adjacent Hotel Property. Owners have rights to these recreational facilities pursuant to the Deed of Constitution of Reciprocal Easements for Facilities Use, Easement for Use of Golf and Health Club Facilities, Right of Way Easement for Beach Access and Subordination of Mortgages. The recreational facilities which are available for use at Coconut Plantation are located on Condominium Property, except the Beach Facilities, which are located on Big Hickory Island, and the Tennis and Golf Facilities which are located on property adjacent to Coconut Plantation. Owners have use rights to these recreational facilities pursuant to the terms of the Amended and Restated Declaration And General Protective Covenants For Pelican Landing, the Hotel Boat Use and Beach Access Agreement, and the Amended and Restated Residential Golf Course Access Easement Agreement.

| Resort/Component Site: | VII. | Windward Pointe, a Leasehold Condominium[1] | VIII. | H.I. Resort, a Leasehold Condominium[1] | IX. | Coconut Plantation, a Condominium[1] |
|---|---|---|---|---|---|---|
| (4)   Additional Facilities | n/a | | n/a | | | • Sand volleyball court;<br>• Half basketball court;<br>• Sauna and Steam room;<br>• Shuffleboard court;<br>• Cabana;<br>• Kids play area;<br>• Fire pit;<br>• Tennis Facilities - Two tennis courts;<br>• Beach Facilities - Beach park located on Big Hickory Island;<br>• Golf Facilities - 18 hole championship golf course, practice facilities and clubhouse.<br><br>Fees Associated with Club Members' Use:  There are use fees associated with the Golf Facilities.  There may be use fees associated with the Tennis Facilities.  Please refer to the condominium documents for more information. |

[1] The recreational facilities which are available for use at Sunset Harbor Resort, Beach House, Windward Pointe, Forest Road Condominium (a/k/a Hyatt Pinon Pointe), and High Sierra Lodge are located on Condominium Property.  The recreational facilities at Mountain Lodge are located on the adjacent Master Property which Mountain Lodge Owners have use rights in pursuant to the terms of the Master Declaration.  The olympic sized pool, spas, and deck at Hacienda del Mar are located on the common elements of the Hacienda del Mar property.  The other recreational facilities which Hacienda del Mar Owners are entitled to use are located on the adjacent Hotel Property.  Owners have use rights to these recreational facilities pursuant to the Deed of Constitution of Reciprocal Easements for Facilities Use, Easement for Use of Golf and Health Club Facilities, Right of Way Easement for Beach Access and Subordination of Mortgages. The recreational facilities which are available for use at Coconut Plantation are located on Condominium Property, except the Beach Facilities, which are located on Big Hickory Island, and the Tennis and Golf Facilities which are located on property adjacent to Coconut Plantation.  Owners have use rights to these recreational facilities pursuant to the terms of the Amended and Restated Declaration And General Protective Covenants For Pelican Landing, the Hotel Boat Use and Beach Access Agreement, and the Amended and Restated Residential Golf Course Access Easement Agreement.

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tablerec_cln11.doc
9/29/03 4:49 PM.rc

| Resort/Component Site: | X.        Forest Road Condominium (a/k/a Hyatt Pinon Pointe)[1] | | |
|---|---|---|---|
| Facilities Available for Use by Club Members | (There are no recreational or other commonly used facilities that will be used only by Owners. All recreational and/or other commonly used facilities will be available for use by short-term renters or other users of accommodations constructed, but not yet declared to the Condominium, short-term renters of Units, Club Members pursuant to the Club Timeshare Plan, and exchangers) | | |
| (1)        Swimming Pool | • One outdoor heated swimming pool.<br>• One wading pool.<br><br>Fees Associated with Club Members' Use: None. | | |
| (2)        Spas | • Two spas located on the pool deck area.<br><br>Fees Associated with Club Members' Use: None | | |
| (3)        Sun/Bathing Deck | • Deck surrounding the pools and spas.<br><br>Fees Associated with Club Members' Use: None | | |
| (4)        Additional Facilities | • Activity Building.<br><br>Fees Associated with Club Members' Use: None | | |

---

[1] The recreational facilities which are available for use at Sunset Harbor Resort, Beach House, Windward Pointe, Forest Road Condominium (a/k/a Hyatt Pinon Pointe), and High Sierra Lodge are located on Condominium Property. The recreational facilities at Mountain Lodge are located on the adjacent Master Property which Mountain Lodge Owners have use rights in pursuant to the terms of the Master Declaration. The olympic sized pool, spas, and deck at Hacienda del Mar are located on the common elements of the Hacienda del Mar property. The other recreational facilities which Hacienda del Mar Owners are entitled to use are located on the adjacent Hotel Property. Owners have use rights to these recreational facilities pursuant to the Deed of Constitution of Reciprocal Easements for Facilities Use, Easement for Use of Golf and Health Club Facilities, Right of Way Easement for Beach Access and Subordination of Mortgages. The recreational facilities which are available for use at Coconut Plantation are located on Condominium Property, except the Beach Facilities, which are located on Big Hickory Island, and the Tennis and Golf Facilities which are located on property adjacent to Coconut Plantation. Owners have use rights to these recreational facilities pursuant to the terms of the Amended and Restated Declaration And General Protective Covenants For Pelican Landing, the Hotel Boat Use and Beach Access Agreement, and the Amended and Restated Residential Golf Course Access Easement Agreement.

G:\ORdata1\bcg3278\24048\94001\TABLE ACC-REC\tablerec_cln11.doc
9/29/03 4:49 PM.rc



# *Grand Aspen Resort Condominium Documents*

- o  State of Colorado Disclosure Document with Condominium Association Budget
- o  City of Aspen Disclosure Document
- o  Declaration of Condominium for G.A. Resort Condominiums
- o  Condominium Association Articles of Incorporation
- o  Condominium Association Bylaws
- o  Condominium Association Rules and Regulations
- o  Form Special Warranty Deed
- o  Summary of Soils Report
- o  Preliminary Condominium Map

**Hyatt Grand Aspen™**
205 South Mill Street, Aspen, Colorado 81611 Main.970.920.3204 Fax.970.920.4555
www.hyattaspen.com

# HYATT GRAND ASPEN

## G.A. RESORT CONDOMINIUMS
## CITY OF ASPEN
## PITKIN COUNTY, COLORADO

## COLORADO DISCLOSURE DOCUMENT

## THE STATE OF COLORADO HAS NOT PREPARED OR ISSUED THIS DOCUMENT NOR HAS IT PASSED ON THE MERITS OF THE SUBDIVISION DESCRIBED HEREIN

The following disclosures are provided to you in connection with the purchase of property from Grand Aspen Lodging, LLC, a Delaware limited liability company (the "Developer"). Capitalized terms not defined below shall have the same meaning provided for in the Declaration of Condominium for G.A. Resort Condominiums (the "Declaration").

1.      **NAME AND ADDRESS OF THE DEVELOPER AND OF THE SUBDIVISION LOTS OR UNITS.** Rule S-23 (a).

      **Name and address of the Developer:**

      Grand Aspen Lodging, LLC, a Delaware limited liability company
      c/o Four Peaks Development, LLC
      1000 South Mill Street
      Aspen, CO  81611

      **Name and address of Subdivision:***

      G.A. Resort Condominiums,
      400 Dean Street
      Aspen, Colorado 81611
      (referred to herein as the "Condominium")

2.      **AN EXPLANATION OF THE TYPE OF OWNERSHIP OR OCCUPANCY RIGHTS BEING OFFERED. Rule S-23 (b).**

      Purchasers will acquire an undivided 1/20th fee ownership interest in a specific condominium unit. Each Timeshare Interest in the Condominium allows each Owner the annual right to reserve and use a Fixed Week (7 days/nights) in such unit. Fixed Weeks are designated as Weeks 5 through 12, inclusive, Weeks 26 through 35, inclusive, and Weeks 51 and 52. Each Timeshare Interest in the Condominium will also allow each Owner the annual right to reserve and use a Floating Week (7 days/nights) and a Floating Split Week (4 days/nights or 3 days/nights) in the type of unit purchased. Floating Weeks consist of all weeks other than Fixed Weeks. The Developer has also reserved the right to sell Biennial Timeshare Interests that allow for use during alternating (i.e., even and odd numbered) years.

      The Condominium will, upon completion of construction, be a Component Resort of Hyatt Vacation Club (the "Club") by means of the Hyatt Vacation Club Resort Agreement ("Affiliation Agreement"). Use of the Condominium will require Owners to reserve the use of the Timeshare Periods in conformity with the Hyatt Vacation Club Rules and Regulations (the "Club Rules"). Each Purchaser of a Timeshare Interest in the Condominium automatically becomes a member of the Club.

If the Affiliation Agreement is ever terminated each Owner will be entitled to the use of his Fixed Week, a Floating Week and a Split Week in accordance with reservation procedures that would then be established by G. A. Resort Condominium Association, Inc. (the "Association").

During an Owner's Fixed Week the Owner will be permitted to use the Unit in which the Owner has purchased his or her Timeshare Interest. Assignment of units for use during Floating Weeks will be made at the time of check-in a Unit of the type purchased but not necessarily the same Unit purchased.

**Purchasers should refer to the Club Documents for further information regarding the Hyatt Vacation Club and reservation procedures.**

3.     **DISCLOSURE REGARDING AMENITIES AND ACCOMMODATIONS. Rule S-23 (c).**

The Condominium will consist of a single building with a total of fifty (50) Residential Units, nine (9) Affordable Housing Units, two (2) Commercial Units and one hundred eleven (111) Parking Units. The Residential Units include 1 four-bedroom unit, 28 three-bedroom units (five of the 28 three-bedroom units will be configured as two-bedroom units with a den and Murphy bed), 19 two-bedroom units and 2 one-bedroom units that may be committed to the Timeshare Plan. Some units will be arranged to allow individual bedrooms to be locked-off with access from common corridors. Several units will be ADA accessible. The estimated completion date of the Condominium is December 2005.

On-site amenities and recreational facilities consist of:

- Underground parking. While in residence, Owners will have the right to use one parking space per Timeshare Unit occupied. Valet parking may be provided at an additional cost.
- Outdoor swimming pool (approximately 40'x18')
- Two outdoor hot tubs each with a capacity of approximately 6-8 people
- Exercise facility (approximately 48'x15')
- Landscaped courtyard
- Guest drop-off area
- Central lobby area with reception desk
- Shuttle service to and from the Aspen/Pitkin County Airport
- Outdoor ice skating rink (approximately 118'x62') square feet. The ice rink will be operated and maintained by the Association and available for use during the winter months by Hyatt Grand Aspen Owners and guests as well as the general public. Fees for use of the rink by owners are included in the annual maintenance fees. During the summer months, the area comprising the rink will be operated and maintained by the Association as a public park.

Currently, the Developer plans on creating a bar and lounge area within the Common Elements located adjacent to the main entry. Initial services as described above have been determined by the Developer. Future service levels and amenities that will be funded through the annual maintenance fees will be determined by the Association.

In addition to the above-described amenities, the project is anticipated to include two commercial units that may be operated as a sundries shop and a storage area for sports equipment while in residence. The uses of the commercial units are subject to change. The Developer will determine the service levels to be provided from the commercial units.

4.     **A GENERAL DESCRIPTION OF ALL JUDGMENTS AND ADMINISTRATIVE ORDERS ISSUED AGAINST THE SELLER, DEVELOPER, HOMEOWNERS' ASSOCIATION OR MANAGING ENTITY, WHICH ARE MATERIAL TO THE SUBDIVISION PLAN. Rule S-23 (e).**

None.

5.      ANY TAXES OR SPECIAL ASSESSMENTS, EXISTING OR PROPOSED, TO WHICH THE PURCHASER MAY BE SUBJECT OR WHICH ARE UNPAID AT THE TIME OF CONTRACTING, INCLUDING OBLIGATIONS TO SPECIAL TAXING AUTHORITIES OR DISTRICTS. Rule S-23 (f).

The property is subject to the following taxing districts, each of which is funded through ad valorem real estate taxes and empowered to levy special assessments against the Condominium.

| | |
|---|---|
| City Of Aspen | Aspen Valley Hospital |
| Aspen Fire Protection | Aspen Ambulance District |
| Aspen Sanitation District | Pitkin County Library |
| Aspen School District | Pitkin County |
| Colorado Mountain College | Open Space & Trails |
| Colorado River Water Cons | |

In addition, the Association may approve special assessments in accordance with the project documents.

To the best of Developer's knowledge, no special assessments by the City of Aspen, County of Pitkin or any other taxing districts, special districts, governmental entity or the Association are proposed. No special assessments are currently planned by Developer for the Condominium. Developer would be responsible for paying any special assessment approved by the Association for such repair and renovation on Units which it owns which are being marketed and sold pursuant to a plan of timeshare ownership.

The City of Aspen collects a real estate transfer tax 1.5% on all transfers of real property, including the Timeshare Interests. This tax is payable by the Purchaser at closing. In accordance with the land use approvals for the Condominium, a Timeshare Impact Fee shall be paid to the City of Aspen upon the closing of each initial Timeshare Interest. This fee will be paid by Developer at closing. The resale of Timeshare Interests is exempt from this Timeshare Impact Fee.

To the best of Developer's knowledge, none of the taxing districts has defaulted on any obligation, nor has it filed for bankruptcy protection, nor are such actions pending. Purchasers may upon request receive a copy of the most recent audited financial statement of the special districts from the administrative offices for the special districts. No person affiliated with Developer has direct or indirect control of any of the special districts. Neither Developer nor any financially interested person affiliated with the Developer has any financial interest in, nor will he or she potentially derive any income or profit from, any of the special districts. No such person has any right to borrow or authorize borrowing from any special district.

Developer is not in default on payment of any of its obligations to the special districts. To the best of Developer's knowledge, the Association is not in default in payment of any obligation to the districts for service fees.

6.      THE PROVISIONS FOR AND AVAILABILITY OF LEGAL ACCESS, ROADS, SEWAGE DISPOSAL, PUBLIC UTILITIES, INCLUDING WATER, ELECTRICITY, GAS, TELEPHONE AND OTHER PROMISED FACILITIES IN THE SUBDIVISION, AND WHETHER THESE ARE TO BE AN EXPENSE OF THE DEVELOPER, THE PURCHASER OR A THIRD PARTY. Rule S-23 (m).

The Condominium will be constructed on lawfully platted city lots in the City of Aspen. The Condominium has received or will receive prior to closing all necessary land use approvals from the City of Aspen Legal access to the property is available by means of South Mill Street, South Galena Street and Dean Street. All utilities and services including water, sanitary sewer, electricity, natural gas, telephone and cable television are or will be installed and available to the Condominium and each of the Units included therein prior to closing. If not previously paid, Developer will pay all tap fees for utilities. There will be no further expense to purchasers to bring utilities to the Condominium or to any of the individual Units. Purchasers will pay utility usage charges through assessment charges by the Association.

The following list describes the type of service provided and the name of the respective provider of such service. No service contracts have been signed at this time. Those services marked with an asterisk (*) are subject to change:

| Service | Service Provider |
| --- | --- |
| Cable * | Comcast Corporation, 1500 Market Street, Philadelphia, PA  19102 |
| Natural Gas | KN Energy (Kinder Morgan, Inc.), P.O. Box 3000, Scottsbluff, NE |
| Electricity | City of Aspen, 130 S. Galena, Aspen, CO  81611 |
| Telephone * | Qwest Communications, 1801 California St., Denver, CO 80202 |
| Water | City of Aspen, 130 S. Galena, Aspen, CO  81611 |
| Sanitary Sewer | Aspen Consolidated Sanitation District 565 N. Mill Street Aspen, CO  81611 |
| Solid Waste Disposal * | Waste Management, PO Box 961, Carbondale, CO  81623 |
| Fire Protection | Aspen Volunteer Fire Department, 420 E. Hopkins Ave, Aspen, CO  81611 |
| Police Protection | City of Aspen Police Department 506 E. Main Street Aspen, CO  81611 |
| Snow Removal | City of Aspen Street Department 1080 Power Plant Road Aspen, CO  81611 |

7.     **IF THE SUBDIVISION HAS A HOMEOWNERS OR SIMILAR ASSOCIATION.** Rule S-23(n).

   i.     *Whether membership in such association is mandatory.*

**G.A. Resort Condominium Association, Inc.**

All Owners are mandatory members of the Association. The Association is responsible for the management, administration, and operation of the Condominium, including maintenance of all Common Elements and Units; for the maintenance, operation and administration of the timeshare ownership regime for the Condominium, including reservations and housekeeping; and for the maintenance, repair and replacement as needed of all personal property consisting of furniture, fixtures and equipment in the Units committed to the Timeshare Plan.

The Association has the right to propose special assessments as provided in the Declaration, Articles of Incorporation, Bylaws, rules and regulations and all amendments and supplements thereto, which govern the Association. The Association operates from a budget approved by the Executive Board.

Budgets are adopted annually by the Association based on the anticipated expenses required for the operation of the Association. The Association is or will, prior to completion of construction of the Condominium, be incorporated in the State of Colorado as a nonprofit corporation for the purpose of administering the operation and maintenance of the Condominium.

ii.     *An estimate of association dues and fees which are the responsibility respectively of the purchaser and the Developer.*

A copy of the annual budget and estimated Assessments for the Association is provided with this disclosure document. The obligation for payment of Assessments due for the year of closing will be determined by agreement between Developer and the Purchaser at the time a purchase contract is signed. Developer will be responsible for all Assessments, if any, accruing prior to closing while the Purchaser will be responsible for all Assessments accruing subsequent to closing. Developer is obligated to pay Assessments for all unsold interests in the same manner as all other owners except Developer is not obligated to pay Club Dues.

iii.    *A description of the services provided by the association.*

The Association is responsible for the operation and administration of the Condominium and Timeshare Plan, including the maintenance, repair and administration of all structure and mechanical components of the Condominium as well as all furniture, fixtures and equipment located within each of the Units committed to the Timeshare Plan. All reservation, reception and departure services and systems are all the responsibility of the Association, as is the supervision of all housekeeping services for Units committed to the Timeshare Plan. All management responsibilities for the Association will be delegated to Hyatt Vacation Management Corporation ("Management Company") pursuant to a management contract by and between the Association and the Management Company. The reservation system will be provided pursuant to the Affiliation Agreement. HVOI owns the hardware and a license for the software that comprise the reservation system.

iv.     *Whether the Developer has voting control of the association and the manner in which such control can or will be transferred.*

Developer is entitled to vote on Association matters in accordance with the provisions of the Declaration, and the Articles of Incorporation and Bylaws of the Association. Developer retains control of the Executive Board until the earliest of the following events:

a.      sixty (60) days after conveyance by Developer of seventy-five percent (75%) or more of the ownership interests in the Condominium to Owners other than Developer,

b.      two (2) years after the last conveyance of an ownership interest by Developer in the ordinary course of business,

c.      two (2) years after any right to add new units was last exercised, or

d.      the date on which Developer voluntarily relinquishes such power evidenced by a notice recorded in the Office of the Clerk and Recorder for Pitkin County, Colorado.

Each member of the Executive Board will serve until his successor is elected or appointed in accordance with the Bylaws. Owners will be permitted to elect directors of the Association in accordance with Colorado law, as follows:

a.      Not later than the earlier of (i) sixty (60) days after twenty-five percent (25%) or more of the ownership interests in the Condominium are owned by Owners other than Developer or (ii) one-year after the sale of the first Timeshare Interest by Developer to a third-party, the Owners other than Developer shall be entitled to elect at least one member and not less than twenty-five percent (25%) of the members of the Executive Board.

b.   Not later than sixty (60) days after fifty percent (50%) or more of the ownership interests in the Condominium are owned by Owners other than Developer, the Owners other than Developer shall be entitled to elect not less than thirty-three and one-third percent (33 1/3%) of the members of the Executive Board.

c.   Not later than the termination of any period of Developer control, the Owners other than Developer shall be entitled to elect a majority of the members of the Executive Board.

Subject to the limitations set forth above, Developer shall be entitled to elect not less than one (1) member of the Executive Board as long as Developer holds for sale in the ordinary course of business at least two percent (2%) of the ownership interests in the Condominium.

v.   *Whether the Developer has any financial interest or will potentially derive any income or profit from such association, including the Developer's right to borrow or authorize borrowing from the association.*

Developer has no direct financial interest nor will it potentially derive any income or profit from the Association. Developer has no right to borrow or authorize borrowing from the Association.

The Management Company, an affiliate of one of the members of Developer, is the managing agent for the Association and will derive income or profit from performing and providing management services pursuant to the terms of the Management Contract.

The Executive Board is responsible for controlling and disbursing funds of the Association. The Management Company, pursuant to the Management Contract, will be delegated the authority to hold funds of the Association and to disburse those funds in accordance with the Management Contract.

## 8.   TIMESHARE PROJECT. Rule S-23(o).

i.   *A description of the timeshare units including the number of timeshare units, the length and number of timeshare interests in each unit, and the timeshare periods constituting the timeshare plan.*

A total of fifty (50) condominium units may be committed to the Timeshare Plan. Some of the Units will be arranged to allow individual bedrooms to be locked-off with separate access from common corridors. Developer will determine which units are committed to the timeshare plan. All units in which Club Members own Timeshare Interest shall be committed to the timeshare plan.

The developer plans to offer twenty timeshare interests in each Unit allowing approximately 17 days/nights of use each year for each 1/20[th] timeshare interest owned. Usage will include use of a fixed week designated at the time of purchase together with approximately 10 days/nights of floating usage.

The Association has the right under the Condominium Documents to reserve at least one Week (a maximum of two Weeks) for maintenance purposes, on a priority basis. Unless the Affiliation Agreement is terminated in accordance with its terms, the Association has agreed with HVOI that the annual reservation of actual time periods for maintenance purposes shall be governed by the Club Rules. Pursuant to the Club Rules, the Association has the right to reserve one Week in each Unit during the Home Resort Preference Period (Float) and up to one additional Week during the Club Use Period on a priority basis for maintenance purposes during the term of the Affiliation Agreement.

The Condominium is a Component Resort of the Club. The Club consists of the exchange and reservation services and vacation and travel benefits, including the Club reservation system, made available to Club Members by HVOI. Subject to availability and pursuant to the Club Rules, Club Members will have the opportunity to reserve accommodations and related facilities located at Hyatt Beach House, Key West, Florida; Hyatt Windward Pointe, Key West Florida; Hyatt Coconut Plantation, Bonita Springs, Florida; Hyatt Sunset Harbor, Key West, Florida; Hyatt High Sierra Lodge, Incline Village, Nevada; Hyatt Mountain Lodge, Beaver Creek, Colorado; Hyatt Main Street Station, Breckenridge, Colorado; Hyatt Hacienda del Mar, Vega Alta, Puerto Rico; Highlands Inn, a

Hyatt Vacation Club, Carmel, California; Hyatt Pinon Pointe, Sedona, Arizona; Hyatt Wild Oak Ranch, San Antonio, Texas; and other Club Resorts, if any, which may be affiliated with the Club from time to time.

Use of Units will be governed by the Club Rules. The Club Rules require Owners to reserve use on an annual basis, including use of any Fixed Week or Floating time. As long as an Owner timely reserves the use of his Fixed Week during the Home Resort Preference Period (Fixed), and as long as an Owner timely reserves the use of a whole Floating Week and a Floating Split Week during the Home Resort Preference Period (Float), in accordance with the Club Rules, the Owner is assured the use of his Fixed Week, one Floating Week and one Floating Split Week at the Condominium each year as a part of his deeded Timeshare Interest.

**Purchasers should refer to the Club Documents for further information regarding the Club and reservation procedures.**

Check-in and check-out days for Fixed Weeks, Floating Weeks and Split Weeks may vary from Unit to Unit. Developer has reserved the right to provide for a different check-in and check-out day for different Units. Unless otherwise designated, the Weeks in a Unit shall begin and end on Saturday. Usage of the Weeks will begin at 4 p.m. on the first day of the Week or Split Week and end at 10 a.m. on the last day of the Week or Split Week.

The Club Rules allow for the reservation of Split Weeks at the Condominium. The Club Rules presently allow an Owner to use of two (2), three (3) or four (4) consecutive days/nights based on availability during the year rather than requiring the Owner to use seven (7) consecutive days. The Club Rules provide additional detail regarding the reservation of Split Weeks, including the designation of days and times for check-in and check-out. Depending on usage, other Split Week combinations may be available.

The Club Rules also describe the manner in which Owners may use their Hyatt Vacation Club points to access other Club Resorts, any Affiliate Resorts, the External Exchange Program (see section 10 below), and other Club benefits. The reservation procedures and the other provisions of the Club Rules and the Club Point Chart may be revised from time to time by HVOI without the consent of the Owners or any Club Member. However, in this regard, HVOI will use its best efforts, in good faith and based upon all reasonably available evidence under the circumstances, to further the best interests of the Club Members as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the Club. Also, revision of the Club Point Chart will not affect the Owners' rights to reserve use at the Condominium during the Home Resort Preference Periods.

       ii.    *The name and business address of the managing entity under the timeshare plan, a description of the services that the managing entity will provide, and a statement as to whether the Developer has any financial interest in or will potentially derive any income or profit from such managing entity, and the manner, if any, by which the purchaser or Developer may change the managing entity or transfer the control of the managing entity.*

The Condominium will be managed by Hyatt Vacation Management Corporation (the "Management Company") pursuant to a management contract. The Association will delegate management, maintenance, administrative and operational duties for the Condominium to the Management Company, whose principal physical and mailing business address is 450 Carillon Parkway, Suite 210, St. Petersburg, Florida 33716. The Management Company is qualified to do business in Colorado with its place of business in Colorado as c/o Four Peaks Development, LLC, 1000 South Mill Street, Aspen, Colorado 81611. The Management Company will provide management services including reception and check-out services, housekeeping, reservations, maintenance, repair, budgeting, and billing. The Management Company is a wholly owned subsidiary of HVOI. Developer has no direct control over the Management Company, has no financial interest in and will not derive any income or profit from the Management Company.

The Management Contract has an initial term of 5 years and shall be automatically renewed for successive 3-year periods unless terminated earlier in accordance with Colorado law or its terms. Pursuant to the Management Contract, the Management Company has the right to cancel the Management Contract without the approval of the Owners upon ninety (90) days' advance written notice to the Association. In addition, if the Management Company determines that compliance with the Management Contract is impractical either due to budget limitations or due to cancellation of all or a portion of the contract by the Association or a court, the

Management Company may terminate the Management Contract upon sixty (60) days' advance written notice. The Association may terminate the Management Contract upon a material breach by the Management Company.

Pursuant to the terms of the Agreement, the Association is obligated to pay to the Management Company an annual management fee in an amount equal to fifteen percent (15%) of the Association's annual budget (excluding reserves and taxes). Payment of the annual management fee shall be in addition to any other reimbursable expenses paid to the Management Company by the Association pursuant to the terms of the Agreement, subject to the aggregate limitations of the Association's budget.

iii. *An estimate of the dues, maintenance fees, real property taxes and similar periodic expenses which are the responsibility respectively of the purchaser and the Developer and a general statement of the conditions under which future changes or additions may be imposed. Such estimate will include a statement as to whether a maintenance reserve fund has been or will be established, the manner in which such reserve fund is financed if not cash funded, an accounting of any outstanding obligations either in favor of or against the fund, the Developer's right to borrow or authorize borrowing from the fund, and the method of periodic accounting which will be provided to the purchaser.*

Estimates of the dues, maintenance fees, ad valorem property taxes and similar periodic expenses for the Condominium are set forth in the budget provided to Purchasers together with this disclosure document. The budget for the Association is modified annually by the Executive Board, subject to any required vote of the Owners. Assessments for common expenses ("Assessments") are allocated among the Owners based upon the respective assessment percentage (i.e. "Allocated Interest") allocated to each Timeshare Interest in the Declaration.

Each Owner is also required to pay Club Dues for membership in Hyatt Vacation Club. Club Dues are equal for all Owners of Timeshare Interests in the Condominium.

As set forth in the Declaration, the Association has a lien right against each Timeshare Interest, as applicable, for any unpaid Assessments including Club Dues. The lien continues in effect until all sums secured by the lien have been fully paid or until such time as is otherwise provided by applicable law. All such liens may be foreclosed by suit brought in the name of the lienholder in the same manner as a foreclosure of a mortgage on real property. Foreclosure may result in loss of ownership of the Timeshare Interest. The Association may also sue to recover a money judgment against an Owner for unpaid maintenance fees without waiving any claim of lien.

The Association has created, or will upon commencement of Assessments create, a reserve fund to provide for the repair and replacement of furniture, fixtures and equipment as well as structural components of the properties administered or managed by the Association.

Assessments and reserve funds for the Association are deposited into separate accounts controlled by the Management Company and will not be commingled by the Management Company with funds held for the benefit of other unrelated owners associations or its own funds. The Management Company must account to the Association for the receipt and disbursement of all Association funds. Developer has no right to borrow from the maintenance or reserve funds, nor may Developer authorize borrowing from the funds by any other party.

Reserve funds for the Association are budgeted as part of the annual maintenance fees and are cash funded.

The Association will report to owners on the financial affairs of the Association at the annual meeting of the Association. In addition, the Association will send copies of proposed annual budgets to owners. Owners may also inspect financial records of the Association.

iv. *A description of insurance coverage provided for the benefit of purchaser.*

The Association, through the Management Company, has, or will prior to completion of construction of the Condominium, obtain insurance coverage for general liability, casualty, and fidelity risks pursuant to the Declaration and applicable law in such amounts as to provide reasonable and cost-effective protection for the Owners in the

event of loss. The amounts of such coverage will be determined by the Executive Board and applicable law. The following are the initial coverages in effect for the Condominium:

General Liability: $1 million per occurrence
$2 million aggregate
Casualty: Full replacement cost for all improvements, furnishings, fixtures and equipment
Fidelity: Not less than $50,000

v. *The mechanic's lien laws of Colorado may authorize enforcement of a lien by selling the entire unit committed to timeshare ownership or the entire project.*

Mechanic's lien protection will be provided to Owners through title insurance.

9. **INTERNAL EXCHANGE PROGRAM. Rule S-24.**

**Hyatt Vacation Club**. HVOI is an exchange company offering exchange and reservation services and related vacation and travel benefits through the Club to Owners at Club Resorts, including the Condominium, during the term of the Condominium's Affiliation Agreement. Membership in the Club is an appurtenance to each Timeshare Interest in a Unit in accordance with the Condominium Declaration and the Hyatt Vacation Club Resort Agreement. Owners should refer to the Exchange Disclosure Guide, the Club Rules, and other Club Documents for a further description of the rights and obligations of Owners in the Club.

a. *The name and business address of the internal exchange company. S-24 (a).*

Hyatt Vacation Ownership, Inc.
450 Carillon Parkway, Suite 210,
St. Petersburg, Florida 33716

b. *Whether the purchaser's contract with the exchange program is separate and distinct from the purchaser's contract with the time share developer. S-24 (b).*

Owners will automatically become members of the Club upon purchase of a Timeshare Interest. Membership in the Club will be mandatory. All Owners will be required to pay annual Club Dues.

c. *Whether the purchaser's participation in the exchange program is dependent upon the developer's continued affiliation with the exchange program. S-24(c).*

The Condominium will remain a Component Resort of the Club as long as the Affiliation Agreement remains in effect, in which case, an Owner will always be eligible to reserve available accommodations at any Club Resort that is affiliated with the Club during the term of that Owner's Club membership in accordance with the reservation procedures set forth in the Club Rules.. In the event that (i) the Management Company is terminated without the consent of Developer; (ii) there is a breach of the Affiliation Agreement is by the Association; or (iii) the Affiliation Agreement is terminated for any reason, benefits available through the Club may be terminated by HVOI. In such event, the Condominium will no longer be a Component Site of the Club and Owners will no longer be eligible to participate in the Club. Owners would continue to own and have use rights at the Condominium.

d. *Whether or not the purchaser's participation in the exchange program is voluntary. S-24 (d).*

Membership in the Club is mandatory. All Owners will be required to pay annual Club Dues. Owners may, but are not required to use the Club exchange program to exchange their Timeshare Interests.

  e. *The specific terms and conditions of the purchaser's contractual relationship with the exchange program and procedure by which changes, if any, may be made in the terms and conditions of such contractual relationship. S-24 (e).*

  The Owner's contractual relationship with the Club will be governed by the Affiliation Agreement by and among the Association, Developer and HVOI. The Affiliation Agreement is an attachment to the Declaration. In addition, the Club Rules govern the methods and procedures for requesting exchanges.

  f. *The procedure for applying for such changes. S-24 (f).*

  HVOI reserves the right to modify the Club Rules and to modify the fees payable for participation in the Club.

  g. *A complete description of all limitations, restrictions, accrual rights, or priorities employed in the operation of the exchange program, including but not limited to limitations on exchanges based on seasonality, unit size, or levels of occupancy; and if the limitations, restrictions or priorities are not applied uniformly by the exchange program, a complete description of the manner of their application. S-24 (o).*

  HVOI has developed a system to facilitate the exchange of accommodations at the Condominium for accommodations at other Club Resorts participating in the Club. This will include determining the relative demand of accommodations at the Condominium and at other resorts participating in the Club for purposes of facilitating exchanges among owners. For administrative convenience only an Owner will annually be assigned a number of points to represent the comparable exchange value of the Timeshare Interest owned at the Condominium.

  h. *Whether exchanges are arranged on a space-available basis or whether guarantees of fulfillment of specific requests for exchange are made by the exchanging company. S-24 (h).*

  All exchange requests will be submitted by Owners to the Club in accordance with the Club Rules. Neither the Club nor the Condominium guarantees fulfillment of a specific request for exchange privileges at a participating Club Resort.

  i. *Whether and under what conditions, a purchaser may, in dealing with the exchange program lose the use and occupancy of the time share period, in any properly applied for exchange without being offered substitute accommodations by the exchange program. S-24 (i).*

  Owners will not be required to deposit use rights associated with their Ownership Interest until and unless such Owner simultaneously receives a confirmed exchange request through the Club.

  j. *The fees for participation in the exchange program, whether the fees may be altered and the method of any altering. S-24 (j).*

  The Association will be billed by HVOI for the annual Club Dues. The Association will, in turn, bill Owners. Club Dues are based on the number of Timeshare Interests owned regardless of size of the condominium unit in which the Timeshare Interest is owned. Other fees for participating in the Club exchange program, including but not limited to exchange fees imposed by Club, will be paid by the Owner in accordance with the Club Rules.

  Additional fees, if any, charged by other Club Resorts for the use of facilities and amenities are determined and levied by each Club Resort. Such fees are the responsibility of the individual Owner. These fees may vary from resort to resort and are subject to change without notice.

  The Club Dues for 2005 and 2006 are estimated to be $215 per deeded Timeshare Interest.

      k.     *The name and location of each accommodation or facility, including the time sharing plans participating in the exchange program. S-24 (k).*

Please see the supplemental information regarding the accommodations and facilities that are available through Hyatt Vacation Club.

      l.     *Termination of Hyatt Vacation Club Resort Agreement by the Association.*

Under the Affiliation Agreement, the Association may terminate the Affiliation Agreement upon occurrence of either of the following: (i) the Club shall become insolvent or make an assignment for the benefit of creditors; or (ii) Club shall default in the performance of any of the provisions of the Affiliation Agreement and fails to rectify such default within thirty (30) days after receipt of written notice specifying such default, or such additional period of time as is reasonably required to correct such default.

## 10.    EXTERNAL EXCHANGE PROGRAM. Rule S-24.

**Interval International**. The information provided in this Section is intended to provide only general information with respect to the Club's participation in the exchange program with Interval International, Inc. ("Interval"). More specific information regarding the exchange program is provided to you by Interval in the Interval Buyer's Guide and the Interval Resort Directory (collectively, the "Interval Disclosure Package") and in the Club Rules.

In order to increase the range of options available to Club Members, HVOI has arranged for an "External Exchange Program." This program currently consists exclusively of an exchange agreement between HVOI and Interval, as the External Exchange Company, under which HVOI is a "corporate member" on behalf of all Club Members (the "Interval Affiliation Agreement"). The Interval Affiliation Agreement allows Club Members to exchange to resorts that participate in the Interval exchange network.

All external exchange requests will be submitted by Club Members to HVOI in accordance with the Club Rules. The Purchaser's participation in the External Exchange Program is voluntary and the use of the exchange program is subject to the availability of other timeshare interests in the exchange network, and to the rules, regulations, terms, and other restrictions set by Interval from time to time. The exchanging Club Member will be charged Interval's published fee to confirm an external exchange.

**HVOI'S current Affiliation Agreement with Interval expires on December 31, 2007. Neither HVOI nor Interval is obligated to extend or renew the Interval Affiliation Agreement for any particular length of time, nor makes any commitment to do so. Upon termination or expiration of the Interval Affiliation Agreement, HVOI, subject to its reasonable business judgment as to availability, economic feasibility, and the best interests of the Club Members as a whole, may enter into another agreement of short or long duration with Interval or with another External Exchange Company so that Club Members will have the opportunity to avail themselves of an External Exchange Program through the term of the various Hyatt Vacation Club Resort Agreements. There can be no assurance, however, that HVOI will do so or will be successful in doing so.**

      a.     *The name and business address of the exchange company. S-24 (a).*

      Interval International, Inc.
      6262 Sunset Drive
      Miami, Florida 33143

      b.     *Whether the purchaser's contract with the exchange program is separate and distinct from the purchaser's contract with the time share developer. S-24 (b).*

The External Exchange program currently consists of an exchange agreement between HVOI and Interval, under which HVOI is a "corporate member" on behalf of all Club Members. Purchasers do not have a contract with Interval that is separate and distinct from HVOI's agreement.

     c.    *Whether the purchaser's participation in the exchange program is dependent upon the developer's continued affiliation with the exchange program. S-24(c).*

Although the Developer has entered into a multi-year corporate membership agreement with Interval with respect to the offering of exchange services, the Developer reserves the right, in its sole discretion, to change its affiliation to another exchange company at a future date, and any such change will not be deemed a material change. Purchaser's participation in Interval's exchange program is dependent on developer's continued affiliation with Interval's exchange program.

     d.    *Whether or not the purchaser's participation in the exchange program is voluntary. S-24 (d).*

The purchaser's eligibility to participate in the External Exchange Program is automatic; however, actual participation in the External Exchange Program is only available through the Club and is voluntary. The use of such exchange program is subject to availability of other timeshare interests in the Interval exchange network, rules, regulations, terms, and other restrictions (including transaction fees) that may be set by Interval from time to time.

     e.    *The specific terms and conditions of the purchaser's contractual relationship with the exchange program and procedure by which changes, if any, may be made in the terms and conditions of such contractual relationship. S-24 (e).*

More specific terms of the contractual relationship of HVOI with Interval are provided in the Interval Disclosure Package.

     f.    *The procedure for applying for such changes. S-24 (f).*

The terms and conditions for applying for exchanges are set forth in the Interval Disclosure Package, as it may be changed from time to time by Interval in its sole discretion, and the Club Rules, as it may be change from time to time by HVOI in its sole discretion. Individual members will be provided written notice of any such changes.

     g.    *A complete description of all limitations, restrictions, accrual rights, or priorities employed in the operation of the exchange program, including but not limited to limitations on exchanges based on seasonability, unit size, or levels of occupancy; and if the limitations, restrictions or priorities are not applied uniformly by the exchange program, a complete description of the manner of their application. S-24 (o).*

Interval assigns a priority to each exchange request based upon a number of factors, as determined by Interval with respect to each resort. More specifics with respect to these factors are provided in the Interval Disclosure Package.

     h.    *Whether exchanges are arranged on a space-available basis or whether guarantees of fulfillment of specific requests for exchange are made by the exchanging company. S-24 (h).*

All exchange requests will be submitted by Owners to Interval though the Club in accordance with the rules, regulations, terms and conditions set by Interval from time to time. Interval does not guarantee fulfillment of a specific request for exchange privileges at a participating resort.

     i.    *Whether and under what conditions, a purchaser may, in dealing with the exchange program lose the use and occupancy of the time share period, in any properly applied for exchange without being offered substitute accommodations by the exchange program. S-24 (i).*

Interval has no obligation to provide an individual member depositing a pre-reserved Week in the Condominium with exchange accommodations in a subsequent year if: (a) the member fails to submit a valid exchange request listing travel dates no later than 24 months after the commencement date of the deposited week; or

(b) the member's requested accommodations are not available and any alternative accommodations offered by Interval are not accepted by the individual member.

> j.      *The fees for participation in the exchange program, whether the fees may be altered and the method of any altering. S-24 (j).*

The Club, through HVOI, has a corporate membership with Interval. Fees for the annual membership will be paid by Owners as part of their assessments for payment of dues for the Club. A Club Member will be separately charged Interval's published fee to confirm an external exchange. The External Exchange Program is a standard service offered by Interval.

Additionally, fees, if any, charged by Interval member resorts for the use of facilities and amenities are determined and levied by each member resort. Such fees are the responsibility of the individual member. These fees may vary from resort to resort and are subject to change without notice.

> k.      *The name and location of each accommodation or facility, including the time sharing plans participating in the exchange program. S-24 (k).*

Each purchaser of a Timeshare Interest participating in the External Exchange Program will be provided with a current Interval Resort Directory, which lists the resorts participating in the Interval exchange program.

> l.      *Termination of Interval Affiliation Agreement by the Association.*

Any agreement with Interval will be by means of the Interval Affiliation Agreement by and between Interval and HVOI.

> m.      *Interval Disclosures*

See the Interval International, Inc. Buyer's Disclosure Guide.

## 11.      RESTRICTIONS ON RENTAL AND RESALE; EXPECTATIONS OF TAX TREATMENT.

Any permitted sale of a Unit or Timeshare Interest between an Owner and a bona fide third party shall be deemed to contain a provision requiring that any sums due to the Association as Assessments must be paid in full as a condition of closing of the sale. Any lease or rental agreement shall be deemed to contain a provision requiring that any sums due to the Association as Assessments must be deducted from the gross rentals and paid directly to the Association. Developer has a 15-day right of first refusal that runs with the land to purchase any Unit or Timeshare Interest that is offered for resale, transferred or hypothecated at any time on the same terms and conditions as those offered by any bona fide third party, including financing. Developer's right of first refusal terminates upon the earliest of (a) the date which is ten (10) years after the date of recording of the Declaration, (b) the filing of a notice in the Office of the Clerk and Recorder of Pitkin County, Colorado by Developer terminating its rights, or (c) the date Developer sells its last interest in the Condominium. Please refer to the Declaration for a detailed description of all of these restrictions and controls.
**Developer has no obligation to assist Owners in the resale of Units or Timeshare Interests or to provide financing for any such resale.**

**The expectation of deriving any rental or other revenue, profit or gain should not be a consideration in the decision to purchase a Timeshare Interest in the Condominium.**

**Generally, an Owner should expect substantial competition from Developer in the event an Owner desires to resell or rent a Timeshare Interest. In this regard, Owners should not expect any established resale or rental market. Furthermore, any Owner who attempts to rent a unit to a third party will experience considerable competition from resort hotels near the Condominium (including those owned or operated by Hyatt Companies) and from Developer, who will be renting its unsold inventory of Timeshare Interests.**

Anticipated tax benefits or the expectation of any particular tax treatment should not be a consideration in the decision to purchase a Timeshare Interest.

## Exhibit A

**Budget for G.A. Resort Condominium Association, Inc.**

*See attached.*

# HYATT GRAND ASPEN
## Preliminary Master Operating Budget Worksheet
### 2005 & 2006

1 4 bedroom units
28 3 bedroom units
19 2 bedroom units
2 1 bedroom units
50 Shares 1/20
1000 Intervals

(not an HOA Expense)

| | Master Budget 100.00% | 2.39% of Master | Non Club Residential Contribution 0.67% 28.03% | Commercial Contribution 0.70% 29.29% | Garage Contribution 1.02% 42.68% | Residential Club Contribution 97.61% |
|---|---|---|---|---|---|---|
| **INCOME** | | | | | | |
| Interest - Fee Operating | 3,000.00 | | | | | 3,000.00 |
| Interest Other Operating | 6,000.00 | | | | | 6,000.00 |
| Delinquency Reinstatement Fees | 1,000.00 | | | | | 1,000.00 |
| Telephone | 20,000.00 | | | | | 20,000.00 |
| Housekeeping Income | 2,000.00 | | | | | 2,000.00 |
| Vending Income | 2,000.00 | | | | | 2,000.00 |
| Misc Income | 6,000.00 | | | | | 6,000.00 |
| | | | | | | |
| Total Misc. Income | 40,000.00 | | | | | 40,000.00 |
| Silver Circle Income | 50,000.00 | | | | | 50,000.00 |
| Non Club Residential Income | 88,020.00 | | | | | 88,020.00 |
| Total Income | 178,020.00 | | 0.00 | 0.00 | 0.00 | 178,020.00 |
| | | | | | | |
| **EXPENSES** | | | | | | |
| **General & Administrative** | | | | | | |
| **Salaries** | | | | | | |
| a   Admin Salary | 90,000.00 | 2,151.00 | 603.00 | 630.00 | 918.00 | 87,849.00 |
| a   Bookkeeper Salary | 45,000.00 | 1,075.50 | 301.50 | 315.00 | 459.00 | 43,924.50 |
| a   Security | 48,256.00 | 1,153.32 | 323.32 | 337.79 | 492.21 | 47,102.68 |
| club   Front Desk Salary | 317,280.00 | | | | | 317,280.00 |
| club   Transportation Salary | 96,720.00 | | | | | 96,720.00 |
| club   Housing Salary | 18,000.00 | | | | | 18,000.00 |
| subtotal salaries | 615,256.00 | 4,379.82 | 1,227.82 | 1,282.79 | 1,869.21 | 610,876.18 |
| Taxes & Benefits (35%) | 215,339.60 | 1,532.94 | 429.74 | 448.98 | 654.22 | 213,806.66 |
| a   Uniforms | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| club   Payroll Accounting | 800.00 | | | | | 800.00 |
| club   Continuing Education | 3,500.00 | | | | | 3,500.00 |
| club   Recruitment | 3,000.00 | | | | | 3,000.00 |
| G&A Payroll & Benefits | 842,895.60 | 6,032.25 | 1,691.05 | 1,766.77 | 2,574.44 | 835,863.35 |

## G&A Expenses

| | Account | | | | | | Total |
|---|---|---|---|---|---|---|---|
| ≡ | Bank Charges | 3,000.00 | 71.70 | 20.10 | 21.00 | 30.60 | 2,928.30 |
| a | Legal | 3,000.00 | 71.70 | 20.10 | 21.00 | 30.60 | 2,928.30 |
| a | Office Expense | 15,000.00 | 358.50 | 100.50 | 105.00 | 153.00 | 14,641.50 |
| a | Office Equipment | 2,000.00 | 47.80 | 13.40 | 14.00 | 20.40 | 1,852.20 |
| a | Postage | 1,000.00 | 23.90 | 6.70 | 7.00 | 10.20 | 976.10 |
| club | Computer | 20,000.00 | | | | | 20,000.00 |
| club | Computer Supplies | 1,500.00 | | | | | 1,500.00 |
| club | Computer Equipment | 1,000.00 | | | | | 1,000.00 |
| club | Credit Card Fees | 7,500.00 | | | | | 7,500.00 |
| club | Express Mail | 1,500.00 | | | | | 1,500.00 |
| club | Gst/Owner Satisfaction | 4,000.00 | | | | | 4,000.00 |
| club | Meetings - Directors | 1,000.00 | | | | | 1,000.00 |
| club | Meetings - Gen Membership | 1,000.00 | | | | | 1,000.00 |
| club | Miscellaneous Exp | 10,000.00 | | | | | 10,000.00 |
| club | Newsletter | 3,000.00 | | | | | 3,000.00 |
| club | Printing Gst Info FD | 1,500.00 | | | | | 1,500.00 |
| club | Printing Gst Info Unit | 6,000.00 | | | | | 6,000.00 |
| club | Subscriptions,Dues | 1,200.00 | | | | | 1,200.00 |
| club | Continental Breakfast | 67,000.00 | | | | | 67,000.00 |
| club | Wine and Cheese | 14,000.00 | | | | | 14,000.00 |
| | **Subtotal** | 164,200.00 | 573.60 | 160.80 | 168.00 | 244.80 | 163,626.40 |
| | | | | | | | |
| | **Total General & Administrative** | 1,007,095.00 | 6,605.85 | 1,851.85 | 1,934.77 | 2,819.24 | 1,000,488.75 |

## Engineering & Housekeeping

### Engineering

| | Account | | | | | | Total |
|---|---|---|---|---|---|---|---|
| a | Engineering Payroll | 221,080.00 | 5,283.81 | 1,481.24 | 1,547.56 | 2,255.02 | 215,796.19 |
| a | Taxes & Benefits (35%) | 77,378.00 | 1,849.33 | 518.43 | 541.65 | 789.26 | 75,528.67 |
| a | Uniforms | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| ≡ | Continuing Education | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| | **Engineering Payroll & Benefits** | 308,458.00 | 7,372.15 | 2,066.67 | 2,159.21 | 3,146.27 | 301,085.85 |

### Housekeeping

| | Account | | | | | | Total |
|---|---|---|---|---|---|---|---|
| a | Housekeeping Payroll | 851,216.00 | 20,344.06 | 5,703.15 | 5,958.51 | 8,682.40 | 830,871.94 |
| a | Taxes & Benefits (35%) | 297,925.60 | 7,120.42 | 1,996.10 | 2,085.48 | 3,038.84 | 290,805.18 |
| a | Uniforms | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| a | Continuing Education | 5,000.00 | 137.00 | 38.41 | 40.13 | 58.47 | 4,863.00 |
| club | Contract Housekeeping | 45,000.00 | | | | | 45,000.00 |
| club | Contract Laundry | 45,000.00 | | | | | 45,000.00 |
| | **Housekeeping Payroll & Benefits** | 1,249,141.60 | 27,720.98 | 7,771.16 | 8,119.12 | 11,830.71 | 1,221,420.62 |

**Eng & Help Expenses**

| Code | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| a | Building | 6,000.00 | 143.40 | 40.20 | 42.00 | 61.20 | 5,856.60 |
| a | Cleaning Equip & Supplies | 30,000.00 | 717.00 | 201.00 | 210.00 | 306.00 | 29,283.00 |
| a | Decorations | 6,000.00 | 143.40 | 40.20 | 42.00 | 61.20 | 5,856.60 |
| a | Electrical Repairs | 2,000.00 | 47.80 | 13.40 | 42.00 | 20.40 | 1,924.20 |
| a | Housekeeping Supplies | 40,000.00 | 956.00 | 288.00 | 280.00 | 408.00 | 39,044.00 |
| a | Help Equip Repairs | 1,000.00 | 23.90 | 6.70 | 7.00 | 10.20 | 976.10 |
| a | Lamping | 2,000.00 | 47.80 | 13.40 | 14.00 | 20.40 | 1,952.20 |
| a | Maint Equip Repairs | 1,000.00 | 23.90 | 6.70 | 7.00 | 10.20 | 976.10 |
| a | Maintenance Supplies | 10,000.00 | 239.00 | 67.00 | 70.00 | 102.00 | 9,761.00 |
| club | Maintenance Weeks | 10,000.00 | | | | | 10,000.00 |
| club | Amenities/Guest Supplies | 85,000.00 | | | | | 85,000.00 |
| club | Replacement Glasses | 3,000.00 | | | | | 3,000.00 |
| club | Repl/Repair Appliances | 2,000.00 | | | | | 2,000.00 |
| club | Replacement China | 3,000.00 | | | | | 3,000.00 |
| club | Replacement Linen | 10,000.00 | | | | | 10,000.00 |
| club | Replacement Utensils | 1,200.00 | | | | | 1,200.00 |
| | **Eng & Help Exp subtotal** | 212,200.00 | 2,342.20 | 686.60 | 714.00 | 989.60 | 209,829.80 |
| | **Total Engineering & Housekeeping** | 1,769,799.60 | 37,435.33 | 10,494.42 | 10,962.32 | 15,976.58 | 1,732,336.27 |

**Utilities and Services**

| Code | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| a | Trash Removal | 15,000.00 | 358.50 | 100.50 | 105.00 | 153.00 | 14,641.50 |
| a | Electricity | 45,000.00 | 1,075.50 | 301.50 | 315.00 | 459.00 | 43,924.50 |
| a | Elevator | 12,800.00 | 301.14 | 84.42 | 88.20 | 128.52 | 12,298.86 |
| a | Gas | 60,000.00 | 1,434.00 | 402.00 | 420.00 | 612.00 | 58,566.00 |
| a | Fire, Life, Safety | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| a | Heating & A/C | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| a | Landscaping | 10,000.00 | 239.00 | 67.00 | 70.00 | 102.00 | 9,761.00 |
| a | Painting | 3,000.00 | 71.70 | 20.10 | 21.00 | 30.60 | 2,928.30 |
| a | Pest Control | 3,000.00 | 71.70 | 20.10 | 21.00 | 30.60 | 2,928.30 |
| a | Plumbing | 1,500.00 | 35.85 | 10.05 | 10.50 | 15.30 | 1,464.15 |
| a | Snow Removal | 5,000.00 | 119.50 | 33.50 | 35.00 | 51.00 | 4,880.50 |
| a | Water/ Sewer | 30,000.00 | 717.00 | 201.00 | 210.00 | 306.00 | 29,283.00 |
| a | Window Washing | 4,500.00 | 107.55 | 30.15 | 31.50 | 45.90 | 4,392.45 |
| club | Pools & Spas | 7,500.00 | | | | | 7,500.00 |
| club | CATV | 25,000.00 | | | | | 25,000.00 |
| club | Transportation Expense | 50,000.00 | | | | | 50,000.00 |
| club | Telephone | 30,000.00 | | | | | 30,000.00 |
| | **Total Utilities & Services** | 312,100.00 | 4,770.44 | 1,337.32 | 1,397.20 | 2,035.92 | 307,329.56 |

**Fixed Expenses**

| Code | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| a | Insurance | 30,000.00 | 717.00 | 201.00 | 210.00 | 306.00 | 29,283.00 |
| a | Audit & Accounting | 20,000.00 | 478.00 | 134.00 | 140.00 | 204.00 | 19,522.00 |
| a | Depreciation | 6,000.00 | 143.40 | 40.20 | 42.00 | 61.20 | 5,856.60 |
| club | Assessment,Billing,Collections | 8,000.00 | | | | | 8,000.00 |
| club | Bad Debt | 25,000.00 | | | | | 25,000.00 |
| club | Corporate Taxes | 13,000.00 | | | | | 13,000.00 |
| club | License/Permits | 5,000.00 | | | | | 5,000.00 |
| | **Total Fixed Expenses** | 107,000.00 | 1,338.40 | 375.20 | 392.00 | 571.20 | 105,661.60 |
| | | 3,195,995.20 | 50,160.03 | 14,058.79 | 14,716.29 | 21,402.94 | 3,145,817.17 |



**Other Association Expenses**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| club | Master Lease Non Club Residential (1) | 88,020.00 | | | | | 88,020.00 |
| club | Non Club Residential Operating Exp (2) | 16,167.61 | | | | | 16,167.61 |
| club | Non Club Reserve Exp | 4,986.80 | | | | | 4,986.28 |
| club | Non Club Residental Garage Exp (3) | 2,611.23 | | | | | 2,611.23 |
| club | Silver Circle Expense (4) | 100,000.00 | | | | | 100,000.00 |
| club | Garage Operating Expense (5) | 14,796.99 | | | | | 14,796.99 |
| club | Club Fees | 215,000.00 | | | | | 215,000.00 |
| | Subtotal For Management Fee | 3,637,577.84 | 50,150.03 | 14,058.79 | 14,716.29 | 21,482.94 | 3,587,399.30 |
| | Management Fee 15% | 545,636.68 | 7,522.50 | 2,108.82 | 2,207.44 | 3,210.44 | 538,109.97 |
| | Total Common Expenses | 4,183,214.52 | 57,672.53 | 16,167.61 | 16,923.74 | 24,613.38 | 4,125,509.27 |
| | <Less Assn Misc Income> | 178,020.00 | | | | | 178,020.00 |
| | Total Operating Expense | 4,005,194.52 | 57,672.53 | 16,167.61 | 16,923.74 | 24,613.38 | 3,947,489.79 |
| | Reserves | 744,298.39 | 17,788.73 | 4,986.80 | 5,210.09 | 7,591.84 | 726,509.66 |
| | Property Taxes | 485,000.00 | | | | | 485,000.00 |

**In Summary**

| | Grand Total | 5,234,492.91 | 75,461.26 | 21,154.41 | 22,133.82 | 32,205.22 | 5,156,999.45 |
|---|---|---|---|---|---|---|---|

**Per Bedroom Unit**

| | # Units | | # Bedrooms | | Per Interval |
|---|---|---|---|---|---|
| 4 Bedroom Unit | 1 | 161,218.73 | 4 | 161,218.73 | 8,061 |
| 3 Bedroom Unit | 28 | | 84 | 120,914.05 | 6,046 |
| 2 Bedroom Unit | 19 | | 38 | 80,609.37 | 4,030 |
| 1 Bedroom Unit | 2 | | 2 | 40,304.68 | 2,015 |
| Totals | 50 | | 128 | 403,046.83 | |

| 290.14 | Per Space |
|---|---|
| 2,611.23 | Affordable Housing |
| 14,796.99 | Villas |
| 14,796.99 | Developer |

**Parking Spaces - 111 Total**

| 111 | Spaces |
|---|---|
| 9 | Affordable Housing |
| 51 | Villas |
| 51 | Developer |

**CITY OF ASPEN**
**DISCLOSURE STATEMENT**
**FOR**
**G.A. RESORT CONDOMINIUMS**
**Aspen, Colorado**

NO WARRANTY OR GUARANTEE IS MADE BY THE CITY OF ASPEN WITH REGARD TO THE COMPLETENESS OR ACCURACY OF ANY INFORMATION CONTAINED HEREIN OR ANY APPROVAL GRANTED BY THE CITY OF ASPEN. NO PERSON MAY ADVERTISE OR REPRESENT THAT THE CITY OF ASPEN OR ANY OF ITS OFFICERS OR EMPLOYEES HAVE RECOMMENDED THE SALE OR PURCHASE OF TIMESHARE UNITS.

This Disclosure Statement is for certain residential condominium units in the above-referenced condominium project that will be marketed pursuant to a plan of timeshare ownership under the name "Hyatt Grand Aspen." The individual timeshare units will be affiliated with Hyatt Vacation Club and together will be considered a Hyatt Vacation Club Resort.

1. *The name and address of the developer of the timeshare development as well as a summary of the developer's business experience including all background and experience in the development of timeshare development and the present financial condition of the developer.*

> Grand Aspen Lodging, LLC
> c/o Four Peaks Development, LLC
> 1000 South Mill Street
> Aspen, CO  81611

Developer is a wholly owned subsidiary of Grand Aspen Holdings, LLC, a development company that includes a Hyatt affiliate, HTS-Aspen, L.L.C. as one of its members. Developer has contracted with another Hyatt affiliate, Hyatt Vacation Ownership, Inc. ("HVOI") to provide timeshare support services. Hyatt affiliates, directly or through participation in joint ventures, have developed timeshare ownership resort properties in various locations including but not limited to Key West, Florida, Bonita Springs, Florida, Beaver Creek, Colorado, Vega Alta, Puerto Rico, Breckenridge, Colorado, Incline Village, Nevada, Sedona, Arizona, Carmel Highlands, California and San Antonio, Texas. The developer owns the real property on which the project will be constructed. The developer has a positive net worth based on the value of the unimproved property when compared to existing liabilities.

2. *The name and address of the manager/management company for the development, if any, and a description of the manager's/management company's responsibility, powers, duties, authority and business experience. All information on the manager's background and experience specifically related to timeshare development shall be provided.*

> Hyatt Vacation Management Corporation
> 450 Carillon Parkway, Suite 210
> St. Petersburg, FL  33716

The manager of development operations will be Hyatt Vacation Management Corporation, a Delaware corporation authorized to transact business in Colorado. Hyatt Vacation Management Corporation provides hospitality and homeowner's association management services to each Hyatt

Vacation Club resort including Hyatt Sunset Harbor, Hyatt Beach House, Hyatt Windward Point, Hyatt Coconut Plantation, Hyatt Mountain Lodge, Hyatt Main Street Station, Hyatt High Sierra Lodge, Hyatt Hacienda del Mar, Hyatt Pinon Pointe, Highlands Inn, a Hyatt Vacation Club and Hyatt Wild Oak Ranch. Hyatt Vacation Management Corporation has been in business since 1994. Hyatt Vacation Management Corporation is a subsidiary of Hyatt Corporation that operates over 120 Hyatt Hotels throughout the United States, Canada and Caribbean.

3.    *The names and addresses of the marketing entity and the listing broker and a statement of whether there are any lawsuits pending or investigations that have been undertaken against the marketing entity or listing broker, and if so, a description of the status or disposition of said lawsuits or investigations. A summary of the marketing entity's business experience including all background and experience related to timeshare development.*

The marketing entity and listing broker is:

> Hyatt Vacation Marketing Corporation
> 205 South Mill Street
> Aspen, CO 81611

All marketing will be conducted through Hyatt Vacation Marketing Corporation, a Florida corporation authorized to transact business and licensed as a real estate brokerage company in Colorado. The designated broker is Lisa Hatem. All sales activity requiring real estate licensing will be conducted through licensed real estate brokers and brokerage companies in the state in which such activity takes place.

No lawsuits are pending and no investigations have been undertaken against Hyatt Vacation Marketing Corporation. Hyatt Vacation Marketing Corporation and its affiliate HVOI provides sales and marketing consulting services to each Hyatt Vacation Club resort while in active sales.

4.    *A description of the timeshare units, including the developer's schedule for completion of all buildings, units and amenities, and dates of availability.*

The project consists of a single building. Construction of the project will not be phased. Timeshare units will include 2 one-bedroom units, 19 two-bedroom units, 28 three-bedroom units, and 1 four-bedroom unit. Five of the three bedroom units will be configured as 2 bedroom units with den and Murphy bed. Some units will be arranged to allow individual bedrooms to be locked-off with separate access from common corridors. All residential units, common areas, and amenities are scheduled to be completed and available for occupancy by December 2005.

5.    *If the timeshare plan consists of a condominium or a similar form of ownership, a description of the development and any pertinent provisions of the condominium instruments.*

The project will be a condominium having the formal legal name: "G.A. Resort Condominiums." The project will be marketed as "Hyatt Grand Aspen." In addition to the 50 separate condominium units that will be available for timeshare ownership the project will include 9 one-bedroom affordable housing units, 2 small commercial units and 111 parking units.

6.      *Any restraints on the transfer of the purchaser's interest in the timeshare units or plan.*

The condominium declaration provides that the transfer of a timeshare interest after the initial transfer by the developer will be subject to a right of first refusal held by the developer.

The condominium declaration also provides that upon the sale of any timeshare interest, the applicable real estate transfer tax ("RETT") as provided under the City of Aspen Municipal Code, shall be paid at closing and shall be calculated based on the value of the land and the value of the improvements that are conveyed, whether or not it is ever determined that RETT applies only to the value of the land conveyed (and not the value of improvements).

7.      *The timeshare use plan which shall include a description of the rights and responsibilities under the plan.*

Each purchaser will acquire an undivided 1/20th interest in a specific unit which entitles the owner the right to occupy the unit purchased for one specified "fixed week" each year and the right to occupy a unit of the type purchased for approximately ten (10) additional days/nights each year (referred to as "floating use".) Confirmation of intended usage must be made by owners in accordance with the Hyatt Vacation Club Rules (the "Club Rules"). The project is affiliated with Hyatt Vacation Club. Hyatt Vacation Club is not a legal entity but rather a combination of benefits and services comprised primarily of reservation and exchange services provided by HVOI. Owners confirm and reserve use by means of a reservation system that allows for use, rental or exchange of accommodations by owners in this and other Hyatt Vacation Club resorts and affiliated properties. The developer reserves the right to sell biennial interests allowing use every other year.

Units that are not reserved for use by owners sixty (60) days prior to the commencement of a use period are required to be available for rent to the general public.

8.      *Notice of any liens, title defects or encumbrances on or affecting the title to the units or plan and, if there are encumbrances or liens, a statement as to whether, when and how they will be removed.*

There are various title exceptions affecting title to the property, none of which materially and adversely affect marketability of title. Each purchaser should consult its legal counsel for guidance in this regard.

The property is or will be encumbered by one or more liens securing financing for development and construction of the project. All liens that secure financing will be released with respect to a given timeshare interest at or before closing on the sale of such timeshare interest. If any components of the project are not complete prior to the closing of a sale of a timeshare interest, the developer will provide a letter of credit or post a bond to secure completion of such facilities as approved by the Colorado Real Estate Commission.

9.      *Notice of any pending or anticipated legal actions that are material to the timeshare units or plan of which the applicant has, or should have, knowledge.*

None.

10.    *The total financial obligation of the purchaser, which shall include the initial price and
any additional charges to which the purchaser may be subject in purchasing the unit.*

At closing, each purchaser shall be obligated to pay the purchase price for the timeshare interest
purchased together will reasonable closing costs.  Purchasers will also be obligated to pay periodic
assessments for the management, administration, maintenance, repair and operation of the resort as
well as real property taxes and dues for membership in Hyatt Vacation Club ("Club Dues") as long as
they own a timeshare interest.  At closing purchasers who are financing their purchases may be
required to pay loan origination and discount fees.  Prior to closing, each purchaser will be advised of
all charges for which purchaser will be responsible.

In accordance with the land use approvals for the Condominium, a Timeshare Impact Fee shall be
paid to the City of Aspen upon the closing of each initial Timeshare Interest.  This fee will be paid by
Developer at closing.  The resale of Timeshare Interests is exempt from this Timeshare Impact Fee.

11.    *An estimate of the dues, maintenance fees, real property taxes, sales taxes, real estate
transfer tax and similar periodic expenses, and the method or formula by which they are
derived and apportioned, which shall include whether maintenance fees are determined by
unit, time of year, or prorated share of the overall maintenance costs, or any other means
utilized to compute maintenance fees.*

Maintenance fees, taxes and similar periodic expenses shall be apportioned among the owners in
accordance with the condominium declaration. Purchasers will be provided with copies of the
proposed operating budget for the owners association as required by Colorado law.  All $1/20^{th}$
timeshare interests within similarly sized units will be subject to the same annual maintenance fee.
Two bedroom units will be subject to an annual maintenance fee that is twice the maintenance fee of
one bedroom units.  Three bedroom units will be subject to an annual maintenance fee that is three
times the maintenance fee of one bedroom units.  Club dues are the same for each $1/20^{th}$ timeshare
interest regardless of the size of the particular condominium unit in which the interest is owned.

Units at the resort that are rented for a fee whether by an owner, the owners association or the
managing agent shall be subject to the City's sales tax.  This sales tax shall not be applicable to
occupancy by owners and their guests, members of the Hyatt Vacation Club and exchange guests.
Owners who rent their units themselves are personally liable for payment of such tax.  The owners
association and management company are each responsible for charging, withholding and remitting
sales tax on units rented by each of them, respectively.

12.    *A statement demonstrating the manner in which management/assessment fees will be held,
utilized and accounted for.*

Annual assessments will be billed, collected, held and accounted for by the management company.
Operating funds will be held separately from reserve funds.

13.    *A description of any financing offered by the applicant.*

There is no assurance that financing will be made available to purchasers.  The developer reserves the
right to arrange or provide financing for qualified purchasers on terms competitive in the market at
the time of closing.

14.     *The terms and significant limitations of any warranties provided, including statutory warranties and limitations on the enforcement thereof or on damages.*

Developer warrants the materials and workmanship of the resort for a period of one (1) year from the date of issuance of a certificate of occupancy for the project. Unless required by Colorado law, the developer does not make any other warranty of any kind, express or implied, and disclaims any and all such other warranties, including but not limited to implied warranties of merchantability and fitness for a particular purpose, either with respect to the construction of the resort or with respect to the personal property located within the units and common elements or on the premises. Warranties for equipment, building components, appliances and furnishings are solely those of the manufacturers. Developer will assign to the Association, prior to closing, any unexpired warranties the developer has received from manufacturers to the extent such warranties are assignable. Owners assume all risk and liability resulting from the use of this property. Damages, if any, are limited to the cost of repair or replacement of such materials or workmanship.

15.     *A statement that the proposed development will comply with all applicable requirements of Title 12, Article 61, C.R.S. Upon request from the city, the applicant shall provide a copy of the document submitted to the state of Colorado for the registration and certification of the timeshare developer.*

The development will comply with all applicable requirements of Title 12, Article 61, C.R.S.

16.     *The extent to which a timeshare unit may become subject to a tax or other lien arising out of claims against other timeshare owners of the same timeshare unit.*

Under Colorado law, timeshare interests are separate interests in real property, and as such, one timeshare interest will not be subject to taxes or other liens arising out of claims against other timeshare interests within the same unit.

17.     *The minimum percentage of units the developer will require to be sold before the developer will proceed with the completion of the timeshare development.*

The developer reserves the right to terminate the offering of the timeshare ownership program if developer has not placed fifty percent (50%) of the total number of timeshare interests under contract within 180 days after the first purchaser of a timeshare interest signs a sales contract.

18.     *A description of the maintenance to be supplied to the timeshare development including how and when such maintenance will be provided.*

Maintenance will be provided on an on-going basis by the management company. This will include day-to-day upkeep of the premises as well as repair of the timeshare units and the common elements as necessary. The managing agent will have a priority right to reserve at least one week in each unit each year for maintenance.

19.     *Whether any or all of the units in the proposed development will be available for participation in an exchange program. The applicant shall disclose which exchange program(s) the timeshare estate owners will be eligible to utilize.*

All of the units committed to the timeshare program will participate in Hyatt Vacation Club which will provide exchange services in addition to reservation services. External exchange services will be available through Interval International.

**20.**     *A description of all insurance covering the property.*

General liability, casualty and fidelity insurance will be obtained through the management company for the benefit of the owners association in such amounts as to provide reasonable and cost-effective protection in the event of loss.  General liability insurance will insure against injuries to guests and renters but not owners.

**21.**     *A description of the on-site amenities and recreational facilities which are available for use by the unit owners.  All on-site amenities shall be owned by the homeowner's association and the developer shall not be allowed to charge any additional fees for use of the amenities.  If there are any off-site facilities that are related to the property, these shall also be described, including a summary of any fees that timeshare owners would have to pay to use those off-site facilities.*

Amenities include underground parking, outdoor, year-round swimming pool, two hot tubs, exercise facility, ice skating rink for winter use and for use as an outdoor plaza in the summer, airport shuttle service, landscaped courtyard and central lobby area with front desk for check-ins.  Currently, the Developer plans on creating a bar and lounge area within the Common Elements located adjacent to the main entry.

Portions of the property will include commercial units that may be operated as a sundries shop and a storage area for sporting equipment.  The uses of the commercial units are subject to change.

Additional services such as massages, personal trainers, recreational activities arranged by the association or management company, valet parking services, food and beverage charges, storage of personal belongings and additional housekeeping, may be available at the resort to purchasers on an "a la carte" basis for an additional fee. Tipping is permitted.

**22.**     *A statement that any timeshare interest shall be expressly subject to all requirements and representations set forth in the disclosure statement.*

Any timeshare interest shall be expressly subject to all requirements and representations set forth in this disclosure statement or any amendments hereto.

DECLARATION OF CONDOMINIUM

FOR

G.A. RESORT CONDOMINIUMS

CITY OF ASPEN
PITKIN COUNTY
COLORADO

## TABLE OF CONTENTS

Page

| ARTICLE I | INTRODUCTION | 1 |
| 1.1 | Purpose | 1 |
| 1.2 | Name | 1 |
| 1.3 | Legal Description | 1 |
| 1.4 | Development and Use | 2 |
| 1.5 | Covenants Running With the Land | 2 |
| 1.6 | Mixed Use | 2 |
| 1.7 | Timeshare Plan and Multisite Timeshare Plan | 2 |
| ARTICLE II | DEFINITIONS | 3 |
| ARTICLE III | MAP | 11 |
| ARTICLE IV | EASEMENTS | 12 |
| 4.1 | General Easements | 12 |
| 4.2 | Association Easements | 13 |
| 4.3 | Declarant Easements | 13 |
| 4.4 | Cross Use Easements Pertaining to Timeshare Interests | 15 |
| 4.5 | Permitted Exceptions | 15 |
| 4.6 | Reservation of Easement Rights | 15 |
| 4.7 | Conveyances | 15 |
| 4.8 | Manner of Granting Easements | 15 |
| ARTICLE V | UNITS | 16 |
| 5.1 | Description of Units | 16 |
| 5.2 | Affordable Housing Units | 17 |
| 5.3 | Parking Units | 18 |
| 5.4 | Limited Common Elements | 18 |
| 5.5 | Restricted Common Elements | 18 |
| 5.6 | Warranty Limitation | 19 |
| ARTICLE VI | APPURTENANCES | 19 |
| 6.1 | Appurtenant Allocated Interests | 19 |
| 6.2 | No Partition of Common Elements | 20 |
| 6.3 | No Partition of Units or Timeshare Interests | 20 |
| 6.4 | Hyatt Vacation Club | 20 |
| 6.5 | Parking Units | 21 |
| ARTICLE VII | MAINTENANCE, ALTERATION AND IMPROVEMENT | 21 |
| 7.1 | Owner's Rights and Duties with Respect to Interiors | 21 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 7.2 | Responsibility of the Association | 21 |
| 7.3 | Owner's Failure to Maintain or Repair | 21 |
| 7.4 | Association's Access to Units | 22 |
| 7.5 | Maintenance Weeks | 22 |
| 7.6 | Common Elements | 22 |
| ARTICLE VIII | ASSESSMENTS AND COMMON EXPENSES | 23 |
| 8.1 | Assessments | 23 |
| 8.2 | Annual Budget | 23 |
| 8.3 | Special Assessments | 23 |
| 8.4 | Common Surplus | 24 |
| 8.5 | Refunds of Common Surplus | 24 |
| 8.6 | Certificate | 24 |
| 8.7 | Club Dues | 24 |
| 8.8 | Ad Valorem Taxes | 25 |
| 8.9 | Waiver of Homestead Exemption | 25 |
| 8.10 | Billing and Collection | 25 |
| 8.11 | Common Expenses | 28 |
| 8.12 | Personal Expenses | 28 |
| ARTICLE IX | THE ASSOCIATION | 28 |
| 9.1 | Membership in Association | 28 |
| 9.2 | Voting Rights. | 28 |
| 9.3 | Articles of Incorporation | 28 |
| 9.4 | Bylaws | 29 |
| 9.5 | Limitation upon Liability of Association | 29 |
| 9.6 | Restraint upon Assignment of Shares and Assets | 29 |
| 9.7 | Declarant Control of Association | 29 |
| 9.8 | Association Management Contract | 30 |
| 9.9 | Other Association Powers | 30 |
| 9.10 | Title to Property | 31 |
| 9.11 | Administration, Powers, and Services | 31 |
| 9.12 | Acquiring and Disposing of Personal Property | 31 |
| 9.13 | Cooperation with Other Associations | 32 |
| 9.14 | Appointment of Executive Board as Agent for Service of Process | 32 |

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| ARTICLE X | INSURANCE | 32 |
| 10.1 | Authority to Purchase; Named Insured; Required Provisions | 32 |
| 10.2 | Coverage | 33 |
| 10.3 | Premiums | 34 |
| 10.4 | Insurance Trustee; Share of Proceeds | 34 |
| 10.5 | Distribution of Proceeds | 35 |
| 10.6 | Association as Agent and Attorney-in-Fact | 36 |
| 10.7 | Insurance Obtained by Owners | 36 |
| 10.8 | Insurance Disclosure | 37 |
| ARTICLE XI | RECONSTRUCTION OR REPAIR AFTER CASUALTY OR EMINENT DOMAIN | 37 |
| 11.1 | Obligation to Reconstruct or Repair | 37 |
| 11.2 | Plans and Specifications | 37 |
| 11.3 | Estimates of Cost | 37 |
| 11.4 | Assessments | 38 |
| 11.5 | Construction Funds | 38 |
| 11.6 | Eminent Domain | 39 |
| ARTICLE XII | USE RESTRICTIONS | 40 |
| 12.1 | Commercial Uses. | 40 |
| 12.2 | Residential Uses | 40 |
| 12.3 | Personal Use Restriction for Timeshare Units | 40 |
| 12.4 | Common Elements | 40 |
| 12.5 | Nuisances | 40 |
| 12.6 | Lawful Use | 41 |
| 12.7 | Signs | 41 |
| 12.8 | Bicycles, Motorcycles, and Sporting Equipment | 41 |
| 12.9 | Condominium Rules and Regulations | 41 |
| 12.10 | Declarant's Use | 41 |
| 12.11 | No Pets | 41 |
| 12.12 | Antennas | 41 |
| 12.13 | Decoration of Units | 42 |
| 12.14 | Right of Occupancy - Holdover Owners | 42 |
| 12.15 | No Domiciliary Intent | 42 |

## TABLE OF CONTENTS
### (continued)

Page

12.16   Use of Units under Timeshare Plan ...................................................... 43

12.17   Restrictions on Subdividing or Relocating Boundaries ........................... 44

12.18   Rental of Unreserved Timeshare Units ................................................. 44

12.19   Compliance with Liquor Laws ............................................................. 44

ARTICLE XIII      ALIENABILITY OF UNITS OR OWNERSHIP INTERESTS ....... 44

13.1   Alienability Restrictions ..................................................................... 44

13.2   Declarant's Right of First Refusal to Purchase ..................................... 44

13.3   Leasing and Rental Restrictions ........................................................... 45

13.4   Obligation for Payment of Transfer Tax ............................................... 45

ARTICLE XIV      SPECIAL DECLARANT RIGHTS .......................................... 46

14.1   Right to Change Interior Design ........................................................... 46

14.2   Right to Combine or Subdivided Units, Add Unspecified Real Estate to the Property and Withdrawal Real Estate from the Property ........................... 46

14.3   Sharing of Common Areas ................................................................... 46

14.4   Right to Change Size of the Undivided Fractional Interests ..................... 47

14.5   Declarant Rights Transferable ............................................................. 47

ARTICLE XV      COMPLIANCE AND DEFAULT ............................................. 47

15.1   Compliance and Default ...................................................................... 47

15.2   Costs and Fees ................................................................................... 47

15.3   No Waiver of Rights ........................................................................... 48

15.4   Injunctive Relief ................................................................................ 48

15.5   Governing Law; Waiver of Jury Trial; Venue of Actions ....................... 48

15.6   Arbitration ........................................................................................ 48

ARTICLE XVI      AMENDMENTS ................................................................. 48

16.1   By Owners ......................................................................................... 48

16.2   By the Declarant ................................................................................. 49

16.3   Amendments to Common Elements ....................................................... 50

ARTICLE XVII      TERMINATION ................................................................ 50

17.1   Termination ....................................................................................... 50

17.2   Termination through Condemnation ...................................................... 50

17.3   Certificate .......................................................................................... 50

ARTICLE XVIII      IMPLEMENTATION OF THE TIMESHARE PLAN ............... 50

ARTICLE XIX      SEVERABILITY ................................................................. 51

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE XX     MERGER ........................................................................ 51

ARTICLE XXI     OTHER ASSOCIATION MATTERS .................................. 51

    21.1    General Reservation ................................................... 51

    21.2    No Use of Trademarks ................................................ 51

    21.3    Membership in a Master Association ......................... 52

    21.4    Resort Activities ....................................................... 52

    21.5    Amenities ................................................................. 52

ARTICLE XXII     MORTGAGEE PROTECTIONS ...................................... 53

    22.1    Introduction .............................................................. 53

    22.2    Notice of Actions ...................................................... 53

    22.3    Consent Required ...................................................... 53

    22.4    Actions ..................................................................... 54

    22.5    Notice of Objection .................................................. 55

EXHIBIT "A" –ALLOCATED INTERESTS IN COMMON ELEMENTS AND COMMON EXPENSES .. A-1

EXHIBIT "B" – HYATT VACATION CLUB RESORT AGREEMENT ................................................ B-1

EXHIBIT "C" – HYATT VACATION CLUB RULES AND REGULATIONS ................................. C-1

EXHIBIT "D" – PERMITTED EXCEPTIONS ................................................................................ D-1

EXHIBIT "E" – CITY OF ASPEN DISCLOSURE STATEMENT ................................................ E-1

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

**DECLARATION OF CONDOMINIUM**

**FOR**

**G.A. RESORT CONDOMINIUMS**

The undersigned, Grand Aspen Lodging, LLC, a Delaware limited liability company, whose address is c/o Four Peaks Development, LLC, 1000 South Mill Street, Aspen Colorado 81611 ("Declarant"), being the fee simple owner of those certain lands located and situate in the City of Aspen, Pitkin County, Colorado, and more particularly described in Section 1.2 below, (the "Property") does hereby submit fee simple title to the Property, together with all improvements, appurtenances, and facilities relating to or located thereon now and in the future, to the condominium form of ownership in accordance with the provisions of the Colorado Common Interest Ownership Act as set forth in Article 33.3, Title 38, Colorado Revised Statutes ("CCIOA") and the provisions of Sections 38-33-110 to 38-33-113 of the Colorado Condominium Ownership Act as set forth in Article 33, Title 38, Colorado Revised Statutes ("CCIOA" or "Timeshare Provisions") and the following grants, submissions, declarations, covenants, conditions, restrictions, easements, reservations, rights-of-way, and other provisions of this Declaration. Declarant hereby declares that all of such property shall be held, sold, conveyed, encumbered, leased, rented, used, occupied, possessed and improved, subject to the provisions of this Declaration.

**ARTICLE I**
**INTRODUCTION**

1.1   Purpose.

Declarant desires to create a mixed-use condominium project (the "Condominium") on the Property pursuant to CCIOA. The Condominium will include individual condominium units allowing residential and commercial uses as the same may be permitted by applicable land use regulations governing the Property and as may be permitted by this Declaration. The residential portion of the project may include living units for both short-term occupancy (the "Residences") as well as employee housing (the "Affordable Housing Units"). The Residences may be committed to a plan of fractional ownership (sometimes referred to herein as a plan of timeshare ownership or "Timeshare Plan") under Colorado law.

1.2   Name.

The name by which this condominium is to be identified for legal description purposes is G.A. RESORT CONDOMINIUMS (the "Condominium"). The Condominium may utilize such other names for marketing purposes as the Declarant or, after the Declarant Control Period, the Association, as hereinafter defined, may determine.

1.3   Legal Description.

The property that is hereby submitted to the condominium form of ownership under this Declaration consists of that certain real property (the "Property") situate in Pitkin County, Colorado, that is more particularly described as follows:

LOT 5, ASPEN MOUNTAIN SUBDIVISION ACCORDING TO THE AMENDED PLAT THEREOF RECORDED APRIL 4, 2003 IN PLAT BOOK 64 AT PAGE 92 AT RECEPTION NO. 480988, COUNTY OF PITKIN, COLORADO; and

LOT 6, ASPEN MOUNTAIN SUBDIVISION, ACCORDING TO THE SEVENTH AMENDED PLAT OF ASPEN MOUNTAIN SUBDIVISION AND PLANNED UNIT DEVELOPMENT RECORDED FEBRUARY 9, 1993 IN PLAT BOOK 30 AT PAGE 69

together with those easements more specifically described in Article IV herein and subject to those title exceptions ("Permitted Exceptions") listed on Exhibit D attached hereto and incorporated herein by reference.

1.4     Development and Use.

As of the recording of this Declaration, the Condominium consists of:

(a)     Fifty (50) Residences that may be committed to a Timeshare Plan and may be known as "Timeshare Units";

(b)     Nine (9) Affordable Housing Units;

(c)     Two (2) Commercial Units; and

(d)     One hundred eleven (111) Parking Units.

The initial Residences consist of one (1) 4-bedroom Residential Unit, twenty-eight (28) 3-bedroom Residential Units, nineteen (19) 2-bedroom Residential Units and two (2) 1-bedroom Residential Units.

The maximum number of Units that can be created within the Condominium, subject to any development limitations governing the Property as reflected in the Subdivision/PUD Agreement for Lot 5 Aspen Mountain Subdivision recorded April 4, 2003 under Reception No. 480989 and City of Aspen Ordinance No. 52 (Series of 2001) recorded February 27, 2002 under Reception No. 464426, as the same each may be amended, is one hundred (100) Residences, eighteen (18) Affordable Housing Units, ten (10) Commercial Units, and two hundred twenty-two (222) Parking Units.

1.5     Covenants Running With the Land.

All provisions of this Declaration shall be deemed to be servitudes that run with the land that provide a legal foundation for the shared use, ownership, maintenance, operation and repair of the Property. The benefits, burdens, and other provisions contained in this Declaration shall be binding upon and shall inure to the benefit of Declarant, all Owners, and their respective heirs, executors, administrators, personal representatives, successors, transferees, assigns, guests, tenants, invitees and licensees.

1.6     Mixed Use.

The functions, activities, physical appearance and other features commonly associated with commercial uses and residential uses shall be expressly permitted on the Property and within the

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Building and other improvements, all as more particularly described and governed herein.

### 1.7   Timeshare Plan and Multisite Timeshare Plan.

A Timeshare Plan will be created with respect to some of the Residential Units in the Condominium. The degree, quantity, nature and extent of the Timeshare Plan that will be created are hereinafter defined and described in detail. The Timeshare Units shall also be included as part of a Multisite Timeshare Plan, pursuant to the terms of the Hyatt Vacation Club Resort Agreement, as hereinafter defined and described in detail.

**ARTICLE II**
**DEFINITIONS**

The terms used in this Declaration and in its exhibits, as well as in the Articles of Incorporation, Bylaws and Rules and Regulations of the Association, shall be defined in accordance with the provisions of CCIOA and the Timeshare Provisions and as follows unless the context otherwise requires:

Ad Valorem Taxes shall mean those property taxes and special assessment liens duly imposed by a Colorado governmental or political subdivision, special improvement district, or special taxing district. The Association shall serve as the agent of the Timeshare Owners for the purpose of collection of Ad Valorem Taxes.

Ad Valorem Taxes Common Expenses shall mean Ad Valorem Taxes, which are assessed against Timeshare Owners, which remain uncollected by the Association by the due date. Ad Valorem Taxes Common Expenses shall be assessed to all Timeshare Interests in proportion to the Allocated Interest appurtenant to the Timeshare Interest.

Affiliate Resort shall mean a resort for which HVOI has determined that membership in the Club should be made available on a voluntary basis to owners of Timeshare Interests at such resort in accordance with terms and conditions determined by HVOI in its sole discretion.

Affordable Housing Common Expenses means that portion of the Common Expenses incurred in the operation, maintenance and repair of the Affordable Housing Units and Limited Common Elements – Affordable Housing or for the benefit of the Affordable Housing Owners that are to be paid by the Affordable Housing Owners.

Affordable Housing Owner means those Owners of Affordable Housing Units within the Condominium.

Affordable Housing Unit means a Unit designated with the letters "AH" on the Map and restricted to use as an affordable housing unit, whether for sale or rent in accordance with applicable land use regulations and pursuant to the Permitted Exceptions.

Allocated Interests shall mean the percentage of undivided ownership interest and, except as otherwise provided herein, obligation for payment of Assessments allocated to each Unit as set forth in Exhibit A attached hereto. Allocated Interests may also be calculated for the various classes or categories of Units. Allocated Interests for Timeshare Interests are calculated by multiplying the percentage or fractional ownership interest of the Timeshare Interest by the Allocated Interest of the particular Unit in which the Timeshare Interest is owned.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Articles of Incorporation or Articles shall mean the Articles of Incorporation of the Association, as they may be amended from time to time.

Assessments shall mean any assessments charged to an Owner by the Association for Common Expenses. Assessments may include annual Assessments, special Assessments, personal Assessments and default Assessments.

Association shall mean G.A. Resort Association, Inc., a Colorado nonprofit corporation, and its successors, the members of which are the Owners of the Condominium. The Association is responsible for the administration, management and operation of the Condominium.

Building shall mean the building (including all fixtures and improvements contained within it) located on the Property in which Units are located.

Bylaws shall mean the Bylaws of the Association, as they may be amended from time to time.

CCIOA shall mean the Colorado Common Interest Ownership Act as set forth in Article 33.3 of Title 38, Colorado Revised Statutes, as such act exists on the date hereof, except to the extent that the applicability of future amendments to CCIOA is mandatory.

Club or Hyatt Vacation Club shall mean the Hyatt Vacation Club, which is the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed through HVOI. The services to be provided by HVOI include the operation of the reservation system, through which Owners of Timeshare Interests in the Condominium and Club Members from other Club Resorts reserve and exchange the use of accommodations at the Condominium or other Club Resorts pursuant to the priorities, restrictions and limitations set forth in the Club Documents. The Hyatt Vacation Club is not a legal entity or association of any kind.

Club Documents shall mean those instruments governing the use and operation of the Club, including, but not limited to, the Hyatt Vacation Club Resort Agreement (the "Resort Agreement") and the Hyatt Vacation Club Rules and Regulations, which are promulgated, executed or amended by HVOI from time to time.

Club Dues shall include the costs and expenses of the Club that are chargeable to each Club Member or Component Resort each calendar year in accordance with the terms of the Hyatt Vacation Club Resort Agreement for a Club Resort. Club Dues are charged equally to each Owner of a Timeshare Interest pursuant to the terms of the Hyatt Vacation Club Resort Agreement, without regard to the Allocated Interest of the Timeshare Interest owned.

Club Dues Common Expenses shall mean any costs and fees charged as Club Dues against Timeshare Owners, pursuant to the terms of the Resort Agreement for the Condominium, which are not collected from such Owners by the Association by March 1st of each calendar year.

Club Member shall mean the owner of record of a Timeshare Interest at any Component Resort, including the Condominium, or an owner of record of a Timeshare Interest at an Affiliate Resort who has complied with all of the terms and conditions for membership in the Club as determined by HVOI for that Affiliate Resort.

Club Resort shall mean both Component Resorts and Affiliate Resorts, to the extent that owners of Timeshare Interests at such Affiliate Resorts have become Club Members.

Commercial Common Expenses means that portion of the Common Expenses incurred in the operation, maintenance and repair of the Commercial Units and Limited Common Elements – Commercial or for the benefit of the Commercial Owners and that are to be paid by the Commercial Owners.

Commercial Owners means those Owners of Commercial Units within the Condominium.

Commercial Unit means a Unit having a commercial use, and not a Residential Unit, Affordable Housing Unit or Parking Unit.

Common Elements shall mean those items defined in CCIOA as Common Elements, those items declared in this Declaration to be included within the Common Elements and those areas identified on the Map as Common Elements. Common Elements also include, but are not limited to, all personal and intellectual property related to the operation of the Condominium, **except** (a) all of Declarant's and Managing Agent's personal and intellectual property, including the trade names of Declarant and Managing Agent and their respective principals, partners, affiliates or subsidiaries and any and all personal and intellectual property related to the operation of any reservation system by Managing Agent, which always shall be the personal property of Managing Agent, (b) any reservation system provided to the Condominium by HVOI, including, but not limited to, any and all computer hardware and software, which is and always shall be the personal property of HVOI, (c) any lines, wires, conduits, equipment, or system used for transmitting or receiving communications (including cable television) which may serve the Property but are owned by a third party, regardless of whether contained in a Unit, (d) any other personal property which is not owned in common by the Owners or the Association, and (e) all of HVOI's personal and intellectual property related to its operation of the exchange and reservation system pursuant to the Resort Agreement, including HVOI's trade name and the trade names of HVOI's affiliates or subsidiaries, all of which always shall be the personal property of HVOI.

Common Expenses means Ad Valorem Taxes Common Expenses, Club Dues Common Expenses, and Maintenance Fee Common Expenses (which include Condominium Common Expenses, Residential Common Expenses, Timeshare Plan Common Expenses, Affordable Housing Common Expenses, Commercial Common Expenses and Parking Common Expenses). The various types of Maintenance Fee Common Expenses described above are commonly referred to as general common expenses and limited common expenses.

Common Surplus shall mean any excess of receipts of the Association over the amount of Common Expenses or any category thereof.

Component Resort shall mean a resort which has become affiliated with the Club from time to time pursuant to a written agreement or otherwise, and for which membership in the Club is an appurtenance of ownership of a Timeshare Interest and includes the Condominium.

Condominium Common Expenses shall mean those expenses that relate to the condominium as a whole, and may include but are not necessarily limited to:

(a)     Expenses of administration and management of the Property and of the Association, including, but not limited to, compensation paid by the Association to a Managing Agent, accountant, attorney, or other employee or independent contractor.

(b)     Expenses of maintenance, operation, repair and replacement of the General Common Elements, including but not limited to utilities consumed in the operation, maintenance and repair of the Condominium, which are not separately metered and which are not separately allocated or allocable to less than all Units or Owners.

(c)     Expenses declared Condominium Common Expenses by the provisions of this Declaration, the Condominium Documents, CCIOA or the Executive Board.

(d)     Any valid charge against the Property as a whole.

(e)     All costs and expenses incurred by the Association in connection with regulatory compliance for the Property as a whole.

(f)     All reserves for repairs, replacement and maintenance of the Property as a whole, taxes, and capital improvements as required by the CCIOA or determined by the Executive Board.

(g)     Casualty, flood, liability or other insurance on the General Common Elements for the benefit of the Association or the Owners.

(h)     Any assessments against the Association pursuant to the terms of any master declaration.

(i)     Any other expenses incurred in the operation, maintenance and repair of the Units and the Common Elements that cannot be attributed to a particular Unit or Owner or respective group, class or category thereof or that are incurred in carrying out all other powers, rights, and duties of the Association specified in the Condominium Documents.

Condominium Documents shall mean and include this Declaration together with the exhibits attached hereto, exclusive of the Club Documents.  The Condominium Documents include, but are not limited to, this Declaration, the Articles of Incorporation, Bylaws and Rules and Regulations of the Association, the Management Agreement, and the Resort Agreement.  The Resort Agreement is also considered to be a Club Document.

Condominium Map or Map shall mean and include the engineering survey or surveys depicting the Property in three dimensions as described in Article III, below.

Condominium Property or Property shall mean and include the lands, leaseholds, easements and personal property that are subjected to condominium ownership from time to time as part of this Condominium, whether or not contiguous, and all improvements thereon and all easements and rights appurtenant thereto intended for use in connection with this Condominium.

Declarant shall mean Grand Aspen Lodging, LLC, a Delaware limited liability company, its successors and assigns.  No party other than Declarant shall exercise the rights and privileges reserved herein to the Declarant unless such party shall receive and record in the Records, a written assignment from Declarant, of all or a portion of such rights and privileges.

Page 6

<u>Declarant Control Period</u> shall have the meaning set forth in Section 9.6 below.

<u>Declaration</u> shall mean this Declaration of Condominium for G.A. Resort Condominiums, as it may lawfully be amended from time to time, pursuant to the provisions hereof.

<u>Executive Board</u> (sometimes referred to as the Board of Directors or Board of Managers) means the governing body of the Association.

<u>First Mortgage</u> shall mean any unpaid and outstanding mortgage, deed of trust or other security instrument recorded in the Records, which encumbers any Unit or any Timeshare Interest which has priority over every other type of encumbrance except those securing real estate taxes, governmental obligations and, to the extent permitted by law, owner association assessments.

<u>First Mortgagee</u> shall mean any person or entity named as a mortgagee or beneficiary under any First Mortgage, or any successor to the interest of any such person under such First Mortgage.

<u>Fixed Week</u> shall mean a Week within a specific Timeshare Unit, the exclusive use and occupancy of which is reserved to a particular Timeshare Owner during the Home Resort Preference Period (Fixed), subject to the Club Documents. Each 1/20th Timeshare Interest shall include use of one Fixed Week. The use of a Fixed Week is conveyed to each Timeshare Owner as a part of the Owner's 1/20th Timeshare Interest. A Fixed Week shall be designated by the Declarant in each deed conveying a 1/20th Timeshare Interest.

<u>Floating Week</u> shall mean a Week within a specific Timeshare Unit type, the exclusive use and occupancy of which may be reserved by Timeshare Owners on a first come, first served basis during the Home Resort Preference Period (Float), subject to the Club Documents. The Floating Weeks at the Condominium shall be all Weeks that are not designated as Fixed Weeks. The right to reserve a whole Floating Week and a Floating Split Week is assigned to each Timeshare Owner as a part of the Owner's 1/20th Timeshare Interest.

During the term of the Resort Agreement, the Association has a priority right to reserve one Floating Week in each Timeshare Unit during the Home Resort Preference Period (Float), and up to three (3) additional Weeks in each Timeshare Unit during the Club Use Period, for maintenance purposes. The Association may delegate the right to designate maintenance weeks to the Managing Agent.

<u>General Common Elements</u> means the Common Elements, except for Limited Common Elements and the Restricted Common Elements.

<u>Home Resort Preference Period</u> shall mean both the Home Resort Preference Period (Fixed) and the Home Resort Preference Period (Float).

<u>Home Resort Preference Period (Fixed)</u> shall mean the period beginning not less than one year prior to the first day of use of a Fixed Week and lasting at least six months, during which the Owner of such Fixed Week, as a part of the rights appurtenant to the Owner's Timeshare Interest, shall have the exclusive right to reserve its use and occupancy in the specific Residence in which the Owner owns a Timeshare Interest. This reservation "window" may be increased but not decreased by HVOI as long as the Resort is a Component Resort of the Club.

<u>Home Resort Preference Period (Float)</u> shall mean the period during which each Owner has the right to reserve the use and occupancy of an available Floating Week in the type of Unit (but not

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

the specific Unit) owned, on a first come, first served basis as part of the rights appurtenant to an Owner's Timeshare Interest. The Home Resort Preference Period (Float) at the Condominium for reservations for a Floating Week or a Floating Split Week in a given calendar year begins one (1) year prior to the first day of the first Floating Week occurring in such calendar year and lasts six months. For each undivided 1/20th Timeshare Interest owned and in addition to the annual right to reserve the use of a Fixed Week an Owner may reserve one whole Floating Week and one Floating Split Week during the Home Resort Preference Period (Float) on an annual basis. This reservation "window" may be changed by HVOI as long as the Resort is a Component Resort of the Club.

HVOI shall mean Hyatt Vacation Ownership, Inc., a Delaware corporation. HVOI is an exchange company offering exchange and reservation services and related vacation and travel benefits to Club Members at Club Resorts including the Condominium as provided in the Resort Agreement.

Hyatt Vacation Club Resort Agreement or the Resort Agreement means the contract among HVOI, the Declarant, the Association and the Managing Agent by which the Condominium is included as a Component Resort of the Hyatt Vacation Club, a copy of which is attached hereto as Exhibit B and incorporated herein by reference.

Hyatt Vacation Club Rules and Regulations or the Club Rules shall mean the rules and regulations governing the reservation and use of Hyatt Vacation Club accommodations and facilities. The Club Rules have been promulgated, adopted and may be amended from time to time by HVOI, in its reasonable business judgment, for the principal purpose of improving the quality and operation of the Club and furthering the collective enjoyment of the accommodations and facilities by present and future members as a whole. A copy of the initial Hyatt Vacation Club Rules and Regulations is attached hereto as Exhibit C and incorporated herein by reference.

Limited Common Elements shall mean those Common Elements that are reserved for the use of one or more, but fewer than all, Units. Limited Common Elements may be designated on the Map by the abbreviation "LCE" together with reference to the type, class or category of Unit to which use is reserved. Limited Common Elements reserved for the exclusive use of Timeshare Owners include all furnishings, fixtures, equipment, housewares, and other personal property contained within Residences that are not the property of individual Owners. The Association shall hold title to the furnishings and other personal property constituting Limited Common Elements-Timeshare for the benefit of Owners of Timeshare Interests.

Limited Common Expenses shall mean those expenses incurred in the normal operation and maintenance of the Limited Common Elements or which can otherwise be attributed to one or more, but fewer than all, Units or one or more, but fewer than all, Owners.

Maintenance Fee Common Expenses shall mean Condominium Common Expenses, Timeshare Plan Common Expenses, Residential Common Expenses, Affordable Housing Common Expenses, Commercial Common Expenses or Parking Common Expenses, as applicable. In addition to being responsible for a portion of Condominium Common Expenses (i) Owners of Timeshare Interests are responsible for Timeshare Plan Common Expenses, (ii) Owners of Affordable Housing Units are responsible for Affordable Housing Common Expenses, (iii) Owners of Commercial Units are responsible for Commercial Common Expenses, and (iv) Owners of Parking Units are responsible for Parking Common Expenses, respectively.

Management Contract shall mean the contract for the management and operation of the Condominium between the Association and the Managing Agent.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Managing Agent shall mean Hyatt Vacation Management Corporation, a Delaware corporation qualified to do business in Colorado, or any entity engaged to manage the Condominium, pursuant to a Management Contract.

Multisite Timeshare Plan shall mean the Timeshare Plan during the term of the Resort Agreement whereby an Owner of a Timeshare Interest in the Condominium obtains the right to reserve the use, occupancy and possession of accommodations in the Condominium and other Club Resorts in accordance with the priorities and provisions of the Club Documents.

Owner shall mean, in the case of the Condominium, the owner of a Unit or Timeshare Interest. In the case of other Club Resorts at which accommodations are made available from time to time by affiliation of that resort with the Club, the term "Owner" shall mean the owner of a Timeshare Interest at such Club Resort. For the purposes of use and occupancy rights, a Timeshare Owner shall only be considered an Owner during the time of the Owner's confirmed reservation for use of a Unit at the Condominium.

Parking Common Expense means that portion of the Common Expenses to be paid by the Owners of the Parking Units for the maintenance of the Parking Units and the appurtenant Limited Common Elements- Parking.

Parking Owners means those Owners of Parking Units within the Condominium.

Parking Units means those Parking Units designated on the Map.

Records shall mean the official, public records of the Office of the Clerk and Recorder of Pitkin County, Colorado.

Residential Common Expense means that portion of the Common Expenses to be paid by the Residences not committed the Timeshare Plan for the maintenance of the Limited Common Elements- Residential.

Residential Owners means those Owners of Residences within the Condominium.

Residential Unit or Residence means a Unit having a residential use (including the units committed to the Timeshare Plan), and not the Affordable Housing Units, the Commercial Units or the Parking Units.

Resort Documents shall mean all of the documents, by whatever names denominated, and any amendments thereto, which create and govern the rights and relationships of the Club Members who own Timeshare Interests in a given Club Resort and which govern the use and operation of that Club Resort, exclusive of the Club Documents. The Resort Documents for the Condominium shall also mean the Condominium Documents.

Restricted Common Elements means those portions of the Common Elements that are, or may be, reserved for the exclusive use and are under the exclusive control of the Association or Managing Agent, which may be designated as "RCE" on the Map, designated by the Executive Board or designated in this Declaration.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Rules and Regulations shall mean and refer to the rules and regulations concerning the use of the Condominium as may be promulgated and amended from time to time by the Association in the manner provided by its Bylaws.

Split Week shall mean a Week, the use of which is divided into periods of less than seven (7) consecutive days and nights. This may be modified by an amendment to the Club Rules. Floating Split Week shall mean a Split Week that is reserved during the Home Resort Preference Period (Float). The Club reserves the right to limit the reservation of Split Weeks in the best interests of Club Members as a whole.

Timeshare Interest shall mean, in the case of the Condominium, an undivided interest in a specific Timeshare Unit, the fractional or percentage interest of which is initially set forth in a deed of conveyance from the Declarant. Each 1/20th Timeshare Interest shall include with it the exclusive right to use one (1) Fixed Week together with additional usage on a "floating" (i.e., reservation request subject to availability) basis. In the case of other Club Resorts, Timeshare Interest shall mean a real or personal ownership interest in accommodations at such other Club Resorts. Annual Timeshare Interest shall mean a Timeshare Interest entitling the Owner to use and reserve a Unit annually. Biennial Timeshare Interest shall mean a Timeshare Interest entitling the Owner to use and reserve a Unit every other calendar year. A Biennial Timeshare Interest will be identified by reference either to "Even Year" or "Odd Year." Owners of Even Year Biennial Timeshare Interests shall have the right to reserve and use a Unit during calendar years (based on the Gregorian calendar) ending in 0, 2, 4, 6, and 8. Owners of Odd Year Biennial Timeshare Interests shall have the right to reserve and use a Unit during calendar years (based on the Gregorian calendar) ending in 1, 3, 5, 7, and 9. Any reference to "Timeshare Interest" in the Resort Documents shall be deemed to include a reference to a "Biennial Timeshare Interest" unless the context dictates otherwise. In the absence of a reference to "Biennial" in an instrument conveying a Timeshare Interest, a Timeshare Interest shall be deemed to mean an Annual Timeshare Interest.

Timeshare Owners means those Owners of Timeshare Interests within the Condominium. Unless the context otherwise requires, Timeshare Owners shall be deemed to be Owners for usage and access purposes only during those times when they are entitled pursuant to the Condominium Documents to have access to the Condominium.

Timeshare Plan shall mean the ownership and use plan established by this Declaration that provides for separate ownership and periodic use of individual Units committed to such plan. The specific terms and conditions of the Timeshare Plan are more particularly described in Article XII below.

Timeshare Plan Common Expenses shall mean those Common Expenses related directly to the operation, maintenance and repair of the Timeshare Units, Limited Common Elements – Timeshare and the Timeshare Plan and include, but are not limited to, the following:

       (a)     Repair and maintenance of the interior of a Timeshare Unit including but not limited to all furnishings, fixtures, equipment, housewares and appliances;

       (b)     Repair and replacement of Limited Common Elements–Timeshare, and deferred maintenance and replacement reserves for the same;

       (c)     Liability and casualty insurance coverage relating to the interior and contents of any Timeshare Unit and Limited Common Elements—Timeshare;

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

        (d)      Utility Services for the Timeshare Units and Limited Common Elements—Timeshare;

        (e)      Any other expenses incurred in the normal operation and maintenance of the Timeshare Units and Limited Common Element – Timeshare which cannot be attributed to a particular Owner; and

        (f)      Expenses declared Common Expenses of the Timeshare Plan or Multisite Timeshare Plan by CCIOA or the Timeshare Provisions.

Timeshare Provisions shall mean the provisions of Sections 38-33-110 to 38-33-113 of the Colorado Condominium Ownership Act as set forth in Article 33, Title 38, Colorado Revised Statutes, as such provisions exist on the date hereof, except to the extent that the applicability of future amendments to the Timeshare Provisions is mandatory.

Timeshare Unit means a Residence committed to the Timeshare Plan in accordance with the terms and provisions of this Declaration.

Unit means the physical portion of the Condominium designated for separate ownership by one or more persons.

Utility Services shall mean and includes, but not be limited to, electric power, water, sanitary sewer, trash collection, natural gas, common energy sources, cable television, satellite communication, telephone service, internet service and all other services and facilities servicing the Condominium.

Week shall mean a period of seven (7) consecutive days during which a Timeshare Unit may be used pursuant to the Resort Documents for a Club Resort or pursuant to the Club Documents. A Week is either a Fixed Week or a Floating Week. With respect to the Condominium, a Week shall mean a period of time in a Unit which shall consist of not less than seven (7) consecutive days commencing at 12:00 noon on a day of the week designated by the Declarant and ending at 12:00 noon on the same day in the following week. Weeks shall be numbered 1 through 52. Unless otherwise designated by the Declarant in the first deed conveying a Week in a given Unit, the Weeks for a Unit shall begin and end on Saturday. Therefore, unless otherwise designated by the Declarant, Week No. 1 is the seven (7) days commencing on the first Saturday in each calendar year, and Week No. 2 is the seven (7) days immediately following. Additional weeks up to and including Week No. 52 are computed in a like manner. Excess days, if any, between the end of Week No. 52 and the beginning of Week No. 1, regardless of the month, year or number of days shall be deemed Week No. 53. The use of Week No. 53 shall be assigned to the person entitled to use Week 52 in a Unit. Week No. 53 may not be partitioned or separately conveyed. Notwithstanding the particular Timeshare Interest owned, during the term of the Resort Agreement, an Owner shall not be entitled to the use and occupancy of any Floating Week except pursuant to the Club Documents. The Timeshare Interest Owner shall be entitled to the use and occupancy of the Fixed Week conveyed as part of his Timeshare Interest in the initial deed from the Declarant, subject to the Club Documents.

## ARTICLE III
## MAP

        The Map shall be recorded in the Records. Any map filed subsequent to the first Map shall be termed a supplement to such Map, and the numerical sequence of such supplements shall be

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

shown thereon. The Map shall be filed for record following substantial completion of the Building and prior to the conveyance of any Unit depicted on the Map or Timeshare Interest to a purchaser. The Map will include, together with any additional information required by law, the following:

        (a)    <u>Legal Description.</u> The legal description of the Property.

        (b)    <u>Survey.</u> An engineering survey of the Property and all improvements thereon including but not limited to the Condominium.

        (c)    <u>Site Plan and Floor Plans.</u> A graphic description of the Units located in the Condominium and a site plan which, together with this Declaration, are of sufficient detail to identify and locate the Common Elements and each Unit in the Building and their relative locations and approximate dimensions, both horizontally and vertically and the thickness of the common walls, if any, between or separating the Units from one another or from the Common Elements, as applicable.

        (d)    <u>Identifying Number.</u> A separate and unique number identifies each Unit so that no Unit bears the same designation as any other Unit. The numbering for legal description purposes may vary from the numbering system used on the physical units or within the reservation, phone and communication systems.

        (e)    <u>Building Elevations.</u> The elevation planes of each floor level of the Building.

        (f)    <u>Other Information.</u> Other drawings or diagrammatic plans and information regarding the Property as may be included in the discretion of the Declarant.

        The Map shall contain a certificate of a registered professional engineer, a licensed architect or a licensed land surveyor certifying that the Map substantially depicts the location and the horizontal and vertical measurements of the Building and the Units, the dimensions and, if Declarant directs, the square foot areas of the Units, and the elevations of the unfinished floors and ceilings as constructed, and certifying that such Map is prepared subsequent to the substantial completion of the improvements. Each supplement or amendment shall set forth a like certificate when appropriate. The Map shall further contain such other information, certifications and depictions as may be required under Section 38-33.3-209 of CCIOA. Declarant reserves for itself and the Association the right to unilaterally amend the Map from time to time to conform the information in it to the actual location of the Units and Common Elements. The Map is incorporated herein by this reference and, together with this Declaration, will serve to describe and delineate each Unit for all purposes hereunder. Declarant further reserves the right to amend the Map, from time to time, to the fullest extent permitted under CCIOA.

**ARTICLE IV**
**<u>EASEMENTS</u>**

        The following easements are hereby expressly reserved for the benefit of, or have been or may be granted by the Declarant during the Declarant Control Period or thereafter by the Association:

        4.1    <u>General Easements.</u>

        Non-exclusive easements over, across and under the Property are expressly provided for and reserved in favor of the Declarant and the Owners, and their respective lessees, guests and invitees, as follows:

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(a)     Utilities.  Easements are reserved over, across and under the Property as may be required for installation, replacement, repair, maintenance and delivery of Utility Services in order to serve the Condominium adequately; including, but not limited to, easements for the purpose of allowing such access rights as are necessary to utilize and service any lift station or utility transformer boxes located within the Property.  Specific utility easements that exist on the Property are as shown on the Map and as listed on Exhibit "D" attached hereto.

(b)     Encroachments.  In the event that any Unit shall encroach upon any of the Common Elements or upon any other Unit, or in the event any Common Element shall encroach upon any Unit, then an easement shall exist to permit such encroachment so long as the same shall exist.  In the event of destruction and rebuilding of such Unit in substantial conformity with the Map, then an easement shall exist thereafter to permit the encroachments described in this subparagraph so long as the same shall exist.

(c)     Traffic.  An easement shall exist for pedestrian traffic over, through and across sidewalks, paths, walks, halls, lobbies, and other portions of the Common Elements as may be from time to time intended and designated for such purpose and use, and for vehicular and pedestrian traffic over, through and across such portions of the Common Elements as may from time to time be paved and intended for such purposes, and for vehicular parking on such portions of the Common Elements as may from time to time be paved, intended and designated for such purposes, and such easements shall be for the use and benefit of the respective Owners within this Condominium and those claiming by, through or under the aforesaid.  In addition, further easements shall exist for ingress and egress over such streets, walks and other rights of way serving the Units as may be designated by the Declarant or the Association as shall be necessary to provide for reasonable access to the public ways.  Access by and through Owners may be limited in relation to type, class or category of Unit owned, as designated on the Map or as determined by the Executive Board.

(d)     Limitations.  The rights and easements reserved in Articles 4.1 and 4.2 shall be subject to the following:

(1)     The covenants, conditions, restrictions, easements, reservations, rights-of-way, and other provisions contained in the Condominium Documents and the Map;

(2)     The right of the Association to regulate from time to time on an equitable basis the use of Common Elements by means of rules and regulations or policies;

(3)     The right of the Association to adopt, from time to time and in cooperation with any master association, any and all rules and regulations concerning vehicular traffic and travel upon, in, under, and across the Condominium; and

4.2     Association Easements.

Except as limited by CCIOA, the Association may grant easements from time to time over the Common Elements, subject to the limitations of Section 4.1(d).

4.3     Declarant Easements.

In addition to any easement rights granted to Declarant pursuant to CCIOA, and notwithstanding the limitations described in Section 4.2(d), above, the Declarant hereby reserves the following exclusive easements and rights to grant easements:

(a) <u>Marketing, Sales, Rental and Management.</u>  The Declarant reserves exclusive easement rights in, on, within, over and across the Property for the purpose of marketing, sales, rental and management of Units and Timeshare Interests at this Condominium, Timeshare Interests at other Club Resorts or such other timeshare or multisite timeshare plans developed or marketed by Declarant or its affiliates from time to time, and for the purpose of leasing any Units that have not been sold or conveyed.  The Declarant reserves exclusive easement rights over and across any parking spaces that are Common Elements of the Condominium that relate to unsold Units or Timeshare Interests and that have not been assigned by the Association for use by Owners of Timeshare Interests pursuant to Section 6.5.  The Declarant may use such parking spaces for the purpose of marketing, sales, rental and management of Units and Timeshare Interests at this Condominium, Timeshare Interests at other Club Resorts or such other timeshare or multisite timeshare plans developed or marketed by Declarant or its affiliates from time to time, and for the purpose of leasing any Units owned by Declarant.  Except to the extent limited by the terms of any written lease agreement lessees of Declarant-owned Units shall have, for the length of the term of their leases, the same easement rights over and across the Property and use rights to the recreational areas and facilities of the Condominium as are reserved for the Declarant.  The Declarant shall have the right to utilize any unsold Units and Timeshare Interests on the Property as sales models for the purpose of marketing, sales and rental of Units and Timeshare Interests at this Condominium, Timeshare Interests at other Club Resorts or such other timeshare or multisite timeshare plans developed or marketed by Declarant or its affiliates from time to time.  These rights include the right to use Common Elements for sales, marketing and rental activities including the placement and use of desks, chairs, equipment and sales materials thereon.

(b) <u>Governmental Requirements.</u>  The Declarant hereby reserves the right to grant such easements, from time to time, as may be required by any government agency.  Such easements shall specifically include, but not be limited to, any environmental easements required by federal, state or local environmental agencies, for so long as the Declarant holds any interest in any Unit subject to this Declaration.

(c) <u>Declarant Easements.</u>  The Declarant reserves unto itself, its successors, assigns, lessees, guests, licensees and invitees, for so long as it holds any interest in any Unit or Timeshare Interest, the same easement rights granted to Owners under this Declaration and specific easement rights over and across the Property as it may deem necessary for its use from time to time.

(d) <u>Construction Easements.</u>  The Declarant hereby reserves easement rights over, under and across the Property as is necessary, from time to time, for the purpose of completing construction of improvements that are part of the Condominium.

(e) <u>Recreational Areas and Commonly Used Facilities.</u>  The Declarant hereby reserves the right, as more specifically set forth in Section 14.2, to grant such easements, from time to time, to any other third party for the purpose of providing such parties with the same use rights over and across the Property and the recreational areas and commonly used facilities as those reserved for Owners.

(f) <u>Reservation of Air Rights and Rights in Subjacent Areas.</u>  The Declarant reserves all air rights over and under the Condominium for future development of the maximum number of units permitted by and subject to applicable land use laws, ordinances and regulations.  In connection with the reservation and furtherance of such rights Declarant further reserves (i) the right of subjacent and lateral support for any such improvement in any Common Element to which such improvement abuts, (ii) access over such portions of the Common Elements as may be reasonably necessary to provide ingress to and egress to and from any improvements built in such area, including temporary easements

during construction and (iii) utility service for such additional development.  Such expansion may be accomplished by the filing of a supplement to the Map or by the filing of a separate declaration and separate map in order to create a separate condominium regime.  The supplement shall set forth (A) any Common Elements attributable to the Units shown on the supplement, (B) the floor plans and linear dimensions of the interior of the Units, (C) the designation by number or other symbol of the Units, (D) the elevation of the unfinished interior surfaces of the floors and ceilings of the Units as established from a datum plane and the distances between floors and ceilings, and (E) the number of square feet of space included within such expansion Units.  Upon filing such supplement to the Map, the Allocated Interests all of the Units shall be equitably adjusted so that the expansion Units bear a fair share of the cost of operating and maintaining the Condominium.  The rights reserved in this section may be separately assigned or conveyed by the Declarant.

4.4     Cross Use Easements Pertaining to Timeshare Interests.

In order to maximize the availability of space to fulfill Owners' desired use of a Timeshare Interest, all Timeshare Units shall be available for reservation, occupancy and use (the "Use Right Easement") by all Owners owning Timeshare Interests in the Condominium in accordance with the Club Rules.  Each deed conveying a Timeshare Interest shall be deemed to include a reservation of this Use Right Easement benefiting all Owners of Timeshare Interests.

4.5     Permitted Exceptions.

The Property shall be subject to any easements, licenses or other matters of record ("Permitted Exceptions") as reflected on Exhibit "D" attached hereto, as shown on any recorded plat affecting the Property and as shown on the Map.

4.6     Reservation of Easement Rights.

Declarant reserves for itself, its successors and assigns the right to establish from time to time by declaration or otherwise, or to convey by exclusive or non-exclusive license, easement or otherwise, or by combination thereof, to any third party an interest in any portion of the Common Elements. Expenses for Utility Services that can be separately metered to any area granted pursuant to this Section shall be borne by the party granted the right of access to such area.  A reasonable amount of expenses for Utility Services that cannot be separately metered to a given area shall be charged to the party granted the right of access to such area.  Declarant may assign its rights hereunder without restriction.

4.7     Conveyances.

All conveyances of Units hereafter made, whether by Declarant or otherwise, shall be construed to grant, reserve or be subject to the respective easements contained in this Article, even though no specific reference to such easements or to this Article appears in the instrument for such conveyance.  Such conveyances shall also be construed to include as an appurtenance thereto an undivided interest in the Common Elements.

4.8     Manner of Granting Easements.

Easements reserved or granted under this Article, or easements which may be granted by the Declarant during the Declarant Control Period or thereafter by the Association in accordance with this Article, may be exclusive or non-exclusive and created by recorded instrument or reflected on the

Map, or a supplement thereto. There is no durational limit for easements created pursuant to this Article.

## ARTICLE V
## UNITS

5.1     Description of Units.

Unless otherwise prohibited by CCIOA, each Unit shall include that part of the Building containing the Unit that lies within the boundaries of the Unit, which boundaries are depicted on the Map and which are more particularly defined as follows:

(a)     Upper and Lower Boundaries.  The upper and lower boundaries of the Unit shall be the following boundaries extended to an intersection with the perimeter boundaries:

(1)     Upper Boundaries.  The interior unfinished lower surface of the ceiling of the Unit.

(2)     Lower Boundaries.  The interior unfinished upper surface of the floor of the Unit.

(b)     Perimeter Boundaries.  The perimeter boundaries of the Unit shall be the interior unfinished surfaces of perimeter walls and doors and windows in their closed position, or where no wall exists, an imaginary vertical plane along and coincident with the perimeter of such Unit as described in the Maps.

(c)     Legal Description of Units.  Any contract of sale, deed, lease, deed of trust, mortgage, will or other instrument affecting a Unit shall describe it by its identifying number shown on the Map, and the description will be followed by a reference to this Declaration and the Map.  To illustrate, the legal description contained in any instrument affecting title to a Unit will be in substantially the following form, with such omissions, insertions, recitals of fact or other provisions as may be required by the circumstances or appropriate to conform to the requirements of any governmental authority, or any law relating to such matters:

Unit No. _____, of G.A. RESORT CONDOMINIUMS, according to the Declaration of Condominium for G.A. RESORT CONDOMINIUMS, recorded _____, 200_ at Reception No. _____ as amended and supplemented from time to time and according to the Map for G.A. RESORT CONDOMINIUMS recorded _____, 200_ in Book ____ at Page _____, Reception No. _____ as amended and supplemented from time to time, all in the office of the Clerk and Recorder of Pitkin County, Colorado

(d)     Legal Description of Timeshare Interests.  Any contract of sale, deed, lease, deed of trust, mortgage, will or other instrument affecting a Timeshare Interest shall describe it by (i) the identifying number of its related Unit; (ii) the undivided fractional interest in such Unit attributable to the Timeshare Interest; and (iii) the Fixed Week attributable to the Timeshare Interest pursuant to Section 12.14, and (iv) if a Biennial Timeshare Interest, state whether the Timeshare it is an Even Year Biennial Timeshare Interest or an Odd Year Biennial Timeshare Interest, such description shall be followed by a reference to this Declaration and the Map.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(1)     Annual Timeshare Interest.  To illustrate, the legal description contained in any instrument affecting title to an Annual Timeshare Interest will be in substantially the following form, with such omissions, insertions, recitals of fact or other provisions as may be required by the circumstances or appropriate to conform to the requirements of any governmental authority, or any law relating to such matters:

An undivided 1/20th fee ownership interest as tenant-in-common in Unit No. _____, of G.A. RESORT CONDOMINIUMS, according to the Declaration of Condominium for G.A. RESORT CONDOMINIUMS recorded _____, 200_ at Reception No. _____ as amended and supplemented from time to time and according to the Map for G.A. RESORT CONDOMINIUMS recorded _____, 200_ in Book ____ at Page _____, Reception No. _____ as amended and supplemented from time to time, all in the office of the Clerk and Recorder of Pitkin County, Colorado, together with the perpetual use of **Fixed Week No.** ___ in such Unit and together with the use of a Floating Week and a Floating Split Week in accordance with the Declaration of Condominium for G.A. RESORT CONDOMINIUMS.

(2)     Biennial Timeshare Interest.  To illustrate, the legal description contained in any instrument affecting title to a Biennial Timeshare Interest will be in substantially the following form, with such omissions, insertions, recitals of fact or other provisions as may be required by the circumstances or appropriate to conform to the requirements of any governmental authority, or any law relating to such matters:

An undivided 1/40th fee ownership biennial interest (Even Year/Odd Year) as tenant-in-common in Unit No. ____, of G.A. RESORT CONDOMINIUMS, according to the Declaration of Condominium for G.A. RESORT CONDOMINIUMS recorded _____, 200_ at Reception No. _____ as amended and supplemented from time to time and according to the Map for G.A. RESORT CONDOMINIUMS recorded _____, 200_ in Book ____ at Page _____, Reception No. _____ as amended and supplemented from time to time, all in the office of the Clerk and Recorder of Pitkin County, Colorado, together with the perpetual use of **Fixed Week No.** ___ in such Unit and together with the use of a Floating Week and a Floating Split Week in accordance with the Declaration of Condominium for G.A. RESORT CONDOMINIUMS.

(e)     A contract or other agreement for the sale of a Unit or a Timeshare Interest therein entered into prior to the filing for record of the Condominium Map and this Declaration in the Records, may legally describe such Unit in substantially the manner set forth in above and may indicate that the Condominium Map and this Declaration are to be recorded.

(f)     The foregoing provisions shall not prevent Declarant from creating and conveying other types of timeshare interests as the same may be defined by an amendment to this Declaration or by the terms of deeds of conveyance.

5.2     Affordable Housing Units.

The Affordable Housing Units are subject to certain limits on alienability and use as affordable housing rental units pursuant to, and at all times shall, for as long as required by the City of Aspen, comply with, the Subdivision/PUD Agreement for Lot 5 Aspen Mountain Subdivision recorded April 4, 2003 under Reception No. 480989, the representations made in Declarant's application for final

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

planned unit development approval for the Property, City of Aspen Ordinance No. 52 (Series of 2001) recorded February 27, 2002 under Reception No. 464426, and the deed restrictions as administered by the Aspen/Pitkin County Affordable Housing Authority, each as amended from time to time. For as long as the City of Aspen requires an Affordable Housing Unit to be used as an affordable housing rental unit, rent paid by the occupant of such Affordable Housing Unit shall be in accordance with city regulations and, unless otherwise permitted by the City of Aspen, at no time shall such occupant pay in addition to such rent the Assessments allocated to such Affordable Housing Unit; provided, however, the occupant may also be required to pay, in addition to rent, such other expenses permitted by city regulations, including, without limitation, all utilities that directly serve such Affordable Housing Unit.

5.3     Parking Units.

Initially, there are 111 Parking Units within the Condominium. Parking Units may be held by the Association as Limited Common Elements appurtenant to individual Units or to types, classes or categories of Units. Parking Units shall be identified on the Map by number, and may be conveyed by reference in the instrument of conveyance to such number. The Association shall hold (a) as a Limited Common Element - Timeshare for the benefit of Timeshare Owners, one (1) Parking Unit for each Residence committed to the Timeshare Plan, and (b) as Limited Common Elements appurtenant to the Affordable Housing Units as a class and for the benefit of the Affordable Housing Owners, nine (9) Parking Units. Subject to the fundamental rights of Owners of Parking Units or of Units to which Parking Units are appurtenant as Limited Common Elements, the Association will have full right, power, and authority to regulate parking on an equitable basis as determined by the Executive Board including, without limitation, the right to assign exclusive parking spaces that are or may become Common Elements to certain Units and the right to adopt rules and regulations governing the use and maintenance of such parking. Each Timeshare Owner shall be permitted to use one (1) Parking Unit per Timeshare Unit occupied. Additional Parking Units may be made available for use on such terms as the Owners thereof may establish.

5.4     Limited Common Elements.

Limited Common Elements shall include, but not be limited to, any shutter, awning, window box, doorstep, stoop, balcony, deck, patio, entryway, porch or individual fireplace chimneys and flues appurtenant to any Unit; and, for all Timeshare Units, all appliances, wall coverings, floor coverings, furniture, fixtures, house wares contained within Timeshare Units, and any areas designated as Limited Common Elements for particular Units on the Maps. Any shutter, awning, window box, doorstep, stoop, deck, balcony, patio or fireplace chimney which is accessible solely from, associated with, and which adjoin a particular Unit, without further reference thereto, shall be used in connection with such Unit to the exclusion of the use thereof by the other Owners, except by invitation. No reference thereto need be made in any instrument of conveyance, encumbrance, or other instrument. Storage spaces may be designated on the Map or may be designated by the Association as Limited Common Elements appurtenant to the Units or to particular Unit(s) and reserved for the exclusive use of the Owners and the tenants, guests, lessee, licensees, permittees and invitees of the Owner(s) of such Unit(s). All remaining storage spaces shall be designated as General Common Elements or Restricted Common Elements and subject to regulation by the Executive Board. Declarant hereby reserves the right to redesignate Common Elements as Limited Common Elements and to reassign Limited Common Elements to the fullest extent permitted under CCIOA.

5.5     Restricted Common Elements.

The Association shall have the exclusive use and control of the Restricted Common Elements, which may be designated as such on the Map, by the Executive Board or in this Declaration, and may include, but is not limited to, storage areas, mechanical rooms, linen and housekeeping closets, and administrative offices.

Declarant hereby reserves the right and grants to the Association the right to reassign Restricted Common Elements to the fullest extent permitted under the Act.

5.6     Warranty Limitation.

EXCEPT FOR THOSE WARRANTIES REQUIRED BY COLORADO LAW, THE DECLARANT DOES NOT MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AND THE DECLARANT HEREBY DISCLAIMS ANY SUCH WARRANTIES, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND THE OWNERS AND THE ASSOCIATION ASSUME ALL RISK AND LIABILITY RESULTING FROM THE USE OF THIS PROPERTY.

## ARTICLE VI
## APPURTENANCES

6.1     Appurtenant Allocated Interests.

Each Unit shall have as an appurtenance thereto that undivided share (i.e. the "Allocated Interest") of the Common Elements, Common Expenses and Common Surplus as more specifically described in Exhibit "A" attached hereto and by this reference incorporated herein.  Each Owner shall be liable for that share of the Condominium Common Expenses that equals the Allocated Interest in the Common Elements and Common Surplus appurtenant to the Owner's Unit or Timeshare Interest.  In addition to its share of Condominium Common Expenses, Owners shall also be liable for the Limited Common Expenses allocated, attributed to or benefiting the respective type, class or category of Units owned by such Owners.  Residential Owners of Residential Units not committed to the Timeshare Plan shall also be liable for Residential Common Expenses.  Timeshare Owners shall also be liable for Timeshare Plan Common Expenses, Ad Valorem Taxes Common Expenses and Club Dues Common Expenses.  Affordable Housing Unit Owners shall also be liable for the Affordable Housing Common Expenses.  Commercial Unit Owners shall also be liable for Commercial Common Expenses.  Parking Unit Owners shall also be liable for Parking Common Expenses.

Unless the Declarant exercises its unilateral right under Section 14.3 to create different sized undivided fractional interests in a Unit, the Owner of each Annual Timeshare Interest shall own an undivided 1/20th of the Common Elements and of the Common Surplus allocated to the Owner's Unit and shall also be responsible for 1/20th of the Common Expenses allocated to Owner's Unit; and, the Owner of each Biennial Timeshare Interest shall own an undivided 1/40th of the Common Elements and of the Common Surplus allocated to the Owner's Unit and shall also be responsible for 1/40th of the Common Expenses allocated to Owner's Unit.

SOLICITORS,  00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

6.2   No Partition of Common Elements.

The Allocated Interest in the Common Elements appurtenant to each Unit and each Timeshare Interest shall remain undivided, and no Owner shall bring, or have any right to bring, any action for partition or division of it.

6.3   No Partition of Units or Timeshare Interests.

No action for partition of any Unit or Timeshare Interest or to any appurtenance to a Unit or Timeshare Interest shall lie.  Notwithstanding such limitation, if any Unit or Timeshare Interest is owned by two (2) or more persons as tenants-in-common or as joint tenants, nothing herein contained shall prohibit a judicial sale of such Unit or Timeshare Interest in lieu of partition as between such co-tenants or joint tenants.

6.4   Hyatt Vacation Club.

Membership in the Hyatt Vacation Club is an appurtenance to each Timeshare Interest in accordance with the Club Documents, the same being a covenant running with the land.  HVOI shall have the right to amend the terms and conditions of the Club Documents from time to time as set forth therein.

In accordance with the terms of the Club Documents, HVOI may require Owners to be current in the payment of all Assessments and to make advance payment of estimated Assessments that have not yet been billed by the Association for the upcoming year, as a condition to accepting reservation requests for such year.  All monies so collected by HVOI shall be held in escrow for the benefit of the Association and/or the Owners as required by applicable Colorado law.  Any interest earned on such escrowed funds will be paid to the Association and in no event will it be due and payable to an Owner. In the event the amount remitted to the HVOI for estimated Assessments is in excess of the Assessments actually due, the excess amount shall be returned to the Owner or applied to the following year's Assessments, at the sole discretion of HVOI.  In the event the amount remitted to HVOI is less than the Assessments actually due, the Owner shall remain liable for the deficiency and in no event shall be forgiven for said deficiency.

In the event that the Resort Agreement is terminated in accordance with its terms, the Association shall establish reservation procedures for use of the Condominium, which may or may not be identical to the reservation procedures set forth in the Club Documents.   Notwithstanding such termination each Owner of an undivided 1/20th Timeshare Interest shall be entitled to the use of the Fixed Week designated in the Owner's deed, together with a Floating Week and a Floating Split Week, every year and each Owner of an undivided 1/40th Timeshare Interest shall be entitled to the use of his Fixed Week, a Floating Week and a Floating Split Week, every other year.  Furthermore, as set forth in the Resort Agreement, upon the termination of such agreement, the Condominium will cease to be a Club Resort and the Owners will not be able to use accommodations and facilities at other Club Resorts through the Club reservation system or the Multisite Timeshare Plan.  In addition, the Association and all Owners shall cease using all personal and intellectual property related to the Club including, but not limited to, HVOI's reservation and exchange system for the Condominium, and all computer hardware and software (except as otherwise set forth in the Resort Agreement).

6.5     Parking Units.

Parking Units may be held as Limited Common Elements appurtenant to individual Units or to types, classes or categories of Units as further provided in Section 5.3 above.

## ARTICLE VII
## MAINTENANCE, ALTERATION AND IMPROVEMENT

7.1     Owner's Rights and Duties with Respect to Interiors.

Each Owner (but not any Timeshare Owner or Parking Unit Owner) shall have the exclusive right and responsibility at such Owner's sole expense to paint, tile, wall paper or otherwise decorate or redecorate and to maintain and repair the interior surfaces of the walls, floors, ceilings and doors forming and within the boundaries of such Owner's Unit.

Each Owner (but not any Timeshare Owner or Parking Unit Owner) at the Owner's expense shall have the exclusive right and responsibility at such Owner's sole expense to maintain and keep in repair the interior of the Unit, including the fixtures and utilities located in the Unit to the extent current repair shall be necessary in order to avoid damaging other Units or the Common Elements. All fixtures, equipment and utilities installed and included in a Unit serving only that Unit, commencing at a point where the fixtures, equipment and utilities enter the Unit, shall be maintained and kept in repair by the Owner of that Unit. An Owner shall also maintain and keep in repair all windows and other glass items related to such Owner's Unit and all entry door and interior doors serving such Unit. Notwithstanding the foregoing provisions of this Section, the maintenance and repair of any Timeshare Unit and Parking Unit shall be undertaken by the Executive Board at the expense of the Owners thereof in conformance with the provisions of this Declaration; and, no individual Owner of any Timeshare Interest or Parking Unit shall have any of the rights heretofore described. An Owner shall not allow any action or work that will threaten or impair the structural soundness of the improvements, threaten or impair the proper functioning of the utilities, heating, ventilation or plumbing systems or integrity of the Building, or threaten or impair any easement or hereditament. Except as otherwise set forth herein, no Owner shall alter any Common Elements without the prior written consent of the Association.

7.2     Responsibility of the Association.

The Association, without the requirement of approval of the Owners but subject to Article IX below, shall maintain and keep in good repair, replace and improve, as a Common Expense, all General, Limited and Restricted Common Elements and all portions of the Condominium not required in this Declaration to be maintained and kept in good repair by one or more Owners or Declarant. The Association shall also be responsible for maintaining, repairing and keeping in good repair and condition all Timeshare Units and all Parking Units.

7.3     Owner's Failure to Maintain or Repair.

In the event that portions of a Unit or other improvements are not properly maintained and repaired or in the event that such improvements are damaged or destroyed by an event of casualty, and if the responsibility for maintenance or repair lies with the Owner of the Unit, and the Owner does not take reasonable measures to diligently pursue the repair and reconstruction of the damaged or destroyed improvements to substantially the same condition in which they existed prior to the damage or destruction, then the Association, with the approval of the Executive Board and after thirty (30) days prior written notice to the Owner, shall have the right to enter upon the Unit to perform such work as is

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

reasonably required to restore the Unit and other improvements to a condition of good order and repair; provided, however, if such repair and reconstruction are required due to an event of casualty and cannot be reasonably performed within such thirty (30) day cure period, the Owner shall have such time as reasonably required to perform such repair and reconstruction so long as the work has been commenced within such cure period and is diligently pursued to completion. All costs incurred by the Association in connection with the restoration shall be a default Assessment and shall be reimbursed to the Association by the Owner, upon demand. All unreimbursed costs shall be a lien upon the Unit until reimbursement is made. The lien may be enforced in the same manner as a lien for an unpaid Assessment levied in accordance with Article VIII of this Declaration. In the event of an emergency which threatens bodily harm or property damage the Association shall have the right to give such shorter notice as may be reasonable under the circumstances and to undertake repairs if not undertaken by such Owner.

### 7.4   Association's Access to Units.

The Association has the irrevocable right of access to each Unit whenever necessary for: (i) inspecting, maintaining, replacing, or operating the Condominium Property; (ii) making emergency repairs necessary to prevent damage to the Common Elements or to any Unit, or (iii) responding to or investigating any emergency or threat of same and taking such action as the Association may deem necessary or appropriate under the circumstances.

### 7.5   Maintenance Weeks.

Subject to the provisions of the Resort Agreement, the Association shall have the right to reserve at least one Week (a maximum of four Weeks) per year per Timeshare Unit for maintenance purposes. Unless the Resort Agreement is terminated in accordance with its terms, the Association has agreed with HVOI that the Hyatt Vacation Club Rules and Regulations shall govern the reservation of specific time periods for maintenance purposes. Pursuant to the Club Documents, the Association shall have the right to reserve one (1) Week in each Timeshare Unit during the Home Resort Preference Period (Float) and up to three (3) additional Weeks during the Club Use Period (as defined in the Resort Agreement attached hereto as Exhibit B) for maintenance purposes during the term of the Resort Agreement. In the event the Hyatt Vacation Club Resort Agreement is terminated the Association shall have the right to designate up to four Weeks per year for maintenance purposes.

### 7.6   Common Elements.

Subject to the rights and obligations of Declarant and Owners as set forth in this Declaration, the Association shall be responsible for the exclusive management, control, maintenance, repair, replacement, and improvement of all Common Elements and shall keep the same in good, clean, attractive, and sanitary condition, order, and repair. The expenses, costs, and fees of such management, operation, maintenance, and repair by the Association shall be part of the Common Expenses, and, subject to the budget approval procedures of Article VIII below, prior approval of the Owners shall not be required in order for the Association to pay any such expenses, costs, and fees. Each Owner shall be responsible for any Limited Common Elements appurtenant to his Unit, other than those areas the Association chooses to maintain, which for purposes of this Section shall be treated as Common Elements, and for other areas which, pursuant to Section 4.1.d. (2) above, may be designated for use in connection with the Owner's Unit, and for keeping the same in a good, clean, sanitary, and attractive condition. The Executive Board has the right, in its sole discretion and without the approval of the Owners, to maintain, repair, alter, rearrange, improve, remove, substitute and replace any or all furnishings and other personal property contained within each Timeshare Unit that are not the property of individual Owners from time to time. The Association shall be responsible for maintaining and repairing

Limited Common Elements appurtenant to Units committed to the Timeshare Plan and Parking Units, the expense of which shall be the responsibility of the Owners of respective Units to which the Limited Common Elements are appurtenant.

## ARTICLE VIII
## ASSESSMENTS AND COMMON EXPENSES

### 8.1    Assessments.

Declarant, by creating the Units pursuant to this Declaration, and every other Owner, by acceptance of the deed or other instrument of transfer of the Owner's Unit or Timeshare Interest (whether or not it shall be so expressed in such deed or other instrument of transfer), is deemed to personally covenant and agree, jointly and severally, with every other Owner and with the Association, and hereby does so covenant and agree to pay to the Association all Assessments, including, but not limited to, Assessments for Maintenance Fee Common Expenses, and in the case of Timeshare Units Ad Valorem Tax Common Expenses and Club Dues Common Expenses, relative to the particular Unit or Timeshare Interest owned.   The Association shall prepare budgets for the Condominium as a whole as well as budgets for each type, class or category of Unit.

### 8.2    Annual Budget.

The Executive Board shall adopt a budget and submit the budget to a vote of the Owners subject to such budget no less frequently than annually.   Copies of the proposed budget and proposed assessments (or a summary thereof) must be transmitted to each Owner subject thereto in accordance with the requirements of CCIOA, except the first Fiscal Year, when the budget shall be distributed as soon as reasonably possible.   The budget shall contain:  (a) the estimated revenue and expenses on an accrual basis; (b) an identification of the amount of the total cash reserves currently available for replacement or major repair of common facilities and for contingencies; and (c) concerning those components of the common areas and facilities for which the Association is responsible, the following information:  (i) an itemized estimate of the remaining life, (ii) the methods of funding used to defray the future repair, replacement, or additions, and (iii) a general statement addressing the procedures used for calculating and establishing reserves to defray the expenses listed in (ii).

At any meeting of Owners called by the Executive Board for consideration of the budget as required by CCIOA unless the Owners of sixty-seven percent (67%) of the Allocated Interests of Units or Timeshare Interests that are subject to such budget reject it, such proposed budget is ratified, whether or not a quorum is present.   In the event that any proposed budget is rejected, the periodic budget last ratified by the Owners subject to such budget must be continued until such time as the Owners ratify a subsequent budget proposed by the Executive Board.

The Executive Board shall levy and assess the Association's annual assessments in accordance with the budgets.

### 8.3    Special Assessments.

In addition to the annual Assessments for Common Expenses authorized above, the Executive Board, subject to the provisions of CCIOA, may at any time and from time to time determine, levy, and assess in any fiscal year a special Assessment applicable to that particular fiscal year (and for any such longer period as the Executive Board may determine in its reasonable judgment) for the purpose of defraying, in whole or in part, the unbudgeted or unanticipated costs, fees, and expenses of the

SOLICITORS,  00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Condominium, of the Association, or of any type, class or category of Unit or of any construction, reconstruction, repair, demolishing, replacement, renovation, management or maintenance of the Property or of any facilities located on the Property, specifically including any fixtures and personal property related to it. Any amounts determined, levied, and assessed pursuant to this Declaration for the benefit of any type, class, or category of Unit shall be assessed to such Units, or, if applicable, to the Timeshare Interests in such Units in proportion to the Allocated Interests appurtenant to all Units or Timeshare Interests of a similar type, class or category; provided, however, that any extraordinary insurance costs incurred as a result of the value of a particular Owner's Unit or Timeshare Interest, or the actions of a particular Owner (or his agents, servants, guests, tenants, or invitees) may, in the judgment of the Executive Board, be assessed to and borne by that Owner. Special Assessments shall be based on a budget adopted in accordance with Section 8.2 above, provided that if necessary, the Association may adopt a new budget pursuant to Section 8.2 prior to levying a special Assessment.

### 8.4    Common Surplus.

Each Owner shall own a share of the Common Surplus attributable to each Unit or Timeshare Interest owned in accordance with Section 6.1 above. Common Surplus shall be allocated to the types, classes or categories of Units from which it resulted if such allocation can be so determined with reasonable certainty and without undue cost. The Executive Board may, within its discretion, apply the surplus funds (a) to reserves, (b) toward the following year's Common Expenses, (c) as a credit to Owners against future Assessments, (d) as a refund to Owners, or (e) any combination of the foregoing. Nothing herein shall prevent the Executive Board from applying such surplus funds in accordance with the respective types, classes and categories of Units from which the surplus funds resulted.

### 8.5    Refunds of Common Surplus.

If the Association shall refund all or a portion of any Common Surplus to the Owners for any fiscal year in which the Declarant paid any Assessment, such refund shall be prorated as of the date of closing of any sale of a Unit or Timeshare Interest by the Declarant during such year, and the prorated amount allocable to the period of time of the Declarant's ownership shall be refunded directly to the Declarant by the Association.

### 8.6    Certificate.

Any Owner shall have the right to require from the Association a certificate showing the current amount of unpaid Assessments against the Owner with respect to the Owner's Unit or Timeshare Interest. The holder of a Mortgage or other security interest shall have the same right as to any Unit or Timeshare Interest upon which it has a lien. Such certificate shall be requested from the Association, in writing, delivered personally or by certified mail, first-class postage prepaid, return receipt, to the Association's registered agent. Upon receipt of such written request, the Association shall furnish the certification within fourteen (14) calendar days. The certificate is binding on the Association, the Executive Board and every Owner.

### 8.7    Club Dues.

For so long as the Condominium remains a Component Resort, the Association, as agent of the Timeshare Owners, shall collect and remit to HVOI the total amount of Club Dues which are charged against such Owners, pursuant to the terms of the Resort Agreement. Furthermore, in accordance with the Resort Agreement, the Association shall pay to HVOI by March 1st of each year an amount equal to all Club Dues charged against such Owners for that year, whether or not the Association

has actually been successful in collecting such amount from the Owners by such date. Any amounts charged against individual Timeshare Owners for Club Dues, pursuant to the terms of the Resort Agreement, which are not collected by the Association shall constitute a Club Dues Common Expense. As provided in the Resort Agreement, the Association shall collect Club Dues in conjunction with its collection of Common Expenses, and in this regard, shall have all collection and enforcement rights that HVOI is entitled to exercise.

### 8.8   Ad Valorem Taxes.

The Association shall serve as the agent of the Timeshare Owners for the purpose of collecting Ad Valorem Taxes. Each Timeshare Owner shall be responsible for a portion of the Ad Valorem Taxes assessed to all Timeshare Units in proportion to the size of the Timeshare Interest owned relative to all other Timeshare Interests owned. Ad Valorem Taxes that are assessed against Owners of Timeshare Units that remain uncollected by the Association by the due date shall constitute an Ad Valorem Taxes Common Expense. Ad Valorem Taxes Common Expenses shall be assessed to all Timeshare Interests in the Condominium in proportion to the Allocated Interest appurtenant to the Timeshare Interest.

### 8.9   Waiver of Homestead Exemption.

By acceptance of the deed or other instrument of transfer of a Unit, each Owner irrevocably waives, for the benefit of the Association, the homestead exemption provided by Colorado law. Each Owner acknowledges and agrees that the lien or liens that may be asserted by the Association for the enforcement of Assessment liens shall in all respects be senior and superior to the right title or interest of the Owner of any Unit or Timeshare Interest.

### 8.10   Billing and Collection.

The billing and collection of amounts payable by each Owner shall be pursuant to the Bylaws of the Association, subject to the following provisions:

(a)     Interest; Application of Payments.  Assessments and installments on such Assessments not paid within five (5) days after the date due shall bear interest at the rate established by the Executive Board, but not exceeding the highest lawful rate, from the date due until paid. In addition to such interest, the Association may charge an administrative late fee on delinquent accounts in an amount of not less than twenty-five dollars ($25) for each annual installment or fifteen dollars ($15) for each installment due more frequently than annually, or such other charge as the Executive Board may fix by rule from time to time, to cover the extra expenses involved in handling such delinquent Assessment installment.

The Association is further authorized to utilize the services of either a collection agency or attorney, or both, for collection of delinquent accounts and to charge and impose a lien against the delinquent Owner for such costs in accordance with CCIOA. The Association is further authorized to charge and impose a lien against the delinquent Owner for any costs with regard to denying use of the accommodations and facilities of the Timeshare Plan.

All payments on accounts shall be first applied to any interest that has accrued, then to any administrative late fee, then to any costs and reasonable attorneys' fees incurred in collection, and then to the Assessment payment first due. The Executive Board shall have the discretion to increase or decrease the amount of the administrative late fee or interest rate within the limits imposed by law;

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

provided, however, that such increase or decrease shall be made effective by amending the rules and regulations for the Condominium and notifying the Owners of same by regular mail addressed to each Owner at the Owner's last known address. Notwithstanding any provision of this paragraph to the contrary, the Association shall have the right to waive any late fees or interest that accrue as a result of delinquent payment. The Association shall be entitled to recover the costs of collection including court costs and attorneys fees from the delinquent Owner.

(b)     Lien for Assessments.   The Association shall automatically have a lien against each Unit or Timeshare Interest, as applicable, for any unpaid Assessments (including installments of Assessments), late charges, reasonable attorneys' fees and costs, fines, fees, charges, and for interest accruing thereon, incurred by the Association incident to the collection of such Assessment or enforcement of such lien, whether or not legal proceedings are initiated. The lien is automatically perfected from and after the recording of this Declaration without the necessity of recording any notice of lien. The lien shall continue in effect until all sums secured by the lien shall have been fully paid.

Except to the extent a lien for Assessments is expressly entitled to priority under CCIOA, all such liens shall be subordinate to: (i) any lien or encumbrance recorded prior to the date of recording the Declaration; (ii) a security interest on the Unit or Timeshare Interest which has priority over all other security interests on the Unit or Timeshare Interest and which was recorded before the date on which the Assessment sought to be enforced became due, to the extent permitted under CCIOA; and (iii) any liens for real estate taxes and other governmental assessments or charges against the Unit or Timeshare Interest. All other persons not holding liens described in the previous sentence and obtaining a lien or encumbrance on any Unit or Timeshare Interest after the recording of this Declaration shall be deemed to consent, acknowledge and agree that any such lien or encumbrance shall be and is subordinate and inferior to the Association's past and future liens for Assessments, interest, late charges, costs, expenses, and attorneys' fees, as provided in this Article, whether or not such consent is specifically set forth in the instrument creating any such lien or encumbrance.

Nothing in this section shall be construed to affect the provisions governing the relative priority of liens held by other associations as provided in Colo. Rev. Stat. § 38-33.3-316(3).

All liens held by the Association may be foreclosed by suit brought in the name of the Association in the same manner as a foreclosure of a mortgage or deed of trust on real property. The Association may also sue to recover a money judgment for unpaid Assessments without thereby waiving any lien.

Foreclosure or attempted foreclosure by the Association of its lien shall not be deemed to stop or otherwise preclude the Association from again foreclosing or attempting to foreclose its lien for any other Assessments (or installments thereof) which are not fully paid when due. The Association shall have the power and right to bid in or purchase any Unit or Timeshare Interest at foreclosure or other legal sale and to acquire and hold, lease, or mortgage the Unit or Timeshare Interest, or exercise the votes in the Association appurtenant to ownership of the Unit or Timeshare Interest, and to convey, or otherwise deal with the Unit or Timeshare Interest acquired in such proceedings.

In the event a First Mortgagee shall obtain title to a Unit or Timeshare Interest as a result of the foreclosure of such First Mortgage, or in the event such First Mortgagee shall obtain title to a Unit or Timeshare Interest as the result of a conveyance in lieu of foreclosure of such First Mortgage or security interest, such First Mortgagee shall not be liable, except to the extent provided under CCIOA, for that share of the Assessments, interest, late charges, costs, expenses, charges, fees, and reasonable attorneys' fees and costs chargeable to the Unit or Timeshare Interest, or the Owner thereof, which

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

became due prior to the acquisition of title by such First Mortgagee, and any such unpaid share of Assessments, fees or costs, chargeable against any such foreclosed Unit or Timeshare Interest or against any Unit or Timeshare Interest in a Unit transferred in lieu of foreclosure, shall be deemed a Condominium Common Expense to be paid in the same manner as other Common Expenses of the Condominium by all of the Owners.

Nothing contained herein shall be construed as a modification of any rights or remedies of the Association pursuant to CCIOA, except to the extent that the Condominium Documents allow additional remedies to those expressly set forth in said statute and to the extent that such additional remedies are not prohibited by said statutes.

(c)     Personal Liability for Unpaid Assessments.  Each Owner is personally liable for all Assessments made against the Unit or Timeshare Interest pursuant to this Declaration and CCIOA, and the Association may bring an action for a money judgment against a delinquent Owner to collect all sums due the Association, including, but not limited to, unpaid Assessments, interest, late charges, fines, fees, charges, costs and reasonable attorneys' fees.  In the event more than one person or entity owns a Unit or Timeshare Interest such owners shall be jointly and severally liable for all Assessments made against the Unit or Timeshare Interest.  The Association may bring an action to foreclose the lien for Assessments, may bring an action for a money judgment or may do both.

(d)     Payments of Assessments.  No Owner may withhold payment of any monthly Assessment or special Assessment or any portion thereof because of any dispute which may exist between that Owner and the Association, the directors of the Association, the Managing Agent or the Declarant or among any of them, but rather each Owner shall pay all Assessments when due pending resolution of any dispute.  No Owner may avoid personal liability for the payment of Common Expenses provided for in this Declaration by not using the Common Elements or the facilities contained in the Common Elements or by abandoning or leasing his Unit or Timeshare Interest.

(e)     Suspension of Privileges and Monetary Penalties.  If any Owner or an Owner's guest shall be in breach of the Resort Documents, including but not limited to the failure of any Owner to pay any assessment on or before the due date therefor, the Association may levy a monetary penalty against and/or suspend the right of the Owner and/or guest to reserve and/or occupy the Owner's Timeshare Interest and the right of the Owner to participate in any vote or other determination provided for herein.  Unless the violation consists of the failure to pay assessments when due (for which violation the right of an Owner to occupy a Timeshare Interest may be immediately suspended until the delinquent assessments be paid), no such penalty shall be imposed and no such suspension shall be made except after a meeting of the Executive Board at which a quorum of the Executive Board is present, duly called and held for this purpose in the same manner as provided in the Bylaws for the noticing, calling and holding of a meeting of the Executive Board.  Written notice of the meeting and the purpose thereof, including the reasons for the penalty or suspension sought, shall be given to the Owner against whom such penalty is sought to be imposed or whose privileges are being sought to be suspended at least fifteen (15) days prior to the holding of the meeting.  The Owner shall be entitled to appear at the meeting and present the Owner's case as to why the penalty should not be imposed or the privileges should not be suspended.  The Executive Board may determine whether the Owner will be permitted to present a written or oral defense to the charges.

The decision as to whether the penalty should be imposed or the privileges should be suspended shall be made by a majority of the members of the Executive Board present at the meeting.  Written notice of disciplinary action taken and the reasons therefor shall be given to the disciplined Owner and the disciplinary action shall become effective on the date the notice is given.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

8.11   Common Expenses.

As determined by the Executive Board, Common Expenses may be allocated among Owners on any reasonable basis including but not limited to allocations based on the same or similar method by which certain charges are charged by third party providers.   Common Expenses solely affecting or benefiting certain types, classes or categories of Units or Owners may be allocated solely among such Units or Owners based on the relative Allocated Interests of each such type, class or category of Unit or Owner including Timeshare Owner.

8.12   Personal Expenses.

In addition to payment of Common Expenses, each Owner shall be obligated to pay as part of such Owner's obligation to pay Assessments, all personal charges incurred in connection with the Condominium and the Association including, but not limited to, (i) the cost of damage to the Common Elements, (ii) the cost of any deductible for damage caused by such Owner or such Owner's family members, or (iii) the cost of any personal benefits or services supplied or provided to or for the benefit of such Owner or such Owner's guests.

**ARTICLE IX**
**THE ASSOCIATION**

The operation of the Condominium shall be by the Association, which shall fulfill its functions directly or through a professional management company, pursuant to the following provisions:

9.1   Membership in Association.

Each Owner shall automatically become and remain a member of the Association for the period of the Owner's ownership of a Unit or Timeshare Interest pursuant to the provisions of the Resort Documents.   Membership in the Association shall be an appurtenance to and shall not be separated from ownership of a Unit or Timeshare Interest.

9.2   Voting Rights.

Each Owner shall have a vote in the affairs of the Association in which members are permitted to vote.   Each Unit will be allocated one vote.   The vote with respect to each Unit that is committed to the Timeshare Plan will be allocated to the Owners of Timeshare Interests in such Unit based on each Owner's undivided ownership interest in the Unit expressed as a fraction or as a percentage.   To illustrate, if a Unit is divided into Timeshare Interests each constituting a $1/20^{th}$ ownership interest of such Unit, then each Owner of a Timeshare Interest therein shall be entitled to cast a vote equal to $1/20^{th}$ of the vote appurtenant to such Unit.

When a Timeshare Interest stands of record in the names of two or more Owners, such Owners shall designate a single agent as the spokesperson and voter for all such Owners.

9.3   Articles of Incorporation.

The Articles of Incorporation of the Association set forth the Association's powers and duties.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

9.4     Bylaws.

The initial Bylaws of the Association are incorporated herein by reference.

9.5     Limitation upon Liability of Association.

NOTWITHSTANDING THE DUTY OF THE ASSOCIATION TO MAINTAIN AND REPAIR PORTIONS OF THE PROPERTY, THE ASSOCIATION SHALL NOT BE LIABLE TO OWNERS FOR INJURY OR DAMAGE, OTHER THAN FOR THE COST OF MAINTENANCE AND REPAIR, CAUSED BY ANY LATENT CONDITION OF THE PROPERTY TO BE MAINTAINED AND REPAIRED BY THE ASSOCIATION, OR CAUSED BY THE ELEMENTS OR OTHER OWNERS OR PERSONS.

9.6     Restraint upon Assignment of Shares and Assets.

Each Owner's share in the funds and assets of the Association cannot and shall not be assigned, hypothecated or transferred in any manner except as an appurtenance to the Owner's Unit or Timeshare Interest.

9.7     Declarant Control of Association.

The Declarant shall be entitled to elect or designate the members of the Executive Board as provided in the Bylaws except as limited by the following or by Colorado law:

(a)     Not later than sixty (60) days after conveyance of twenty-five percent (25%) of the Allocated Interests in the Condominium to Owners other than the Declarant, at least one member and not less than twenty-five percent (25%) of the members of the Executive Board must be elected by Owners other than the Declarant.

(b)     Not later than sixty (60) days after conveyance of fifty percent (50%) of the Allocated Interests in the Condominium to Owners other than the Declarant, not less than thirty-three and one-third percent (33 1/3%) of the members of the Executive Board must be elected by Owners other than the Declarant.

(c)     Not later than the termination of the Declarant Control Period (as defined below), the Owners other than the Declarant shall elect an Executive Board of at least three members at least a majority of whom must be Owners other than Declarant or must be designated representatives of Owners other than Declarant. The Declarant Control Period shall commence upon on the date of incorporation of the Association and terminate upon the earliest of the following events, or such longer period as permitted under Colorado law (the "Declarant Control Period"):

(1)     Sixty (60) days after conveyance of seventy-five percent (75%) of the Units in the Condominium to Owners other than the Declarant,

(2)     Two (2) years after the last conveyance of a Unit by the Declarant in the ordinary course of business,

(3)     Two (2) years after any right to add new Units was last exercised, or

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(4)     The date on which Declarant voluntarily relinquishes such power evidenced by notice recorded in the Records.

(d)     Declarant shall be entitled to appoint and remove the members of the Association's Executive Board and officers of the Association to the fullest extent permitted under CCIOA. As long as Declarant owns any interest in the Condominium the Declarant shall be entitled to appoint a member of the Executive Board. Declarant may voluntarily relinquish such power evidenced by a notice recorded in the Records, but, in such event, Declarant may at its option require that specified actions of the Association or the Executive Board as described in the recorded notice, during the period Declarant would otherwise be entitled to appoint and remove directors and officers, be approved by Declarant before they become effective.

(e)     During the Declarant Control Period neither the Executive Board nor the Association acting through its members shall be authorized to amend any of the Condominium Documents without Declarant's consent. After the expiration of the Declarant Control Period, and as long thereafter as Declarant holds any Allocated Interests in the Condominium whether by ownership of Units or Timeshare Interests, the Association shall not be permitted to amend any Condominium Document that will adversely affect or restrict the rights, or increase the obligations, of Owners including Declarant, unless Declarant consents thereto.

9.8     Association Management Contract.

The Association is authorized to contract for management of the Condominium and to delegate to such contractor all powers and duties of the Association except such as are specifically required by CCIOA or the Condominium Documents to have approval of the Executive Board or members of the Association; provided, however, if a Timeshare Plan has been created with respect to all or part of the Residences, the Association shall designate a Managing Agent as provided in this Section, and the Management Agreement for such Managing Agent shall allow for either party to terminate, for cause, upon sixty (60) days' notice, or as required by applicable law. The initial Managing Agent is Hyatt Vacation Management Corporation, a Delaware corporation. Notwithstanding any provisions contained in this Declaration to the contrary, it is the intent of this Declaration that a management contract entered into by the Executive Board may only be terminated as provided in Colo. Rev. Stat. § 38-33.3-305 by a vote of two-thirds (2/3) of the members of the Executive Board and by a vote of the Owners of two-thirds (2/3) of the Units including the Owners of two-thirds (2/3) of the Timeshare Interests that have been created in the Condominium. In no event may the Association or the Executive Board unilaterally terminate the Managing Agent without such a vote. In the event the Managing Agent is terminated as provided under this Section, a new Managing Agent shall be designated as quickly as possible by the Association.

9.9     Other Association Powers.

In the event this Condominium is merged, pursuant to CCIOA or pursuant to the provisions of this Declaration, with another separate and independent condominium to form a single condominium, the Association is expressly empowered to manage and operate the resulting single condominium as provided for in CCIOA and this Declaration. The Association is also specifically empowered to manage, operate and maintain any other separate and independent condominiums that the Executive Board shall elect to manage, operate and maintain from time to time in accordance with CCIOA, this Declaration and the Declaration of Condominium of the other separate and independent condominium.

### 9.10 Title to Property.

The Association shall have the power to acquire title to and hold, convey or encumber non-condominium real property, and the Property, in whole or in part, in accordance with the provisions of CCIOA; provided, however, that the Association first obtains the written approval of Declarant for so long as the Declarant continues to sell Units or Timeshare Interests in the ordinary course of business. The Executive Board shall have the authority to lease non-condominium property for the Association as lessee, and to lease the Property, in whole or in part, for the Association as lessor, without first obtaining approval of the Owners; provided, however, that the Executive Board shall only exercise such power when it is in the best interests of the Owners and upon receipt of the prior written approval of Declarant for so long as the Declarant continues to sell Units or Timeshare Interests in the ordinary course of business. The Association shall have the power to obtain easement rights over, under and across other buildings or properties. Neither the Association nor the Executive Board shall have the power to convey, mortgage or lease as lessor any Unit not owned by the Association. In addition, neither the Association nor the Executive Board shall convey, mortgage or lease any Limited Common Elements without the approval by majority vote of the Owners of the Unit or Units to which the Limited Common Element are appurtenant.

### 9.11 Administration, Powers, and Services.

Responsibility for the administration of the Condominium and Timeshare Plan, operation maintenance, repair and restoration of the Units and their respective Common Furnishings, and any alterations and additions thereto is vested in the Association. The Association has the power to make material alterations and improvements to Units, Common Elements, and Limited Common Elements without the consent of the Owners. The Association acting alone (through the Executive Board, its Officers, or other duly authorized representatives) may, subject to the provisions of the Condominium Documents and applicable law, exercise any and all rights and powers herein, all the rights and powers of a nonprofit corporation under applicable laws.

### 9.12 Acquiring and Disposing of Personal Property.

The Association may acquire, own and hold for the use and benefit of some or all Owners tangible and intangible personal property including furniture, furnishings, equipment, appliances, house wares, membership rights, licenses, and other beneficial use rights for access to and use of recreational or other facilities, and may dispose of the same by sale or otherwise, and the beneficial interest in any such personal property shall be deemed to be owned by the Owners in the same undivided proportion as their respective undivided interests in the Common Elements. In the event that such property is acquired for the benefit of some but not all Owners the cost of acquisition, maintenance, repair and replacement of such property shall be the sole obligation of the Owners of the type, class or category of Units for whose benefit the property is acquired and the property shall be considered Limited Common Elements appurtenant to such unit for the benefit of such Owners. Such interests shall not be transferable except with the transfer of a Unit or Timeshare Interest.

A conveyance of a Unit or Timeshare Interest shall transfer ownership of the transferor's beneficial interest in such personal property without any reference thereto. Each Owner may use such personal property in accordance with the purposes for which it is intended, without hindering or encroaching upon the lawful rights of other Owners in accordance with the Condominium Documents. The transfer of title to a Unit or Timeshare Interest under foreclosure shall entitle the purchaser to the interest in such personal property associated with the foreclosed Unit or Timeshare Interest.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

9.13   Cooperation with Other Associations.

The Association may contract or cooperate with other homeowners' associations or entities as convenient or necessary to provide services, benefits and privileges, such as access to recreational facilities, and to fairly allocate costs among the Owners or the parties utilizing such services and privileges. The costs associated with such services, benefits or privileges by the Association (to the extent not chargeable to other organizations) shall be a Common Expense allocable among the type, class or category of Unit or Units the Owners of which benefit therefrom. The Association shall provide current addresses of Owners to the other associations from time to time when necessary and appropriate in connection with the performance of the official duties of such associations.

9.14   Appointment of Executive Board as Agent for Service of Process.

As required by applicable law, each Timeshare Owner, solely by virtue of its ownership of an interest in a Timeshare Unit, hereby appoints the Executive Board or their designee as its agent for service of process (for purposes of satisfying the requirements of personal service in the State of Colorado as provided in Rule 4(e) of the Colorado Rules of Civil Procedure, as amended) and receipt of legal notices in all matters relating to the Timeshare Plan and such Timeshare Owner's ownership of a Timeshare Unit.

## ARTICLE X
## INSURANCE

The insurance other than title insurance, if any, which shall be carried upon the Property, shall be governed by the following provisions:

10.1   Authority to Purchase; Named Insured; Required Provisions.

All insurance policies upon the Property shall be purchased by the Association from a fiscally responsible company authorized to do business in the State of Colorado and shall have a minimum term of one year. The named insured shall be the Association individually and as agent for the Owners, without naming them, and as agent for their First Mortgagees. Provisions shall be made for the issuance of mortgagee endorsements and memoranda of insurance to the Association and, upon request, to Owners and First Mortgagees. Unless otherwise provided by statute, the insurer issuing the policy may not cancel or refuse to renew it until thirty (30) days after notice of the proposed cancellation or nonrenewal has been mailed to the Association and to each Owner and First Mortgagee to whom a certificate or memorandum of insurance has been issued at their respective last-known addresses. Insurance policies shall provide that payments by the insurer for losses shall be made to the Association or the Insurance Trustee designated below, and all policies and their endorsements shall be deposited with the Association or the Insurance Trustee. To the extent commercially obtainable at reasonable prices insurance policies must provide that:

(a)   Each Owner is an insured person under the policy with respect to liability arising out of such Owner's interest in the Common Elements or membership in the Association;

(b)   The insurer waives its rights to subrogation under the policy against any Owner or guest;

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(c)     No act or omission by any Owner, unless acting within the scope of such Owner's authority on behalf of the Association, will void the policy or be a condition to recovery under the policy; and

(d)     If, at the time of a loss under the policy, there is other insurance in the name of an Owner covering the same risk covered by the policy, the Association's policy provides primary insurance.

10.2   Coverage.

(a)     Property Casualty Insurance.   Casualty insurance on the Property shall include broad form coverage for casualty losses, except that the total amount of insurance must be not less than the full insurable replacement costs of the insured property less deductibles approved by the Executive Board or the Managing Agent at the time the insurance is purchased and at each renewal date, exclusive of land, excavations, foundations, paving areas, landscaping and other items normally excluded from property policies.   All personal property owned by the Association shall be insured for its replacement cost as shall be determined from time to time by the Executive Board.   Coverage shall afford protection against:

(1)     Loss or damage by fire and other hazards normally covered by a standard extended coverage endorsement;

(2)     Such other risks, including flood, as from time to time shall be customarily covered with respect to buildings similar in construction, location and use as the buildings on the Property, including all perils normally covered by the standard "all risk" endorsement where such is available, including but not limited to vandalism and malicious mischief.

(b)     General Liability.   General liability insurance against claims and liabilities arising in connection with the ownership, existence, use, or management of the Property and the Association, in an amount, if any, deemed sufficient in the judgment of the Executive Board, but shall not be less than $1,000,000/$2,000,000 for personal injury and $100,000 for property damage, insuring the Executive Board, the Association, the Managing Agent, and their respective employees, agents, and all persons acting as agents.   Declarant shall be included as an additional insured in Declarant's capacity as an Owner and member of the Executive Board.   The Owners shall be included as additional insureds but only for claims and liabilities arising in connection with the ownership, existence, use or management of the Common Elements.   The insurance shall cover claims of one or more insured parties against other insured parties, if available.   All insurers shall waive their right to subrogation under the policy against any Owner or member of the Owner's household.   The policy must also include a provision or endorsement that no act or omission by an Owner, unless acting within the scope of the Owner's authority on behalf of the Association, will void the policy or operate as a condition to recovery under the policy by any other person.

(c)     Worker's Compensation.   Worker's compensation insurance shall be carried to the extent necessary to meet the requirements of law.

(d)     Fidelity Bond.   Fidelity bonds must be maintained by the Association to protect against dishonest acts on the part of its officers, directors, trustees, employees and contractors and on the part of all others who handle or are responsible for handling the funds belonging to or administered by the Association in an amount not less than the greater of (i) two (2) months' current Common Expenses plus reserves as calculated from the current budget of the Association, or (ii) 110% of

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

all Association funds held at any given time; provided, however, in no event shall the coverage for third parties handling the collection, deposit, transfer or disbursement of Association funds be less than $50,000. In addition, all funds and accounts of the Association being held by Managing Agent or other third persons shall be kept in an account separate from the funds of other parties held by such Managing Agent or third party, and all reserves of the Association shall be kept in an account separate from the operational account of the Association. Any such fidelity coverage shall name the Association as an obligee and such bonds shall contain waivers by the issuers of all defenses based upon the exclusion of persons serving without compensation from the definition of "employees," or similar terms or expressions.

(e)     Business Interruption.   If reasonably obtainable, the Executive Board may obtain business interruption or loss of use insurance.

(f)     Other.   Such other insurance may be carried, as the Executive Board shall determine from time to time to be desirable.

(g)     Cancellation.   If the insurance described in this Article X is not reasonably available, or if any policy of such insurance is canceled or not renewed without a replacement policy therefor having been obtained, the Association promptly shall cause notice of that fact to be hand delivered or sent prepaid by United States mail to all Owners.

10.3    Premiums.

Premiums upon insurance policies purchased by the Association shall be paid by the Association as a Common Expense and allocated to the appropriate Owner or Owners to which such policies pertain.

10.4    Insurance Trustee; Share of Proceeds.

All insurance policies purchased by the Association shall be for the benefit of the Association and the Owners and any mortgagees as their interests may appear, and shall provide that all proceeds covering property losses shall be paid to the Association or to a named Insurance Trustee (the "Insurance Trustee") if the Executive Board shall so elect, and not to any First Mortgagee. All references to an Insurance Trustee herein shall apply to the Association if the Executive Board elects not to appoint an Insurance Trustee. Any Insurance Trustee appointed by the Executive Board shall be a commercial bank with trust powers authorized to do business in Colorado or another entity acceptable to the Executive Board. The Insurance Trustee (other than the Association) shall not be liable for payment of premiums nor for the failure to collect any insurance proceeds. The duty of the Insurance Trustee shall be to receive such proceeds as are paid and hold the proceeds in trust for the purposes stated herein for the benefit of the Owners and any First Mortgagees in the following shares; provided, however, that such shares need not be set forth on the records of the Insurance Trustee:

(a)     Proceeds on Account of Damage to Common Elements and Limited Common Elements.   Proceeds on account of damage to Common Elements and Limited Common Elements, when such Common Elements or Limited Common Elements are not to be restored, shall be held in undivided shares for each Owner, such share being the same as the Allocated Interest appurtenant to each Unit or Timeshare Interest.

(b)     Units.   Proceeds on account of damage to Units when the Building or Unit is not to be restored, shall be held in undivided shares for each Owner of those Units or Unit

affected thereby, such share being the same as the Allocated Interest appurtenant to each Owner's interest.

(c)     First Mortgagees.   In the event a mortgagee endorsement has been issued, any share for the Owner shall be held in trust for the First Mortgagee and the Owner as their interests may appear; provided, however, that no First Mortgagee shall have the right to determine or participate in the determination as to whether any damaged property shall be reconstructed or repaired, and no First Mortgagee shall have any right to apply or have applied to the reduction of a Mortgage debt any insurance proceeds except distributions of such proceeds made to the Owner and First Mortgagee pursuant to the provisions of this Declaration.  Notwithstanding the foregoing, the First Mortgagee shall have the right to apply or have applied to the reduction of its Mortgage debt any or all sums of insurance proceeds applicable to its mortgaged interest in the event a determination is made as provided herein not to reconstruct or repair the damaged property.

10.5     Distribution of Proceeds.

Proceeds of insurance policies received by the Insurance Trustee shall be distributed to or for the benefit of the beneficial owners of such proceeds in the following manner:

(a)     All expenses of the Insurance Trustee shall be paid first or provisions made for such payment.

(b)     If the damage for which the proceeds are paid is to be repaired or reconstructed, the proceeds shall be paid to defray the cost thereof as provided herein.  Any proceeds remaining after defraying such cost of repair or reconstruction shall be distributed to the beneficial owners, remittances to Owners and any First Mortgagees being payable jointly to them.  This is a covenant for the benefit of, and may be enforced by, any First Mortgagee.  Owners and First Mortgagees are not entitled to receive payment of any portion of the proceeds unless there is a surplus of proceeds after the damaged property has been completely repaired or restored or the Condominium created by this Declaration is terminated.

(c)     If it is determined in the manner provided herein that the damage for which proceeds are paid shall not be reconstructed or repaired, the proceeds attributable to any damaged Common Elements must be used to restore the damaged area to a condition compatible with the remainder of the Property, and except to the extent that other persons will be distributees, any remaining proceeds shall be distributed to the beneficial owners, remittances to Owners and any First Mortgagees being payable jointly to them, as their interests may appear, in proportion to their respective ownership interests in the Common Elements.  This is a covenant for the benefit of, and may be enforced by, any First Mortgagee.   In this regard, the Owners of any Units in the Condominium which are not reconstructed or repaired after casualty (or an eminent domain action as set forth in Section 11.6 below), and for which insurance proceeds are distributed as provided herein, shall be removed from the Hyatt Vacation Club so that Owners will not be competing for available accommodations within the Hyatt Vacation Club on a greater than one-to-one Owner to accommodation ratio.

(d)     In making distribution to Owners and any First Mortgagees, the Insurance Trustee may rely upon a certificate of the Association made by its president and secretary as to the names of the Owners and their respective shares of the distribution.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

10.6   Association as Agent and Attorney-in-Fact.

The Association is hereby irrevocably appointed agent and attorney-in-fact for each Owner, to adjust all claims arising under the insurance policies purchased by the Association and to execute and deliver releases upon the payment of a claim. The Association may adopt and establish written nondiscriminatory policies and procedures relating to the submittal of claims, responsibility for deductibles, and any other matters of claims adjustment. To the extent the Association settles claims for damages to the Property, it shall have the authority to assess negligent Owners causing such loss or benefiting from such repair or restoration all or any equitable portion of the deductibles paid by the Association.

10.7   Insurance Obtained by Owners.

It shall be the responsibility of each Owner, at such Owner's expense, (but not Owners of Timeshare Interests) to maintain (i) casualty insurance on the interior, finished surfaces of walls, floors and ceilings of such Owner's Unit, on such Owner's personal property, furnishings, appliances and equipment and (ii) general liability insurance in a limit of not less than one million dollars ($1,000,000) for each Owner's Unit in respect to bodily injury or death to any number of persons arising out of one accident or disaster, or for damage to property owned by third parties, or such other amounts as may be required by the Executive Board. If higher limits shall at any time be customary to protect against tort liability as determined by the Executive Board such higher limits shall be carried; provided, however, that any liability or casualty insurance required to be carried with respect to a Timeshare Unit shall be maintained by the Executive Board, and not by the Owners of the Timeshares Interests in such Timeshare Units. Notwithstanding the foregoing, the Association is not obligated to obtain property damage insurance for personal property owned by Owners of Timeshare Interests, or their tenants or guests.

In addition, an Owner may obtain such other and additional insurance coverage on and in relation to the Owner's Unit as the Owner in the Owner's sole discretion shall conclude to be desirable. However, none of such insurance coverages obtained by such Owner shall adversely affect any insurance coverage obtained by the Association or cause the diminution or termination of that insurance coverage, nor shall such insurance coverage of an Owner result in apportionment of insurance proceeds as between policies of insurance of the Association and the Owner. An Owner shall be liable to the Association for the amount of any such diminution of insurance proceeds to the Association as a result of insurance coverage maintained by the Owner, and the Association shall be entitled to collect the amount of the diminution from the Owner as a personal Assessment, with the understanding that the Association may impose and foreclose a lien for the payment due.

Any insurance obtained by an Owner shall include a provision waiving the particular insurance company's right of subrogation against the Association and other Owners except for damages caused by intentional acts or omissions of Owners. Each Owner shall be responsible to provide insurance coverage for the amount of any additional value to any Unit caused by any improvement to the Unit made by such Owner and not initially made by Declarant, including, but not limited to, the value of structural upgrades or fixtures supplied by the Owner, or if the applicable insurance is to be provided by the Association, for any additional insurance costs associated with such increased value due to the improvements.

The Executive Board may require an Owner who purchases additional insurance coverage for the Owner's Unit (other than coverage for the Owner's personal property) to file copies of such policies with the Association within thirty (30) days after purchase of the coverage to eliminate potential conflicts with any master policy carried by the Association.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

10.8    Insurance Disclosure

**Any Owner may, upon request and provision of reasonable notice, review the association's insurance policies and, upon request and payment of reasonable duplication charges, obtain copies of those policies. Although the association maintains policies of insurance, the association's policies of insurance may not cover: (i) personal property of Owners, or their tenants or guests or improvements in, to or around Owners' Units, or (ii) personal injuries or other losses that occur to Owners, their tenants or guests in or around an Owner's Unit. Even if a loss is covered, Owners may nevertheless be responsible for paying all or a portion of any deductible that applies. Owners should consult with their individual insurance brokers or agents for appropriate additional coverage.**

## ARTICLE XI
## RECONSTRUCTION OR REPAIR AFTER CASUALTY OR EMINENT DOMAIN

11.1    Obligation to Reconstruct or Repair.

If any part of the Property shall be damaged by casualty, it must be repaired or replaced promptly by the Association unless:

(a)    The Condominium created by this Declaration is terminated;

(b)    Repair or replacement would be illegal under any state or local statute or ordinance governing health or safety;

(c)    Eighty percent (80%) of the Owners of a Unit or Units or assigned Limited Common Element directly and adversely affected that will not be rebuilt agree in writing not to rebuild; or

(d)    Prior to the conveyance of any Unit to a person other than Declarant, the First Mortgagee holding a Mortgage on the damaged portion of the Condominium Property rightfully demands all or a substantial part of the insurance proceeds.

The Insurance Trustee may rely upon a certificate of the Association made by its president and attested by its secretary as to whether or not the damaged property is to be reconstructed or repaired.

11.2    Plans and Specifications.

Any reconstruction or repairs must be substantially in accordance with the plans and specifications for the damaged property as originally constituted, or in lieu thereof, according to the plans and specifications approved by the Executive Board, the Managing Agent and any governmental authority having jurisdiction over such matters.

11.3    Estimates of Cost.

The Association shall obtain reliable and detailed estimates of the cost to rebuild or repair.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

11.4   Assessments.

The cost of repair or replacement in excess of insurance proceeds and reserves is a Common Expense. If the proceeds of insurance are not sufficient to defray the estimated costs of reconstruction and repair by the Association, or if at any time during reconstruction and repair or upon completion of reconstruction and repair, the funds from insurance for the payment of the costs of reconstruction and repair are insufficient, special Assessments shall be made against all Owners in sufficient amounts to provide funds for the payment of such costs. Such special Assessments shall be in proportion to the Owners' respective obligations for Common Expenses.

11.5   Construction Funds.

The funds for payment of costs of reconstruction and repair after casualty, which shall consist of proceeds of insurance held by the Association or the Insurance Trustee and funds collected by the Association through Assessments against Owners, shall be disbursed in payment of such costs in the following manner:

(a)   Association. If the total of Assessments made by the Association in order to provide funds for the payment of costs of reconstruction and repair that are the responsibility of the Association is more than fifty thousand dollars ($50,000) as the same may be adjusted for inflation, then the sums paid upon such Assessments shall be deposited by the Association with the Insurance Trustee (if other than the Association). In all other cases the Association may hold the sums paid upon such Assessments and disburse them in payment of the costs of reconstruction and repair.

(b)   Insurance Trustee. The proceeds of insurance collected on account of casualty, and the sums deposited with the Insurance Trustee by the Association from collections of Assessments against Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

(1)   Association - Minor Damage. If the amount of the estimated costs of reconstruction and repair that is the responsibility of the Association is less than fifty thousand dollars ($50,000) as the same may be adjusted for inflation, then the construction fund may be disbursed in payment of such costs upon the order of the Executive Board; provided however, that upon request by a First Mortgagee that is a beneficiary of an insurance policy the proceeds of which are included in the construction fund, such fund shall be disbursed in the manner provided for the reconstruction and repair of major damage.

(2)   Association - Major Damage. If the estimated cost of reconstruction and repair that is the responsibility of the Association is equal to or more than fifty thousand dollars ($50,000) as the same may be adjusted for inflation, then the construction fund shall be applied by the Insurance Trustee to the payment of such costs, and shall be paid to or for the account of the Association from time to time as the work progresses, but not more frequently than once in any calendar month. The Insurance Trustee shall make payments upon the written request of the Association for withdrawal of insurance proceeds accompanied by a certificate, dated not more than fifteen (15) days prior to such request, signed by an officer of the Association and by an architect in charge of the work, who shall be selected by the Executive Board, setting forth that the sum then requested either has been paid by the Association or is justly due to contractors, subcontractors, materialmen, architects, or other persons who have rendered services or furnished materials in connection with the work, giving a brief description of the services and materials and any amounts paid prior to the request, and stating that the sum requested does not exceed the value of the services and material described in the certificate; that

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

except for the amount stated in such certificate to be due as aforesaid, there is no outstanding indebtedness known to the person signing such certificate after due inquiry, which might become the basis of a vendor's, mechanic's, materialmen's or similar lien upon such work against the Common Elements or any Unit or Timeshare Interest; and that the cost as estimated by the person signing such certificate of the work remaining to be done subsequent to the date of such certificate does not exceed the amount of insurance proceeds or other funds remaining in the hands of the Insurance Trustee after the payment of the sum so requested.

(3)     Surplus.  It shall be presumed that the first monies disbursed in payment of costs of reconstruction and repair shall be from insurance proceeds.  If there is a balance in a construction fund after payment of all costs of the reconstruction and repair for which the fund is established, such balance shall be distributed or credited to the beneficial owners of the fund; except, however, that only those portions of the fund in excess of Assessments paid by an Owner to the construction fund may be made payable to any First Mortgagee.

(4)     Certificate.  Notwithstanding the provisions of this Declaration, the Insurance Trustee shall not be required to determine whether sums paid by the Owners upon Assessments shall be deposited by the Association with the Insurance Trustee, nor to determine whether the disbursements from the construction fund are to be upon the order of the Association or approval of an architect or otherwise, nor whether a disbursement is to be made from the construction fund nor to determine the payee nor the amount to be paid.  Instead, the Insurance Trustee may rely upon a Certificate of the Association made by its president and secretary as to any or all of such matters and stating that the sums to be paid are due and properly payable and stating the name of the payee and the amount to be paid; provided, that when a First Mortgagee is required in this instrument to be named payee, the Insurance Trustee shall also name the First Mortgagee as a payee of any distribution of insurance proceeds to an Owner; and further provided, that when the Association, or a First Mortgagee that is the beneficiary of an insurance policy whose proceeds are included in the construction fund, so requires, the approval of an architect named by the Association shall be first obtained by the Association prior to disbursements in payment of costs of reconstruction and repair.

11.6     Eminent Domain.

The Association is hereby empowered on its own behalf and on behalf of all adversely affected Owners to defend and/or settle any action or threatened action with respect to the taking in condemnation of any portion of the Common Elements or any Unit or portion of any Unit.  Upon obtaining knowledge of such action or threatened action, the Association shall notify all affected Owners and their First Mortgagees of record of it.

(a)     Common Elements.  Any award or settlement made as a result of such a taking of all or a portion of the Common Elements shall be made payable to the Association.  In the event any repair or restoration of the Common Elements is necessary in the opinion of a majority of the Executive Board on account of such taking, or in the event a majority of the voting interests at a duly called and constituted meeting of the Association promptly approve such restoration or repair, the Executive Board shall arrange for same and shall disburse such of the proceeds of such award or settlement as shall reasonably be necessary to effect such restoration or repair to the contractors engaged for such purpose in appropriate progress payments.  The balance of such proceeds, or all of such proceeds if no determination to repair or restore is made, shall be disbursed by the Association in the same manner as insurance proceeds under Section 10.5 above where there is no repair or restoration of the damage.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(b)     Units.  Any award or settlement for the taking in condemnation of a Unit shall be paid to the affected Owner or Owners and their mortgagees as their interests may appear and made pursuant to Section 38.33.3-107 of CCIOA.  Any required reallocations of Allocated Interests pursuant to CCIOA shall be confirmed by an amendment to the Declaration prepared, executed and recorded by the Association.  If a temporary taking in condemnation of use (but not title) of a Unit occurs, the entire award or settlement for such temporary taking shall be paid to the Association for the benefit of the Owners and mortgagees of such Unit as their respective interests may appear.

**ARTICLE XII**
**USE RESTRICTIONS**

The use of the Property shall be in accordance with the following provisions:

**12.1     Commercial Uses.**

The Executive Board may adopt rules and regulations limiting permitted uses of commercial units.  Uses that constitute a nuisance are prohibited.  There shall be no use that adversely affects that use, enjoyment or possession of a unit as a result of noise, odor, heat, vibration or appearance.

**12.2     Residential Uses.**

All Residences shall be used for dwelling and lodging purposes only in conformity with all applicable zoning laws, ordinances and regulations.  Use of Residences for any purposes other than the use described in this Declaration and other than the uses reserved by and for the benefit of Declarant is expressly prohibited.

**12.3     Personal Use Restriction for Timeshare Units.**

Except for Units owned or leased by the Declarant each of the Timeshare Units shall be occupied only as vacation accommodations by Owners, their tenants and guests.  Use of the Timeshare Units is limited solely to the personal use of Owners, their guests, invitees and lessees and for recreational uses by corporations and other entities owning Timeshare Interests.

**12.4     Common Elements.**

The Common Elements shall be used only for the purposes for which they are intended in the furnishing of services and facilities for the enjoyment of the use of the Owners subject to such easements created, granted or reserved by Declarant.

**12.5     Nuisances.**

No nuisance shall be allowed upon the Property or within a Unit, nor any use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the Property by the Owners.  All parts of the Condominium shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate or any fire hazard allowed to exist.  No Owner shall permit any use of a Unit or make or permit any use of the Common Elements that will increase the cost of insurance upon the Property.  Every Owner, occupant, tenant, guest and invitee recognizes that the Property includes Units allowing a mix of uses including long term occupancy in Affordable Housing Units, commercial activities in Commercial Units and short term occupancy in

Timeshare Units.  The Executive Board shall have the authority to regulate activities among the various Unit types in order to preserve harmony and prevent disruption within the Condominium.

### 12.6    Lawful Use.

No immoral, improper, offensive or unlawful use shall be made of the Property or a Unit, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction shall be observed.  The responsibility of meeting the requirements of governmental bodies for maintenance, modification or repair of the Property or a Unit shall be the same as the responsibility for the maintenance and repair of the property concerned.

### 12.7    Signs.

Except as expressly permitted by the Executive Board from time to time no "For Sale" or "For Rent" signs or other displays or advertising shall be maintained on any part of the Common Elements or Units, except that the right is specifically reserved to the Declarant to place and maintain "For Sale" or "For Rent" signs on the Property for as long as it may have Units or Timeshare Interests to sell.

### 12.8    Bicycles, Motorcycles, and Sporting Equipment.

Bicycles, motorcycles and sports equipment shall be stored on the Property only in areas designated by the Executive Board for this purpose.

### 12.9    Condominium Rules and Regulations.

Reasonable rules and regulations concerning the use of Property may be promulgated and amended from time to time by the Executive Board in the manner provided by its Articles of Incorporation and Bylaws, which rules and regulations shall be substantially consistent with the rights and duties established in this Declaration.

### 12.10    Declarant's Use.

The Declarant may make such use of the Common Elements and the Units as may facilitate the sale of Units or Timeshare Interests in this Condominium and Timeshare Interests at other Club Resorts or other timeshare or multisite timeshare plans developed or marketed by the Declarant from time to time, including, but not limited to, showing of the property and the display of signs and other promotional devices.  Further, Declarant reserves the right to lease or rent on a long or short-term basis unsold Units and Timeshare Interests.

### 12.11    No Pets.

Pets are prohibited on the Property.  The provisions of this subsection shall not apply to service animals as defined by the Americans with Disabilities Act.

### 12.12    Antennas.

No antennas of any type designed to serve a Unit shall be allowed on the Common Elements, except as may be provided by the Association to serve as a master antenna for the benefit and use of the Condominium.  No electrical or other equipment may be operated on the Property that interferes with television signal reception.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

12.13    Decoration of Units.

No Owner shall alter the furniture, furnishings, appliances, house wares, personal property or decor of any Timeshare Unit without the prior written consent of the Executive Board or the Managing Agent. The Association shall determine the interior color scheme, decor and furnishings of each Timeshare Unit as well as the proper time for redecorating and renovating such Unit and its contents.

12.14    Right of Occupancy - Holdover Owners.

In the event any Owner fails to vacate a Timeshare Unit at the expiration of any reserved Week each year, as may be required by the rules and regulations governing occupancy of such Unit, the Owner shall be deemed a "holdover owner." It shall be the responsibility of the Association to take such steps as may be necessary to remove such holdover owner from the Unit, and to assist the holder of any subsequent reservation who may be affected by the holdover owner's failure to vacate, in finding alternate accommodations during such holdover period.

(a)    In addition to such other remedies as may be available to it, the Association shall have the right, but not the obligation, to secure, at its initial expense, alternate accommodations for any holder of a subsequent reservation that may be denied occupancy of the Unit due to the failure to vacate of any holdover owner. Such accommodations shall be as near in value as possible to the Unit reserved. The holdover owner shall be charged for the cost of such alternate accommodations, any other costs incurred due to the holdover owner's failure to vacate, and an administrative fee as determined by the Executive Board during this period of holding over. In the event it is necessary that the Association contract for a period greater than the actual period of holding over in order to secure alternate accommodations as set forth above, the entire period shall be the responsibility of the holdover owner, although the administrative fee shall cease upon actual vacating by the holdover owner.

(b)    The Association shall submit a bill to the holdover owner in accordance with this Section. Before the Association may levy a fine against a party for violation of any of the provisions of the Condominium Documents, the Association must afford the party reasonable notice of the levy and a right to a hearing as may be required under Colorado law.

(c)    The foregoing provisions shall not abridge the Association's right to take such other action against a holdover owner as is permitted by law including, but not limited to, eviction proceedings. Further, the foregoing provisions shall not limit the Association's right to take any action permitted by Colorado law against trespassers who are not Owners.

(d)    The Association shall have a lien against such holdover Owner's Unit or Timeshare Interest to secure payment of such costs, charges, fees and expenses, including, but not limited to, reasonable attorneys' fees and costs incurred in connection with such holdover Owner.

12.15    No Domiciliary Intent.

No person or party may enter, stay or dwell upon or about a Timeshare Unit with the intent or desire to be or become legally domiciled in the State of Colorado or any political subdivision thereof, and all such persons or parties shall and do hereby waive, release and remise any such intent or desire. No person or party may enter, stay or dwell upon or about a Timeshare Unit with the intent that

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

such Unit be or become that person's or party's principal dwelling, and such person or party shall maintain a principal dwelling at all times at a location other than within a Timeshare Unit.

### 12.16   Use of Units under Timeshare Plan.

Notwithstanding the specific Unit in which an Owner has a Timeshare Interest, it is the express intent of this Declaration, which intent is consented to by each Owner through acceptance of a conveyance hereunder, that all Timeshare Units shall be available for use only pursuant to this Section 12.16. Each undivided 1/20th Timeshare Interest in the Condominium will allow each Owner the annual right to reserve and use approximately seventeen (17) days in a Unit, including a Fixed Week in the specific Unit owned, a Floating Week in the Unit type owned and a Floating Split Week in the Unit type owned. The Declarant reserves the right to create other timeshare plans for Units in the Condominium that may vary from the Timeshare Plan described in this Section 12.16. During the term of the Resort Agreement the Club Documents shall govern the check-in and checkout times.

(a)   Fixed Weeks. In the initial deed conveying a Timeshare Interest in a Unit, Declarant shall convey a Fixed Week in such Unit as part of the Timeshare Interest, and such conveyance shall be binding upon all successors in title to such Timeshare Interest until such time as the Condominium is terminated. The Owner of each Timeshare Interest shall have the exclusive right to use and occupy such conveyed Fixed Week, subject to the provisions of the Club Documents. In the event that the Resort Agreement is terminated in accordance with its terms, the Owner of each Timeshare Interest shall nevertheless retain the exclusive use of his Fixed Week in the specific Unit in which the Timeshare Interest is owned. The Owner that has been conveyed Fixed Week No. 52 as part of his Timeshare Interest shall also have the exclusive right to use and occupy Week No. 53 in the Unit containing such Timeshare Interest whenever such Week occurs as a result of excess days between the end of Week No. 52 and the beginning of Week No. 1 in the following year.

(b)   Floating Weeks. During the term of the Resort Agreement, the Club shall automatically be assigned the use of the Floating Weeks each year, subject to the priority rights of Owners of Timeshare Interests in the Condominium to reserve one Floating Week and one Floating Split Week during the Home Resort Preference Period (Float) and subject to the other provisions set forth in the Club Documents. The Owner of each Timeshare Interest within the Condominium shall annually be assigned an allocation of Hyatt Vacation Club points to represent the reservation power of the Owner's access to the Floating Weeks in the Condominium arising from his Timeshare Interest. Pursuant to the Resort Agreement, the Association has assigned its rights in the maintenance weeks to the Club, and the Association shall have the right to reserve one Week in each Timeshare Unit during the Home Resort Preference Period (Float) and up to three (3) additional Weeks during the Club Use Period on a "super-priority" basis for maintenance purposes during the term of the Resort Agreement.

(c)   Club Use. Owners of Timeshare Interests at Club Resorts, including the Condominium, will be able to reserve the use of available Fixed Weeks and Floating Weeks within the Condominium on a first come, first served basis, subject to the priority rights established in favor of each Owner of a Timeshare Interest in the Condominium during the Home Resort Preference Periods (Fixed and Floating) and in accordance with the other reservation and exchange rules and regulations set forth in the Resort Agreement and the Club Rules. Likewise, during the term of the Resort Agreement, an Owner of a Timeshare Interest at the Condominium will be able to reserve the use of accommodations at other Club Resorts subject to similar restrictions and limitations.

(d)   Association Reservation Procedures. In the event that the Resort Agreement is terminated in accordance with its terms, the Association shall establish reservation

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

procedures by which use of the Units committed to the Timeshare Plan shall circulate among the Owners of Timeshare Interests in the Condominium.  Such reservation procedures shall entitle each Owner of a Timeshare Interest in the Condominium to the use of a Fixed Week, a Floating Week and a Floating Split Week.  Such reservation procedures shall also include the right for the Association to reserve at least one Week (a maximum of four Weeks) per Timeshare Unit for maintenance purposes, on a super priority basis.

(e)     Compensation for Association and/or Management Error.  In the event a Unit is unavailable for the period of use to which the Owner is entitled by schedule or under a reservation system because of an error by the Association or Management Company, the Association shall provide the Owner, at its expense, alternate accommodations that shall be as near in value as possible to the Unit reserved.

### 12.17   Restrictions on Subdividing or Relocating Boundaries.

Except as provided herein and in Article XIV, no boundary between adjoining units may be relocated without the prior written approval of the Association and the Declarant, for so long as the Declarant has interests to sell in the Condominium.  Except as provided in herein and in Article XIV, no Unit may be divided or subdivided into smaller Units without the prior written approval of the Association and the Declarant, for so long as the Declarant has interests to sell in the Condominium.

### 12.18   Rental of Unreserved Timeshare Units.

As required by the terms of the land use approvals for the Condominium any Timeshare Units that have not been reserved sixty (60) days prior to commencement of an occupancy period shall be available for rent to the general public.

### 12.19   Compliance with Liquor Laws.

To the extent necessary to comply with applicable requirements of the Liquor Code of the State of Colorado, the Executive Board and any Managing Agent may grant exclusive possession and control of any portion of the Common Elements and/or any Unit owned or leased by the Association to a duly authorized licensee for the limited purpose of serving all types of alcoholic beverages.

## ARTICLE XIII
## ALIENABILITY OF UNITS OR OWNERSHIP INTERESTS

### 13.1   Alienability Restrictions.

The right of an Owner to sell, transfer, assign or hypothecate the Owner's Unit or Timeshare Interest shall not be subject to the approval of the Association.  Accordingly, a proper transfer or conveyance of such Unit or Timeshare Interest shall not require the written approval of the Association.

### 13.2   Declarant's Right of First Refusal to Purchase.

In the event an Owner desires to sell, transfer, assign or hypothecate the Owner's Unit or Timeshare Interest, the Declarant shall have the right of first refusal to purchase the Unit or Timeshare Interest under the same terms and conditions as are offered to or by a bona fide third party, including financing.  Declarant's right of first refusal shall terminate upon the earliest of (a) the date which is ten

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(10) years after the date of recording of this Declaration, (b) the filing of a notice in the Records by the Declarant terminating its rights hereunder, or (c) the date Declarant sells its last interest in the Condominium. Accordingly, each Owner desiring to sell the Owner's Unit or Timeshare Interest must notify the Declarant in writing no less than thirty (30) days in advance of the proposed closing date of the Owner's intent to sell and must include a copy of the proposed transaction reduced to writing in all respects. Upon receipt of such written notice, the Declarant shall determine on or prior to the date falling fifteen (15) days thereafter whether the Declarant wishes to exercise its right of first refusal set forth herein. If the Declarant elects to exercise its right of first refusal, the Declarant shall notify the Owner in writing of such election within such fifteen (15) day period, and the purchase by the Declarant shall be closed on or before the proposed closing date as outlined in the original written notice to the Declarant.

If the Declarant fails to notify the Owner of its election to exercise such right of first refusal on or prior to the expiration of such fifteen (15) day election period the Owner may proceed to close on the Owner's transaction with such bona fide third party. In addition, any permitted sale between an Owner and a bona fide third party shall be deemed to contain a provision requiring that any sums due to the Association as Assessments must be paid in full as a condition of closing of the sale.

In any and all events, the Declarant's right of first refusal as set forth above shall be a requirement of any successor in title to an Owner, the same being a covenant running with the land and the membership being an appurtenance to each Timeshare Interest.

### 13.3   Leasing and Rental Restrictions.

The right of an Owner to lease or rent the Owner's Unit or Timeshare Interest shall not be subject to the approval of the Association; however, notice of the lease or rental of a Unit or Timeshare Interest must be delivered to the Association within five (5) days of the Owner's agreement to lease or rent. Any leasing or rental arrangement must be in writing and must be in conformance with the form lease or rental agreement approved by the Executive Board from time to time. Any leasing or rental agreements must set forth or will be deemed to have set forth an acknowledgment and consent on the part of the lessee, sub-lessee, tenant or occupant only to use, occupy and possess such Unit in conformance and compliance with the provisions of the Condominium Documents. In the event an Owner fails to secure a written leasing rental agreement, the Association shall have the right to request the lessee, sub-lessee, tenant or occupant to execute an acknowledgment to use and occupy the rental or leased Unit in conformance with the Condominium Documents. Any lease or rental agreement shall be deemed to contain a provision requiring that any sums due to the Association as Assessments must be deducted from the gross rentals and paid directly to the Association. Access can be denied to any lessee, sub-lessee, tenant or occupant in the event of any delinquent Assessments. Declarant, its successor and assigns, shall have the right to rent or lease unsold Timeshare Interests subject to the obligation to pay assessments thereon.

Owners who rent their Units are responsible for paying all applicable sales taxes. If the Association or Managing Agent rents any Unit it will be responsible for charging, withholding and paying all applicable sales tax.

### 13.4   Obligation for Payment of Transfer Tax.

As provided in the land use approvals for the Condominium upon the sale of any interest in a free-market residential unit within the Condominium, each applicable real estate transfer tax ("RETT") as provided under the City of Aspen Municipal Code, shall be paid at closing and shall be calculated based on the value of the land and the value of the improvements that are conveyed, whether

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

or not it is determined after the date hereof that RETT applies only to the value of the land conveyed (and not the value of the improvements.) This requirement shall continue in effect for as long as the City of Aspen imposes RETT.

13.5    Obligation for Payment of Timeshare Impact Fee.

As required by Aspen Ordinance No. 52 (Series of 2001), a Timeshare Impact Fee (as defined in such Ordinance) shall be paid upon the initial transfer of each Timeshare Interest from the Declarant. This requirement shall continue in effect for as long as required by the City of Aspen.

## ARTICLE XIV
## SPECIAL DECLARANT RIGHTS

14.1    Right to Change Interior Design.

Notwithstanding anything in this Declaration to the contrary, and in addition to any other rights which may be reserved to the Declarant herein, the Declarant reserves the right to change the interior design and arrangement of a Timeshare Unit so long as the Declarant owns the entire Unit so changed and altered.

14.2    Right to Combine or Subdivided Units, Add Unspecified Real Estate to the Property and Withdrawal Real Estate from the Property.

Declarant reserves the right for itself and any successor Declarant, for as long as it owns a Unit or Timeshare Interest, and without the prior written approval of the Association or the Owners, to:

> (a)    relocate the boundary between adjoining Declarant-owned Units;

> (b)    combine or subdivide any Declarant-owned Unit;

> (c)    expand the Property by the addition of any unspecified real estate and subject such real estate to this Declaration. In the event of such change, the Declarant reserves the right to create new Units, subject to the limitations set forth in Section 1.4, and to expand the Common Elements. All Residences may be subject to further subdivision into Timeshare Interests;

> (d)    withdraw from the Condominium and from the provisions of this Declaration any Unit subjected to this Declaration prior to the time of a sale of such Unit or a Timeshare Interest within such Unit; and

> (e)    reallocate Allocated Interests accordingly due to the exercise of such right.

In the event Declarant exercises its rights under this Section, Declarant shall record an amendment to the Condominium Map and if action results in a change in the Allocated Interests, Declarant shall record an amendment to this Declaration. Any such amendment need be signed and acknowledged only by the Declarant and need not be approved by the Association or other Owners, whether or not elsewhere required for an amendment, except that no change shall be made by the Declarant which would conflict with the provisions of CCIOA.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

### 14.3    Sharing of Common Areas.

The Declarant also reserves the right to unilaterally amend this Declaration to provide for the sharing of the common areas of this Condominium with the owners of units in other resorts or condominiums located adjacent to or in near proximity to this Condominium, including the granting of any ingress and egress easements necessary to effectuate same; provided, however, that in the event this Declaration is so amended, such other resort or condominium owners shall be required to share with the Owners of this Condominium any recreational facilities and common areas existing as a part of their resort or condominium; and provided further, however, that the owners at each resort or condominium shall bear their pro rata share of the costs of maintaining all such shared facilities and common areas as determined by agreement of the Declarant during the Declarant Control Period or, thereafter, by the Association.

### 14.4    Right to Change Size of the Undivided Fractional Interests.

Notwithstanding anything in this Declaration to the contrary, and in addition to any other rights which may be reserved to the Declarant herein, the Declarant reserves the right, in its sole discretion, to create different sized undivided fractional interests in a Timeshare Unit in the initial conveyance of a Timeshare Interest in each Unit, provided such change shall be reflected by an amendment to this Declaration. Any such amendment shall be signed and acknowledged only by the Declarant and need not be approved by the Association or other Owners, whether or not elsewhere required for an amendment, except that no change shall be made by the Declarant which would conflict with the provisions of CCIOA.

### 14.5    Declarant Rights Transferable.

Any rights or interest reserved or held by or for the benefit of Declarant or any successor Declarant whether created by this Declaration, by statute or otherwise by law, may be transferred or assigned by written instrument describing the rights transferred. Such instrument shall be executed by the Declarant or successor Declarant as the case may be and by the transferee or assignee and shall be recorded in the Records.

### ARTICLE XV
### COMPLIANCE AND DEFAULT

### 15.1    Compliance and Default.

Each Owner shall be governed by and shall comply with the terms of the Condominium Documents and the Rules and Regulations adopted pursuant to those documents, and as they may be amended from time to time. Failure of an Owner to comply with the provisions of such documents and regulations shall entitle the Association or other Owners to pursue any and all legal and equitable remedies for the enforcement of such provisions, including, but not limited to, an action for damages, an action for injunctive relief or an action for declaratory judgment. All provisions of this Declaration shall be enforceable equitable servitudes and shall run with the land and shall be effective until the Condominium is terminated.

### 15.2    Costs and Fees.

In any proceeding arising because of an alleged failure of an Owner or the Association to comply with the terms of the Condominium Documents as they may be amended from time to time, the

prevailing party shall be entitled to recover the costs of the proceeding, and recover such reasonable attorneys' and other professionals' fees as may be awarded by a court, including all appeals and all proceedings in bankruptcy.

### 15.3    No Waiver of Rights.

The failure of the Declarant, the Association or any Owner to enforce any covenant, restriction or other provision of CCIOA or the Condominium Documents shall not constitute a waiver of the right to do so thereafter.

### 15.4    Injunctive Relief.

The Association may seek an injunction from a court of equity to compel compliance or prohibit violation of the Condominium Documents regardless of whether an adequate remedy at law exists.

### 15.5    Governing Law; Waiver of Jury Trial; Venue of Actions.

This Declaration shall be governed by, and shall be construed in accordance with, the laws of the State of Colorado.  THE ASSOCIATION, EACH OWNER, THE DECLARANT, THE MANAGING AGENT, AND ANY OTHER PARTY CLAIMING RIGHTS OR OBLIGATIONS BY, THROUGH, OR UNDER THIS DECLARATION, EACH HEREBY WAIVES ANY RIGHT THEY MAY HAVE UNDER ANY APPLICABLE LAW TO A TRIAL BY JURY WITH RESPECT TO ANY SUIT OR LEGAL ACTION WHICH MAY BE COMMENCED BY OR AGAINST THE OTHERS CONCERNING THE INTERPRETATION, CONSTRUCTION, VALIDITY, ENFORCEMENT OR PERFORMANCE OF THIS DECLARATION OR ANY OTHER AGREEMENT OR INSTRUMENT EXECUTED IN CONNECTION WITH THIS DECLARATION.  In the event any such suit or legal action is commenced by any party, the other parties hereby agree, consent and submit to the personal jurisdiction of the state court in and for Pitkin County, Colorado, or, if applicable, the federal court for the District of Colorado with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county.  Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

### 15.6    Arbitration.

**Notwithstanding the foregoing any unresolved dispute, disagreement or controversy between Declarant and the Association, shall at the request of either party be submitted to an arbitration board of a single arbitrator in accordance with the Colorado Uniform Arbitration Act (presently codified at C.R.S. Section 13-22-201 et seq.).  Such decisions shall include the awarding of costs, including reasonable attorneys' fees, as the arbitrator shall determine.  The decision of the arbitrator shall be judicially enforceable as a judgment.  In the event the parties can not agree on a single arbitrator each party shall select an arbitrator and the arbitrators so selected shall select a single arbitrator to decide the issue.**

## ARTICLE XVI
## AMENDMENTS

16.1    By Owners.

Except as otherwise expressly provided in CCIOA or herein, the Declaration may be amended in the following manner:

(a)    Notice.  Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting of the Association at which a proposed amendment is to be considered.

(b)    Resolution.  A resolution for the adoption of a proposed amendment shall be included in the notice of any meeting of the Association at which a proposed amendment is to be considered.

(c)    Adoption.  The provisions of this Declaration may be amended or terminated, in whole or in part, from time to time, upon the written consent of Owners representing sixty-seven percent (67%) or more of all Allocated Interests in the Condominium, subject, however, to any other provisions of this Declaration requiring the consent of a certain percentage of First Mortgagees. Notwithstanding the foregoing, any proposed amendment to this Declaration which materially and adversely affects a class of membership in the Association shall require the affirmative approval of a majority of the votes in such affected class, in addition to the approval requirements otherwise set forth herein.  Owners may propose such an amendment by instrument in writing directed to the president or secretary of the Association signed by not less than holders of ten percent (10%) of all of the Allocated Interests in the Condominium.  Amendments may be proposed by action of a majority of the Executive Board at any regularly constituted meeting thereof.  Upon an amendment being proposed as herein provided, the president, or, in the event of the Owner's refusal or failure to act, the Executive Board, shall call a meeting of the Owners to be held not sooner than fifteen (15) days nor later than sixty (60) days thereafter for the purpose of considering said amendment.  Members of the Executive Board and Owners not present in person or by proxy at the meeting considering the amendment may express their approval in writing provided such approval is delivered to the secretary at or prior to the meeting.

(d)    Consent of Declarant or First Mortgagee.  No amendment which materially affects the rights and privileges of the Declarant, as determined by Declarant in its sole discretion, shall become effective unless and until approved, in writing, by the Declarant.  Any amendment that would adversely affect First Mortgagees must have the prior written consent of the holders First Mortgages as provided in Article XXII below.

(e)    Execution and Recording.  Each amendment shall be attached to or shall contain a certificate certifying that the amendment was duly adopted, and the certificate shall be executed by the president of the Association and attested by the secretary with the formalities of a deed, and said amendment shall be effective upon recordation of the amendment and certificate in the Records.

16.2    By the Declarant.

Notwithstanding any provisions of this Declaration to the contrary, the Declarant reserves the right at any time, so long as it owns any of the Units or Timeshare Interests in the Condominium, to unilaterally amend this Declaration as it may deem appropriate, in its sole discretion, to the fullest extent permitted under CCIOA, to carry out the purposes of the project, to expand or enhance

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

the Timeshare Plan or Multisite Timeshare Plan or as may be required by any lending institution, title insurance company or public body or as may be necessary to conform the same to the requirements of law, or to facilitate the operation and management of the Condominium or the sale of Units or Timeshare Interests in the Condominium. Any amendments to this Declaration which may be unilaterally made by the Declarant shall become effective upon the recording in the Records of an instrument executed solely by the Declarant, setting forth the text of such amendment in full, together with the appropriate recording data of this Declaration. No amendment of this Declaration not hereby expressly permitted to be unilaterally made by the Declarant shall be permitted if such amendment would prejudice or impair to any material extent the rights of any Owner or any First Mortgagee of record, or if such amendment would increase the proportion of Common Expenses or decrease the ownership of the Common Elements borne by the Owners.

16.3    Amendments to Common Elements.

Subject to the Declarant's rights as set forth in Section 16.2, no material alteration or substantial additions to the Common Elements shall be permitted unless such material alteration or substantial addition is required by any governmental entity, or has been approved by the Declarant, for so long as the Declarant owns an Ownership Interest, and has been approved by the Owners of a majority of all Allocated Interests in the Condominium.

## ARTICLE XVII
## TERMINATION

17.1    Termination.

The Condominium may be terminated at any time by the approval in writing of Owners of sixty-seven percent (67%) or more of the Allocated Interests in the Condominium, and with the written approval of First Mortgagees required for amendments of "Material" provisions as provided in Article XXII. Notice of a meeting at which the proposed termination is to be considered shall be given not less than thirty (30) days prior to the date of such meeting.

17.2    Termination through Condemnation.

The Condominium may only be terminated by virtue of a condemnation action if all Property is taken in condemnation. If less than all of the Property is taken in condemnation, the Condominium shall continue as to those portions of the Property not so taken unless terminated by vote of the Owners representing sixty-seven percent (67%) of the Allocated Interests in the Condominium.

17.3    Certificate.

Termination of the Condominium in either of the foregoing manners shall be evidenced by a notice of the Association executed by its president and secretary setting forth the facts effecting the termination, said certificate to become effective upon being recorded in the Records by the Association's president and secretary or assistant secretary. Thereafter, the entire Property shall either be sold by the Association, or owned by the Owners as a tenant-in-common, pursuant to the terms of this Article. At the time of the vote for termination in Section 17.1, the Owners shall also vote to determine whether the property will be sold by the Association, or owned by the Owners as a tenant-in-common, pursuant to the terms of this Article. Unless the Owners have voted to continue to own the property as a tenant-in-common by a majority vote, the Association as attorney-in-fact will sell the Property for all of the Owners, free and clear of the provisions contained in this Declaration, the Map, the Articles of

Incorporation, and the Bylaws. Assessments for Common Expenses shall not be abated during the period prior to sale. Alternatively, unless the Owners have voted to sell the Property, after termination of the Condominium, each Owner shall own an undivided equal share of the Property and all assets of the Association as a tenant-in-common with all other Owners in accordance with the Allocated Interests set forth in Exhibit "A." In the event the Condominium is terminated, the Executive Board may file suit in a court of competent jurisdiction for judicial sale of the Property in lieu of partition.

### ARTICLE XVIII
### IMPLEMENTATION OF THE TIMESHARE PLAN

It is the intention of the Declarant to implement the Timeshare Plan in the ordinary course of business, and to commit Residences to the Timeshare Plan in any sequence and according to such schedule as determined by Declarant, considering market conditions and absorption rates. Each Residence will be committed to the Timeshare Plan and the Club upon the recording of the first deed conveying a Timeshare Interest in said Unit. Until such time as a Residence becomes committed to the Timeshare Plan and the Club, the Unit remains a whole condominium Unit subject to common expenses and assessments only for whole condominium Units. No Residence may be committed to the Timeshare Plan or the Club by any person or entity other than the Declarant; provided, however, the Declarant may assign its right to commit Units to the Timeshare Plan or the Club to any entity to which it conveys substantially all Units or Timeshare Interests that it owns in the Condominium.

### ARTICLE XIX
### SEVERABILITY

The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase or word, or other provision of the Condominium Documents or the Rules and Regulations shall not affect the validity of the remaining portions.

### ARTICLE XX
### MERGER

This Declaration, the Association and the Common Elements of this Condominium described herein may be merged with the declaration of condominium, Association and common elements of another independent and separate condominium to form a single condominium with the consent of the Owners of sixty-seven percent (67%) of the Allocated Interests in the Condominium and with the written approval of First Mortgagees required for amendments of "Material" provisions as provided in Article XXII. In the event such consent and approval is obtained, an agreement shall be recorded pursuant to Section 38-33.3-221 of CCIOA and shall contain such provisions as are necessary to amend and modify the appurtenances to the Units and the percentages by which the Owners of Units share the Common Expenses and own the Common Surplus and Common Elements in order to create a consolidated single condominium.

### ARTICLE XXI
### OTHER ASSOCIATION MATTERS

21.1    General Reservation.

Declarant reserves the right to dedicate or grant any easements, access roads and streets serving the Property for and to public or private use.

21.2   No Use of Trademarks.

The terms "Hyatt," "Hyatt Vacation Club" and "Hyatt Vacation Club Grand Aspen" are service marks and trademarks of Hyatt Corporation, a Delaware corporation. Each Owner, by accepting a deed to a Unit or Timeshare Interest, covenants and agrees that such Owner shall not use the terms "Hyatt," "Hyatt Vacation Club" or "Hyatt Vacation Club Grand Aspen" or other trademarks or service marks for any purpose without the prior written permission of Hyatt Corporation.

21.3   Membership in a Master Association.

The Declarant during the Declarant Control Period reserves the right to subject the Property and the Condominium to the provisions of a master declaration. In such event all Owners shall become members of a master association and be subject to the provisions of a master declaration including but not limited to the requirement to pay assessments levied by such master association. Assessments levied by a master association to its members shall be considered Common Expenses of the Association.

21.4   Resort Activities.

Each Owner is hereby advised of the following matters affecting the Property and the Owners, use and enjoyment thereof:

(a)   The Property is located in close proximity to a public skiing facility and year-round recreation area (the "Ski Facility"), which may generate an unpredictable amount of visible, audible and odorous impacts and disturbances from activities relating to construction, operation, use and maintenance. The activities associated with the Ski Facility include, without limitation: (i) vehicular and residential traffic, including, without limitation (A) buses which transport skiers and others around the City of Aspen and the Ski Facility, (B) buses, vans, snowcats, snowmobiles and other vehicles which transport residents and guests of the Ski Facility over, around and through the Ski Facility and the City of Aspen, and (C) construction vehicles and equipment; (ii) activities relating to the construction, operation and maintenance of ski trails, skiways and skier bridges and tunnels relating to the Ski Facility, including, without limitation, (A) tree cutting and clearing, grading and earth moving, and other construction activities, (B) construction, operation and maintenance of the Ski Facility's access roads (including, without limitation, the mountain road located proximate to and east of the Property) snowmaking equipment and chair lifts, gondolas and other skier transportation systems, and (C) operation of snow-grooming vehicles and equipment and safety and supervision vehicles; and (iii) activities relating to the use of the Ski Facility, including, without limitation, skiing, snow-boarding, hiking, horseback riding, bicycling and other recreational activities and organized events and competitions relating to such activities.

(b)   Substantial construction-related activities relating to the development of the Property, or other nearby developments may cause considerable noise, dust and other inconveniences to the Owners.

21.5   Amenities.

Neither the Association nor any of the Owners have any ownership interest or use rights in any amenity not located on the Property. The owners of those facilities shall have the right, in their sole discretion, to remove, relocate, discontinue operation, restrict access to, charge fees for the use of,

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

sell interests in or otherwise deal with such assets in their sole discretion without regard to the interests of Owners, guests or residents of any of the Units in the Condominium.

## ARTICLE XXII
## MORTGAGEE PROTECTIONS

22.1   Introduction.

This Article establishes certain standards and covenants that are for the benefit of the holders, insurers and guarantors of certain Mortgages. This Article is supplemental to, and not in substitution for, any other provisions of this Declaration, but in the case of any conflict, this Article shall control.

22.2   Notice of Actions.

The Association shall give prompt written notice to each eligible First Mortgagee of the following:

(a)   Any condemnation loss or any casualty loss that affects a material portion of the Common Elements or any Unit in which a First Mortgagee holds an interest.

(b)   Any lapse, cancellation, a material modification of any insurance policy or fidelity bond maintained by the Association.

(c)   Any proposed action that would require the consent of any First Mortgagee.

(d)   Any judgment rendered against the Association.

A First Mortgagee becomes an "eligible First Mortgagee" and is the holder of an "eligible" First Mortgage by filing with the Association or the Managing Agent a notice setting for the name and address of the First Mortgagee, the date of the mortgage, the name and address of the Owners and the number or other identifying name, letter or number of the Timeshare Interest encumbered by such First Mortgage.

22.3   Consent Required.

(a)   Document Changes. Except as otherwise provided in this Declaration, no amendment of any material provision of this Declaration described in this Section 22.3. (a) may be effective without the vote of Owners of at least sixty-seven percent (67%) of the Allocated Interests in the Condominium and until approved in writing by (i) eligible First Mortgagees holding at least a majority of the eligible First Mortgagees encumbering Units and Timeshare Interests in the Condominium, and (ii) the First Mortgagee holding First Mortgages securing repayment of the then current, greatest dollar amount encumbering Units and Timeshare Interests in the Condominium. "Material" provisions include any provision affecting the following:

(1)   Voting rights.

(2)   Reserves for maintenance, repair and replacement of Common Elements.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(3)     Responsibility for maintenance and repair.

(4)     Rights to use Common Elements.

(5)     Reallocation of Allocated Interests in the Common Elements, except that when Limited Common Elements are reallocated by agreement between Owners, only those Owners and the First Mortgagees having an interest in such Units must approve such action.

(6)     Definitions of boundaries of Units except as otherwise provided in this Declaration and except with respect to boundaries of only adjoining Units that may be involved, in which case only those Owners and the First Mortgagees having an interest in such Units must approve the action.

(7)     Decreases in insurance or fidelity bonds.

(8)     Imposition of restrictions on an Owner's right to sell or transfer the Owner's Unit.

(9)     Restoration or repair of the Condominium after hazard damage or partial condemnation in a manner other than that specified in this Declaration.

(10)     Termination of this Declaration after the occurrence of substantial destruction or condemnation.

(11)     The merger of this Declaration, the Association and the Common Elements of the Condominium described herein with the declaration of condominium, Association and common elements of another independent and separate condominium to form a single condominium.

(12)     The benefits or burdens of First Mortgagees.

22.4     <u>Actions.</u>

The Association may not take any of the following actions, except as such rights have been specifically reserved by Declarant under the provisions of this Declaration, without the approval of (i) eligible First Mortgagees holding at least a majority of the eligible First Mortgages encumbering Units and Timeshare Interests in the Condominium, and (ii) the eligible First Mortgagee holding the then current, greatest dollar amount of eligible First Mortgages encumbering Units and Timeshare Interests in the Condominium:

(a)     Conveyance or encumbrance of the Common Elements (provided, however, that the granting of easements for public utilities, for construction or for other public purposes not inconsistent with the use of the Common Elements by the Owners will not be deemed a conveyance, encumbrance or other transfer within the meaning of this clause).

(b)     Restoration or repair of the Condominium (after hazard damage or partial condemnation) in a manner other than that specified in this Declaration.

(c)     Termination of this Declaration for reasons other than substantial destruction or condemnation.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

(d)   Merger of the Condominium with any other common interest community.

(e)   The granting of easements, leases, licenses or concessions through or over the Common Elements (excluding, however, any such grants for public utilities or other public purposes consistent with the use of the Common Elements by the Owners).

(f)   The assignment of the future income of the Association, including its right to receive Assessments.

(g)   Any action not to repair or replace the Common Elements except as otherwise permitted in this Declaration.

22.5   Notice of Objection.

Unless an eligible First Mortgagee provides the secretary of the Association with written notice of its objection, if any, to any proposed amendment or action outlined above within thirty (30) days following the receipt of notice of such proposed amendment or action, the First Mortgagee will be deemed conclusively to have approved the proposed amendment or action.

[Signature follows]

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc 12/20/04

Executed as of the _____ day of _____, 200__.

> GRAND ASPEN LODGING, LLC, a Delaware limited liability company
>
> By:_____
>
> Name:_____
>
> Title:_____

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 200__, by _____ _____, as _____ of Grand Aspen Lodging, LLC, a Delaware limited liability company.

WITNESS my hand and official seal.

My commission expires:

_____
            [SEAL]

_____
NOTARY PUBLIC

### Exhibit "A"

**ALLOCATED INTEREST IN
COMMON ELEMENTS, COMMON EXPENSES AND COMMON SURPLUS
and
LIST OF UNITS/TYPES**

The following formulae and percentages ("Allocated Interests") shall control the allocation of ownership, expenses and surpluses among the various types of Units and among Units within a specific Unit type or types.  A Unit's Allocated Interest in the Common Elements and Common Surplus shall be the same as such Unit's Allocated Interest in the Condominium Common Expenses.

Residential Units.  Residential Units shall as a whole be allocated 97.61% of the Condominium Common Expenses.  Condominium Common Expenses allocated to Residential Units shall be allocated among Residential Units based on number of bedrooms per Residential Unit as set forth below.  Based on the above formula, each Residential Unit shall have the following Allocated Interest in the Condominium Common Expenses:

> One Bedroom Unit = 0.763%
> Two Bedroom Unit = 1.525%
> Three Bedroom Unit = 2.288%
> Four Bedroom Unit = 3.05%

Residential Common Expenses shall be allocated among each Residential Unit not committed to the Timeshare Plan based on the number of bedrooms per such Residential Unit.  The resulting Allocated Interests will change based on the number of Residential Units not committed to the Timeshare Plan.

Ad Valorem Taxes Common Expenses, Club Dues Common Expenses and Timeshare Plan Common Expenses shall be allocated among each Timeshare Unit based on the number of bedrooms per Timeshare Unit.  The resulting Allocated Interests will change based on the number of Residential Units committed to the Timeshare Plan.

Affordable Housing Units.  Affordable Housing Units as a whole shall be allocated 0.67% of the Condominium Common Expenses.  Common Expenses allocated to Affordable Housing Units shall be allocated equally to each of the nine (9) Affordable Housing Units.

Based on the above formula, each Affordable Housing Unit shall have the following Allocated Interest in the Condominium Common Expenses:  0.074%.

Based on the above formula, each Affordable Housing Unit shall have the following Allocated Interest in the Affordable Housing Common Expenses: 11.11%.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Commercial Units.  Commercial Units shall as a whole be allocated 0.70% of the Condominium Common Expenses.  Common Expenses allocated to Commercial Units shall be allocated based of the relative square footage of the two (2) Commercial Units.

Based on the above formula, each Commercial Unit shall have the following Allocated Interest in the Condominium Common Expenses:

| | |
|---|---|
| Unit #01C | 0.494% |
| Unit #02C | 0.206% |

Based on the above formula, each Commercial Unit shall have the following Allocated Interest in the Commercial Common Expenses:

| | |
|---|---|
| Unit #01C | 70.617% |
| Unit #02C | 29.383% |

Parking Units.  Parking Units shall as a whole be allocated 1.02% of the Condominium Common Expenses.  Expenses allocated to Garage Units shall be allocated equally to each of the one hundred eleven (111) Garage Units.

Based on the above formula, each Parking Unit shall have the following Allocated Interest in the Condominium Common Expenses:  0.009%.

Based on the above formula, each Parking Unit shall have the following Allocated Interest in the Parking Common Expenses: 0.9%.

In the event expenses are to be allocated among more than one but less than all Unit types designated above, expenses shall be allocated between or among such Unit types based on a formula the numerator of which is the Allocated Interest designated above for each respective Unit type and the denominator of which is the total of the Allocated Interests for all Unit types to which such expenses are to be allocated.

The above Allocated Interests are based on the number of Units created upon the recording of this Declaration.  In the event Units are added or withdrawn from the Condominium, the Allocated Interests for each Unit type as a whole listed above shall be adjusted proportionally to reflect such addition or withdrawal.  After such adjustment, the Allocated Interest for the Residential Units as a whole shall be allocated among each of the Residential Units based on the number of bedrooms per Residential Unit, the Allocated Interest for the Affordable Housing Units as a whole shall be allocated equally among each of the Affordable Housing Units, the Allocated Interest for the Commercial Units as a whole shall be allocated among each of the Commercial Units based on relative square footage, and the Allocated Interest for the Parking Units as a whole shall be allocated equally among each of the Parking Units.

The total percentage of Allocated Interests may not equal 100% due to rounding.

**[See Attached List of Units/Types]**

## RESIDENTIAL UNITS

| | |
|---|---|
| UNIT #01 | 3BR |
| UNIT #02 | 3BR |
| UNIT #03 | 3BR |
| UNIT #04 | 2BR |
| UNIT #05 | 2BR |
| UNIT #06 | 3BR |
| UNIT #07 | 1BR |
| **UNIT #08** | 3BR |
| UNIT #09 | 2BR |
| UNIT #10 | 2BR |
| UNIT #11 | 1BR |
| UNIT #12 | 2BR |
| UNIT #14 | 3BR |
| UNIT #15 | 2BR |
| UNIT #16 | 2BR |
| UNIT #17 | 3BR |
| UNIT #18 | 2BR |
| **UNIT #19** | 3BR |
| UNIT #20 | 2BR |
| UNIT #21 | 3BR |
| UNIT #22 | 3BR |
| UNIT #23 | 2BR |
| **UNIT #24** | 3BR |

| | |
|---|---|
| UNIT #25 | 2BR |
| UNIT #26 | 2BR |
| UNIT #27 | 3BR |
| UNIT #28 | 3BR |
| UNIT #29 | 3BR |
| UNIT #30 | 3BR |
| UNIT #31 | 3BR |
| UNIT #32 | 2BR |
| **UNIT #33** | 3BR |
| UNIT #34 | 2BR |
| UNIT #35 | 3BR |
| UNIT #36 | 3BR |
| UNIT #37 | 2BR |
| **UNIT #38** | 3BR |
| UNIT #39 | 2BR |
| UNIT #40 | 3BR |
| UNIT #42 | 4BR |
| UNIT #43 | 3BR |
| UNIT #44 | 3BR |
| UNIT #45 | 3BR |
| UNIT #46 | 3BR |
| UNIT #47 | 2BR |
| UNIT #48 | 3BR |

| | |
|---|---|
| UNIT #49 | 2BR |
| UNIT #50 | 2BR |
| UNIT #51 | 3BR |
| UNIT #52 | 3BR |

Units designated in **bold** are three bedroom units for ownership and assessment purposes but are configured as two bedroom units with a den and Murphy bed.

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

## AFFORDABLE HOUSING UNITS

| UNIT #53AH | 1BR |
|---|---|
| UNIT #54AH | 1BR |
| UNIT #55AH | 1BR |
| UNIT #56AH | 1BR |
| UNIT #57AH | 1BR |
| UNIT #58AH | 1BR |
| UNIT #59AH | 1BR |
| UNIT #60AH | 1BR |
| UNIT #61AH | 1BR |
| UNIT #62AH | 1BR |

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc 12/20/04

# COMMERCIAL UNITS

| UNIT #01C |
|---|
| |
| UNIT #02C |
| |

**PARKING UNITS**

UNITS 1-111

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Exhibit "B"

HYATT VACATION CLUB RESORT AGREEMENT

[See attached]

## Exhibit "C"

### HYATT VACATION CLUB RULES AND REGULATIONS.

**[See attached]**

SOLICITORS, 00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

Exhibit "D"

PERMITTED EXCEPTIONS

[See attached]

SOLICITORS,  00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

# ALTA COMMITMENT

### Schedule B - Section 2

#### (Exceptions)

Our Order No.   Q385141-3

THE FOLLOWING EXCEPTIONS APPLY TO BOTH LOTS 5 AND 6:

RIGHT OF PROPRIETOR OF A VEIN OR LODE TO EXTRACT AND REMOVE HIS ORE THEREFROM SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES AS RESERVED IN UNITED STATES PATENT RECORDED APRIL 04, 1884, IN BOOK 11 AT PAGE 65, RECORDED MAY 20, 1949 IN BOOK 175 AT PAGE 202.

RIGHT OF WAY FOR DITCHES OR CANALS CONSTRUCTED BY THE AUTHORITY OF THE UNITED STATES AS RESERVED IN UNITED STATES PATENT RECORDED RECORDED MAY 20, 1949 IN BOOK 175 AT PAGE 202.

ANY VEIN OR LODE OF QUARTZ OR OTHER ROCK IN PLACE BEARING GOLD, SILVER, CINNABAR, LEAD, TIN, COPPER, OR OTHER VALUABLE DEPOSITS, CLAIMED OR KNOWN TO EXIST WITHIN THE SUBJECT PROPERTY AS OF JULY 28, 1882.

ALL ORES AND MINERALS AND MINERAL BEARING ROCK AS CONVEYED IN DEEDS RECORDED DECEMBER 30, 1892 IN BOOK 106 AT PAGE 482, ANY AND ALL ASSIGNMENTS THEREOF OR INTERESTS THEREIN.

## ALTA COMMITMENT

### Schedule B - Section 2

(Exceptions)                              Our Order No.   Q385141-3

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

EASEMENTS AND RIGHTS OF WAY AS RESERVED IN ORDINANCE 14 (SERIES 1985) VACATING PORTIONS OF DEAN STREET RECORDED JUNE 26, 1985 IN BOOK 488 AT PAGE 717.

TERMS, CONDITIONS AND PROVISIONS OF ASSIGNMENT AND ASSUMPTION OF COVENANT AND AGREEMENT REGARDING COMPLIANCE WITH PUD/SUBDIVISION AGREEMENT RECORDED JANUARY 12, 2001 AT RECEPTION NO. 450480.

TERMS, CONDITIONS AND PROVISIONS OF DEAN STREET PEDESTRIAN EASEMENT RECORDED APRIL 04, 2003 AT RECEPTION NO. 480991.

THE FOLLOWING EXCEPTIONS APPLY TO LOT 5 ONLY:

ALL ORES AND MINERALS AND MINERAL BEING ROCK AS CONVEYED IN DEED RECORDED JUNE 2, 1891 IN BOOK 93 AT PAGE 130, AND ANY AND ALL ASSIGNMENTS THEREOF OR INTERESTS THEREIN.

ALL MINERAL AND MINERAL RIGHTS AS RESERVED BY JAMES BEGLSY IN THE DEED RECORDED AUGUST 9, 1939 IN BOOK 157 AT PAGE 599, ANY AND ALL ASSIGNMENTS THEREOF OR INTERESTS THEREIN.

EASEMENT AND RIGHT OF WAY FOR ELECTRIC LINE PURPOSES AS GRANTED TO  HOLY CROSS ELECTRIC ASSOCIATION, INC. IN INSTRUMENT RECORDED JUNE 21, 1988  IN BOOK 566 AT PAGE 997.

TERMS, CONDITIONS, PROVISIONS, OBLIGATIONS, RESTRICTIONS AND OTHER MATTERS AS SET FORTH IN PLANNED UNIT DEVELOPMENT/SUBDIVISION AGREEMENT  FOR LOT 5 RECORDED APRIL 4, 2003 UNDER RECEPTION NO. 480989.

EASEMENTS, RIGHTS OF WAY AND OTHER MATTERS AS SET FORTH ON THE PLAT OF SUBJECT PROPERTY RECORDED APRIL 4, 2003 IN PLAT BOOK 64 AT PAGE 92 UNDER RECEPTION NO. 480988.

TERMS, CONDITIONS AND PROVISIONS OF CONSENT TO MODIFICATION OF OPEN SPACE EASEMENT AND WAIVER, RELEASE, AND RELINQUISHMENT OF RIGHTS RECORDED FEBRUARY 08, 2002 AT RECEPTION NO. 463753.

## ALTA COMMITMENT

### Schedule B - Section 2

**(Exceptions)**                    Our Order No.   Q385141-3

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

TERMS, CONDITIONS AND PROVISIONS OF ORDINANCE 52 (SERIES 2001) APPROVING THE FINAL PLANNED UNIT DEVELOPMENT RECORDED FEBRUARY 27, 2002 AT RECEPTION NO. 464426.

TERMS, CONDITIONS AND PROVISIONS OF ALPINE TRAIL EASEMENT RECORDED APRIL 04, 2003 AT RECEPTION NO. 480990.

TERMS, CONDITIONS AND PROVISIONS OF PEDESTRIAN EASEMENTS RECORDED APRIL 04, 2003 AT RECEPTION NO. 480992.

TERMS, CONDITIONS AND PROVISIONS OF EXCAVATION AND SHORING EASEMENT AGREEMENT RECORDED MAY 19, 2003 AT RECEPTION NO. 482897.

ENCROACHMENT OF WOODEN WALKWAY ON THE SOUTHERLY PORTION OF THE SUBJECT PROPERTY, AND ENCROACHMENT OF ASPHALT OF SOUTH MILL STREET AND SIDEWALK ON THE WESTERLY PORTION OF THE SUBJECT PROPERTY AS DESCRIBED ON SURVEY BY SCHMUESER, GORDON, MEYER DATED OCTOBER 11, 2000 AS JOB NO. 2000-41-01 AS DESCRIBED IN DEED RECORDED JANUARY 12, 2001 UNDER RECEPTION NO. 450486.

THE FOLLOWING EXCEPTIONS APPLY TO LOT 6 ONLY:

RESERVATIONS AND EXCEPTIONS AS SET FORTH IN THE DEED FROM THE CITY OF ASPEN RECORDED NOVEMBER 22, 1888 IN BOOK 59 AT PAGE 507, PROVIDING AS FOLLOWS: THAT NO TITLE SHALL BE HEREBY ACQUIRED TO ANY MINE OF GOLD, SILVER, CINNABAR OR COPPER OR TO ANY VALID MINING CLAIM OR POSSESSION HELD UNDER EXISTING LAWS.

TERMS, CONDITIONS AND PROVISIONS OF DECLARATION OF RESTRICTIVE COVENANT RECORDED JUNE 28, 1990 IN BOOK 624 AT PAGE 51.

TERMS, CONDITIONS, PROVISIONS, RESTRICTIONS AND OTHER MATTERS AS SET FORTH IN PLANNED UNIT DEVELOPMENT/ SUBDIVISION AGREEMENT RECORDED OCTOBER 3, 1988 IN BOOK 574 AT PAGE 792.

# ALTA COMMITMENT

### Schedule B - Section 2

(Exceptions)                              Our Order No.    Q385141-3

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

TERMS, CONDITIONS AND PROVISIONS OF COVENANT AND AGREEMENT REGARDING COMPLIANCE WITH PUD/SUBDIVISION AGREEMENT RECORDED JANUARY 15, 1998 AT RECEPTION NO. 412581.

: EASEMENTS, RIGHTS OF WAY AND OTHER MATTERS AS SET FORTH IN PLAT RECORDED FEBRUARY 9, 1993 IN PLAT BOOK 30 AT PAGE 69.

Exhibit "E"

## CITY OF ASPEN DISCLOSURE STATEMENT

[See attached]

SOLICITORS,  00312, 00001, 100341985.9, Declaration of Condominium for G.A. Resort Condominiums.doc
12/20/04

## JOINDER OF LIENOR

The undersigned, beneficiary under the Deed of Trust dated _____, and recorded _____, 200__ in Book ____ at Page ____ in the office of the Clerk and Recorder of Pitkin County, Colorado, as amended and supplemented from time to time (the "Deed of Trust"), for itself and its successors and assigns, approves the foregoing Declaration for affecting a portion of the property encumbered by the Deed of Trust, and agrees that no foreclosure or other enforcement of any remedy pursuant to the Deed of Trust shall impair, invalidate, supersede or otherwise affect the covenants, conditions, restrictions and easements established by that Declaration.

_____

(Type Name of Lienholder)

By: _____

Name: _____

Title: _____

Address: _____

_____

STATE OF _____)
                                               ) ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ____ day of _____, 200__, by _____, as _____ of _____, a _____.

WITNESS my hand and official seal.

My commission expires:

_____

[SEAL]

_____

NOTARY PUBLIC

**ARTICLES OF INCORPORATION**

OF

**G.A. RESORT CONDOMINIUM ASSOCIATION, INC.**

RECEIVED

2004 FEB 27  PM 12: 49

SECRETARY OF STATE
STATE OF COLORADO

Pursuant to the Colorado Revised Nonprofit Corporation Act (Articles 121 through 137 of Title 7, Colorado Revised Statutes) these Articles of Incorporation are delivered to the Colorado Secretary of State for filing:

## ARTICLE I

### NAME

The name of the corporation shall be G.A. RESORT CONDOMINIUM ASSOCIATION, INC. (the "Association").

## ARTICLE II

### PURPOSES

2.1     The purpose for which the Association is organized is to manage, operate and maintain a condominium to be known as G.A. RESORT CONDOMINIUMS (the "Condominium") to be located on certain property identified in that certain Declaration of Condominium for G.A. RESORT CONDOMINIUMS (the "Declaration") and Condominium Map for G.A. RESORT CONDOMINIUMS (the "Condominium Map") to be filed in the records of the Clerk and Recorder of Pitkin County, Colorado and in accordance with the Colorado Common Interest Ownership Act ("CCIOA") and the Colorado Revised Nonprofit Corporation Act ("CRNCA"), each as amended or revised from time to time. All terms used in these Articles of Incorporation shall have the same meaning as the identical terms utilized in the Declaration, unless the context otherwise requires.

2.2     The Association shall be a nonprofit corporation and shall have no capital stock.

2.3     The Association shall promote the health, safety, welfare and common interests of the owners of Units and Timeshare Interests in the Condominium (the "Owners").

## ARTICLE III

### POWERS

3.1     The Association shall have all of the common law and statutory powers of a nonprofit corporation under the laws of the State of Colorado, which are not in conflict with the terms of these Articles or the Declaration including but not limited to CCIOA and CRNCA.

3.2     The Association shall have all of the powers reasonably necessary to implement the purpose of the Association, and all the powers, rights and privileges which are granted to a common interest community association under the laws of the State of Colorado and the Condominium Documents, including, but not limited to, the following:

    a.     **To adopt and amend budgets** for revenues, expenditures and reserves and levy and collect assessments for common expenses from owners to defray the costs of the Condominium, the Timeshare Plan, Club Dues, and Ad Valorem Taxes.

    b.     **To maintain, manage, repair,** replace, reconstruct, refurbish, improve and operate the Condominium Property, including but not limited to general and limited common elements.

    c.     To enforce by legal means the provisions of the various Condominium Documents, these Articles, the Bylaws of the Association and the Condominium Rules and Regulations.

    d.     To contract for the management of the Condominium and to delegate to such managing agent all powers and duties of the Association except such as are specifically required by the various Condominium Documents or Colorado law to have approval of the Executive Board or the members of the Association. Notwithstanding any provisions contained in these Articles to the contrary, the Executive Board shall not be able to terminate a contract for the management of the Condominium without a vote of the Owners as provided in the Bylaws.

    e.     To exercise its powers in connection with the property of a single condominium resulting from a merger of this Condominium with another independent and separate condominium pursuant to the merger provisions of the Declaration.

    f.     To enter into agreements providing for the participation of the Condominium and the Timeshare Plan in an exchange system or network of resorts allowing for the reciprocal use of resort properties by Owners of Timeshare Interests in the Condominium.

    g.     To operate and manage directly or through contracts with third parties any reservation system created for the Condominium, including making and collecting assessments against Club Members for the Club.

    h.     To lease non-condominium property, as lessee, and Units, or Timeshare Interests and appurtenant use periods, owned by the Association and Common Elements of the Condominium as lessor in accordance with the Declaration, and to lease, license or otherwise obtain and grant beneficial use rights of or easements over Condominium and non-Condominium Property.  All funds and the titles to all property acquired by the Association and the proceeds thereof shall be held only for the benefit of the members in accordance with the provisions of the Condominium Documents.

    i.     To own, maintain, manage, repair, replace and operate parking spaces whether as units or as common elements subject to the Declaration, and to promulgate, administer and enforce regulations concerning parking.

    j.     To operate, own or manage commercial enterprises not inconsistent with the purposes of the Association.

    k.     Such other powers granted to the Association pursuant to Section 38-33.3-302 of CCIOA.

    3.3    The powers of the Association shall be subject to and shall be exercised in accordance with the provisions of the Declaration.

## ARTICLE IV

### MEMBERS

The qualifications of members, the manner of their admission and voting by members shall be as follows:

4.1     All Owners shall be members of this Association, and no other persons or entities shall be entitled to membership.  There shall be one membership for each Unit and for each Timeshare Interest. Membership in the Association may be divided into separate classes as provided in the Declaration and the Bylaws.

4.2     Members shall be entitled to a vote at Association meetings for each Unit or Timeshare Interest owned as provided in the Bylaws.

4.3     Membership in the Association appurtenant to each Unit or Timeshare Interest shall automatically transfer upon the conveyance of each respective Unit or Timeshare Interest.  The new Owner shall deliver a copy of the recorded conveyance instrument to the Association.

4.4     The share of a member in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to the member's Unit or Timeshare Interest.

## ARTICLE V

### DIRECTORS

5.1     The affairs of the Association will be managed by an executive board of not less than three (3) and not more than seven (7) directors as shall be determined by the Bylaws.

5.2     Directors of the Association shall be appointed or elected at the annual meeting of the members in the manner determined by the Bylaws.

5.3     A majority of the directors shall be members, excepting that during the Declarant Control Period the directors appointed by the Declarant need not be members.

5.4     No director of the Association shall have any liability to the Association or to its members for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability is not permitted under CCIOA or CRNCA.  Any repeal or modification of the foregoing sentence shall not adversely affect any right or protection of a director in respect of any act or omission occurring prior to such repeal or modification.

## ARTICLE VI

### INDEMNIFICATION

Every director and every officer of the Association shall be indemnified by the Association against all expenses and liabilities, including attorneys' fees, reasonably incurred by or imposed upon such person in connection with any proceeding to which such person may be a party, or in which such person may become involved by reason of such person being or having been a director or officer at the time such expenses are incurred, except in such cases where indemnification is not permitted under the

CRNCA; provided, that in the event of a settlement, the indemnification herein shall apply only when the Executive Board has approved such settlement and reimbursement as being in the best interests of the Association and not contrary to Colorado law.  The foregoing indemnification shall be in addition to and not exclusive of all other rights to which such director or officer may be entitled.

## ARTICLE VII

## BYLAWS

7.1     The Bylaws shall be adopted by the Executive Board and may be altered, amended or rescinded by not less than two-thirds (2/3rds) of all the directors until the first election of a majority of directors by Owners other than the Declarant.  Thereafter, the Bylaws may be altered, amended or rescinded by not less than two-thirds (2/3rds) of all the directors and by not less than a majority of the members of the Association present in person or by proxy and entitled to vote at a duly called meeting of the Association at which a quorum is present.  Notwithstanding any of the requirements of this Article, and except as provided in Section 7.2 below, no amendment to the Bylaws may be enacted without the vote or written assent of at least ten percent (10%) of the voting power of the Association residing in members other than the Declarant, if any at the time of the amendment.  The percentage of the voting power of the Association necessary to amend a specific clause or provision of the Bylaws shall not be less than the percentage of affirmative vote prescribed for action to be taken under that clause or provision.

7.2     Notwithstanding the foregoing, the Bylaws shall be amended by the Declarant, if necessary, to make the same consistent with the provisions of the Declaration, to meet the requirements of any governmental entity or statute, as may be in the best interests of the Association, and as it may deem appropriate, in its sole discretion, to carry out the purposes of the project and to expand or enhance the Timeshare Plan or Multisite Timeshare Plan.

## ARTICLE VIII

## AMENDMENTS

Amendments to these Articles of Incorporation shall be proposed and adopted in the following manner:

8.1     Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is considered.

8.2     Until the first election of a majority of directors by members other than the Declarant, an amendment to these Articles of Incorporation shall require the affirmative action of two-thirds (2/3) of the entire membership of the Executive Board and no meeting of the members nor any approval thereof need be had.

8.3     After the first election of a majority of directors by members other than the Declarant, a resolution approving a proposed amendment may be proposed by either the Executive Board or by the members of the Association, and after being proposed and approved by one of such bodies, requires the approval of the other body.  Except as otherwise provided herein, such approvals must be by not less than two-thirds (2/3) of the entire membership of the Executive Board and by a vote of the owners of not less than two-thirds (2/3) of the allocated interests in the Condominium including the vote of at least one-fourth (1/4) of the allocated interests in the Condominium residing in members other than the Declarant, if any at the time of the amendment, present in person or by proxy and entitled to vote at a duly called meeting of the Association at which a quorum is present; provided, however, that the percentage of the

voting power of the Association necessary to amend a specific clause or provision of these Articles of Incorporation shall not be less than the percentage of affirmative vote prescribed for action to be taken under that clause or provision.

8.4     An amendment when adopted shall be effective when filed with the Secretary of State of the State of Colorado.

8.5     Notwithstanding the foregoing, these Articles may be amended by the Declarant as may be required by any governmental entity; as may be necessary to conform these Articles to any governmental statutes; as may be in the best interests of the Association; or as the Declarant may deem appropriate, in its sole discretion, to carry out the purposes of the project and to expand or enhance the Timeshare Plan or Multisite Timeshare Plan.

## ARTICLE IX

### TERMINATION AND DISSOLUTION

9.1     The Association shall continue in existence until the Condominium is terminated in accordance with the Declaration or otherwise by law.  Upon termination of the Condominium, the Association shall thereupon be dissolved.  Notwithstanding dissolution, the Association shall continue in existence for such additional time as may be reasonably necessary to wind up and liquidate its affairs.

9.2     Upon dissolution, winding up and liquidation of its affairs, the assets of the Association shall be distributed to the members in accordance with each member's undivided ownership interest in the Condominium.

## ARTICLE X

### SPECIAL MEETINGS

Special members' meetings shall be held whenever called by the president or vice-president or by a majority of the Executive Board and must be called by such officers upon receipt of a written request from the holders of five percent (5%) of the voting interests of the Association residing in members other than the Declarant, unless otherwise provided by law.

## ARTICLE XI

### PRINCIPAL OFFICE

The physical address and mailing address of the initial principal office of the Association is 1000 S. Mill Street, Aspen, Colorado 81611.

## ARTICLE XII

### REGISTERED AGENT AND REGISTERED OFFICE

The initial registered agent shall be A.G.C. Co.  The initial registered office is 303 East 17th Avenue, Suite 1100, Denver, Colorado 80203-1264.  The registered agent or registered office or both may be changed by majority vote of the Executive Board.

## ARTICLE XIII

### INCORPORATOR

The name and address of the incorporator to these Articles of Incorporation is as follows:

| Name | Address |
|------|---------|
| James R. Martin | 303 East 17th Avenue, Suite 1100<br>Denver, Colorado 80203-1264 |

## ARTICLE XIV

### FILING

The name and address of the individual who causes this document to be delivered for filing, and to whom the Secretary of State may deliver notice if filing of this document is refused is:

| Name | Address |
|------|---------|
| James R. Martin | 303 East 17th Avenue, Suite 1100<br>Denver, Colorado 80203-1264 |

# BYLAWS

## OF

## G.A. RESORT CONDOMINIUM ASSOCIATION, INC.

### I.     IDENTITY

These are the Bylaws of G.A. Resort Condominium Association, Inc., a Colorado nonprofit corporation (the "Association"). The Association has been organized for the purpose of administering and managing a condominium and timeshare ownership plan known as G.A. Resort Condominiums (the "Condominium"), in accordance with the Declaration of Condominium for G.A. Resort Condominiums (the "Declaration"), recorded or to be recorded in the records of the Clerk and Recorder of Pitkin County, Colorado.

### II.     MEMBERS

2.1     <u>Members</u>.   All Owners of Units or Timeshare Interests in the Condominium are automatically members of the Association.

2.2     <u>No Resignation</u>.   A member may not resign from the Association as long as a member is an Owner of a Unit or Timeshare Interest in the Condominium.   Membership in the Association appurtenant to each Unit or Timeshare Interest shall automatically transfer upon the conveyance of each respective Unit or Timeshare Interest.   The new Owner shall deliver a copy of the recorded conveyance instrument to the Association.

2.3     <u>Members' Meetings</u>.

A.     Unless prohibited by law, annual members' meetings shall be held at such time, place, and date and by such means and manner as may be designated by the Executive Board, for the purpose of electing directors and transacting any other business authorized to be transacted by the members or the Condominium Documents.   Meetings shall be held at a place specified in writing by the Executive Board in the State of Colorado.   Meetings of members may be held outside of the State of Colorado if the location is readily accessible at reasonable cost to a significant portion of the membership. The first annual meeting of the Association shall be held within one year after the closing of the first sale of a Unit or Timeshare Interest or within sixty (60) days after conveyance of twenty-five percent (25%) of the Units to Owners other than Declarant, whichever occurs first.

B.     As set forth in Article X of the Articles, special members' meetings shall be held whenever called by the president, the vice-president, if any, or by a majority of the Executive Board, at such time, place and date as may be designated by the Executive Board, and must be called by such officers upon receipt of a written request from members other than Declarant owning five percent (5%) of the voting interests in the Condominium except as provided in Article III below.

C.     Notice of all members' meetings stating the time and place and the agenda for which the meeting is called shall be mailed to each member, unless waived in writing.   Such notice shall be in writing and be hand delivered or sent prepaid by U.S. Mail to each member at such member's address, as it appears on the books of the Association, not less than ten (10) nor more than fifty (50) days prior to the date of the meeting or such other time periods permitted by Colorado law.   In the event electronic, email, telephonic facsimile or other method of notification is recognized as reliable and

effective and provided such other method of notification is not prohibited by applicable law other methods of notification may be used to provide valid notice of members' meetings. An affidavit executed by the secretary attesting to giving of notice and the manner and means of such notice shall be retained in the records of the Association as proof of such provision of notice. The notice shall state the time and place of each meeting, and, the items on the agenda, including the general nature of any proposed amendment to the Declaration or Bylaws, any budget changes, any proposal to remove an officer or member of the Executive Board and, in the case of a special meeting, the purpose or purposes for which the meeting is called. The notice must also include the name, address, and a brief biographical sketch if available of each member who has announced an intention to stand for election to the Executive Board. Members may waive notice of specific meetings and may take action by written agreement without meetings. First Mortgagees shall, upon prior written request, be entitled to receive notice of all members' meetings. Failure to provide such notice shall not invalidate any action taken at an otherwise properly noticed meeting. Where assessments against members are to be considered for any reason at a members' meeting, the notice shall contain a statement that assessments will be considered and shall specify the nature of any such assessment.

   D.   Quorum. The presence in person or by proxy of members representing fifteen percent (15%) of the total voting interests eligible to vote shall constitute a quorum including the presence in person or by proxy of members representing at least ten percent (10%) of the voting power of the Association residing in members other than the Declarant shall be necessary to constitute a quorum. Decisions shall be made by the vote of the members holding a majority of the voting interests at a meeting at which a quorum is present, whether in person or by proxy, unless a different number or method of voting is expressly required by statute or by the Declaration, the Articles, or these Bylaws. Notwithstanding any other provision herein, if less than one-third (1/3) of the total voting power of the Association is in attendance in person or by proxy at any meeting of the Association, only those matters of business, the general nature of which was given in the notice of the meeting may be voted upon by the members of the Association.

   E.   Adjournment if no Quorum. If any meeting of members cannot be organized because a quorum has not been achieved, no business shall be conducted and the presiding officer shall adjourn the meeting sine die.

   F.   Order of Business. Unless modified by the Executive Board or the members, the order of business at annual members' meetings and, as far as practicable at all other members' meetings, shall be:

   (1)   Call to order.

   (2)   Election of chairman of the meeting.

   (3)   Proof of notice of meeting or waiver of notice.

   (4)   Calling of the roll and certifying of proxies.

   (5)   Reading and disposal of any unapproved minutes.

   (6)   Report of officers.

   (7)   Report of committees.

   (8)   Election of directors.

(9)    Unfinished business.

(10)   New business.

(11)   Adjournment.

     G.    Limitation of Action. For so long as the Declarant holds Units or Timeshare Interests for sale in the ordinary course of business, neither of the following actions may be taken without the prior written approval by the Declarant:

        (1)    Any action by the Association that would be detrimental to the sale of Units or Timeshare Interests by the Declarant; and,

        (2)    Any other action by the Association for which the Condominium Documents require the prior written approval of the Declarant.

    2.4    Voting. There shall be one vote for each Unit in the Condominium. Each owner of Timeshare Interests shall have a vote equal to the undivided ownership interest owned in a Unit.

    2.5    Proxies. Votes may be cast in person or by proxy. Proxies shall be filed with the secretary at or before the appointed time of the meeting or meetings for which they are valid. Each proxy shall specifically set forth the name of the person voting by proxy, the name of the person authorized to vote the proxy for him, the date and time the proxy was given, the time period for which the proxy is valid and shall be signed by at least one of the Owners of the Unit or Timeshare Interest for which the proxy is given. In the event that conflicting proxies are given by co-owners of a Unit or Timeshare Interest then the Executive Board may in its reasonable judgment refuse to recognize such proxies. If a limited proxy, the proxy may set forth those items which the holder of the proxy may vote and the manner in which the vote is to be cast. In no event shall any proxy be valid for a period of longer than eleven (11) months after the date it was given, unless the proxy provides otherwise. Every proxy shall be revocable at any time at the pleasure of the member executing it, upon providing actual notice of such revocation to the person presiding over a meeting of the Association. If a proxy expressly provides, any proxy holder may appoint in writing a substitute to act in his place. If such provision is not made, substitution is not authorized.

    2.6    Action by Written Consent. Except as may be prohibited by Colorado law any action that may be taken at any regular or special meeting of members may be taken without a meeting provided the following ballot requirements are satisfied:

     A.    The Association distributed a written ballot to every member entitled to vote on the matter;

     B.    The ballot sets forth the proposed action, provides an opportunity to specify approval or disapproval of any proposal, and provides a reasonable time within which to return the ballot to the Association;

     C.    The number of votes cast by ballot within the time period specified equals or exceeds the quorum required to be present at a meeting authorizing the action;

     D.    The number of approvals equals or exceeds the number of votes that would be required to approve the action at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot; and

E.      The ballot affords an opportunity for the member to specify a choice between approval and disapproval of each order of business proposed to be acted upon by the Association and further provides that the vote of the members shall be cast in accordance with the choice specified. In any election of directors, any form of written ballot in which the directors to be voted on are named therein as candidates and which is marked by a member "withheld" or otherwise marked in a manner indicating that the authority to vote for the election of directors is withheld shall not be voted either for or against the election of a director.

## III.   DIRECTORS

3.1     Number and Qualification of Directors.  The affairs of the Association shall be managed by an Executive Board.  The initial Executive Board shall consist of three (3) directors.  After the expiration of the Declarant Control Period, the Executive Board shall consist of not less than three (3) or more than seven (7) directors as determined by the Executive Board from time to time.  At least a majority of the members of the Executive Board shall be members of the Association, except that during the Declarant Control Period the directors appointed by the Declarant need not be members.  Where Units or Timeshare Interests are owned by business organizations, the officers, directors, employees or other designated representatives of said business organizations shall be eligible to serve on the Executive Board of the Association.  After the Declarant Control Period at least one director shall be an owner of a Timeshare Interest and at least one director shall be an owner of either a Commercial Unit, an Affordable Housing Unit or a Parking Unit.

3.2     Election of Directors.  Election of directors shall be conducted in the following manner:

A.      Members of the Executive Board shall be elected at an annual meeting of the members of the Association in accordance with Subsection 3.2.C, below.  There shall be no cumulative voting.  Candidates receiving the most votes even if not a majority shall be elected to fill the available seats on the Executive Board.

B.      Vacancies on the Executive Board may be filled by the remaining directors subject to the provisions of Subsection 3.2.C, below.  A director appointed to fill a vacancy in office shall serve the remainder of the term of the office to which he is appointed and thereafter until his successor is elected.

C.      Declarant shall be entitled during the Declarant Control Period (defined below) to appoint and remove the members of the Executive Board and the officers of the Association, subject to the following restrictions:

(1)     Not later than sixty (60) days after twenty-five percent (25%) of the Allocated Interests in the Condominium are owned by Owners other than the Declarant at least one member and not less than twenty-five percent (25%) of the members of the Executive Board shall be elected by Owners other than Declarant.

(2)     Not later than sixty (60) days after fifty percent (50%) of the Allocated Interests in the Condominium are owned by Owners other than the Declarant, the Owners other than the Declarant shall be entitled to elect not less than one-third (1/3) of the members of the Executive Board.

(3)     Not later than the termination of the Declarant Control Period, the Owners other than the Declarant shall be entitled to elect a majority of the members of the Executive Board.

D.      Except as otherwise provided for under these Bylaws or in the Declaration, Declarant shall be entitled to appoint and remove the members of the Executive Board and officers of the Association to the fullest extent permitted under Colorado law.

3.3      Termination of Declarant Control Period.

A.      The Declarant Control Period shall terminate upon the earliest of the following events:

(1)      sixty (60) days after conveyance by Declarant of seventy-five percent (75%) or more of the ownership interests in the Condominium to Owners other than the Declarant;

(2)      two (2) years after the last conveyance of an ownership interest by the Declarant in the ordinary course of business;

(3)      two (2) years after any right to add new units was last exercised; or

(4)      the date on which Declarant voluntarily relinquishes such power evidenced by a notice recorded in the office of the Clerk and Recorder for Pitkin County, Colorado.

B.      Subject to the limitations set forth above, the Declarant shall be entitled to appoint not less than one (1) member of the Executive Board as long as the Declarant owns any interest in the Condominium.

C.      Nothing in this subsection shall be construed so as to preclude the Declarant from relinquishing control of the Executive Board at any time the Declarant may so elect, and under such conditions as Declarant may establish as long as such conditions are not in violation of CCIOA.

3.4      Term of Office. Members of the Executive Board shall serve one (1) year terms or until the next annual meeting of the members, whichever is sooner, and thereafter, unless and until his successor is duly elected or qualified or until he is removed in the manner elsewhere provided. Directors may not serve on the Executive Board more than six (6) consecutive years.

3.5      Organizational Meeting. The organizational meeting of a newly elected Executive Board shall be held within ten (10) days of their election at such place, date and time and by such manner and means as shall be fixed by the directors at the meeting at which they were elected, and no further notice of the organizational meeting shall be necessary provided that a quorum is present.

3.6      Regular Meetings. Regular meetings of the Executive Board may be held not less than annually at such time and place and by such manner and means as shall be determined from time to time by a majority of the directors. Meetings of the Executive Board shall be held in or near the Condominium unless a meeting at another location either in or outside of the State of Colorado would significantly reduce the costs to the Association or reduce the inconvenience to the members of the Executive Board. Notice of regular meetings shall be given to each director by facsimile, by mail, by email, or otherwise in writing at least three (3) days prior to the date named for such meeting unless such notice is waived pursuant to Section 3.8. Any item not included on the notice may be taken up on an emergency basis by at least a majority plus one of the members of the Executive Board. Such emergency action shall be noticed and ratified at the next regular meeting of the Executive Board. All members will have the right to attend and listen to the deliberations and proceedings of the meetings of the Executive Board; provided, however, that members who are not members of the Executive Board are not entitled to participate in the deliberations or discussion unless expressly authorized by the Executive Board. The Executive Board

may, with the approval of a majority of a quorum of members of the Executive Board, adjourn a meeting and reconvene in executive session to discuss and vote upon:

        A.    Employment or personnel matters for employees or agents of the Executive Board or Association;

        B.    Legal advice from an attorney to the Executive Board or Association;

        C.    Pending or contemplated litigation;

        D.    Pending or contemplated matters relating to the enforcement of the Association's documents or rules; or

        E.    Orders of business of a similar nature and as permitted under CCIOA.

        The nature of any and all business to be considered in executive session shall first be announced in open session.

    3.7    <u>Special Meetings</u>. Special meetings of the Executive Board may be called by the chairperson of the Executive Board or the president and must be called by the secretary at the written request of a majority of the Executive Board. Not less than three (3) days notice of the meeting shall be given by mail, by facsimile, by email or otherwise in writing, which notice shall state the time, place and purpose of the meeting unless such notice is waived.

    3.8    <u>Waiver of Notice</u>. Any director may waive notice of a meeting in writing before, during or after the meeting, and such waiver shall be deemed equivalent to the giving of notice.

    3.9    <u>Quorum of Executive Board</u>. A quorum at Executive Board meetings shall consist of the directors entitled to cast a majority of the votes of the entire Executive Board. The acts of the Executive Board approved by a majority of votes present at which a quorum is present shall constitute the acts of the Executive Board except as specifically otherwise provided in the Declaration. If at any meeting of the Executive Board there is less than a quorum present, the majority of those present may adjourn the meeting from time to time until a quorum is present. At the adjourned meeting any business that might have been transacted at the meeting as originally called may be transacted without further notice.

    3.10    <u>Presiding Officer</u>. The presiding officer of Executive Board meetings shall be the president of the Association. In the absence of the president the vice-president, if any, shall preside or such other individual as voted on by the Executive Board.

    3.11    <u>Directors' Fees</u>. Directors' fees, if any, shall be determined by the members of the Association, and no director shall receive a fee prior to the election of a majority of the members of the Executive Board by Owners other than the Declarant. Directors shall be reimbursed for any transportation expenses reasonably incurred and directors shall be entitled to reasonable per diem payments for attendance at regular and special meetings of the governing body.

    3.12    <u>Removal</u>. Directors elected by Owners other than Declarant may be removed from the Executive Board pursuant to Section 38-33.3-303 of CCIOA; provided, however that Directors elected by Owners other than Declarant may only be removed from the Executive Board prior to the expiration of their term of office only by a vote of the voting power residing in Owners other than Declarant.

3.13    Appointment. Notwithstanding anything to the contrary contained herein, any director who is appointed by the Declarant may be removed by the Declarant at any time.  Upon such removal, the Declarant shall immediately appoint a replacement director and notify the remaining directors, if any, of such removal and appointment.

## IV.    POWERS AND DUTIES OF THE EXECUTIVE BOARD

All of the powers and duties of the Association shall be exercised by the Executive Board including those existing under the common law, Colorado law, the Articles and the Condominium Documents. The Executive Board may do all such acts and things which are not specifically required to be done by the members of the Association by law, the Declaration, the Articles, or these Bylaws.  Such powers and duties of the directors shall be exercised in accordance with the provisions of the Declaration which governs the Condominium, and shall include, but not be limited, to the following:

4.1    To adopt a budget and to levy and collect assessments against Owners to pay the expenses of the Condominium and the Association.

4.2    To levy and collect special assessments whenever, in the opinion of the Executive Board, it is necessary to do so in order to meet unanticipated operating or maintenance expenses or costs or additional capital expenses, or because of emergencies, subject to any limitations imposed by the Declaration and CCIOA.

4.3    To use the proceeds of assessments in the exercise of its powers and duties.

4.4    To maintain, manage, repair, replace, reconstruct, refurbish, improve and operate the Condominium Property.

4.5    To obtain and maintain insurance to protect the Association and the Condominium Property.

4.6    To promulgate and amend the Condominium Rules and Regulations respecting the use of Condominium Property.  Such rules and regulations may be promulgated by the Executive Board at any duly noticed meeting of the Executive Board or of the members.

4.7    To administer and enforce by legal means the provisions of the Condominium Documents.

4.8    To contract for management of the Condominium and to delegate to such managing agent all powers and duties of the Association except such as are specifically required by the Condominium Documents to have approval of the Executive Board or members of the Association.  Notwithstanding any provisions contained in these Bylaws to the contrary, the Executive Board shall not be able to terminate a contract for the management pursuant to Colo. Rev. Stat. § 38-33.3-305 without a vote of two-thirds (2/3) of the members of the Executive Board and by a vote of the Owners of two-thirds (2/3) of the Units including the Owners of two-thirds (2/3) of the Timeshare Interests that have been created in the Condominium.

4.9    To pay taxes and governmental or quasi-governmental assessments which are liens against any part of the Condominium, and to assess the same against the Owner or Owners subject to such liens.

4.10    To pay the cost of all power, water, sewer and other utility services rendered to the Condominium and not billed to Owners of individual Units or Timeshare Interests.

4.11    To employ and remove personnel for reasonable compensation to perform the services required for proper administration of the purposes of the Association, including, but not limited to, accountants and attorneys.

4.12    To bond any or all employees, officers and directors of the Association, for which the Association shall bear the costs.  This duty shall include, but not be limited to, the duty to obtain fidelity insurance as required by CCIOA.

4.13    To maintain, manage, repair, replace and operate the property of the single condominium resulting from a merger of this Condominium with another independent and separate condominium pursuant to the merger provisions of the Declaration.

4.14    To maintain all books and records concerning the Condominium and the Timeshare Plan including, but not limited to, the maintenance of the membership register (including mailing addresses and telephone numbers), a copy of which shall be provided to the State of Colorado Real Estate Commission upon request.   The membership register, books of account, minutes of members' and Executive Board meetings, and all other records of the Condominium maintained by the Association or the Managing Agent shall be made available for inspection and copying by any member or by any member's duly appointed representative, at any reasonable time for a purpose reasonably related to membership in the Association.

This inspection shall take place in accordance with the Declaration and these Bylaws at the office where the records are maintained.  Upon receipt of an authenticated written request from a member along with the fee prescribed by the Executive Board to defray the costs of reproduction, the Managing Agent or other custodian of records shall prepare and transmit to the member a copy of any and all records requested.

The Association may, as a condition to permitting the inspection of the membership register or to its furnishing information from the register, require that the member agree in writing not to use, or allow the use of, information from the register for commercial or other purposes not reasonably related to the regular business of the Association and the member's interest in the Association.

A.      The Board shall establish reasonable rules with respect to:

(1)    Notice to be given to the Managing Agent or other custodian of records by members desiring to make the inspection or to obtain copies.

(2)    Hours and days of the week when a personal inspection may be made.

(3)    Payment of the cost of reproducing copies of records requested by a member.

B.      Each director shall have the absolute right at any time to inspect all books, records, and documents of the Association and all real and personal properties owned or controlled by the Association.   The right of inspection by a director includes the right to make extracts and copies of records.

4.15     To operate and administer any reservation system created for the Condominium, to amend or revise the reservation system as is necessary from time to time or to delegate responsibility or contract for management of same, to administer and enforce the provisions of the Hyatt Vacation Club Resort Agreement to the extent permitted under its terms and the Declaration and to collect assessments and perform other duties as permitted under the Declaration.

4.16     To lease, license or otherwise obtain and grant beneficial use rights of and easements burdening or benefiting the Condominium in accordance with the Declaration.

4.17     To administer and enforce the provisions of a master declaration, if any, to the extent permitted under such master declaration and to collect assessments and perform other duties on behalf of a master association as permitted under such master association's governing documents.

4.18     To maintain a current list of owners including current mailing addresses and to provide such list to a master association, if any, from time to time to facilitate notices that are required to be given to owners as members of such master association.

4.19     In general, to perform all other acts permitted under CCIOA, to carry on the administration of the Association and to do all those things necessary and responsible in order to carry out the proper governance and operation of the Association and the Condominium, all in accordance with the Declaration.

## V.     OFFICERS

5.1     General.  The executive officers of the corporation shall be a president, a secretary, and a treasurer.  Any person may hold two or more offices except that the president, if any, shall not also be the vice-president or secretary.  The Executive Board shall from time to time elect such other officers and designate their powers and duties as the Executive Board determines necessary to manage the affairs of the Association.  Except as may be required by law, officers need not be members or directors.

5.2     President.  The president shall be the chief executive of the Association.  He shall have all of the powers and duties which are usually vested in the office of president including, but not limited to, the power of appointing committees from among the members from time to time, as he may in his discretion determine appropriate, to assist in the conduct of the affairs of the Association.

5.3     Vice-President.  If a vice-president is appointed, the vice-president shall in the absence of or disability of the president exercise the powers and duties of the president.  He shall also generally assist the president and exercise such other powers and perform such other duties as shall be prescribed by the directors.

5.4     Secretary.  The secretary shall keep the minutes of the proceedings of the directors and the members in a book available for inspection by the directors or members, or their authorized representatives, at any reasonable time.  The Association shall retain these minutes for not less than seven (7) years.  He shall attend to the giving and serving of all notices required by law.  He shall have custody of the seal of the Association and affix the same to instruments requiring a seal when duly signed.

5.5     Treasurer.  The treasurer shall have custody of all property of the Association, including financial records, funds, securities and evidences of indebtedness.  He shall keep the financial records of the Association and shall keep the assessment rolls, the accounts of the members, and the books of the Association in accordance with generally accepted accounting principles.  He shall perform all other

duties incident to the office of the treasurer of an Association and as may be required by the directors or the president.

5.6     Compensation.  The compensation of all employees of the Association shall be fixed by the directors.  This provision shall not preclude the Executive Board from employing a director or officer as an employee of the Association nor preclude the contracting with a director for the management of the Condominium.

## VI.     FISCAL MANAGEMENT

The provisions for fiscal management of the Association set forth in the Declaration and the Articles shall be supplemented by the following provisions:

6.1     Assessments.

A.     The Executive Board of the Association shall fix and determine, from time to time, the sum or sums necessary and adequate for the Common Expenses of the Condominium.  Common Expenses shall include the expenses for the operation, maintenance, repair or replacement of the Common Elements, costs of carrying out the powers and duties of the Association, all insurance premiums and expenses relating thereto, including fire insurance and extended coverage, replacement reserves and any other expenses designated as Common Expenses from time to time by the Executive Board, or under the provisions of the Declaration.

B.     Assessments for a budget year shall be billed no less frequently than annually as directed by the Executive Board in consultation with the Managing Agent.  Failure to bill in conformity with such time limits shall not affect the enforceability of assessments or the obligation of owners to pay assessments.  Special assessments, should such be required by the Executive Board, shall be levied in the same manner as provided for regular assessments, and shall be payable in the manner determined by the Executive Board.  If a member shall be in default in the payment of any assessment or taxes due on his interest, the Association shall have all collection rights available to it under CCIOA.  If any unpaid share of Common Expenses or assessments is extinguished by foreclosure of a superior lien or by a deed in lieu of foreclosure thereof, the unpaid share of Common Expenses or assessments shall be Common Expenses collectible from all the Owners.

C.     The assessment roll shall be maintained in a set of accounting books or records in which there shall be an account for each Unit and Timeshare Interest.  Such an account shall designate the name and address of the members or member, the dates and amounts in which the assessments come due, the amounts paid upon the account and the balance due upon assessments.  Assessments shall be made against members in an amount not less than required to provide funds in advance for payment of all of the anticipated current operating and reserve expenses and for all of the unpaid and unfunded operating and reserve expenses previously incurred.  In the absence of a determination by the directors as to the frequency of assessments, assessments shall be due and payable annually.  The personal liability of a member for assessments shall survive the termination of such member's membership in the Association.

D.     Any member shall have the right to require from the Association a certificate showing the amount of unpaid assessments against him with respect to his Unit or Timeshare Interest.  The holder of a mortgage or other lien shall have the same right as to any Unit or Timeshare Interest upon which such holder has a lien.  Any person who relies upon such certificate shall be protected thereby.

E.     Notice of any meeting, whether a meeting of the Executive Board or of the members of the Association, at which assessments against members are to be considered for any reason

shall specifically contain a statement that assessments will be considered and the nature of such assessments.

6.2   Budget.

A.   The Executive Board shall adopt a budget for each fiscal year which shall contain estimates of income and expenses of the Association. The proposed annual budget of Common Expenses shall be detailed and shall show the amounts budgeted by accounts and expense classifications. In addition to annual operating expenses, the budget shall include adequate reserve accounts for capital expenditures, deferred maintenance, and repair or replacement of those Common Elements that must be replaced on a periodic basis. The budget shall include the costs and expenses of membership in the Hyatt Vacation Club that are attributable to the Condominium as a Component Resort each calendar year. The budget shall also include proposed assessments against each Unit and Timeshare Interest. The budget must include the following items, as applicable:

(1)   The estimated revenue and expenses on an accrual basis.

(2)   A summary of reserve accounts for major components of capital expenditures and deferred maintenance having a remaining useful life of less than thirty years based upon the most recent review or study. The summary shall be printed in bold type and include the following:

(a)   The current estimated replacement cost, estimated remaining useful life, and estimated useful life of each major component.

(b)   As of the end of the Fiscal Year for which the study is prepared:

(i)   The current estimate of the amount of cash reserves necessary to repair, replace, restore, or maintain the major components.

(ii)   The current amount of accumulated cash reserves actually set aside to repair, replace, restore, or maintain the major components.

(iii)   The percentage that the amount determined for purposes of (ii) above equals the amount determined for purposes of (i) above.

(3)   A general statement addressing the procedures used for the calculation and establishment of those reserves to defray the future repair, replacement, or additions to those major components that the Association is obligated to maintain.

B.   Copies of the proposed budget and proposed assessments described above (or a summary thereof) must be transmitted to each member after adoption by the Executive Board, except the first Fiscal Year, when the budget shall be distributed as soon as reasonably possible.

C.   Unless the owners of sixty-seven percent (67%) of the Allocated Interests in the Condominium reject the budget, such proposed budget is ratified, whether or not a quorum is present. In the event that the proposed budget is rejected, the periodic budget last ratified by the Owners must be continued until such time as the Owners ratify a subsequent budget proposed by the Executive Board. The Executive Board shall adopt a budget and submit the budget to a vote of the Owners as provided herein no less frequently than annually. The Executive Board shall levy, and assess the Association's annual assessments in accordance with the annual budget. The Executive Board may, in its discretion, establish separate and independent budgets for different types, classes and categories of Units in which

case the Owners of such Units shall have the right to reject such independent budgets as provided in the Condominium Documents.

6.3     Dissemination of Information.  The Executive Board shall disseminate to every member such information as may be required by Colorado law to be disseminated to members together with such other information as the Executive Board may determine should be distributed in the best interests of the Association or as may be directed by any lawful authority.

6.4     Depository.  The depository of the Association shall be such bank or other institution as permitted by applicable Colorado law, as shall be designated from time to time by the Executive Board and from which the monies in such accounts shall be withdrawn only by checks signed by such persons as are authorized by the Executive Board.

6.5     Annual Accounting.   The Association shall require the preparation of an annual accounting and financial statement for Association funds by the Managing Agent, public accountant or certified public accountant.

6.6     Fidelity Insurance.  Fidelity bonds must be maintained by the Association to protect against dishonest acts on the part of its officers, directors, trustees, employees and contractors and on the part of all others who handle or are responsible for handling the funds belonging to or administered by the Association in an amount not less than that required by Colorado law and in such additional amounts as the Executive Board may determine in the exercise of reasonable business judgment.  Any such fidelity coverage shall name the Association as an obligee and such bonds shall contain waivers by the issuers of all defenses based upon the exclusion of persons serving without compensation from the definition of "employees," or similar terms or expressions.

6.7     Funds.  All funds and accounts of the Association being held by Managing Agent or other third persons shall be kept in an account separate from the Managing Agent's own funds and the funds of other parties held by such Managing Agent or third party, and all reserve funds of the Association shall be kept in an account separate from reserve funds.

6.8     Fiscal Year.  The fiscal year of the Association shall be the calendar year unless otherwise established by the Executive Board.

## VII.     PARLIAMENTARY RULES

Robert's Rules of Order (latest edition) shall govern the conduct of the Association proceedings when not in conflict with the Articles and Bylaws or with applicable law.

## VIII.     AMENDMENTS

8.1     Bylaws.  Amendments to the Bylaws shall be proposed and adopted in the following manner:

A.     Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is considered.

B.     An amendment may be proposed by either the Executive Board or by the membership of the Association.  Except as otherwise provided herein, a resolution adopting a proposed amendment to the Bylaws must receive approval of not less than two-thirds (2/3rds) of all the directors until the first election of a majority of directors by Owners other than the Declarant.  Thereafter, the

Bylaws may be amended by not less than two-thirds (2/3rds) of all the directors and by not less than a majority vote of the members of the Association present in person or by proxy, at a duly called meeting of the Association. Notwithstanding any of the requirements of this subparagraph, and except as provided in Subsection 8.1.D, no amendment to these Bylaws may be enacted without the vote or written assent of at least ten percent (10%) of the voting power of the Association residing in members other than the Declarant. The percentage of the voting power of the Association necessary to amend a specific clause or provision of these Bylaws shall not be less than the percentage of affirmative vote prescribed for action to be taken under that clause or provision.

        C.     An amendment when adopted shall become effective ten (10) days after notice thereof is given to Owners.

        D.     These Bylaws shall be amended by the Declarant, if necessary, to make the same consistent with the provisions of the Declaration, to meet the requirements of any governmental entity or statute, as may be in the best interests of the Association, and as it may deem appropriate, in its sole discretion, to carry out the purposes of the project and to expand or enhance the Timeshare Plan or Multisite Timeshare Plan.

        E.     No Bylaw shall be revised or amended by reference to its title or number only. Proposals to amend existing bylaws shall contain the full text of the bylaws to be amended. New text shall be underlined, and deleted text shall be lined through. However, if the proposed change is so extensive that this procedure would hinder rather than assist the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but, instead, a notation must be inserted immediately preceding the proposed amendment in substantially the following language "Substantial rewording of Bylaw. See Bylaw _____ for present text." Nonmaterial errors or omissions in the bylaw amendment process shall not invalidate an otherwise properly promulgated amendment.

    8.2    <u>Declaration</u>. Amendments to the Declaration shall be prepared by an attorney licensed to practice in the state of Colorado. A copy of each amendment to the Declaration shall be attached to a certificate certifying that the amendment was duly adopted as an amendment of the Declaration in accordance with Colorado law and in accordance with the provisions of the Declaration governing amendments. The certificate shall be executed by the President or Vice President and attested by the Secretary or Assistant Secretary of the Association with the formalities of a deed. The amendment shall be effective when the certificate and copy of the amendment are recorded in the public records of Pitkin County.

        IX.    <u>SEVERABILITY AND CONFORMITY TO STATE LAW</u>

These Bylaws are to be governed by and construed according to the laws of the State of Colorado. If it should appear that any of the provisions hereof are in conflict with the Declaration or any rule of law or statutory provision of the State of Colorado, then such provisions of these Bylaws shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to the Declaration or such rule of law.

        X.    <u>MISCELLANEOUS</u>

    10.1    <u>Corporate Seal</u>. The corporate seal shall be circular and shall have inscribed thereon the name of the corporation and the word "Colorado" in the circle and the word "Seal" in the middle. The seal shall also indicate that the Association is a non-profit corporation under Colorado law. If and when

so directed by the Executive Board, a duplicate seal may be kept and used by such officer or other person as the Executive Board may name.  The corporate seal shall be in the custody and control of the secretary.

      10.2    <u>Definitions</u>.  The capitalized terms used in these Bylaws shall have the same meaning as the identical terms defined in the Declaration, unless the context otherwise requires.

## CONDOMINIUM RULES AND REGULATIONS

## G.A. RESORT CONDOMINIUM ASSOCIATION, INC.

The following rules and regulations, except as otherwise expressly stated, apply to all Owners and their families, lessees, employees, agents, invitees and guests with respect to the use of the Units and any other portion of the Condominium. Defined terms not specifically defined in these Condominium Rules and Regulations shall have the meaning attached to such terms in the Declaration of Condominium for G.A. Resort Condominiums ("Condominium Declaration").

### GENERAL

1.    Personal Use of Units.  Each of the Units committed to the Timeshare Plan shall be occupied only as vacation accommodations.  Use of the Units of the Condominium is limited solely to the personal use of Owners, their guests, invitees and lessees and for recreational uses by corporations and other entities owning Unit Weeks.  Use of Units or the Common Elements for commercial purposes or any purposes other than the personal use described herein is expressly prohibited unless otherwise approved by the Executive Board.

2.    Temperature.  The Temperature in each Unit shall be maintained at no less than fifty-five degrees Fahrenheit (55°F) to minimize any damage which could result from the freezing of pipes.  This minimum heating requirement must be met even when the Unit is vacant.

3.    Speed Limits.  Vehicles using the driveway, garage and parking areas may not exceed a speed of five (5) miles per hour.

4.    Exterior Appearance.  The balconies, terraces, stairways and windows shall be used only for the purposes intended, and shall not be used for drying or hanging garments, cleaning of rugs, or storing other objects.  The sidewalks, driveways and entrances must not be obstructed or encumbered or used for any purpose other than ingress and egress to and from the Condominium unless otherwise authorized by the Executive Board.  No Owner shall decorate or alter any part of a Unit committed to the Timeshare Plan so as to affect the appearance of the Unit from the exterior.  Such decoration or alteration shall include, but not be limited to, painting or illumination of the exterior of a Unit, display of plants or other objects upon balconies or railings or exterior windowsills or ledges, reflective film or other window treatments, draperies, window shades, screen doors and lights.  The Condominium Association shall have the sole discretion, which may be based on aesthetic principles only, to determine compliance with this provision.

5.    Trash Disposal.  All parts of the Condominium shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate nor any fire hazard allowed to exist.  Disposition of garbage and trash shall be only by the use of garbage disposal units, by employees or agents of the Management Company or by the use of sealed trash bags placed in the Condominium Association's common trash dumpsters for pick-up by the trash company.

6.    Entry of Units.  In case of emergency originating in or threatening any Unit, regardless of whether or not the Owner is present at the time of such emergency, the Executive Board, the Management Company or any other person authorized by them, shall have the right to enter such Unit for the purpose of remedying or abating the cause of such emergency, and such right of entry shall be immediate, and to

facilitate entry in the event of any such emergency, the Executive Board and/or the Management Company shall retain a pass key to each Unit within the Condominium. For any lock on any door changed by an Owner, the Owner shall immediately provide the Executive Board with a new key; provided however, that the no Owner shall be permitted to change the lock on any door to a Unit committed to the Timeshare Plan. Failure to comply could result in, and each Owner hereby authorizes, forced entry by either the Executive Board or the Management Company. Failure to comply will also result in the removal or re-keying of the lock, all at the Owner's expense.

7.      Outdoor Fixtures or Improvements. Any antenna or other wiring erected on the roof or exterior walls of the Building without the prior consent of the Executive Board in writing is subject to being removed without notice or compensation. No antennas of any type designed to serve a Unit shall be allowed on the Common Elements or Limited Common Elements, except as may be provided by the Executive Board in writing, or as may be provided to serve as a master antenna for the benefit and use of the Condominium. No electrical or other equipment may be operated on the Condominium Property that interferes with television signal reception.

8.      No Pets. All pets are prohibited within on the Condominium Property unless required pursuant to applicable law.

9.      Use of Common Elements. The Common Elements and Limited Common Elements shall be used only for the purposes for which they are intended in the furnishing of services and facilities for the enjoyment of the personal use of the Owners. No part of the Common Elements may be used for storage, vehicle repair, construction or any other purpose unless expressly authorized by the Executive Board. If, in the judgment of the Executive Board, any item must be removed from the applicable area of Common Elements, the Owner of said item shall be charged for the cost of such removal.

10.     Children. Children are to play only in areas either designated or clearly intended for play, and they are not to play in public halls, in the garage, on stairways, or other common areas which would cause an obstruction. Reasonable supervision of children by parents or guardians must be exercised at all times.

11.     Smoking. Smoking is prohibited in enclosed common areas and in the Units. Smoking is permitted on individual decks which are limited common elements provided the door to the Unit is closed to prevent smoke from entering the Unit.

12.     Storage. The storage of flammable material that may unreasonably jeopardize the safety and welfare of any person or property is not permitted on or in the Condominium.

13.     Parking. Owners and their families, guests, invitees, employees and lessees are permitted to park only in their assigned space or other areas designated by the Executive Board. No vehicle shall be parked at any time in a manner that will prevent proper snow removal from the Condominium. No trailers, oversized vehicles or commercial vehicles (excluding those vehicles owned by the Developer or the Management Company, and excluding those vehicles which have received advance written consent of the Management Company) shall be parked in any parking space, except such temporary parking spaces provided for the purpose as may be necessary to effectuate deliveries to the Condominium, the Condominium Association or the Owners. Bicycles and motorcycles shall not be stored on the Condominium Property except in such areas designated for this purpose. No motorized boat, sailboat, or watercraft of any nature, nor trailers or recreational vehicles, may be stored within any Common Elements. In the event any vehicle is parked in violation of these Rules, such vehicle may be ordered removed or towed, at the Owner's expense, at the discretion of the Condominium Association.

14.  <u>Lawful Use</u>.  No person shall do or permit anything to be done within the Condominium, or bring or keep anything therein which would conflict with health and safety laws or with any insurance policy of the Condominium Association or with any rules of the Condominium Association or with any of the rules, regulations or ordinances of any governmental or quasi-governmental authority having jurisdiction over the Condominium.  No Owner shall permit any use of a Unit or make or permit any use of the Common Elements that will increase the cost of insurance upon the Condominium Property.

15.  <u>Nuisance</u>.  No televisions, radios, stereos, speakers or any other apparatus may be used, nor shall any nuisance or activity be conducted, in a manner that may be an annoyance to other Owners or which interferes with the peaceful possession and proper use of the Condominium Property by the Owners.

16.  <u>Signs</u>.  No sign, advertisement or other lettering shall be exhibited, inscribed, painted or affixed by any Owner or other person on any part of the outside or inside of the Common Elements, Limited Common Elements or Units, nor shall any advertisement, announcements, or solicitation of any kind be distributed or passed out in any part of the Condominium, without prior written consent of the Executive Board, except that the right is specifically reserved to the Developer to place and maintain signs on the Condominium Property promoting the marketing and sale of the Property for as long as it may have Units or Timeshare Interests to sell to sell.

17.  <u>Exterior Projections</u>.  No awnings or other projections shall be attached to the outside walls of the Building without the prior written consent of the Executive Board.

18.  <u>Deliveries</u>.  All deliveries and moving of furniture, fixtures, equipment and other household or commercial items to and from the Units shall be made by authorized entries and elevators only and shall not cause any unreasonable noise or unreasonable disturbance to the Owners or occupants of any other Units.

19.  <u>Floor Load</u>.  Owners shall not place a load on any floor exceeding the floor load per square foot area which the floor was designed to carry and which is allowed by law or which may, in the reasonable opinion of the Executive Board, constitute a hazard to or may damage the Building.

20.  <u>Decoration of Units Committed to the Timeshare Plan</u>.  No Owner may modify a Unit committed to the Timeshare Plan except as approved in writing by the Executive Board.

The Executive Board may effectuate additional rules and regulations regarding the use and operation of the Units; provided, however, any such rules and regulations must not be inconsistent with the Condominium Declaration.

Recorded at _____ o'clock, _____.M., _____
Reception No. _____   Recorder.

## SPECIAL WARRANTY DEED

THIS DEED, Made this ____ day of _____, 200__ between

**GRAND ASPEN LODGING, LLC**, a Delaware limited liability company,

of the County of Pitkin and State of Colorado, GRANTOR, and

whose legal address is _____
of the County of _____ and State of _____, GRANTEE(S) [MAIL TAX STATEMENTS TO: G.A. Resort Condominium Association, Inc., 400 Dean Street, Aspen, Colorado 81611]:

    **WITNESS**, that the GRANTOR, for and in consideration of the sum of Ten dollars, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm unto the grantee, its successors and assigns, forever, as tenants in common or joint tenants (strike one), all the real property, together with improvements, if any, situate, lying and being in the County of Pitkin, State of Colorado, described as follows:

    An undivided 1/20th fee ownership interest as tenant-in-common in Unit _____, of G.A. RESORT CONDOMINIUMS, according to the Declaration of Condominium for G.A. RESORT CONDOMINIUMS recorded _____, 200__ at Reception No. _____ as amended and supplemented from time to time and according to the Map for G.A. RESORT CONDOMINIUMS recorded _____, 200__ in Plat Book ____ at Page _____, Reception No. _____ as amended and supplemented from time to time, all in the office of the Clerk and Recorder of Pitkin County, Colorado, together with the perpetual use of Fixed Week ____ and together with the use of a Floating Week and a Floating Split Week in accordance with the Declaration of Condominium for G.A. RESORT CONDOMINIUMS,

also known as a timeshare estate in Unit(s) _____, G.A. Resort Condominiums located at 400 Dean Street, Aspen, Colorado 81611.

    **TOGETHER** with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the GRANTOR, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances.

    **TO HAVE AND TO HOLD** the said premises above bargained and described, with the appurtenances, unto the GRANTEES, their heirs and assigns forever. And GRANTOR, for itself, its successors, transferees and assigns, does covenant and agree that it shall and will WARRANT AND FOREVER DEFEND the above-bargained premises in the quiet and peaceable possession of the Grantees, their heirs and assigns, against all and every person or persons lawfully claiming the whole or any part thereof, by, through or under the Grantor, **except for** all easements, conditions, restrictions, covenants, limitations and reservations of record or imposed by governmental authorities having jurisdiction or control over the subject property and as contained in the Declaration of Condominium for G.A. Resort Condominiums and the Map for G.A. Resort Condominiums, taxes and assessments for the current year and subsequent years (including, but not limited to, pending and certified county or municipal improvement liens), and the following documents: articles of incorporation, bylaws and rules and regulations of G.A. Resort Condominium Association, Inc. ("Association"); Hyatt Vacation Club Rules and Regulations; and, Hyatt Vacation Club Resort Agreement by and among Grantor, Hyatt Vacation Ownership, Inc., the Association and Hyatt Vacation Management Corporation.

    The singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

Real Estate\00312 Grand Aspen Lodging, LLC\00001 Dev. Project in Aspen, CO\Purchaser Documents\Special Warranty Deed v2.doc

IN WITNESS WHEREOF, GRANTOR has executed this deed on the date set forth above.

**GRAND ASPEN LODGING, LLC**
a Delaware limited liability company

By its Manager:_____

By:_____
Name:_____
Title:_____

STATE OF COLORADO )
                   ) ss.
COUNTY OF PITKIN   )

The foregoing instrument was acknowledged before me this _____ day of _____, 200__ by
_____ as _____ of
_____, manager of Grand Aspen Lodging, LLC, a Delaware limited
liability company.

My commission expires:
Witness my hand and official seal.      _____
                                         Notary Public



Hepworth-Pawlak Geotechnical, Inc.
5020 County Road 154
Glenwood Springs, Colorado 81601
Phone: 970-945-7988

Fax: 970-945-8454
hpgeo@hpgeotech.com

SUBSOIL STUDY
FOR FOUNDATION DESIGN
PROPOSED HYATT GRAND ASPEN PROJECT
SOUTH OF DURANT AVENUE
BETWEEN GALENA & MILL STREETS
ASPEN, COLORADO

JOB NO. 101 531

AUGUST 24, 2001

PREPARED FOR:

GRAND ASPEN LODGING, LLC
C/O FOUR PEAKS DEVELOPMENT, LLC
ATTN: TODD EMERSON
1000 SOUTH MILL STREET
ASPEN, COLORADO 81611

## HEPWORTH - PAWLAK GEOTECHNICAL, INC.

August 24, 2001

Grand Aspen Lodging, LLC
c/o Four Peaks Development, LLC
Attn: Todd Emerson
1000 South Mill Street
Aspen, Colorado 81611

Job No.  101 531

Subject: Report Transmittal, Subsoil Study for Foundation Design, Proposed Hyatt Grand Aspen Project, South of Durant Avenue, Between Galena & Mill Streets, Aspen, Colorado

Dear Mr. Emerson:

As requested, we have conducted a subsoil study for the proposed hotel at the subject site.

Subsurface conditions encountered in the exploratory borings drilled in the proposed building area consist of 8 to 22 feet of medium dense silty to clayey gravelly sand overlying relatively dense silty sandy gravel with cobbles and boulders. Groundwater was not encountered in the borings at the time of drilling.

The proposed hotel can be founded on spread footings placed on the natural dense gravel subsoils and designed for an allowable bearing pressure in the range of 3,000 to 6,000 psf. Subexcavation of unsuitable soils and deepening of the bearing level or placement of structural fill appears needed in the downhill northern part of the building to achieve design bearing conditions.

The report which follows describes our exploration, summarizes our findings, and presents our recommendations. It is important that we provide consultation during design, and field services during construction to review and monitor the implementation of the geotechnical recommendations.

If you have any questions regarding this report, please contact us.

Sincerely,

HEPWORTH - PAWLAK GEOTECHNICAL, INC.

Daniel E. Hardin, P.E.

Rev. by: SLP

DEH/ksw

# TABLE OF CONTENTS

PURPOSE AND SCOPE OF STUDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROPOSED CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SITE CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FIELD EXPLORATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUBSURFACE CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FOUNDATION BEARING CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DESIGN RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      FOUNDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      FOUNDATION AND RETAINING WALLS . . . . . . . . . . . . . . . . . . . . . 5
      FLOOR SLABS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      UNDERDRAIN SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      EXCAVATION CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 7
      SURFACE DRAINAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FIGURE 1 - LOCATION OF EXPLORATORY BORINGS

FIGURES 2 AND 3 - LOGS OF EXPLORATORY BORINGS

FIGURE 4 - LEGEND AND NOTES

FIGURE 5 - SWELL-CONSOLIDATION TEST RESULTS

FIGURES 6 AND 7 - GRADATION TEST RESULTS

TABLE I - SUMMARY OF LABORATORY TEST RESULTS

## PURPOSE AND SCOPE OF STUDY

This report presents the results of a subsoil study for a proposed hotel to be located south of Durant Avenue and between Galena and Mill Streets, Aspen, Colorado. The project site is shown on Fig. 1.  The purpose of the study was to develop recommendations for the foundation design.  The study was conducted in accordance with our proposal for geotechnical engineering services to Grand Aspen Lodging, LLC dated July 20, 2001.  Chen & Associates previously performed a soil and foundation investigation for a large hotel on this site under their Job No. 26,154 and presented their results in a report dated November 18, 1983.

A field exploration program consisting of exploratory borings was conducted to obtain information on subsurface conditions.  Samples of the subsoils obtained during the field exploration were tested in the laboratory to determine their classification, compressibility or swell and other engineering characteristics.  The results of the field exploration and laboratory testing were analyzed to develop recommendations for foundation types, depths and allowable pressures for the proposed building foundation. This report summarizes the data obtained during this study and presents our conclusions, design recommendations and other geotechnical engineering considerations based on the proposed construction and the subsoil conditions encountered.

## PROPOSED CONSTRUCTION

The proposed hotel will be approximately 115,000 square feet with 60 units. The hotel will be a 4 story concrete and steel frame structure with 60,000 square feet of underground parking.   The parking garage floor will be slab-on-grade.  Grading for the structure will involve cut depths between about 10 to 30 feet.  We assume moderate to heavy foundation loadings considering the proposed type of construction.

If building loading, location or grading plans change significantly from those described above, we should be notified to re-evaluate the recommendations contained in this report.

- 2 -

## SITE CONDITIONS

The site was previously occupied by the Grand Aspen Hotel which had been razed at the time of our field work. The site had been excavated to below the previous foundation grades although a few foundation walls were left in place on the east and south sides of the site to act as temporary retaining walls. Current elevation difference across the site is about 25 feet. A construction trailer was in place in the southwest corner of the site. The pavement for Dean Street was still in place. The existing ice rink is located just north of the hotel site. The existing St. Regis hotel is located across Mill Street to the west.

## FIELD EXPLORATION

The field exploration for the project was conducted on July 26, 27 and 30, 2001. Ten exploratory borings were drilled at the locations shown on Fig. 1 to evaluate the subsurface conditions. The borings were advanced with 4 inch diameter continuous flight augers powered by a truck-mounted Longyear BK-51HD drill rig. The borings were logged by a representative of Hepworth-Pawlak Geotechnical, Inc.

Samples of the subsoils were taken with 1⅜ inch and 2 inch I.D. spoon samplers. The samplers were driven into the subsoils at various depths with blows from a 140 pound hammer falling 30 inches. This test is similar to the standard penetration test described by ASTM Method D-1586. The penetration resistance values are an indication of the relative density or consistency of the subsoils. Depths at which the samples were taken and the penetration resistance values are shown on the Logs of Exploratory Borings, Figs. 2 and 3. The samples were returned to our laboratory for review by the project engineer and testing.

## SUBSURFACE CONDITIONS

Graphic logs of the subsurface conditions encountered at the site are shown on Figs. 2 and 3. The subsoils consist of about 8 to 22 feet of medium dense silty to

- 3 -

clayey gravelly sand with interlayered sandy clay and sandy gravel seams overlying relatively dense, silty sandy gravel containing cobbles and boulders. Drilling in the dense gravel with auger equipment was difficult due to the cobbles and boulders and drilling refusal was encountered in the deposit. Fill was encountered overlying the natural soils to depths of 4 to 9 feet in Borings A, E and J on the east side of the site. The upper natural soils became finer and more clayey on the north side of the site (Boring F, G, I and J).

Laboratory testing performed on samples obtained from the borings included natural moisture content, density, Atterberg limits, unconfined compressive strength and gradation analyses. Results of consolidation testing performed on a relatively undisturbed drive sample, presented on Fig. 5, indicate the upper fine grained soils have moderate compressibility under conditions of loading and wetting. Results of gradation analyses performed on small diameter drive samples (minus 1½ inch fraction) of the natural coarser granular soils are shown on Figs. 6 and 7. Atterberg limits testing performed on the finer grained subsoils indicates they are generally low plasticity. Unconfined compressive strength testing indicates strength of 1,500 psf for the upper finer-grained soils in the southwest part of the site and a strength of 2,600 psf for the sandy clays in the north part of the site. The laboratory testing is summarized in Table I.

No free water was encountered in the borings at the time of drilling and the subsoils were slightly moist to moist.

## FOUNDATION BEARING CONDITIONS

The upper sandy clays and clayey sands at the site have low to moderate bearing capacity. The lower dense silty sandy gravel has moderate to high bearing capacity. It appears that, in general, design footing grade will be in or close to the lower dense gravel. There will be areas in the north end of the site where the finer grained soils will be encountered to 3 to 4 feet below footing grade. The more compressible finer-grained soils should be removed and the footing bearing level extended down to the natural dense gravel or the bearing level re-established with compacted structural fill.

H-P GEOTECH

- 4 -

## DESIGN RECOMMENDATIONS

### FOUNDATIONS

Considering the subsoil conditions encountered in the exploratory borings and the nature of the proposed construction, we recommend the building be founded with spread footings bearing on the natural dense granular soils.

The design and construction criteria presented below should be observed for a spread footing foundation system.

1) Footings placed on the undisturbed natural dense granular soils should be designed for an allowable soil bearing pressure of 6,000 psf for footings at least 4 feet wide and 3,000 psf for narrower footings. Based on experience, we expect settlement of footings designed and constructed as discussed in this section will be about 1 inch or less.

2) The footings should have a minimum width of 18 inches for continuous walls and 2 feet for isolated pads.

3) Exterior footings and footings beneath unheated areas should be provided with adequate soil cover above their bearing elevation for frost protection. Placement of foundations at least 42 inches below exterior grade is typically used in this area.

4) Continuous foundation walls should be reinforced top and bottom to span local anomalies such as by assuming an unsupported length of at least 12 feet. Foundation walls acting as retaining structures should also be designed to resist lateral earth pressures as discussed in the "Foundation and Retaining Walls" section of this report.

5) All existing fill, the upper finer-grained soils and any loose or disturbed soils should be removed and the footing bearing level extended down to relatively dense natural granular soils. As an alternative, footing grade could be re-established with a limited depth of compacted, relatively well graded gravel. The gravel should be compacted to at least 100% of the maximum standard Proctor density at a moisture content near optimum. Fill depths below footing should not exceed about 4 feet.

H-P GEOTECH

- 5 -

6) A representative of the geotechnical engineer should observe all footing excavations prior to concrete placement to evaluate bearing conditions.

## FOUNDATION AND RETAINING WALLS

Foundation walls and retaining structures which are laterally supported and can be expected to undergo only a slight amount of deflection should be designed for a lateral earth pressure computed on the basis of an equivalent fluid unit weight of 55 pcf for backfill consisting of the on-site finer-grained soils and 45 pcf for backfill consisting of the on-site gravels or imported granular materials. Restrained walls that are higher than 15 feet should be designed for a uniform pressure of 28H in psf where H is the height of the retained wall in feet. Cantilevered retaining structures which are separate from the hotel and can be expected to deflect sufficiently to mobilize the full active earth pressure condition should be designed for a lateral earth pressure computed on the basis of an equivalent fluid unit weight of 45 pcf for backfill consisting of the on-site finer-grained soils and 35 pcf for backfill consisting of the on-site gravels or imported granular materials.

All foundation and retaining structures should be designed for appropriate hydrostatic and surcharge pressures such as adjacent footings, traffic, construction materials and equipment. The pressures recommended above assume drained conditions behind the walls and a horizontal backfill surface. The buildup of water behind a wall or an upward sloping backfill surface will increase the lateral pressure imposed on a foundation wall or retaining structure. An underdrain should be provided to prevent hydrostatic pressure buildup behind walls.

Backfill should be placed in uniform lifts and compacted to at least 90% of the maximum standard Proctor density at a moisture content near optimum. Backfill in pavement and walkway areas should be compacted to at least 95% of the maximum standard Proctor density. Deep backfill (over 8 feet) under pavement areas should be compacted to 98% standard Proctor density and consist of granular soils to reduce potential long term settlement. Care should be taken not to overcompact the backfill or use large equipment near the wall, since this could cause excessive lateral pressure on the wall. Some settlement of deep foundation wall backfill should be expected, even if

- 6 -

the material is placed correctly, and could result in distress to facilities constructed on the backfill.

The lateral resistance of foundation or retaining wall footings will be a combination of the sliding resistance of the footing on the foundation materials and passive earth pressure against the side of the footing. Resistance to sliding at the bottoms of the footings can be calculated based on a coefficient of friction of 0.50. Passive pressure of compacted backfill against the sides of the footings can be calculated using an equivalent fluid unit weight of 400 pcf. The coefficient of friction and passive pressure values recommended above assume ultimate soil strength. Suitable factors of safety should be included in the design to limit the strain which will occur at the ultimate strength, particularly in the case of passive resistance. Fill placed against the sides of the footings to resist lateral loads should be compacted to at least 95% of the maximum standard Proctor density at a moisture content near optimum.

## FLOOR SLABS

The natural on-site granular soils are suitable to support lightly to moderately loaded slab-on-grade construction. There could be some potential for slab movement in the finer-grained clay and sand subgrade areas. To reduce the effects of some differential movement, floor slabs should be separated from all bearing walls and columns with expansion joints which allow unrestrained vertical movement. Floor slab control joints should be used to reduce damage due to shrinkage cracking. The requirements for joint spacing and slab reinforcement should be established by the designer based on experience and the intended slab use. A minimum 4 inch layer of free-draining gravel should be placed beneath basement level slabs to facilitate drainage. This material should consist of minus 2 inch aggregate with at least 50% retained on the No. 4 sieve and less than 2% passing the No. 200 sieve.

All fill materials for support of floor slabs should be compacted to at least 95% of maximum standard Proctor density at a moisture content near optimum. Required fill can consist of the on-site gravels devoid of vegetation, topsoil and oversized rock.

- 7 -

## UNDERDRAIN SYSTEM

Although free water was not encountered during our exploration, it has been our experience in the area that local perched groundwater may develop during times of heavy precipitation or seasonal runoff. Frozen ground during spring runoff can create a perched condition. We recommend below-grade construction, such as retaining walls, crawlspace and basement areas, be protected from wetting and hydrostatic pressure buildup by an underdrain system.

The drains should consist of drainpipe placed in the bottom of the wall backfill surrounded above the invert level with free-draining granular material. The drain should be placed at each level of excavation and at least 1 foot below lowest adjacent finish grade and sloped at a minimum 1% to a suitable gravity outlet or drywell. Free-draining granular material used in the underdrain system should contain less than 2% passing the No. 200 sieve, less than 50% passing the No. 4 sieve and have a maximum size of 2 inches. The drain gravel backfill should be at least 2 feet deep.

## EXCAVATION CONSIDERATIONS

There is a risk of construction-induced slope instability due to the deep cuts at the site, and shoring of the excavation side slopes will be required. The shoring should be installed by an experienced shoring contractor. We assume the cut depths for the basement level will not exceed about 25 feet. The condition of adjacent buildings should be documented prior to further excavation. Monitoring of the adjacent buildings should be done during nearby excavation and shoring.

Permanent unretained cut and fill slopes should be graded at 2 horizontal to 1 vertical or flatter and protected against erosion by revegetation or other means. The risk of slope instability will be increased if seepage is encountered in cuts and flatter slopes may be necessary. If seepage is encountered in permanent cuts, an investigation should be conducted to determine if the seepage will adversely affect the cut stability. The excavated soils from this site are mostly natural soils and should be suitable as general fill on other sites such as Top of Mill. The excavated soils will contain significant clay and silt and may be difficult to compact to high density particularly in winter conditions. We recommend that the excavated soils from this site not be used as

H-P GEOTECH

- 8 -

structural fill under footings for the hotel support. The soils encountered in the borings did not appear to contain old mine tailings or waste rock.

## SURFACE DRAINAGE

The following drainage precautions should be observed during construction and maintained at all times after the hotel has been completed:

1) Inundation of the foundation excavations and underslab areas should be avoided during construction.

2) Exterior backfill should be adjusted to near optimum moisture and compacted to at least 95% of the maximum standard Proctor density in pavement and slab areas (98% in deep fill areas) and to at least 90% of the maximum standard Proctor density in landscape areas.

3) The ground surface surrounding the exterior of the building should be sloped to drain away from the foundation in all directions. We recommend a minimum slope of 6 inches in the first 10 feet in unpaved areas and a minimum slope of 3 inches in the first 10 feet in paved areas. Free-draining wall backfill should be capped with about 2 feet of the on-site finer-grained soils to reduce surface water infiltration.

4) Roof downspouts and drains should discharge well beyond the limits of all backfill.

## LIMITATIONS

This study has been conducted in accordance with generally accepted geotechnical engineering principles and practices in this area at this time. We make no warranty either expressed or implied. The conclusions and recommendations submitted in this report are based upon the data obtained from the exploratory borings drilled at the locations indicated on Fig. 1, the proposed type of construction and our experience in the area. Our findings include interpolation and extrapolation of the subsurface conditions identified at the exploratory borings and variations in the subsurface conditions may not become evident until excavation is performed. If conditions

- 9 -

encountered during construction appear different from those described in this report, we should be notified so that re-evaluation of the recommendations may be made.

This report has been prepared for the exclusive use by our client for design purposes. We are not responsible for technical interpretations by others of our information. As the project evolves, we should provide continued consultation and field services during construction to review and monitor the implementation of our recommendations, and to verify that the recommendations have been appropriately interpreted. Significant design changes may require additional analysis or modifications to the recommendations presented herein. We recommend on-site observation of excavations and foundation bearing strata and testing of structural fill by a representative of the geotechnical engineer.

Sincerely,

HEPWORTH - PAWLAK GEOTECHNICAL, INC.

Daniel E. Hardin, P.E.
Reviewed by:

Steven L. Pawlak, P.E.

DEH/ksw
cc:    Bill Poss & Associates - Attn: Kim Weil
       Monroe & Newell Engineers, Inc. - Attn: Hannes Spaeh



APPROXIMATE SCALE
1" = 30'

ALPENBLICK
CONDOMINIUMS

GALENA
PLACE

GALENA
PLACE

BORING B

BORING D

BORING E

BORING C

SO. GALENA STREET

BORING G

BORING F

BORING I

BORING H

ST. REGIS
HOTEL

SO. MILL STREET

BORING J      DEAN ST.

BENCH MARK: SURVEY
POINT IN DEAN STREET,
ELEVATION = 7934.12'
AS GIVEN.

EXISTING
SKATE
BUILDING

EXISTING
ICE RINK

DURANT AVENUE

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | LOCATION OF EXPLORATORY BORINGS | Fig.   1 |



Note: Explanation of symbols is shown on Fig. 4.

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | LOGS OF EXPLORATORY BORINGS | Fig. 2 |



Note: Explanation of symbols is shown on Fig. 4.

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | LOGS OF EXPLORATORY BORINGS | Fig. 3 |

**LEGEND:**

FILL: mixed sand, clay and silt, gravelly, loose, moist, brown.

CLAY (CL): silty, sandy, with scattered gravel, stiff, moist, brown.

GRAVEL (GM—GC): silty to clayey, sandy, with scattered cobbles, interlayered with sandy clay seams, medium dense, moist, brown.

SAND (SM—SC): silty to clayey, with gravel, stiff to medium dense, moist, brown.

GRAVEL (GM): with cobbles and boulders, sandy, silty, medium dense to dense, slightly moist to moist, brown.

Relatively undisturbed drive sample; 2-inch I.D. California liner sample.

Drive sample; standard penetration test (SPT), 1 3/8 inch I.D. split spoon sample, ASTM D-1586.

39/12   Drive sample blow count; indicates that 39 blows of a 140 pound hammer falling 30 inches were required to drive the California or SPT sampler 12 inches.

→   Depth at which boring had caved when checked on July 30, 2001.

⊥   Practical drilling refusal.

**NOTES:**

1. Exploratory borings were drilled on July 26, 27 and 30, 2001 with a 4-inch diameter continuous flight power auger.

2. Locations of exploratory borings were measured approximately by pacing from features shown on the site plan provided.

3. Elevations of exploratory borings were measured by instrument level and refer to the Bench Mark shown on Fig. 1.

4. The exploratory boring locations and elevations should be considered accurate only to the degree implied by the method used.

5. The lines between materials shown on the exploratory boring logs represent the approximate boundaries between material types and transitions may be gradual.

6. No free water was encountered in the borings at the time of drilling or when checked on July 30, 2001. Fluctuation in water level may occur with time.

7. Laboratory Testing Results:

   WC = Water Content ( % )             LL = Liquid Limit ( % )
   DD = Dry Density ( pcf )             PI = Plasticity Index ( % )
   +4 = Percent retained on No. 4 sieve.   UC = Unconfined Compressive Strength ( psf )
   −200 = Percent passing No. 200 sieve.

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | LEGEND AND NOTES | Fig. 4 |



Moisture Content = 26.0 percent
Dry Density = 97 pcf
Sample of: Sandy Silty Clay
From: Boring I at 11.5 Feet

No movement upon wetting

Compression %

APPLIED PRESSURE — ksf

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | SWELL CONSOLIDATION TEST RESULTS | Fig. 5 |



GRAVEL 32 %        SAND 46 %        SILT AND CLAY 22 %

LIQUID LIMIT      %        PLASTICITY INDEX      %

SAMPLE OF: Silty Gravelly Sand        FROM: Boring C at 3 Feet

GRAVEL 27 %        SAND 44 %        SILT AND CLAY 29 %

LIQUID LIMIT      %        PLASTICITY INDEX      %

SAMPLE OF: Silty Clayey Gravelly Sand        FROM: Boring D at 10 and 20 Feet Combined

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | GRADATION TEST RESULTS | Fig. 6 |



GRAVEL 38 %          SAND 42 %          SILT AND CLAY 20 %

LIQUID LIMIT     %          PLASTICITY INDEX     %

SAMPLE OF: Silty Sand and Gravel          FROM: Boring E at 14 Feet

GRAVEL 37 %          SAND 45 %          SILT AND CLAY 18 %

LIQUID LIMIT     %          PLASTICITY INDEX     %

SAMPLE OF: Silty Sand and Gravel          FROM: Boring H at 20 Feet

| 101 531 | HEPWORTH—PAWLAK GEOTECHNICAL, INC. | GRADATION TEST RESULTS | Fig. 7 |

HEPWORTH-PAWLAK GEOTECHNICAL, INC.

TABLE I

SUMMARY OF LABORATORY TEST RESULTS

JOB NO. 101 531

Page 1 of 1

| SAMPLE LOCATION | | NATURAL MOISTURE CONTENT (%) | NATURAL DRY DENSITY (pcf) | GRADATION | | PERCENT PASSING NO. 200 SIEVE | ATTERBERG LIMITS | | UNCONFINED COMPRESSIVE STRENGTH (PSF) | SOIL OR BEDROCK TYPE |
| BORING | DEPTH (feet) | | | GRAVEL (%) | SAND (%) | | LIQUID LIMIT (%) | PLASTIC INDEX (%) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 7 | 11.1 | | | | 25 | | | | silty clayey sandy gravel |
|  | 12 | 1.7 | | | | 6 | | | | slightly silty sandy gavel |
| B | 2½ | 18.2 | 109 | | | 48 | | | | clayey silty gravelly sand |
|  | 10 | 15.8 | 116 | | | 49 | | | 1500 | very silty clayey sand |
|  | 30 | 8.2 | 135 | | | 16 | | | | silty sand and gravel |
| C | 3 | 8.4 | | 32 | 46 | 22 | | | | silty gravelly sand |
|  | 7 | 19.4 | | | | 55 | | | | very silty sandy clay |
| D | 10 & 20 combined | 9.9 | | 27 | 44 | 29 | | | | silty clayey gravelly sand |
| E | 5 | 17.2 | | | | 61 | | | | sandy silty clay |
|  | 9 | 17.1 | | | | 38 | 23 | 3 | | silty gravelly sand |
|  | 14 | 7.8 | | 38 | 42 | 20 | | | | silty sand and gravel |
| F | 5 | 21.1 | | | | 71 | 28 | 8 | | sandy silty clay |
|  | 9 | 9.6 | 131 | | | 24 | | | | silty gravelly sand |
| G | 7 | 14.5 | | | | 42 | 28 | 11 | | clayey gravelly sand |
| H | 5 | 7.9 | 108 | | | 13 | | | | clayey gravelly sand |
|  | 10 | 2.0 | 121 | | | 46 | | | | very clayey gravelly sand |
|  | 20 | 7.2 | | 37 | 45 | 18 | | | | silty sand and gravel |
| I | 4 | 20.6 | | | | 70 | 34 | 14 | | sandy silty clay |
|  | 9 | 26.3 | | | | 65 | | | | sandy silty clay |
|  | 11½ | 26.0 | 97 | | | 61 | | | | sandy silty clay |
| J | 10 | 21.3 | 101 | | | 70 | | | 2600 | sandy silty clay |



GRAND ASPEN

DEAN STREET, ASPEN, COLORADO

G.A. RESORT CONDOMINIUM

(HYATT GRAND ASPEN)

A2.0



PRELIMINARY
CONDOMINIUM MAP

GARAGE LEVEL FLOOR PLAN



GRAND ASPEN

DEAN STREET, ASPEN, COLORADO
G.A. RESORT CONDOMINIUM
( HYATT GRAND ASPEN )

A2.1
LEVEL 1

PRELIMINARY
CONDOMINIUM MAP

FIRST LEVEL FLOOR PLAN







GRAND ASPEN

DEAN STREET, ASPEN, COLORADO
G.A. RESORT CONDOMINIUM
( HYATT GRAND ASPEN )

A2.3

LEVEL 3



PRELIMINARY/DRAFT
CONDOMINIUM MAP

THIRD LEVEL FLOOR PLAN



