IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01870-RM-GPG

---

**G.A. RESORT CONDOMINIUM ASSOCIATION, INC**.,
a Colorado Nonprofit Corporation,

*Plaintiff*,

v.

**ILG, LLC**, a Delaware limited liability company,
**CHICAGO TITLE TIMESHARE TRUST, INC.**, a Florida
corporation, as Trustee for HPC TRUST, **GRAND ASPEN
LODGING, LLC**, a Delaware limited liability company,
**HPC DEVELOPER, LLC**, a Delaware limited liability
company, **HPC OWNERS' ASSOCIATION, INC**., a
Florida non-profit, **HV GLOBAL GROUP, INC.,** a
Delaware corporation, **HV GLOBAL MANAGEMENT
CORPORATION**, a Florida corporation, and **MARRIOTT
VACATIONS WORLDWIDE CORPORATION**, a
Delaware corporation,

*Defendants*.

---

### DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

Pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6), Defendants Grand Aspen Lodging, LLC

("G.A. Lodging"), HV Global Group, Inc. ("HVGG") and HV Global Management Corporation

("HVGM") (collectively, the "Main Defendants"), together with ILG, LLC ("ILG"), Chicago Title

Timeshare Land Trust, Inc. ("Chicago Title"), HPC Developer, LLC ("HPC Developer"), HPC

Owners' Association, Inc. ("HPC Owners Assn"), and Marriott Vacations Worldwide Corporation

("MVWC") (collectively, the "Other Defendants" and, with the Main Defendants, the

"Defendants"), move to dismiss the Second Amended Complaint ("SAC" or "Complaint").

**INTRODUCTION AND NATURE OF THE ALLEGATIONS AND CLAIMS**

This case relates to the Hyatt Vacation Club Grand Aspen Resort (the "Resort"), a timeshare resort created in 2005 and located in Aspen, Colorado. The Resort is part of the Hyatt Residence Club ("HRC"), which consists of 16 HRC timeshare resorts. Plaintiff G.A. Resort Condominium Association, Inc. ("Association"), is the Resort's homeowners' association. Association members ("Owners") own one or more of the 1,060 fractional timeshare interests at the Resort—each a 1/20th undivided interest in a specific condominium unit at the Resort that entitles its owner to one fixed-week stay and a one and one-half floating-week stay per year. In addition, *from inception*, pursuant to the 2005 Hyatt Vacation Club Resort Agreement ("Resort Agreement")—that was disclosed and known to all Resort Owners prior to their purchase -- the Resort Owners could exchange their weeks (using their week's pre-assigned point values) for weeks at the 15 other HRC resorts; and over 30,000 other HRC resort owners could exchange their HRC resort weeks to stay at the Resort (using their week's pre-assigned point values). Also *from inception*, through the Resort Agreement, the Resort and all other HRC resorts were subject to an external exchange affiliation with Interval International, Inc. ("Interval"), which enabled HRC owners to exchange their weeks for weeks at more than 5,000 *non*-HRC resorts affiliated with Interval, and permitted more than 700,000 Interval members (owners at Interval affiliated resorts) *vice versa* to exchange their weeks for weeks at the Resort and other HRC resorts.

The Association does not complain about the quality of the Resort or the accommodations. Rather, its grievance centers on the June 2017 transfer of 207 remaining unsold Resort interests from the Resort Developer, G.A. Lodging, to the Hyatt Residence Club Portfolio Trust ("Portfolio Trust").  These interests, along with other timeshare and fractional interests from a number of other HRC resorts, were transferred to the Portfolio Trust for use in connection with the Hyatt Residence Club Portfolio Program ("Portfolio Club"), in which participants buy points to stay at HRC

2

properties and other destinations. The Portfolio Club was created in June 2017 by the "Portfolio Club Entities."[1]  At the time of creation of the Portfolio Club, HVGG (on behalf of all HRC resorts) and the HPC Owners Assn entered into a Club-to-Club Exchange Agreement ("Exchange Agreement") that created an external exchange affiliation between the HRC resorts and the Portfolio Club (which contained interests in the *same* HRC resorts), permitting HRC resort owners to exchange their weeks (using their already pre-assigned point values) for access to Portfolio Club destinations, and reciprocally permitting Portfolio Club members to use their purchased points to access weeks that HRC Resort Owners had exchanged with the Portfolio Club.

Although the Resort Agreement program that was in place from inception of the Resort permitted exchanges with *the same* HRC resorts that are in the Portfolio Club, the Plaintiff alleges that the above-described actions were part of a plot intended to enhance the Portfolio Club at the expense of the Resort's fractional interest values. Specifically, it alleges that (a) the transferred interests were only "unsold" because they had been deliberately withheld from public sale (SAC ¶¶ 8(a), 95); (b) the point value set for accessing Resort fractional interests was purposely underpriced to entice customers to buy into the Portfolio Club, while, at the same time, the number of points required to stay at other HRC resorts increased (*id*. ¶¶8(c), 96);[2] and (c) the amendments to the Resort's Governing Documents, permitting the transfer of the 207 fractional interests, as well as other pertinent facts and materials, were not disclosed to Resort Owners. *Id*. ¶¶75-81, 98.

The Association's allegations fail to state any claim upon which relief could be granted.

---

[1] The "Portfolio Club Entities" are Chicago Title, the Portfolio Club's trustee and the owner of the HRC resorts interests transferred to the HPC Trust; HPC Developer, which created and developed the Portfolio Club and sells Portfolio Club Points to consumers; and HPC Owner Assn, which is the Portfolio Club Points purchasers' owners' association.

[2] Point values for weeks at the Resort and all other HRC resorts are the *same* point values that were *originally* assigned to those weeks *from inception*, and point values sold to Portfolio Club members are also based on the *original* point values of the HRC weeks transferred to the HPC Trust.

Specifically, with respect to the Main Defendants, the Association's contract-related claims fail because both the contracts and the Governing Documents expressly *permit* the complained-of conduct.   Claims based on alleged fiduciary duties also fail because the Association cannot plausibly allege that it was owed any fiduciary duty relating to the fractional interest transfer or as to the Exchange Agreement Club-to-Club affiliation.   The only fiduciary duty the Association is owed derives from its Management Agreement with HVGM, which is required, under that agreement, to protect only *Association assets*.   That narrow duty (owed to the Association and *not* its members), precludes self-dealing by HVGM in its ministerial and administrative functions. In all other respects, the Management Agreement expressly provides that HVGM is an independent contractor.   Similarly, G.A. Lodging, which served as both Developer and a board member, owed no fiduciary duty to the Association as Developer -- the "hat" it was wearing in transferring its remaining 207 fractional interests to the Portfolio Club, and *not* involving its activities or role as a Board member.

The Association also fails to state a constructive fraud claim.   That claim is premised on the Main Defendants' alleged failure to disclose their intention to affiliate the Resort with the Portfolio Club.   Not only were the Main Defendants not obliged to disclose that fact as a matter of law, but the Complaint also does not adequately plead reliance, i.e., that the Association or the Resort Owners would have acted differently had they known of the allegedly undisclosed intention.   In fact, in purchasing their interests, the Resort Owners *knew* that they were buying into a program which, from inception, allowed exchanges with HRC resorts (*16 resorts which are also the resorts in the Portfolio Club*) and with more than 5,000 Interval non-HRC affiliated resorts. The Governing Documents provided to Resort Owners, at the time they purchased, fully disclosed these *existing* exchange affiliations; authorized the Main Defendants to affiliate the Resort with other exchange programs; and described the potential consequences of affiliation.

The Association's statutory claims fare no better.  With respect to the Colorado Organized Crime Control Act, C.R.S. § 18-17-104 ("COCCA"), the Association fails to adequately plead the alleged predicate offenses of mail/wire fraud, computer fraud, or filing of false instruments; and also fails to plead that it or the Resort Owners were deprived of property or money as required by COCCA. Also deficient is the Association's claim under the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq.* ("CCPA"), as that claim is not pled with the particularity required by Fed. R. Civ. P. 9(b).  Moreover, the allegations ostensibly supporting the CCPA claim do not concern fractional interest purchases made during the relevant time period.

The Association also seeks equitable relief, including rescission of the Resort's Management Agreement with HVGM, termination of the Portfolio Club Exchange Agreement, as well as disgorgement of the 207 transferred fractional interests and all amounts paid to and profits earned by Defendants.  Such relief is unavailable, however, as the Governing Documents expressly permit the conduct on which the Association's equitable claims are based.  Importantly, the Association also cannot, as a matter of law, assert a quasi-contractual unjust enrichment claim given the existence of express contracts covering the same subject matter.

As for the Other Defendants, the Association has not plausibly pled that they played any role in the alleged breaches of contractual or fiduciary duties or in the alleged constructive fraud. Rather, those entities are apparently named simply because they are corporate affiliates of the Main Defendants, but derivative liability cannot be imputed on such flimsy grounds.  Finally, this Court lacks personal jurisdiction over Defendants ILG and MVWC (the "Parent Entity Defendants").

## THE GOVERNING DOCUMENTS

The Association alleges that, between 2005 and 2017, more than 560 purchasers purchased approximately 850 fractional interests at the Resort. SAC ¶¶ 33, 35. Each purchase was made pursuant to an individual Purchase Agreement ("PA") (*see* SAC Ex. J (attaching form PA) ECF

#54-10), as well as the Declaration of Condominium for G.A. Resort Condominiums ("Declaration" or "Decl.") (SAC Ex. F, ECF #54-6); the Public Offering Statement ("POS") that included the Colorado Disclosure Document ("Disclosure Document") (SAC Ex. A, ECF #54-1 p.50) and the Exchange Program Disclosure Guide ("Disclosure Guide" or "DG") (Decl. of Roger B. Kaplan ("Kaplan Decl.") Ex. A);[3] the Multisite Public Offering Statement ("Multisite Statement") that accompanied the POS (Kaplan Decl. Ex. B); the Hyatt Vacation Club Resort Agreement ("Resort Agreement" or "RA") (SAC Ex. F, ECF #54-6 p.73); and the Condominium Association Management Contract ("Management Agreement" or "Mgmt. Agmt.") (SAC Ex. G, ECF #54-7). The disclosures in these documents directly *defeat* the Association's claims.

### A.  The Purchase Agreement

The form Purchase Agreements ("PA"), which all Owners signed, set forth HVGG's[4] "right to provide Owners with the opportunity to make reservations for accommodations through external exchange arrangements . . . [and the] right to develop special exchange arrangements and offer special benefits to Owners, from time to time." (PA at ¶ 13 (ECF #54-10 p.6)).  It also set forth G.A. Lodging's "right, at any time after Closing, to amend the Declaration … for the purposes and under the conditions outlined in those documents."  PA at ¶ 17 (ECF #54-10 p.7).

### B.  The Declaration

The Declaration, filed in 2005 by G.A. Lodging as Declarant, establishes the Resort as a condominium property and outlines its governance, use, and maintenance.  SAC ¶ 15, Ex F.  The filed Declaration authorizes G.A. Lodging to "assign its right to commit Units to the Timeshare Plan or the Club to any entity to which it conveys substantially all Units or Timeshare Interests

---

[3] Documents referenced in a complaint, or integral to plaintiff's claims, are properly considered on a motion to dismiss. *Burns v. Freddie Mac*, 2015 WL 4051998, at *4 (D. Colo. July 1, 2015); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)).

[4] HVGG was previously named and referred to as "HVOI" in the Governing Documents.

that it owns in the Condominium." Decl. Art. XVIII (ECF #54-6 p.58).   Under the Declaration, only G.A. Lodging may incorporate new "timeshare plans, fractional plans, exchange programs or clubs, or travel or vacation clubs" with respect to the Resort. *Id*.   The Declaration also gives G.A Lodging the sole "right to create other timeshare plans for Units in the Condominium. . . ." *Id*. § 12.16 (ECF #54-6 p.49).   In addition, G.A. Lodging may use unsold "Timeshare Interests" for "such other timeshare or multisite timeshare plans developed or marketed by [G.A. Lodging] or its affiliates…" *Id*. § 4.3(a) (ECF #54-6 p.20).   And, G.A. Lodging may "unilaterally amend" the Declaration "as it may deem appropriate, in its sole discretion." *Id.* at § 16.2.

### C. The Disclosure Document, and Disclosure Guide in the POS and the Multisite Public Offering Statement ("Multisite Statement") Accompanying the POS

The POS, which G.A. Lodging provided to all Owners, outlined the Resort's structure and management (SAC ¶¶ 56, 132, Ex. A), contained the Colorado Disclosure Document and Disclosure Guide, and was accompanied by the Multisite Statement -- all of which expressly notified purchasers that the Main Defendants had the right to affiliate the Resort with external exchange programs and with other multisite timeshare plans and resort properties, including under the then-existing exchange agreements for the HRC resorts and with Interval. *See* Multisite Statement (Kaplan Decl. Ex. B) at Art. III, § 9 (HVGG and its affiliates "have reserved the right, in their sole discretion, to create separate multisite timeshare plans, develop individual resort properties as residential, transient use or timeshare properties, or enter into management agreements with resort properties without the approval of Developer, Association, Management Company or Club Members"); *id.* at § 13(a) (HVGG "may enter into another agreement of short or long duration with Interval or with another External Exchange Company so that Club Members will have the opportunity to avail themselves of an External Exchange Program through the term of the various Hyatt Vacation Club Resort Agreements"); Disclosure Document at § 10 (ECF #54-

1 p.60) (same).  The Disclosure Guide also advises fractional interest owners that HVGG can change the terms and conditions of any exchange program "without advance notice, including, but not limited to, fees, benefits and reservation procedures."  DG (Kaplan Decl., Ex. A) at IV.

Purchasers also knew that the Developer was not acting as a fiduciary in its role as Developer, or with regard to any fractional interests owned by the Developer, because purchasers were clearly advised that "[g]enerally, an Owner should expect substantial competition from the Developer in the event an Owner desires to resell or rent a Timeshare Interest…."  Disclosure Document at § 11 (ECF #54-1 p.62); *see also* Multisite Statement (Kaplan Decl. Ex. B) at § 6(a) ("The addition of accommodations and facilities [by Developer] may result in the addition of new purchasers who will compete with existing purchasers in making reservations during the Club Use Period for the use of available accommodations and facilities within the plan, and may also result in an increase in the annual assessment against purchasers for common expenses.").

### D.  The Resort Agreement

In 2005, HVGG, G.A. Lodging, HVGM and the Association entered into the Hyatt Vacation Club Resort Agreement which sets out the terms and conditions of the Resort's affiliation with HRC and other HRC Resorts.  SAC ¶¶ 4, 156.  For example, the Resort Agreement grants exchange rights and other privileges to fractional interest owners and gives HVGG certain rights as program manager of the "reservation and exchange system and related services known as the Hyatt Vacation Club."  RA ("Recitals") (ECF #54-6 p.74).  Thus, the Resort Agreement gave HVGG "all of the rights and duties associated with the affiliation of the Resort with any External Exchange Program, and . . . shall have the right to manage all exchanges made through any External Exchange Program on behalf of Owners at the Resort in coordination with the External Exchange Company." *Id*. § 5.8 (ECF #54-6 p.82) (emphasis added).  It granted HVGG the right, "in its sole discretion, [to] create one or more separate multisite timeshare plans … without … the

approval of . . . [the] Association….” *Id.* § 7.1(b) (ECF #54-6 p.84).  These provisions authorizing external exchange programs do not require any *advance* notice to the Association of any *contemplated or planned* new exchange program.  Rather, the Resort Agreement only obligates G.A. Lodging and HVGM to “fully and accurately describe the Resort to Club Members” (*id.* § 4.2(a) (ECF #54-6 p.80)); “not in any way misrepresent the Club or the Resort’s relationship with [HVGG] to Club Members” (*id.*); keep abreast of “new services and benefits provided by [HVGG] to Owners” or those “offered at the Resort” (*id.* §§ 4.1(c), 4.2(b) (ECF #54-6 p.80)); and provide the Association notice of “any change in fact or circumstance affecting the operation of the Resort or the Club with respect to the Resort.” *Id.* § 4.6 (ECF #54-6 p.80).  Finally, the Resort Agreement makes clear that HVGG may “adopt and amend those portions of the Club Documents which [it] in its sole discretion determines are necessary or desirable to adopt or amend from time to time in order to operate and manage the Club or to respond to actual purchaser use patterns and changes in purchaser use demand for Club accommodations and facilities.” *Id.* § 5.2 (ECF #54-6 p.81).

### E.  **The Management Agreement**

As noted in the Declaration, in 2005, the Association entered into a Management Agreement with HVGM under which HVGM agreed to act as the Resort’s exclusive managing entity and to manage the Resort’s assets and daily affairs.  With respect to all other activities, the Management Agreement emphasizes HVGM’s independence and expressly disclaims any agency relationship between the Association and HVGM, which it identifies as an “independent contractor.”  SAC Ex. G, § 9 (ECF #54-7 p.8) (“The parties hereby agree and acknowledge that [HVGM] is an independent contractor of the Association.  The Association hereby releases any right of control over the method, manner or means by which [HVGM] performs its duties and responsibilities under this Contract.”); § 16 (ECF #54-7 p.9) (prohibiting Association from unlawful interference with HVGM “in the performance of its duties or the exercise of any of its

powers…").   The Agreement makes clear that HVGM's duties are limited to ministerial and administrative matters and, as to individual units, to maintenance and repair work.  *Id*. §§ 5, 6 (ECF #54-7 p.2-7). HVGM has no authority to amend the Governing Documents,[5] impose a new exchange program, control use of units, or manage reservations. HVGM's only fiduciary obligations are limited to "the proper protection of and the accounting for the Association's *assets* [and] *[i]n this capacity* … shall deal at arm's length with all third parties [to] … serve the Association's interests…." *Id*. § 7 (ECF #54-7 p.8).   HVGM is responsible for "working with" exchange companies "to stay abreast of relevant reservation and exchange procedures, Club rules and regulations and for informing the Association, the Board and Owners of any significant changes in these procedures," but only "as required." *Id*. § 6(m) (ECF #54-7 p.7).

## ARGUMENT

"[T]o survive a … motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level…." *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007). *See also A*shcroft v. Iqbal*,* 556 U.S. 662, 678, 692 (2009). A proper pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, a complaint should be dismissed if it does not "state a claim to relief that is plausible on its face." *Id.* at 570. While the court may accept all well-pled factual allegations as true, it "will disregard" "legal conclusions" and "conclusory statements." *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012).

## I.     THE CONTRACT-BASED CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED

Whether conduct constitutes a breach is properly decided on a motion to dismiss.  *See, e.g.*, *McKinnis v. Fitness Together Franchise Corp.*, 2010 WL 5056666, at *3 (D. Colo. Dec. 6, 2010)

---

[5] Although HVGM may propose rules and regulations, they must be approved by the Association. *Id*. § 6(i) (ECF #54-7 p.6).

(dismissing "right of first refusal" claim); *State Farm Mut. Auto. Ins. v. Stein*, 940 P.2d 384, 387 (Colo. 1997) (contract interpretation is matter of law for court). The Association claims that G.A. Lodging breached the POS and the Declaration (Count 4); that HVGM breached the Management Agreement (Count 6); and that HVGG, HVGM and G.A. Lodging breached the Resort Agreement (Count 7). As shown below, however, the complained-of conduct was expressly *permitted*.  In addition, the Association cannot, for any of these claims, plausibly allege any "failure to perform" or "resulting damages" elements of a breach of contract claim.  *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (listing elements).  The fact that the complained-of conduct was contractually permitted also means the Association cannot plausibly allege that G.A. Lodging breached an implied covenant of good faith and fair dealing (Count 9) or allege entitlement to a declaration that the Portfolio Club was invalid (Count 5).  The Association's inability to state a breach of contract claim also defeats its claim against the Other Defendants for tortious interference with a contract (Count 8).

A.  **The Governing Documents Expressly Permit the Complained-of Conduct**

The Association alleges that G.A. Lodging's transfer of its remaining 207 fractional interests to the Portfolio Club and HVGG's affiliation of the Resort with the Portfolio Club, together with the failure to apprise Resort Owners of these changes, breached the POS, the Declaration, the Management Agreement and the Resort Agreement.[6]  In fact, each of those Governing Documents, as well as other Governing Documents incorporated therein by reference, expressly permits the complained-of conduct.  The POS, the Declaration, the Resort Agreement, the Multisite Statement, Disclosure Statement, Disclosure Guide, and the form Purchase

---

[6] As explained below, the Association's allegation that the Management Agreement and the Resort Agreement were also breached due to Defendants' alleged breaches of their respective fiduciary duties is not tenable.  *See* Point II, *infra*.

Agreements signed by each Owner expressly permit the affiliation and use of inventory (including unsold inventory) at the Resort for exchange with existing and new exchange programs, as well as the authority to amend the relevant Governing Documents to accommodate such changes—all without the Association's (or the Owners') consent. *See* Governing Documents, *supra;* Multisite Statement Arts. II, II.A, III at § 9 (Kaplan Decl.); Decl. §§ 4.3(a), 12.16, Art. XVIII (ECF #54-6 pp.20, 49, 58); Disclosure Document § 10 (ECF #54-1 p. 60; Disclosure Guide Art. IV (Kaplan Decl.); RA §§ 5.2, 5.8, 7.1(b) (ECF #54-6 pp.81, 82, 84); PA ¶¶ 13, 17 (ECF #54-10 p.6, 7).[7]

The contract provisions upon which the Association relies are inapposite and in no way undercut the ***specific, express*** authorizations set forth above. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) ("To determine the meaning of a contract, courts must examin[e] the entire instrument, and not ... view[] clauses or phrases in isolation. But while every relevant provision must be considered and given effect, '***a more specific provision controls the effect of general provisions***.'") (internal quotations omitted; emphasis added).  For example, the Association cites a provision in the Declaration that precludes partition actions concerning the rights of joint owners. *See* SAC ¶ 134 (citing Decl. § 6.3).  But the fractional interests that were transferred to the Portfolio Trust were wholly owned by G.A. Lodging and were not "partitioned" as between co-owners of the interest—thus, the concept of "partition" is not relevant.  The Association also cites the Declaration's "nuisance" provision, but that has nothing to do with changes in the exchange programs offered to Resort Owners.[8]

---

[7] The Association makes much of the fact that Resort Owners were provided with an unrecorded version of the Declaration that differed in certain respects from the later-recorded version.  The Governing Documents, however, clearly advised Owners that the Declaration could be amended at any time without disclosure or approval by the Association. *See* Governing Documents, *supra*, Sections A and B: PA ¶17 (ECF #54-10 p.7); Decl. Art. XVI (ECF #54-6 p.49).

[8] The cited provision (Decl. § 12.5 (ECF #54-6 p.47)) merely requires that the Resort be kept in a "clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate or

The sections of the 2005 Resort Agreement upon which the Association relies are equally inapposite. *See* SAC ¶¶ 157-59, 161-63 (citing RA §§ 4.1(b), 4.2(a), and 4.6). Section 4.1(b) requires the use of pre-approved advertising and promotional materials, purchase documents and sales scripts that accurately describe the Resort and its exchange programs. The Association does not allege that marketing materials and purchase documents were misleading. In Section 4.2(a), G.A. Lodging and HVGM covenant to "fully and accurately describe the Resort to" the fractional interest owners, and "not in any way misrepresent the Club or the Resort's relationship with [HVGG] to Club Members." But the Association does not allege any misrepresentation concerning the Club or the Resort's relationship to HVGG (which administers the reservation and exchange system). Rather, the Association complains about an entirely different issue: HVGG's 2017 affiliation with an external exchange program (the Portfolio Club), which ***required no advance consent or disclosure***. The Resort Agreement merely requires G.A. Lodging and HVGM to remain "abreast of program changes" and "informed of new services and benefits" offered to the Resort and the owners. RA §§ 4.1(c), 4.2(b), 4.6 (ECF #54-6 p.80). Even if those provisions could be read as imposing a duty on G.A. Lodging and HVGM to disclose the Portfolio Club affiliation beforehand, the Complaint does not allege that the Association or the Owners were injured as a result of any supposed failure to disclose. This causative link between the breach (a failure to disclose) and actual injury is a key element of a claim for breach of contract. *See Western Distrib.*, 841 P.2d at 1058 (breach of contract claim requires "resulting damages to the plaintiff"). Without this causative link, the Association's claims for breach of contract (Counts 4, 6 and 7) fail.

The Management Agreement provisions that the Association cites are similarly misplaced. *See* SAC ¶¶ 148-49 (citing Mgmt. Agmt. §§ 6(m), 7). Like Section 4.1(c) of the Resort Agreement,

---

any fire hazard allowed to exist" and "to regulate activities among the various Unit types in order to preserve harmony and prevent disruption within the Condominium."

Section 6(m) merely requires HVGM to inform the Association and Owners of any significant changes in "relevant reservation and exchange procedures." It does not obligate HVGM to provide advance notice that unsold fractional interests will be used in an external exchange program. Similarly off-point is Section 7, which obliges HVGM to act as a fiduciary "with respect to the proper protection of and the accounting for the Association's assets." The Complaint does not allege that HVGM failed to properly protect and account for any Association assets.[9]

The Governing Documents clearly set forth both the Association's rights and obligations and the terms and conditions of fractional owners' purchases, and the Association is bound by those provisions. *See Cloud v. Association of Owners, Satellite Apt. Bldg, Inc.*, 857 P.2d 435, 439-40 (Colo. App. 1993) (condominium owners' association was bound by declaration of condominium provision that gave declarant a percentage of income from guest rentals since there had been "full disclosure" and "the Association members [had] receive[d] a copy of [the declaration of condominium] when purchasing a unit"). Given the Governing Documents' plain language, the Association cannot allege that the transfer of the fractional interests to the Trust, the affiliation of the Resort with the Portfolio Club, or the failure to apprise the owners in advance, breached any of the above contracts. The Governing Documents permitted these actions.

*Hoyt v. Marriott Vacations Worldwide Corporation*, 2014 WL 509903 (D. Minn. Feb. 7, 2014) (applying Colorado law), is particularly instructive. The court held that, under Colorado

---

[9] The Association also seeks to rescind the Management Agreement and terminate HVGM as Resort manager; however, the Management Agreement provides that "[t]he Association shall only have the right to terminate this Contract . . . at any time for cause upon . . . 30 days prior notice as provided by applicable law . . . by a vote of a majority of the voting interests of the Owners other than the Developer, such vote to be held at a duly called meeting of the Association…." Mgmt. Agmt. § 3 (ECF #54-7 p.1). It is undisputed that these conditions precedent have not been met, i.e., the Association provided no notice to HVGM, nor was the required vote held. *See Burns*, 2015 WL 4051998, at *8 (dismissing contract claim for non-occurrence of condition precedent); *Christenson v. Citimortgage, Inc.*, 2013 WL 5291947, at *7 (D. Colo. Sept. 18, 2013) (same).

law, fractional interest owners at two Colorado fractional interest resorts could not assert breach of contract claims against the developer, the management company and the exchange program manager based on decisions to affiliate the resorts with a new, points-based timeshare exchange program. *Id*. at *1. The court dismissed these claims because, like here, several provisions of the resorts' condominium declarations, affiliation agreement, and purchase contracts—which were similar to the Governing Documents here—expressly permitted the actions. *Id*. at *3 & n.6. As in *Hoyt*, the Association's breach of contract claims (Counts 4, 6 and 7) should be dismissed. *See Rose Bud Catering v. Street Eats Ltd.*, 2012 WL 468522, at *4 (D. Colo. Feb. 13, 2012) (dismissing claim because the defendant "complied with the terms of the contracts"); *McKinnis*, 2010 WL 5056666, at *3 (contract must be enforced as written); *Titan Indem. Co. v. Travelers Prop. Cas. Co. of Am.*, 181 P.3d 303, 306 (Colo. App. 2008) (contract's meaning "is a question of law.").

## B.    The Association Has Not Plausibly Alleged Breach of An Implied Covenant of Good Faith and Fair Dealing

The Association alleges that G.A. Lodging violated the Declaration's implied covenant of good faith and fair dealing by withholding its 207 fractional interests from sale and then transferring those interests to the Portfolio Trust. SAC, Count 9. The Association relies on both an alleged express promise by G.A. Lodging "to limit the use of the [Resort] to the timeshare plan specified in the Declaration and the other offering documents" and an alleged "implied promise by [G.A. Lodging] to sell a sufficient number of Club Interests to make this fractional offering viable." *Id. ¶¶* 176-77. However, an implied covenant cannot impose obligations that would vary or contradict the contract's express provisions. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). Nor can an implied covenant allow a contracting party to add new substantive terms to the contract. *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994). As noted, the Governing Documents ***expressly permitted*** Defendants to

exclude any number of fractional interests at the Resort from sale to the general public and to make those interests available for use by members of a new timeshare program. *See* Point I(A), *supra.* Moreover, nothing in the Governing Documents obligated G.A. Lodging to sell a particular amount of fractional interests, and the implied covenant cannot be used as a device for adding that new obligation. *See Hoyt*, 2014 WL 509903, at *4 (dismissing implied covenant claim where challenged conduct was expressly permitted by contract).

### C.  The Claim for Tortious Interference with Contract Should Be Dismissed

The Association alleges that ***all Defendants*** tortiously interfered with the Purchase Agreement, the Management Agreement, the Declaration, and the Resort Agreement by transferring Developer-owned fractional interests into the Portfolio Trust and by creating the Portfolio Club that used the Trust-owned interests. *Id.* ¶ 171; *see also id.* (Count 8), *passim.* The Association further alleges, in order to frustrate the Owners' ability to reserve "floating" weeks and to violate a promise that these weeks would be available to the Owners on a first-come, first-served basis, ***all Defendants*** interfered with "additional provisions of the underlying contacts specified in the Third Cause of Action for breach of contract" *Id.* at ¶ 172.[10]

As an initial matter, this claim should be dismissed as against G.A. Lodging, HVGM and HVGG with respect to their own contracts—the POS and Declaration for G.A. Lodging; the Management Agreement for HVGM; the Resort Agreement for G.A. Lodging, HVGM and HVGG—because a party cannot tortiously interfere with its own contract. *Chambers v. Prowers Cnty. Hosp. Dist.*, 2009 U.S. Dist. LEXIS 28297, at *48 (D. Colo. Mar. 31, 2009). In addition, the Association cannot state a tortious interference claim because none of the underlying contracts were breached. *See Hertz*, 576 F.3d at 1119 (affirming dismissal of tortious interference claim

---

[10] It is unclear as to what these other "underlying contracts" are, because the "Third Cause of Action" asserts claims for aiding and abetting and constructive fraud—not breach of contract.

where no breach of contract was alleged and holding that, "[i]f the contract has been fully performed, then there has been no interference"); *see also Spring Creek Exploration & Prod. Co. v. Hess Bakken Inv. II, LLC*, 887 F.3d 1003, 1023 (10th Cir. 2018) (affirming dismissal of tortious interference claim where no express contract provision was breached); Point I(A), *supra* (showing that the Governing Documents ***expressly permitted*** every action the Association is challenging).

Finally, the Association fails to allege any facts showing that any of the Other Defendants intentionally induced a breach through "improper" conduct. *See Harris Grp. v. Robinson*, 209 P.3d 1188, 1196 (Colo. App. 2009) (tortious interference requires "more than that a defendant intentionally interfered with an existing contract"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1123 (10th Cir. 2008) (same). Moreover, in pleading "improper conduct," plaintiff must do more than make "unchallengably conclusory" and "broad allegations that [the defendant's] actions were motivated by malice or animosity toward" it. *Warne v. Hall*, 373 P.3d 588, 596 (Colo. 2016). Here, the Complaint is replete with conclusory allegations that do not support the elements of an *intentional inducement* of a breach through *improper* means. Thus, the tortious interference claim (Count 8) fails as a matter of law and should be dismissed.

### D.   The Claim for Declaratory and Injunctive Relief Should Be Dismissed

The Association's claims for declaratory and injunctive relief should be dismissed because the Defendants' alleged conduct was expressly permitted by the Governing Documents, and the Association waived its right to seek such relief. In the SAC, the Association seeks to enjoin all Defendants (except ILG) from relying on Declaration provisions that it alleges are materially different from those appearing in an unsigned version of the Declaration that had been attached to some early POSs issued before the Declaration was filed. The Association also seeks a holding declaring that the current version of the Declaration is invalid. SAC ¶ 141; *see also id.* (Count 5) *passim*. In addition, the Association seeks to enjoin (and obtain declaratory relief against) the

implementation of the Portfolio Club and transferring inventory to the Portfolio Trust. *Id*. ¶ 142.

This claim does not pass muster, because G.A. Lodging had the authority to unilaterally amend the Declaration, and it was not obliged to disclose any changes it deemed non-material to either the Association or the Owners. *See* Point I(A), *supra.* Thus, G.A. Lodging breached no agreement by amending the Declaration. Several of the Governing Documents also permitted the implementation of the Portfolio Club and the use of unsold fractional interests at the Resort in an external exchange program. *See id.* The alleged Declaration amendments did not change that fact.

Second, any claim for injunctive relief should be barred under the doctrine of laches. *See Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1091 (10th Cir. 2014) (equitable doctrine of laches will bar injunctive relief where there has been "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense"). The affiliation and transfer of inventory has already occurred, and the Association acknowledges that Resort Owners were advised of that in 2017. SAC ¶¶ 74-75, 96-97. Had the Association or any Owners wanted to enjoin those actions, they should have acted at that time. Granting the sweeping relief that the Association is only now seeking would be extremely prejudicial to Defendants, as it would force the unwinding of a well-established program that has been sold to, and is operating for the benefit of, approximately 4,500 Portfolio Club members.

Finally, the same conduct on which the Association's equitable claims are based is also the basis for many of the Association's other claims in which compensatory damages are sought on behalf of Owners. The Association is not entitled to equitable relief where, as here, a legal damages remedy exists to compensate it for any alleged injuries. *See Murray v. Crawford*, 2009 WL 1837445, at *8 (D. Colo. June 26, 2009) (equity may not be used to fashion relief when there is an "adequate remedy at law.") (quoting *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 842 (Colo. 2004)). Thus, Count 5, for declaratory and injunctive relief, should be dismissed.

**E.     The Contract-Based Claims Are Time-Barred to the Extent They Are Premised on the 2005 POS or the 2005 Amendment to the Declaration**

Colorado imposes a three-year statute of limitations on claims for breach of contract. C.R.S. § 13–80–101(1)(s). Although the statute may be equitably tolled under appropriate circumstances, no such circumstances are present here. *See, e.g., Moore v. Town of Erie,* 2013 WL 3786646, at *6 (D. Colo. July 19, 2013) (equitable tolling is inappropriate where plaintiff knew the basis for its claims or could have discovered them through reasonable diligence).

To the extent any of the Association's contract-related claims are based on either (i) an alleged failure to have attached the amended final version of the Declaration to POSs issued in 2004 or 2005 (before the amended final Declaration was filed in December 2005), or (ii) the filing of the amended final Declaration in December 2005, the limitations period for such claims has long since expired.  It is undisputed that, in 2005, some Owners received a POS to which an unsigned, unfiled Declaration was attached – a fact that those Owners could have ascertained in 2005 (and, notably, Plaintiffs do not allege that any Owners that purchased after December 2005 did not receive the filed Declaration).  It is also undisputed that, in December 2005, G.A. Lodging filed the final amended version of the Declaration (SAC Ex. F), which has been on record as a public document from December 2005 to the present.  It is further undisputed that control of the Association passed from the Declarant to the Owners 60 days after conveyance of 75% of the Units to Owners other than Declarant (Decl. § 9.7(c)) – a milestone that was reached in 2012, seven years before the Complaint was filed.  SAC ¶¶ 88(c).  Thus, the Association and any Owners knew, or could have known by exercising reasonable diligence, that the final filed Declaration was not identical to the unsigned, unfiled Declaration that was attached to the early POS issued to some

Owners. As a result, any claims concerning the amended Declaration in 2005 are time barred.

## II.   THE TORT-BASED CLAIMS (COUNTS 1-3, 10) SHOULD BE DISMISSED

### A.   The Association's Tort Claims Are Barred by the Economic Loss Doctrine

Under Colorado law, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).   To decide whether the economic loss doctrine applies, "courts look to the source of the duty allegedly breached, asking whether it was created by, or exists independently of, the contract." *A Good Time Rental, LLC v. First Am. Title Agency, Inc.*, 259 P.3d 534, 537 (Colo. App. 2011). To prove independence, a plaintiff must satisfy two conditions: "first, the duty must arise from a source other than the relevant contract"; and "second, the duty must not be a duty also imposed by the contract." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, 2014 WL 4400764, at *8 (D. Colo. Sept. 5, 2014), *aff'd* 887 F.3d 1003 (10th Cir. 2018).

The Association's tort-based claims for breach of fiduciary duty, constructive fraud and civil conspiracy fail because the duties alleged to support those claims are either set forth in the Governing Documents or are expressly disavowed by those documents.  For example, the claim that HVGM breached a fiduciary duty derives from a Management Agreement provision requiring HVGM to "act in a fiduciary capacity with respect to the proper protection of and the accounting for the Association's assets," Mgmt. Agmt. § 7 (ECF #54-7 p.8), but the alleged breach of that duty is also the basis for the Association's breach of contract claim. *See* SAC ¶ 148; and Count 6.

Similarly, while the Association cites the Management and Resort Agreements as sources of the Main Defendants' alleged fiduciary duties, the conduct that it alleges breached such duties is the same conduct alleged to have breached those agreements. *See, e.g.*, SAC ¶¶ 88, 151, 164. In addition, the alleged agency relationship that the Association posits as another basis for the

Main Defendants' fiduciary duties is expressly disclaimed by the Management and Resort Agreements. *See id.* at ¶ 88(a), (b); *See Town of Alma*, 10 P.3d at 1264 (Colo. 2000) (tort claim may not be asserted for same breach alleged in breach of contract claim); *see also McWhinney Holding Co. v. Poag*, 2018 WL 4680342, at *17 (D. Colo. Sept. 28, 2018) (where alleged fiduciary duty stemmed from operating agreement, holding that "any tortious conduct that harmed plaintiffs must be raised through a breach of contract claim"); *Casey v. Colorado Higher Educ. Ins. Benefits All. Tr.,* 310 P.3d 196, 204 (Colo. App. 2012) (finding breach of fiduciary duty claim barred by economic loss doctrine). The Association's fraud and civil conspiracy claims are likewise barred, as they are essentially reiterations of its breach of fiduciary duty claim. *See Pernick v. Computershare Tr. Co.*, 136 F. Supp. 3d 1247, 1270 (D. Colo. 2015) (dismissing fraud claim under economic loss doctrine); *Logixx Automation v. Lawrence Michels Family Tr.*, 56 P.3d 1224, 1231 (Colo. App. 2002) (finding civil conspiracy claim barred by economic loss doctrine). Because Counts 1-3 and 10 are barred by the economic loss doctrine, those counts should be dismissed.

### B. <u>The Association Fails to Allege Any Fiduciary Duty That Was Breached</u>

If a fiduciary relationship is found, it must then be determined "whether the alleged fiduciary was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Medina v. Catholic Health Initiatives*, 2014 WL 4852272, at *4 (D. Colo. Sept. 30, 2014) (quoting *In re Luna*, 406 F.3d 1192, 1207 (10th Cir. 2005)). A fiduciary duty claim may be decided on the pleadings as a matter of law. *United States Welding, Inc. v. Tecsys, Inc.*, 2014 WL 10321666, at *20 (D. Colo. Dec. 1, 2014).

The Association's claims for breach of fiduciary duty are premised on an alleged exercise of control by HVGM, G.A. Lodging and HVGG over Resort property and operations. *See* SAC ¶ 88(a) (HVGM); ¶ 88(c) (G.A. Lodging); and ¶ 88(b) (HVGG); *see also id.* at ¶¶ 111-12. According to the Association, these entities breached supposed fiduciary duties by: (1) running "the affairs of

the Association for their own benefit, including retaining and transferring more than 200 unsold fractionals into the Portfolio Trust and obtaining prime float weeks at a disproportionately high success rate for the Portfolio Club members"; (2) making "critical, adverse changes to terms at the [Resort] to the significant detriment of Owners and Plaintiff," including "recording a different version of the Declaration than they provided to purchasers," "imposing a new Portfolio Club at the resort," "releasing revised Residence Club Rules with new adverse terms"; and (3) "fail[ing] to disclose [these] critical changes to Owners." *Id.* ¶ 112. None of these actions was within the scope of any fiduciary duty owed the Association.[11]

1.   **HVGM**

As noted, the Management Agreement requires HVGM to "act in a fiduciary capacity with respect to the proper protection of and the accounting for the Association's assets." Mgmt. Agmt. § 7 (ECF #54-7 p.8).[12]   The balance of that provision makes clear, however, that it is intended to preclude any self-dealing by HVGM in its selection and retention of third-party servicers. *See id.* ("In this capacity, the Management Company shall deal at arm's length with all third parties and shall serve the Association's interests at all times…"). None of the conduct alleged to constitute fiduciary breaches by HVGM involves the Association's assets or alleged self-dealing with third parties.   For example, changes made to the program to accommodate and implement the Exchange

---

[11] The Association also alleges that HVGM and HVGG breached fiduciary duties by agreeing to be the management company and a program manager, respectively "for a known competitor, without full disclosure or consent" (*id.* ¶ 112(g), (h)). But the Association (a non-profit entity that simply manages the Resort and does not sell interests) does not "compete" with the Portfolio Club.

[12] To the extent a limited fiduciary relationship exists between HVGM and the Association, it would not extend to Association members, the Owners. *See, e.g, Restat. 2d of Agency* § 352 (agent not to person other than his principal); *Willey v. Mayer,* 876 P. 2d 1260, 1266 (Colo. 1994) (third parties harmed by agent's wrongful acts cannot seek recourse from agent); *see also Smith v. Ridgeview Homeowner's Assn,* 2011 WL 1743787, at * 3 (Minn. App. May 9, 2011) (analogizing association's fiduciary duty to act on behalf of entire membership to corporate directors' fiduciary duty "act in the best interest *of the cooperative or corporation*") (italics in original).

Agreement affiliation—i.e., "imposing a new Portfolio Club" and "operating Hyatt Grand Aspen to benefit the Portfolio Club," amendments to the Declaration and the Residence Club Rules, and failing to disclose amendments—had no impact on the Association's assets.

Other than the single narrow fiduciary duty described above (which is inapplicable to the Association's claim), the Association cannot plausibly allege any fiduciary duty owed to it by HVGM. A fiduciary relationship can arise where one party "has a high degree of control over the property or subject matter of another, or when the benefitting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest." *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1117 (D. Colo. 2010), *aff'd*, 566 Fed.Appx. 681 (10th Cir. 2014); *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 889 (Colo. App. 2007). However, HVGM's responsibilities under the Management Agreement do not even approach the high degree of control required for a fiduciary duty. HVGM's responsibilities are limited to ministerial and administrative matters, and its authority with respect to individual units is restricted to maintenance and repair, nor does it have the ability to transfer, convey, mortgage or dispose of fractional interests, nor can it rent or exchange such interests or otherwise determine their usage. *See* Governing Documents, *supra*, Sect. E, *supra.* No fiduciary duty could arise from such limited activities. *See, e.g.*, *Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1179 (D. Colo. 2016) (defendant must have "a high degree of control over the property").

Not only is the Association unable to sustain a fiduciary relationship based on control, it cannot allege such a relationship based on an agency theory. The Management Agreement expressly disclaims any agency relationship, and (except for the one narrow duty to protect Association assets) HVGM is identified as an independent contractor. *See* Governing Documents, Sect. E, *supra; see also City and Cnty. of Denver v. Fey Concert Co.,* 960 P. 2d 657, 661 (Colo.

1998) (finding no agency as a matter of law based on contract language).[13]

As the Colorado Supreme Court has explained, the key feature of an agency relationship is the principal's right to control the activities of the agent, which is "'the very antithesis'" of an independent contractor. *Id.* at 660-61 (citation omitted); *see also Burns v. Mac,* 2015 WL 4051998, at *9 (D. Colo. July 1, 2015) ("'An essential element of agency is the principal's right to control the agent's actions.'") (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013)); *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226, 1241 (D. Colo. 2011) (fiduciary duties can be disclaimed by agreement). Finally, even if the Association could allege some fiduciary duty owed by HVGM, it does not (and cannot) plausibly allege that HVGM engaged in the conduct that was a breach of that duty -- the transfer of fractional interests to the Portfolio Trust; the Club to Club Exchange Agreement affiliation between HVGG and the HPC Owners Assn; or the amendment of the Governing Documents.[14]  Thus, the breach of fiduciary duty against HVGM should be dismissed.

## 2. G.A. Lodging

The Association alleges that G.A. Lodging owed it a fiduciary duty because of the control it exerted over the Resort both as an Association director and as Resort Developer.  SAC ¶ 112(a)-(f).  As to the former role, the Association alleges that G.A. Lodging "wielded formal control over the board until 2012" and that it breached its fiduciary duty to the Association by "r[unning] the affairs of the Association for [its] own benefit."  *Id.* ¶¶ 88(c), 112(a).  The Association, however, alleges no facts that plausibly link G.A. Lodging's supposed control over the Association to any of the conduct on which its breach of fiduciary duty claim is based.  Nor could it do so, as the

---

[13]  As for HVGM and the individual Owners, there is simply no basis for any allegation that HVGM has any agency relationship with individual fractional owners to support the Association's representative claims on behalf of Owners.

[14]  As for amendments, HVGM's authority was strictly limited to only proposing rule changes, which then had to be approved by the Association Board.  *See* Mgmt. Agmt. § 6(i) (ECF 54-7 p.6).

Association had no authority to amend Governing Documents, transfer fractional interests, authorize the establishment of the Portfolio Club, implement the Portfolio Club, or control the reservation system. *Id.* ¶ 112. Since none of the acts alleged to constitute breaches of fiduciary duty were within the Association's authority, the fact that G.A. Lodging was at one time an Association director is irrelevant to the Association's breach of fiduciary duty claim. *See Jarnagin v. Busby, Inc.*, 867 P.2d 63, 67 (Colo. App. 1993) (plaintiff alleging breach of fiduciary duty must show that "the nature and scope of the duty…extended to the subject matter of the suit").

The Association also alleges that, as Resort Developer, G.A. Lodging breached its fiduciary duty by "self-dealing," that is, by changing the "terms at the [Resort] to the detriment of Owners and [the Association]." SAC ¶ 112. As Developer, however, G.A. Lodging owed no fiduciary duty to the Association (or, by extension, to the Owners). *See Summerhouse Condo. Assn v. Majestic Sav. & Loan Assn*, 44 Colo. App. 495, 497 (1980) (developer owes no fiduciary duty to homeowners' association). As Developer, G.A. Lodging owed the Association no fiduciary duty in transferring its remaining 207 interests to the Portfolio Trust.[15] And, whatever fiduciary duty G.A. Lodging owed in its role as a director does not carry over to its role as Resort Developer. To the contrary: where, as here, defendant has a "dual relationship" with plaintiff as both developer and homeowner association director, "[the] two relationships and respective standards of care … must be analyzed separately." *Village Green Owners Assn*, 42 Cal. 3d at 513.

In any event, a fiduciary relationship could not have been formed between the Association and G.A. Lodging as Developer because, as the Disclosure Document and Multisite Statement make clear, they were essentially competitors. *See* Governing Documents, Sect. C (describing

---

[15] *See Frances T. v. Village Green Owners Assn.,* 42 Cal. 3d 490, 513 (1986) (where "Plaintiff … had a dual relationship with defendants [who were both developers and homeowner association directors]," court holds that "plaintiff has alleged no facts to show that these directors had a fiduciary duty to [make the decision that allegedly led to her injuries]").

potential adverse consequences that could result from decisions resulting in "the addition of new purchasers"); *see also Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 235 (Colo. 2018) (contract made clear that parties were acting at arm's length, thus effectively "disclaim[ed] any fiduciary relationship that otherwise may have existed").[16] G.A. Lodging did not breach any fiduciary duty owed to the Association, and this claim should be dismissed.

### 3.    HVGG

The Association alleges that HVGG is its fiduciary because, as program manager of the reservation and exchange system, it exercised control over Association property. SAC ¶ 88(b). Managing a resort's reservation and exchange system is not the "a high degree of control over … property" that could create a fiduciary duty. *Oaster*, 173 F. Supp. at 1179 (quoting *MDM*, 165 P.3d at 889). To rise to that level, HVGG would have had to control the access, transfer, conveyance, mortgage, disposition, or rent of Owners' fractional interests, which the Association does not, and cannot, allege that it does. Moreover, HVGG derives its authority by way of assignment from G.A. Lodging, HVGM and the Association. *See* RA § 5.1 (ECF #54-6 p.81). Since neither G.A. Lodging nor HVGM owed a fiduciary duty to the Association regarding the reservation and exchange system, and the Association had no authority with respect to reservations and exchanges, no fiduciary duty could have passed from those entities to HVGG. Thus, HVGG owed no fiduciary duty under either a control or an agency theory, and the Association's breach of fiduciary duty claims against HVGG should be dismissed.

---

[16] Courts have refused to find fiduciary duties arising from "transactions where parties deal at arm's length for their mutual profit." *Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1246 (10th Cir. 2006) (dismissal of fiduciary duty claim against developers where they "were acting in their own financial interests and not with any paternal consideration for Plaintiffs' pecuniary gain"); *Accident & Injury Med. Specialists, P.C. v. Mintz,* 279 P.3d 658, 663 (Colo. 2012) ("contractual relationships do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial … transactions").

**B. The Constructive Fraud Claim Should Be Dismissed**

To state a claim for constructive fraud, plaintiff must allege:

(1) the existence of a duty due to a relationship between the parties; (2) violation of the duty by making deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance by plaintiff; (4) proximately caused injury to plaintiff; and (5) the gaining of an advantage by defendant at plaintiff's expense.

*Barnett v. Elite Properties of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010).

The Association alleges that the Main Defendants committed constructive fraud by breaching an alleged fiduciary duty to disclose "that the Portfolio Club was going to be unveiled and [would] … damage the Plaintiff's and the Owner's property values, interests, and expectations." SAC ¶¶ 116-17. The Association's failure to plausibly allege any fiduciary duty, however (*see* Point II(A), *supra*), renders it unable to allege the basis for a duty to disclose needed for a claim of constructive fraud. *See Snyder v. Acord Corp.*, 2016 U.S. Dist. LEXIS 5314, at *28 (D. Colo. Jan. 15, 2016) (dismissing fraud claim where plaintiffs failed to adequately allege source of duty to disclose). Moreover, the Governing Documents gave the Association and Owners full notice of both the existence of external exchange programs affiliated with the Resort and the fact that other such programs could be established using the Resort's fractional interests. *See* Governing Documents, *supra*, Sects. A-D, *supra*. Owners were also made aware of the increased competition and expense that affiliating with external exchange programs could impose. *Id.*, Sect. C. In addition, the Governing Documents make clear that Defendants were not obliged to provide advance notice of the introduction of the Portfolio Club. *See id.*, Sects. C, D.

Finally, the Association pleads no facts that could support the reliance element of their claim, urging, instead, that reliance be *presumed*. SAC ¶ 119. Courts faced with such an argument have "reject[ed] the notion that there is any Colorado precedent for a theory of presumed reliance." *Garcia v. Medved Chevrolet, Inc.*, 240 P.3d 371, 380 (Colo. App. 2009), *aff'd*, 263 P.3d 92 (Colo.

2011).   While reliance may be *inferred* under certain circumstances, courts draw a clear "distinction between proving reliance by circumstantial evidence and presuming reliance[.]" *Id.* The Association has alleged no facts that could serve as circumstantial evidence from which reliance could be inferred.  *CGC Holding Co v. Broad & Cassel*, 773 F.3d 1076, 1089-92 (10th Cir. 2014) (to infer reliance, circumstantial evidence must show that plaintiffs took some action or failed to take action as a result of the complained-of act); *Patterson v. BP Am. Prod. Co.*, 240 P.3d 456, 469 (Colo. App. 2010) (same), *aff'd*, 263 P.3d 103 (Colo. 2011).  Indeed, the Resort Owners *knew* that they were buying into a program which allowed exchanges with all the other 15 HRC resorts that are in the Portfolio Club, and with more than 5,000 Interval affiliated resorts. The constructive fraud claim should be dismissed.

### C.     The Association's Derivative Claims for Civil Conspiracy and Aiding and Abetting Fail for Lack of an Underlying Claim

The Association's civil conspiracy and aiding and abetting claims are based on the same wrongful conduct alleged in its breach of fiduciary duty and constructive fraud claims.  *See* SAC ¶¶ 181-82.  Because those underlying claims do not plausibly allege any wrongful or unlawful conduct, these derivative claims fail as well.  *See, e.g.*, *Bituminous Cas. Corp. v. Hartford Cas. Ins. Co.*, 2013 WL 452374, at * (D. Colo. Feb. 6, 2013) ("Civil conspiracy is a derivative cause of action that is not actionable per se…. Where there is no predicate unlawful act, there can be no conspiracy."); *Rocky Mountain Expl.,* 2016 WL 908640, at *9 (finding that, "because [plaintiff's fraud claim] fails, [its] … civil conspiracy to commit fraud … and … aiding and abetting fraud [claims] fail as well"); *Nelson v. Elway*, 971 P.2d 245, 250 (Colo. App. 1998) (an element for aiding and abetting breach of fiduciary duty is an actual breach of fiduciary duty).  Moreover, although civil conspiracy "requires proof of an unlawful intent" (*Nelson*, 971 P.2d at 250), the Association makes no allegation as to any Defendant's intent.

Finally, the Association's civil conspiracy and aiding and abetting claims should be dismissed as against the Other Defendants.  As explained below, they are only named as defendants because of their corporate relationships to the Main Defendants, and no facts have been pled that could plausibly link them to the allegedly wrongful conduct.  *See* Count V, *infra.*

## III.   THE STATUTORY CLAIMS (COUNTS 11-13) SHOULD BE DISMISSED

### A.   The Complaint Fails to State Any COCCA Claim on Which Relief Could Be Granted

To state a claim under COCCA, plaintiff must allege that defendants "(i) joined with one another or third parties to form an 'enterprise,' [and] (ii) that the enterprise engaged in a 'pattern of racketeering activity.'"  *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1124 (D. Colo. 2010).  The Association cannot plausibly allege either of these elements.

### 1.   The Association Fails to Adequately Allege a COCCA "Enterprise"

To properly plead an enterprise, plaintiff must allege: (1) "that there is 'an ongoing organization with a decision-making framework or mechanism for controlling the group,' (2) 'that various associates function as a continuing unit,' and (3) 'that the enterprise exists separate and apart from the pattern of racketeering activity.'"  *Johnson v. Myelin Prods.*, 2013 WL 4551888, at *3 (D. Colo. Aug. 28, 2013) (internal quotations omitted).  "The defendant 'person' must be an entity distinct from the alleged 'enterprise.'"  *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1149 (10th Cir. 1998).

Plaintiff first alleges that the Association, itself, was a COCCA Enterprise, but fails to allege that any of the Defendants: (1) conducted the affairs of the Association through a pattern of racketeering; or (2) acquired or maintained an interest in, or control of, the Association through a pattern of racketeering; or (3) invested the proceeds of a pattern of racketeering in the Association. See C.R.S. § 18-17-104(1)(a), (b) and (c) defining a COCCA violation. Thus, Plaintiff does not allege any COCCA claim with the Association as the COCCA Enterprise.

The Association also alleges a COCCA association-in-fact Enterprise consisting of all named Defendants and non-parties Grand Aspen Holdings, LLC, H Group Holding, Inc., Hyatt Corporation, S.O.I. Acquisition and Interval Acquisition Corp (SAC ¶¶ 25-32, at pp.12-13); and that members of the Enterprise: (a) received, and knowingly used and invested, proceeds from a pattern of racketeering activity, in the Enterprise; (b) knowingly acquired or maintained an interest in as well as control of the "associated-in-fact" Enterprise through a pattern of racketeering activity; and (c) "agreed to function and did function as a unit." SAC ¶¶ 190-95. Stripped to their essence, these allegations do no more than establish that Defendants acted in their corporate capacities. In addition, they fail to distinguish between person and enterprise. *Johnson*, 2013 WL 4551888, at *3 ("[A]ctors who participate in a pattern of racketeering activity do not automatically constitute an 'association-in-fact RICO enterprise' by the virtue of engaging in joint conduct.").

The Association alleges that each supposed enterprise member "is a subsidiary, affiliate, or otherwise formally related to the parent Hyatt, ILG, and Marriott Defendants." SAC ¶ 192. But courts routinely find such corporate affiliation allegations insufficient to show an "enterprise." *See Reich v. Genzyme Corp.*, 2015 WL 13236347, at *8 (D. Colo. Aug. 14, 2015) (holding that a "corporate-controlled entity cannot be both the person who conducts the affairs of the enterprise and the enterprise itself"); *see also Brannon*, 153 F.3d at 1149 ("[I]t is insufficient to allege merely that the RICO person is a parent corporation conducting the affairs of alleged enterprises that are also its subsidiaries and affiliates;" the fact that the bank holding company "benefitted financially from the success of its subsidiary . . . on its own is unrelated to RICO liability").

## 2. The Association Fails To Adequately Plead A Pattern Of Racketeering

A "'pattern of racketeering activity' is established by showing that at least two acts of 'racketeering activity,' as that term is defined in C.R.S. § 18-17-103(5), were committed by a member of the enterprise, and that those predicate acts of racketeering activity … 'relate to the

conduct of the enterprise.'" *Tara Woods*, 731 F. Supp. 2d at 1125.  The predicate acts alleged here are (a) mail and wire fraud (18 U.S.C. §§ 1341 and 1343); (b) violations of the Colorado computer crime statute (C.R.S. § 18-5.5-102(1)(b)) ("CCS"); and (c) filing a false instrument in violation of C.R.S. § 18-5-114(1).  SAC ¶¶ 199-202.

### a. The Association Fails to Adequately Allege Mail or Wire Fraud

The Association alleges a "scheme" by Defendants "to run the affairs of the Association for private financial gain rather than for the benefit of the Hyatt Grand Aspen Owners," and that Defendants withheld "material information" "despite having a duty to disclose." *Id.* ¶¶197, 200(a). According to the Association, this alleged conduct constitutes mail and wire fraud. *Id.*  However, the viability of this allegation turns on whether defendants' activities were permitted by the Governing Documents (which they were), or were fraudulent (which they were not).

In addition, where mail or wire fraud is alleged as a predicate act, a plaintiff must comply with Fed. R. Civ. P. 9(b) and "specify the time, place, and content of the alleged false representation and describe with particularity any allegedly fraudulent transaction, and how the particular mailing or transactions furthered the fraudulent scheme." *Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1138 (D. Colo. 2013).  Here, without any particularized details, the Complaint merely alleges generally that Defendants "sen[t] emails" to Owners from an HVGG email address and that those emails failed to mention the impending Portfolio Club affiliation and transfer of unsold developer fractional interests (SAC ¶ 200(b)). These vague and conclusory allegations do not satisfy Rule 9(b) because they are not sufficiently detailed to support a conclusion that each Defendant "conducted, or participated in, the mailings to" the Association or its fractional owner members.  *See, e.g., Henson*, 935 F. Supp. 2d at 1139 ("[A]part from these sweeping conclusory statements ... [t]here are no facts alleged … that would plausibly demonstrate that [defendant] 'knowingly' participated in any fraudulent activity."); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*,

939 F.2d 887, 892 (10th Cir. 1991) (plaintiff must allege and identify mailings or emails sent "for the purpose of executing a fraudulent scheme"); *Brooks v. Bank of Boulder*, 891 F. Supp. 1469 (D. Colo. 1995) (dismissing COCCA claim where complaint "fails adequately to allege [that defendants] conducted, or participated in, the mailings to Plaintiffs … or [that defendants] conducted, or participated in, the receipt of checks from investors").

### b.  <u>The Association Fails to Adequately Allege a CCS Violation</u>

The CCS makes it a crime if a person "knowingly ***accesses*** a computer, computer network, or computer system or any part thereof for the purpose of devising or executing any scheme or artifice to defraud."  C.R.S. § 18-5.5-102(1)(b) (emphasis added).  Here, the Association alleges that Defendants violated the CCS by using computers to "draft documents," "search the internet," and "send and receive e-mails."  SAC ¶ 201.  But that is merely routine computer use which, given the ubiquitous use of computers, would make virtually any fraud a computer crime if a person used their own computer or computer network to prepare documents or emails.  However, to run afoul of the CCS, ***"[t]he computer must serve as the device by which the fraud is perpetrated*** and the defendant must participate in the access of the computer" for that purpose. *People v. Robb*, 215 P.3d 1253, 1255 (Colo. Ct. App. 2009) (quoting *People v. Jemison,* 466 N.W.2d 378, 380 (1991)) (emphasis added). *See, e.g., People v. Rice*, 198 P.3d 1241, 1244 (Colo. App. 2008) (defendant convicted of violation where she "accessed" the welfare agency's computer telephone system to input fraudulent information about her employment status). The Association does not, and cannot, make any such allegation. Moreover, because it is based on fraud, plaintiff's allegations of a CCS violation must, again, satisfy the requirement of Fed. R. Civ. P. 9(b). There are no particularized allegations with regard to who, what, where and when any defendant "accessed" a computer "as the device by which the fraud [wa]s perpetrated." *Robb,* 215 P.3d at 1255.

In addition, the CSS's "scheme or artifice to defraud" provision, like mail and wire fraud,

requires a "wrongful purpose to injure, with which the scheme or artifice must be connected."

*People v. Galang*, 382 P.3d 1241, 1248-49 (Colo. App. 2016). Simply alleging that the Defendants

used their own computers or computer network to "draft documents," "search the internet," and

"send and receive e-mails" does not allege "accessing" a computer or computer network with a

"wrongful purpose to injure" that could be connected to a "scheme or artifice." Just as the

Association fails to state a claim for mail or wire fraud, its derivative CCS claim likewise fails.

### c. The Association Fails to Adequately Allege a Violation of C.R.S. § 18-5-114

C.R.S. § 18-5-114(1) (Offering a False Instrument for Recording), provides that a person

commits a violation when,

> knowing that a written instrument relating to or affecting real or personal property
> or directly affecting contractual relationships contains a ***material false statement
> or material false information***, and with intent to defraud, he presents or offers it
> to a public office or a public employee, with the knowledge or belief that it will be
> registered, filed, or recorded or become a part of the records of that public office
> or public employee.

*Id.* (emph. added). Because the violation is based on "fraud," the allegations must comply with of

Fed. R. Civ. P. 9(b), and Plaintiff fails to identify any specific *false statement* in any document

filed by any Defendant.  Thus, the Association fails to allege a violation of C.R.S. § 18-5-114.

### B. The CCPA Claim Should Be Dismissed

Plaintiff alleges that defendants engaged in a violation of C.R.S. § 6-1-105(1)(nnn) (which

makes it unlawful for a person to "knowingly or recklessly engage[] in any unfair, unconscionable,

deceptive, deliberately misleading, false, or fraudulent act or practice") and C.R.S. § 6-1-703(4)(a)

(which provides that "[a] person who, as director, officer, or agent of a time share resale entity or

as agent of a person who violates this article, assists or aids, directly or indirectly, in violation of

this article is responsible equally with the person for which the person acts"). SAC ¶¶ 217-19. To

state a claim under the CCPA, plaintiff must allege "(i) that the Defendant engaged in an unfair or

deceptive trade practice; (ii) the practice occurred in the course of the Defendant's business; (iii) the practice significantly impacts the public as actual or potential consumers of the Defendant's goods or services; (iv) the Plaintiff suffered injury to a legally-protected interest; and (v) the challenged practice caused the Plaintiff's injury." *Tara Woods*, 731 F. Supp. 2d at 1123.  "A plaintiff must meet the heightened fraud pleading requirements of Rule 9(b) to prove a deceptive or unfair trade practice under the CCPA."  *Two Moms & a Toy, LLC v. International Playthings, LLC*, 898 F. Supp. 2d 1213, 1219 (D. Colo. 2012).[17]

## 1.  The Association Fails to Plead Its CCPA Claim With Particularity

In support of its CCPA claim, the Association alleges, "on information and belief," that (1) "fractionals were sold at the [Resort] during the period when the ILG and Hyatt Defendants knew about the upcoming addition of the Portfolio Club"; (2) "a larger group of purchasers bought fractionals at the [Resort] at a time when Defendants knew that the [Resort] had been greatly diminished"; and (3) these purchasers bought on the basis of "Defendants' false and misleading statements about the scope of their purchases."  SAC ¶¶ 220-22.  However, the Complaint identifies *no fractional interest sales* that occurred during the period when the Portfolio Club was allegedly being planned – and, certainly, not with any particularity. This failure alone dooms the Association's CCPA claim. Moreover, this allegation is *inconsistent* with the Association's allegations, elsewhere in the SAC, that G.A. Lodging withheld selling its remaining fractional interests for five years before the Portfolio Club was implemented.  SAC ¶¶ 33, 38, 49, 50.

The second allegation is equally vague and speculative.  No particularized facts are pled to support Defendants' purported "concealment."  For example, the Complaint does not allege when the purported concealment occurred, nor does it explain how the Portfolio Club affiliation could

---

[17] The only entity that sold fractional interests was the Developer, G.A. Lodging.  Therefore, the CCPA claim could apply (if at all) to only G.A. Lodging and not to any other Defendants.

have been concealed and implemented at the same time, or how the Portfolio Club affiliation could have injured Owners when the Resort Agreement program that was already in place permitted exchanges with the same Hyatt Residence Clubs. *See Pearson v. Geico Cas. Co.*, 2018 U.S. Dist. LEXIS 76269, at *25 (D. Colo. May 7, 2018) (finding plaintiff had not "adequately plead 'the who, what, when, where, and how of the alleged fraud' sufficient to meet the requirements of Fed. R. Civ. P. 9(b) and necessary to state a deceptive trade practice under the CCPA"); *see also Avalon Condo. Assn v. Secura Ins.*, 2014 U.S. Dist. LEXIS 161772, at *7-*8 (D. Colo. Oct. 30, 2014) (finding proposed CCPA claim futile where it was pled on "information and belief" and was "nothing more than a conclusory statement that falls short of the pleading requirements"); *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603 (Colo. 2016) (dismissing CCPA claim where "plaintiff's allegations "are 'bare bones' and 'only sketch[] the elements of a CCPA offense.'").

## 2. The CCPA Claim Is Improperly Alleged Against the Other Defendants

Even if the CCPA could be sustained (which it cannot), the Association seeks to hold "all Defendants" liable for a CCPA violation, but only G.A. Lodging sold, or offered for sale, fractional interests in the Resort. The Association does not specify, with any particularity, how any of the Defendants, other than G.A. Lodging, could have violated the statute. Indeed, the Portfolio Club Entities—First Chicago, HPC Developer and HPC Owners Assn—did not even exist until the Portfolio Club was formed in June 2017, and MVWC did not acquire ILG and the Main Defendants until September 2018. Thus, none of these Defendants could possibly have been involved in any fractional interest sales or offerings made "in contemplation of the addition of the Portfolio Club."

## IV.  THE EQUITABLE CLAIMS (COUNTS 14-15) SHOULD BE DISMISSED

### A.  The Association's Unjust Enrichment Claim Should Be Dismissed

An unjust enrichment claim is quasi-contractual and is unavailable "when an express contract covers the same subject matter because the express contract precludes any implied-in-law

contract." *Pernick v. Computershare Trust Co.,* 136 F. Supp. 3d 1247, 1268 (D. Colo. 2015) (quoting *Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003)); *see also Mandelbaum v. Fiserv, Inc.*, 787 F.Supp.2d 1226, 1243 (D. Colo. 2011) (dismissing unjust enrichment claims where plaintiff had enforceable contracts with defendants and ***rejecting plaintiff's argument that its unjust enrichment claims should be preserved "in the event that the [contracts] are invalidated and rendered unenforceable"***) (emphasis added); *Evans v. Maytag Aircraft Corp.*, 2017 WL 1437296, at *6-7 (D. Colo. March 14, 2017) (noting that plaintiff had himself alleged that his contract "spelled out the terms of his employment, overtime compensation, and work hours"; thus, plaintiff's unjust enrichment claim was precluded by the express contract and his breach of contract claim).  Here, the Association identifies several express contracts that, by its own allegations, cover the same subject matter as its unjust enrichment claim, and the Association asserts that those contracts were breached.  The Association's unjust enrichment claim is, therefore, precluded as a matter of law.

The Association's unjust enrichment claim is further precluded because, as discussed above, no wrongful conduct has been plausibly alleged that would make the retention of any alleged benefit "unjust."  *See* Points I-III, *supra; Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1084 (D. Colo. 2012) (for unjust enrichment claim, the benefit must have been received under circumstances making it unjust for defendant to retain it).

## B.  The Association's Accounting Claim Should Be Dismissed

The Association purports to assert a separate "claim" for an accounting against all Defendants.  *See* SAC Count 15. The Association is not entitled to this "extraordinary remedy" (*Kirzhner v. Silverstein*, 2010 U.S. Dist. LEXIS 74963, at *33-*34 (D. Colo. July 23, 2010), because it has failed to plausibly plead any claim upon which it could recover damages.  *See Goodwin v. Hatch*, 2018 U.S. Dist. LEXIS 119914, at *32 (D. Colo. July 18, 2018) (dismissing

accounting claim "[i]n light of the Court's dismissal of all of Plaintiff's claims upon which he may have been entitled to damages"). Moreover, "[u]nder Colorado law, a [prior] demand for an accounting and a refusal to comply with the demand must be pleaded and proved." *Id.* No prior demand has been pled here. Therefore, the Association's accounting claim should be dismissed.

## V.   ALL CLAIMS AGAINST THE OTHER DEFENDANTS SHOULD BE DISMISSED

### A. The Association Fails to Allege that any of the Other Defendants Engaged in Any Wrongful Conduct

The Complaint contains no allegation of wrongful conduct by the Other Defendants. Other than alleging their role in the creation of the Portfolio Club, the complaint contains no allegations of any actionable conduct by any of the Portfolio Club Entities (Chicago Title, HPC Developer or HPC Owners Association). Similarly, the principal factual allegation against ILG is that it acquired the Main Defendants in September 2014 and, thereafter, was their parent entity. And, similarly, the only factual allegation against MVWC is that it acquired ILG in September 2018 – 16 months after the Portfolio Club was created, after the 207 fractional interests were transferred to the Portfolio Club, and after HVGG entered into the Exchange Agreement – and that, thereafter, MVWC was the ultimate parent entity of ILG and the Main Defendants, and an executive of MVWC also functioned in a dual role as an executive of the Main Defendants.

### B. The Association Does State an Alter Ego Claim Against ILG or MVWC

"[I]n determining whether to pierce the corporate veil and hold another entity liable for a corporation's conduct on an alter ego theory, the court must determine: (1) whether there was such a unity of interest and lack of respect given to the separate entity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct; and (2) whether adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *Wright v. Cleo Wallace Ctrs.*, 132 F. Supp. 2d 913, 928

(D. Colo. 2000). Under the first prong, the court should consider "the degree to which the corporate legal formalities have been maintained; and the degree to which individual and corporate assets and affairs have been commingled." *Id.* (citations omitted). Under the second prong, "there must be 'an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil.'" *Id.* "The showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form." *Id.*

Here, the SAC does not allege that any of the ILG or MVWC subsidiaries are undercapitalized; or that ILG or MVWC have commingled their assets with those of their subsidiaries, or have otherwise disregarded the corporate forms. Nor does the complaint allege that those subsidiaries are not fully able to satisfy any judgment. The Association alleges only that: (1) "on information and belief" the Main Defendants are "controlled, dominated, and operated by" MVWC and formerly, by ILG (SAC ¶ 27, at p.10), *a bald conclusory allegation*; (2) the Main Defendants' activities and business "are an integral part of the business of [MVWC and] ILG, including by the incorporation of the financial results of [the Main Defendants] into the financial results of [MVWC and] ILG" (*id.*) *as required by SEC rules and GAAP*; (3) the Main Defendants "empowered [MVWC] executives to act as the respective entity's executive officers and directors . . . with respect to certain SEC filings" (*id.*), *also as required by SEC rules;* (4) MVWC (and previously, ILG) "wholly owns all the capital stock of" the Main Defendants (*id.*); and (5) after acquiring ILG in 2018, an executive of MVWC had a dual role and also functioned as an executive of the Main Defendants. *Id.* Such allegations fall far short of any valid alter ego claim.

A parent company's mere ownership of a subsidiary's stock, "identity of officers and directors with subsidiary companies," or "[e]xercise of some degree of supervision" of a subsidiary are "insufficient bas[es] to depart from the general rule that the corporation and its shareholder are to be treated as distinct legal persons." *Wright*, 132 F. Supp. 2d at 928 and 1264; *Jarnagin v.*

*Busby, Inc.*, 867 P.2d at 69 (merely showing that one corporation owns and controls another is insufficient to disregard the corporate entity). Indeed, the Association does not (and cannot) allege any facts showing abuse of the corporate form, manipulation of corporate structures to perpetuate fraud, or, indeed, any basis for imputing, to ILG or MVWC, their subsidiaries' alleged conduct. Finally, given that the Association alleges that MVWC did not acquire ILG until October 2018, the Association cannot plausibly claim that any of the Main Defendants were acting as MVWC's alter ego in connection with the ***past*** conduct that is alleged to have been wrongful.

## C.  This Court Lacks Personal Jurisdiction Over ILG and MVWC

The Association does not (nor could it) allege that the Court has "general" jurisdiction of these defendants. *See Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1780 (2017) (for general jurisdiction, requiring a defendant to be incorporated or have its principal place of business in the state).  Therefore, for this Court to have personal jurisdiction over ILG or MVWC, "specific" jurisdiction must exist, requiring that the Association's claims "arise out of or relate to the defendant's contacts with the forum." *Id*. at 1780. Specific jurisdiction requires that (i) the claims against a defendant concern its activity "in the forum State" (*id*. at 1780); or (ii) "the defendant has 'purposefully directed' its activities toward the forum jurisdiction [and] the underlying action [against the defendant] is based upon activities that arise out of or relate to the defendant's contacts with the forum." *National Business Brokers*, 115 F. Supp. 2d at 1254.  In "an action brought against both the parent company and [its] wholly-owned subsidiary, '[e]ach defendant's contacts with the forum State must be assessed individually.'" *Greentree Transp. Co. v. Speedy Heavy Hauling, Inc.*, 2011 U.S. Dist. LEXIS 135654, at *14-15 (D. Colo. Sept. 19, 2011).

The Association fails to allege any facts that would establish personal jurisdiction over ILG or MVWC.  With respect to ILG, all that is alleged is that it acquired Hyatt's vacation ownership operations in 2014.  SAC ¶ 44.  All other allegations against ILG are improperly premised on the

acts of its subsidiaries.  *See id.* ¶ 100; *see also* Sect. B, *infra* (explaining that no basis for derivative

liability is alleged). *See Colcord v. Armstrong World Indus.*, 1985 U.S. Dist. LEXIS 19870, at *10

(D. Colo. May 13, 1985) ("Personal jurisdiction cannot be imputed to a parent corporation" based

on the conduct of its subsidiaries).

As for MVWC, the Association alleges that MVWC acquired ILG in October 2018 --

which was 13 years after the amended Declaration was filed and Management and Resort

Agreements were entered into; 4 years after the Association alleges G.A. Lodging began

intentionally withholding its remaining fractional interests from the market; and 16 months after

the Portfolio Club was established, when the 207 remaining fractional interests were transferred

to the Portfolio Trust, and when the Exchange Agreement was executed. The Association alleges

that, only *after* October 2018, MVWC became the ultimate parent of the Main Defendants, ILG

and HPC Developer.   *Id*. ¶¶ 23, 99. Thus, jurisdiction could not possibly be based on the prior

activities of MVWC's subsequently acquired subsidiaries.  And, the Association does not, and

cannot, allege that any activities or conduct by MVWC *giving rise to Plaintiff's claims* took place

in, was directed at, or affected Colorado.

## CONCLUSION

The Court should dismiss the Second Amended Complaint in its entirety with prejudice.

Dated:  October 29, 2019

Respectfully submitted,

By:  *s/ Philip R. Sellinger*
    Philip R. Sellinger
    Roger B. Kaplan
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Tel: 973.360.7900
Email:  SellingerP@gtlaw.com
       Kaplanr@gtlaw.com

    -and-

Naomi G. Beer

GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Tel:      303.572.6500
Fax:      303.572.6540
Email:   BeerN@gtlaw.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 29th day of October 2019, a true and accurate copy of the foregoing **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** was filed and served with the Clerk of the Court via ECF, which will send notification to the following:

Matthew C. Ferguson
Michelle K. Schindler
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Ste. 201
Aspen, CO 81611

Tyler Meade
Annie Decker
The Meade Firm, P.C.
12 Funston Ave., Ste. A
San Francisco, CA 94129
tyler@meadefirm.com
annie@meadefirm.com

Michael J. Reiser
Reiser Law, P.C.
1475 N. Broadway, Ste. 300
Walnut Creek, CA 94596
michael@reiserlaw.com

*s/ Greg Scavelli*
Greg Scavelli