IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01870-RM-GPG

**G.A. RESORT CONDOMINIUM ASSOCIATION,
INC**., a Colorado Nonprofit Corporation,

*Plaintiff,*

v.

**ILG, LLC**, a Delaware limited liability company, *et al.,*

*Defendants.*

## DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

### INTRODUCTION

The Association offers no valid reason why Defendants' Motion to Dismiss should not be granted. Among its other failings, the Association cannot plausibly dispute that: (a) the Governing Documents expressly permit the conduct under its contract-based and declaratory judgment claims; (b) its tort-based claims are barred by the economic loss doctrine or fail to state claims upon which relief could be granted; (c) it fails to plead the requisite elements of a COCCA claim; (d) it has shown no nexus between the complained-of conduct and the harm it claims was sustained; and (e) the Court lacks personal jurisdiction over ILG and MVWC. The SAC should be dismissed.

### ARGUMENT

**I.     THE CONTRACT-BASED CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED**

####     A.     The Claims for Breach of Contract and Declaratory Relief Are Not Viable

The Association ignores, misreads, or offers plainly erroneous interpretations of the provisions in the Governing Documents that unequivocally gave Defendants the authority to transfer ownership of interests at HRC into the Portfolio Trust for use in a timeshare plan and also

1

gave HRC and the Portfolio Club authority to enter into an external exchange agreement.[1]   For example, the Association attempts to support its claim that the Portfolio Club's use of HRC accommodations is improper by quoting lengthy passages from the Club and Condo Rules that it asserts show that Club accommodations can be used only for personal, not commercial, purposes. *See* Pl. Br. (ECF #86) at 5-8.   However, both documents explicitly state that the within rules (including the personal use restriction on Club accommodations) do not apply to the Developer.[2] Indeed, Section 5.1 of the Club Rules specifically refers to the Developer*'s* ability to arrange for an "external exchange" "[i]n order to increase the range of options available to Club Members," (ECF #54-6 at 112); and Section 5.1(c) authorizes the Developer to deposit any fractional weeks that have not been timely reserved with an external exchange company (e.g., with Interval International, Inc. ("Interval")). *Id.* at 113.   The Association also quotes Section 12.3 of the Declaration as stating that "[e]ach of the Timeshare Units shall be occupied only as vacation accommodations by Owners, their tenants and guests" (Pl. Br. at 6), while omitting the first part of that sentence, which states: "<u>Except for Units owned or leased by the Declarant [i.e., Developer G.A. Lodging]....</u>"   (ECF #56-6 at 46) (emphasis added).   In fact, the Declaration expressly authorizes G.A. Lodging to "create[], establish[], operate[] or maintain[]" any other "timeshare plans, fractional plans, exchange programs or clubs, or travel or vacation clubs comprised of a

---

[1] The Association cites Hyatt Vacation Club Rules and Regulations ("Club Rules") at § 6.1 (SAC Exh. F, ECF #54-6 at 115); Condominium Rules and Regulations ("Condo Rules") §1 (SAC Exh. A, ECF #54-1 at 1); Declaration of Condominium for G.A. Resort Condominiums ("Declaration" or "Decl.") at § 12.3 (SAC Exh. F, ECF #54-6 at 46); and Hyatt Vacation Club Resort Agreement ("Resort Agreement") § 3.2 (e) (SAC Exh. F, ECF #54-6 at 79).

[2] *See* Club Rules, *preamble* ("<u>Each Club Member</u> of the Hyatt Vacation Club shall…comply with the terms and conditions of these Hyatt Club Rules and Regulations, as amended from time to time) (SAC Exh. F, ECF #54-6 at 1) (emphasis added); Condo Rules, *preamble* ("<u>The following rules and regulations</u>, except as otherwise expressly stated, <u>apply to all Owners and their families</u>….) (SAC Exh. A, ECF #54-1 at 1) (emphasis added).

2

trust [or] membership program . . . with respect to the Property or the Timeshare Interests" and to "incorporate a Timeshare Interest into such entity, program, structure, scheme, device or plan . . . ." *See* Decl., §XVIII at 52 (SAC Ex. F, ECF #54-6 at 58). That same provision allowed G.A. Lodging to transfer its authority to its affiliate, HPC Developer. *Id.* (allowing transfer of authority to third party "with the prior written authorization from the Declarant, which authorization may be given or withheld in the Declarant's sole and absolute discretion, recorded in the Records, and containing a reference to this Declaration and this section").[3]

The Association's other arguments are equally specious. It argues that the Portfolio Club cannot qualify as an "external exchange program" because "it is built primarily on Hyatt Residence Club fractionals." Pl. Br. at 9. But nothing in the quoted language in the Governing Documents on which the Association relies for this argument (the Resort Agreement and the Multisite Public Offering Statement) suggests that the Portfolio Club exchange program is not an "external exchange" simply because it incorporates Hyatt Residence Club fractional interests. *See id.* Moreover, the Colorado Disclosure Document makes clear that the HRC and the Portfolio Club (i.e., the HPC Club) are separate clubs for purposes of exchange:

> In order to increase the range of options available to HPC Club Owners, HVGG and the Trust Association have entered into the Club to Club Exchange Agreement

---

[3] G.A. Lodging evidenced its contemporaneous approval of the transfer of authority by deeding the Timeshare Interests to HPC Developer to be deeded to the HPC Trust (SAC Ex. H (ECF# 54-8)), which was later formally signed and filed. *See* SAC Ex. E (ECF# 54-5). While the Association tries to claim that the approval was ineffective because it was filed after the Timeshare Interests were transferred to the Portfolio Club, the provision permitting the transfer of authority was solely for G.A. Lodging's benefit, and the law is clear that a party can waive compliance with any "provision … included in a contract for that party's sole benefit." *Avicanna Inc. v. Mewhinney*, 2019 COA 129, ¶ 13 (Colo. App. Aug 22, 2019); *accord,* 13 Williston on Contracts § 39:24 (4th ed. 2013). Moreover, the filed formal approval ratified the prior approval and, consistent with law, expressly gave its effective date as that of the prior approval. *See Lynch v. Smyth*, 25 Colo. 103, 109 (1898) ("Ratification has a retroactive effect"); *see also Espinoza v. Zuckerberg*, 124 A.3d 47, 58 n.55 (Del. Ch. 2015) ("Ratification is the affirmance of a prior act [and] retroactively creates the effects of" the prior act) (quoting *Restatement (Third) of Agency* § 4.01 (2006)).

which provides for an "External Exchange Program" with Hyatt Residence Club. The exchange agreement allows HPC Club Owners to exchange to resorts that participate in the Hyatt Residence Club exchange network.… <u>The HPC Club and the Hyatt Residence Club are separate vacation ownership plans.</u> The purchase of an interest in the HPC Club should not be based on the availability of inventory in the Hyatt Residence Club. Purchasers of Vacation Ownership Interests are not members of the Hyatt Residence Club.

Colorado Disclosure Document § 9 (SAC Exh. C, ECF # 54-3 at 31) (emphasis added).[4] The Club is also expressly permitted to "affiliate with … any Hyatt Company-multisite timeshare plans, any Hyatt Company-resort, residential, transient use or timeshare properties or any other Hyatt Company-properties." Multisite Public Offering Statement Art. III, § 9 (SAC Exh. A, ECF 54-1).

In addition, the Association incorrectly, implausibly and with no support whatever:

- reads the Governing Documents' broad grant of authority to establish "separate" multisite timeshare programs as being limited to multisite timeshare programs "elsewhere." Pl. Br. at 10-11.

- interprets the Developer's right to transfer the 207 unsold fractional interests to the HRC Trust as somehow prohibiting HVGG from entering into the exchange agreement with the Portfolio Club. *Id.* at 11;

- ignores the fact that the grant to Declarant of an easement on HRC Club property to market "such other timeshare or other multisite timeshare plans developed … by Declarants or affiliates from time to time" (Decl. § 4.3(a)) shows that development of other timeshare plans at HRC Club properties was always contemplated;

- contends that the fact that Article XVIII of the Declaration begins its list of prohibited actions for Fractional Interest Owners with the word "No" (Pl. Br. at 12) somehow negates that document's express statement (made in Article XVIII and elsewhere) that only the Declarant or its permitted designee can create a timeshare plan or exchange program at the Resort property;[5]

---

[4] The Association's argument that "the Portfolio Club is not an external exchange program," because it is a "second timeshare program" (Pl. Br. at 8-9) is wrong. While the Portfolio Club is a timeshare program, an exchange program between the Portfolio Club and HRC (which is fully recognized and permitted by the Governing Documents) also exists and is described in detail in the June 15, 2017 Club to Club Exchange Agreement between HVGG and HPC Owners Assn. *See* SAC Ex. B (ECF #54-2 at 313-29).

[5] The Association also argues that, unlike the HRC Members who are obliged to reserve HRC accommodations for weeks or split weeks, Portfolio Club Members may reserve accommodations at HRC for a single night. Pl. Br. at 10. It is not clear how this difference

4

- claims that "the parties did not intend to have a second timeshare program at" the Resort (*id*. at 12-13) even though the very documents it cites expressly provide otherwise;[6]

- asserts that Defendants are prohibited from contracting with another exchange program until the arrangement with Interval terminates; and

- disputes Defendants' right to amend the Governing Documents to permit the affiliation with the Portfolio Club even though those documents explicitly permit such amendment.  *See* Decl. at § 16.2 ("The Declarant reserves the right … to unilaterally amend this declaration as it may deem appropriate, in its sole discretion, to the fullest extent permitted by the CCIOA … to expand or enhance the Timeshare Plan or Multistate Timeshare Plan….").

The Association's other contract-related claims fare no better.  For example, the Association cannot plausibly explain how changes to the exchange program offered to fractional interest owners could have violated the Declaration's "nuisance" provision (Decl. § 12.5), when a claim of nuisance "requires proof of a substantial invasion of the use and enjoyment of a plaintiff's property," which is not alleged here. *Satsky v. Paramount Commc'ns, Inc.*, 1996 U.S. Dist. LEXIS

---

bolsters the Association's argument that Defendants were not authorized to enter into the exchange agreement with the Portfolio Club, subject to its own reservation rules.

[6] *See* Purchase Agreement ¶ 13 (SAC Exh J, ECF #54-10) at 6 (giving HVGG the "right to provide Owners with the opportunity to make reservations for accommodations through external exchange arrangements . . . [and the] right to develop special exchange arrangements and offer special benefits to Owners, from time to time"); *see also* Decl. §XVIII (ECF # 54-6 at 52) (permitting Declarant to create, establish, operate or maintain any other "timeshare plans, fractional plans, exchange programs or clubs, or travel or vacations clubs comprised of a trust [or] membership program . . . with respect to the Property or the Timeshare Interests").  The Declaration also gives G.A Lodging the sole "right to create other timeshare plans for Units in the Condominium. . . ." *Id*. § 12.16 at 43.  G.A. Lodging may also use unsold "Timeshare Interests" for "such other timeshare or multisite timeshare plans developed or marketed by [G.A. Lodging] or its affiliates…." Decl. § 4.3(a) at 14; *see also* Articles of Incorporation § 3.2 (SAC Exh. A, ECF #54-1) ("The Association shall have all powers reasonably necessary to implement the purpose of the Association … including, but not limited to, the following: … (f) To enter into agreements providing for the participation of the Condominium and the Timeshare Plan in an exchange system or network of resorts allowing for the reciprocal use of resort properties by Owners of Timeshare Interests in the Condominium.").

*ACTIVE 48996372v1*

23326, *26 (D. Colo. Mar. 13, 1996).[7]   And the Association's claims of improper "partition"
merely re-state its SAC claims and are contrary to the relevant contract provisions.  *See* D. Br. at
12 (concept of "partition" is irrelevant because fractional interests transferred to the Portfolio Trust
were wholly owned by G.A. Lodging); *see also* Decl., Art. XVIII (confirming Declarant's right to
contribute "Units" or "Timeshare Interests" to a timeshare plan, exchange program or club).   The
Association's complaint that HVGM did not provide it with "advance*"* notice similarly lacks
merit, as no such notice was required.  *See* D. Br. at 13-14 (citing Management Agreement).[8]   Nor
do the Association's conclusory assertions that Defendants breached the Management
Agreement's requirement to maintain brand standards warrant consideration.  *See Parker v.
Stryker Corp.*, 584 F. Supp. 2d 1298,1299 (D. Colo. Oct. 22, 2008) (court need not consider
"conclusory allegations or legal conclusions masquerading as factual conclusions").   And the
Association's vague claim that Defendants breached an obligation to "fully and accurately
describe" the Club to the Owners under the Resort Agreement (Pl. Br. at 17) assumes that the
Association or the Owners were entitled to advance notice of changes to the exchange program
(which they were not, *see supra* and D. Br. at 9) -- or that any fractional interest purchases occurred
while the Portfolio Club was being planned, which is not alleged.[9]

       Finally, the Association does not plausibly plead contract damages with respect to its

---

[7] The Association also claims that Section 12.5 prohibits any "use or practice . . . that is a source
of annoyance to the Owners or which interferes with the peaceful possession and proper use of the
Property by the Owners."  Pl. Br. at 14-15.  The SAC, however, only alleges economic harm, and
not "annoyance" or deprivation of the "peaceful possession and proper use of the Property."

[8] The Association also fails to explain how advance notice (or even "after-the-fact" notice beyond
what was provided, *see* Pl. Br. at 16) would have benefited it or the Owners, given that the
Governing Documents gave it no ability to prevent the HPC Program.

[9] The only reasonable interpretation of this allegation is that the Association intends the term
"purchasers" to mean those who purchased Fractional Interests while the Portfolio Club was being
planned (hence the concept of "advance notice").  But no such purchasers are identified or even
alleged to exist; thus, no plausible claim can be made on this basis.

6

failure to disclose claim.  Accepting as true that the Owners experienced the loss of property value, such harm could not have been caused by a supposed failure to disclose the Portfolio Club or the transfer of unsold Developer fractional interests.  Rather, it could only have been caused by the implementation of the Portfolio Club and exchange program, which were contractually permitted.

### B.    The Implied Covenant Claim Is Not Viable

The Association's sole argument in support of its claim for breach of the implied covenant of good faith and fair dealing is that other courts, applying non-Colorado law, have permitted such claims to proceed past the pleading stage in other timeshare-related cases.  Pl. Br. at 18-19.  But in each of those cases (*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 285 A.D.2d 244 (N.Y. App. Div. 2001), *Gillespie v. St. Regis Residence Club N.Y., Inc.*, 343 F. Supp. 3d 332 (S.D.N.Y. 2018), and *Reiser v. Marriott Ownership Resorts, Inc.*, 2016 U.S. Dist. LEXIS 58396 (E.D. Cal. Apr. 27, 2016)), plaintiffs alleged that the very existence of the subject condominium or co-operative property was threatened due to underselling or removal of interests from the plan.  Those cases are, thus, nothing like this one and are, thus, entirely inapposite.[10]

Here, the Association does not (and cannot) plead that the Club's existence and viability

---

[10] *Jennifer Realty* involved a rent-stabilized co-operative building in which less than 40% of the co-op's shares had been sold.  The unsold shares had been removed from the market, threatening the entire co-op's sustainability.  *Id.*, 285 A.D.2d at 245, 247.  Applying New York law, the court deemed the promise to form a stable co-op inherent in the purpose of the offering plan and that the sponsor had failed to provide evidence refuting that implied promise.  *Id.* at 247.  *Gillespie* concerned the sale of fractional interests on certain floors at a hotel where it was alleged that the defendants had abandoned the fractional interest model in favor of renting the units out to the public for overnight use.  In *Reiser*, the implied covenant claim was asserted by fractional interest purchasers at a condominium resort who claimed that the de-annexation of numerous units from the fractional interest program, and a deliberate underselling of additional fractional units violated the implied promise.  *Reiser*, 2016 U.S. Dist. LEXIS 58396, at *5-*6, *17 (court finding that plaintiffs had stated a claim for breach of the implied covenant because they had met the low bar set by California law, which only requires an allegation that defendant's conduct "unfairly frustrated the agreed upon purposes of the contract").  *Id.* at *18.

*ACTIVE 48996372v1*

was ever in doubt because, 80% of the fractional interests had been sold to purchasers, and only the remaining 20% was transferred to a new owner, the Portfolio Trust, which continues to pay all associated maintenance fees on the interests.  SAC ¶¶ 38, 64-69.  Moreover, because the Governing Documents expressly authorized the transfer of these fractional interests to a trust (*see* Decl., Art. XVIII), the Association cannot state an implied covenant claim because an implied covenant cannot vary, contradict, or add to a contract's express provisions. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994). *See also Hoyt v. Marriott Vacations Worldwide Corporation*, 2014 WL 509903 *4 (D. Minn. Feb. 7, 2014) (applying Colorado law) (dismissing implied covenant claim where challenged conduct was expressly permitted by contract).

### C. The Tortious Interference Claim Is Not Viable

The Association fails to address Defendants' argument that, inasmuch as a party cannot interfere with its own contract (*see* D. Br. at 16), its tortious interference claim should be dismissed as to contracting parties G.A. Lodging, HVGM and HVGG.  *See* Pl. Br. at 19.  As to the other Defendants, the Association's tortious interference claim is an impermissible shotgun pleading because it fails to identify which, if any, of the Defendants engaged in the allegedly wrongful, "interfering" conduct, nor does it identify any of the contracts with which they interfered.  The Association also fails to address Defendants' argument that none of the conduct about which it complains amounts to the "improper conduct" required for a tortious interference claim.

### D. The Association's Claims for Injunctive Relief Are Barred by Laches

As Defendants explained in their moving brief, the Association's claim for injunctive relief is barred under the laches doctrine because the relevant events (affiliation with the Portfolio Club and the transfer of unsold fractional interests at the Resort to the Portfolio Club Trust) took place in June 2017 -- almost two years before the Association brought this action.  D. Br. at 18.  In

8

response, the Association contends that its Board of Directors was not "truly independent" until the "end of 2018," and that it acted promptly by filing suit in May 2019 once it was able to "understand the [Portfolio] program and its effects." Pl. Br. at 20. This argument is directly contradicted by the SAC's factual allegations, which establish that, by October 2012, the Board was no longer Developer-controlled, and a majority of its members were Fractional Interest Owners who were unaffiliated with any Defendant in any capacity. *See* SAC ¶ 88(c), Ex. A at 54-55 (Colorado Disclosure Document at 5-6); *id.*, Ex. F (Decl. § 9.7). Thus, the Association's own allegations show that its Board was independent of Defendants over four years before the events giving rise to its claims, and this suit was not filed for another two years after that.

## II. THE TORT-BASED CLAIMS (COUNTS 1-3, 10) SHOULD BE DISMISSED

### A. The Economic Loss Doctrine Bars All the Association's Tort Claims

The Association cannot plausibly dispute that the sources of the fiduciary duties it alleges are the contracts that it claims were breached.[11] Nor can it plausibly dispute that the same conduct (a supposed failure to provide advance notice of, and acts undertaken to implement, the Portfolio Club) is alleged to constitute both breaches of fiduciary duty and breaches of contract.[12] Thus, the

---

[11] *See* SAC ¶¶ 88(a), 148 (alleging Management Agreement as the source of HVGM's fiduciary duties); 88(b) (Resort Agreement as the source of HVGG's fiduciary duties); 88(c-d) (Declaration and Colorado Discovery Document as the sources of G.A. Lodging's fiduciary duties).

[12] *Compare* SAC ¶¶ 148 (alleging HVGM breached section 7 of Management Agreement by "hiding and facilitating the transfer of the Developer fractionals to the Portfolio Trust"), *id.* ¶ 149 (alleging HVGM breached Management Agreement's "clear disclosure duties"), *id.* ¶¶ 158-59 (alleging G.A. Lodging and HVGM breached section 4.1(b) of Resort Agreement by failing to disclose (1) the proper version of the Declaration; (2) "critical documents"; (3) the impending Portfolio Club; or (4) "the transfer of the Developer fractionals into the Portfolio Trust and activation for us by the Portfolio Club"), *id.* ¶¶ 161-63 (alleging HVGG breached its "disclosure obligations" by failing to tell Owners or the Association "about the impending Portfolio Club or the transfer of the Developer fractionals into the Portfolio Trust and activation for use by the Portfolio Club") *with id.* ¶¶ 88, 112 (listing identical alleged breaches of fiduciary duty regarding the transfer of inventory, implementation of the Portfolio Club and failure to disclose); *see also id.*

Association's breach of fiduciary duty claim and its derivative claims for constructive fraud, conspiracy and aiding and abetting are barred under the economic loss doctrine. *See Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000) (application of economic loss doctrine rests on identifying "the source of the duty that forms the basis of the action"); *see also id.* ("'A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie.'") (citation omitted); *id.* at 1266 (finding tort claim "barred by … the economic loss rule" because it was "based solely on the breach of a contractual duty resulting in purely economic loss"); *Micale v. Bank One N.A. (Chicago)*, 382 F. Supp. 2d 1207, 1221 (D. Colo. 2005) (dismissing tort claims under economic loss doctrine where complaint "alleges that the duties Defendants allegedly tortiously breached are the same duties Plaintiff claims Defendants breached under the contract").

The Association seeks to avoid the bar of the economic loss doctrine by arguing that the alleged fiduciary duties exist independent of the contracts "via special relationships, control, and agency." Pl. Br. at 22.  But none of the few special relationships recognized under Colorado law exist here.[13]  Certainly, the principal-agent relationship that the Association alleges as a basis for a fiduciary duty is not a "special relationship" that would override the economic loss rule.  *See First Am. Title Agency*, 259 P. 3d at 540 (where plaintiff alleged a fiduciary duty based on a principal-agent relationship, court refused to find "that a fiduciary duty between contracting parties

---

¶ 151 (alleging that HVGM's breach of fiduciary duties breached Management Agreement), *id.* ¶ 164 (alleging that HVGG's breach of fiduciary duties breached Resort Agreement).

[13] Colorado courts recognize that special relationships exist to protect the following interests: (1) freedom from physical harm to persons or property; (2) "the sense of security enjoyed under an insurance contract"; or (3) "the entitlement to justice within our legal system." *A Good Time Rental, Ltd. Liab. Co. v. First Am. Title Agency, Inc.*, 259 P.3d 534, 540 (Colo. App. 2011).  None of those interests are at issue here.  The SAC does not allege physical harm to the Resort property itself as a result of the implementation of the Portfolio Club; rather, it alleges economic harm to the value of the Owners' Fractional Interests.

10

necessarily creates a special relationship which effectively trumps the economic loss rule"); *see also id.* ("special relationship" must be shown to "implicate[] a risk of damages to interests that contract law is not well suited to protect"); *id.* ("Not every fiduciary relationship implicates a risk of damages for which contract law cannot provide a remedy."); *id.* ("[E]ven if [defendant] had a fiduciary relationship with plaintiffs, its contractual duty . . . cannot serve as the basis of any tort claim seeking additional compensation for its alleged failure to perform that same contractual obligation."). Accordingly, the economic loss doctrine bars the Association's breach of fiduciary duty claim and derivative claims for constructive fraud, conspiracy and aiding and abetting. *See Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232 (Colo. App. 2012) (allowing tort-based claims to proceed would allow plaintiff "to avoid the carefully and expressly drawn allocations of risks, duties, and remedies for which it bargained").

### B.   The Claims for Breach of Fiduciary Duty and Conspiracy are not Viable

#### 1.   The Association fails to state a breach of fiduciary duty claim

Even if not barred by the economic loss rule, the existence and scope of a fiduciary duty presents questions of law for a court to decide. *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306, 1312 (Colo. App. 1998). To state a claim for breach of fiduciary duty, "[p]laintiff must show that the nature and scope of the duty that arose by reason of the confidential relationship extended to the subject matter of the suit." *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. App. 2002). The Association cannot state a breach of fiduciary duty claim against HVGM, HVGG, or G.A. Lodging because none of the alleged breaches fall within the scope of any fiduciary duty that the Association alleges was owed by these Defendants under the Governing Documents.

For example, HVGM's alleged fiduciary duty arises from its duties under the Management Agreement. *See, e.g.,* Pl. Br. at 25 (identifying provisions of Management Agreement relating to

cleaning, security, check-in, maintenance, repair, décor within individual units and dues-collecting). But none of those duties relate to the implementation of the Portfolio Club, which is the subject of the Association's claims. HVGG's alleged fiduciary duty is based on its administrative management of the reservation system and points allocations. *See id.* at 26-27. But to implicate the claims at issue, HVGG would have to control property-related access, transfer, conveyance, mortgage, or disposition of Owners' fractional interests, which the Association does not allege. Finally, G.A. Lodging's alleged fiduciary duty is based on having served on, and supposedly controlled, the Association's Board of Directors. But the Association had no authority with respect to the Portfolio Club (or the transfer of fractional interests); thus, control of the Board could not have impacted the Portfolio Club's implementation. In any event, by October 2012, the Board was under the majority control of individual owners and independent. *See* Point I(D), *supra.*

To the extent the Association argues that G.A. Lodging owed it a fiduciary duty as Developer, simply arguing that G.A. Lodging could wear "more than one hat" (Pl. Br. at 29-30) does not address the Association's failure to plausibly allege any confidential or "special" relationship between the Association and G.A. Lodging as Developer that could give rise to a fiduciary duty. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346-47 (10th Cir. 2008) ("To establish a claim under Colorado law for breach of fiduciary duty, a plaintiff must prove . . . that the nature and scope of the duty extended to the subject matter of the claim…."). The cases the Association cites to try to bolster its "two hats" argument are inapposite, as none involve a homeowners' association and a developer and the scope of the latter's fiduciary duty.[14] By contrast, the case

---

[14] *Kennedy v. Tallant*, 1976 WL 840 (S.D. Ga. Oct. 22, 1976), does not address the differing scope of the defendant's fiduciary duties. *Gardner v. Major Automotive Companies, Inc.*, 2015 WL 1223703 (E.D.N.Y. Mar. 17, 2015), denied the defendant's summary judgment motion in light of factual disputes as to its role in the challenged transaction. *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D. Ill. 1972), addressed the application of the attorney-client privilege, not breach of

Defendants cite in their moving brief (*Frances T. v. Village Green Owners Assn.,* 42 Cal. 3d 490 (1986)) is directly on point. There, the California Supreme Court found that, because a homeowners' association member had a "dual relationship" with defendants (who were both developers and homeowner association directors), determining whether there had been a breach of fiduciary duty required analyzing the scope of defendants' duties in each of its roles. The Court concluded that plaintiff could not state a fiduciary duty claim as she "alleged no facts to show that the directors had a fiduciary duty to" make the decision that allegedly led to her injuries. *Id.* at 513.

### 2.   The Association fails to state a constructive fraud claim

Even if the Association's constructive fraud claim were not dismissed as derivative, it should be independently dismissed because the Association has not plausibly pled reliance -- a required element of a constructive fraud claim. *Barnett v. Elite Properties of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010) (listing "reliance" as a constructive fraud element). The Association's contention that it can rely upon "a presumption of reliance on the part of Plaintiff and the Owners" (SAC ¶ 119) cannot overcome the fatal flaw that the SAC does not allege that any action was taken, or not taken, by either the Association or any Owner in reliance on Defendants' alleged wrongful conduct. *See CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1093 (10th Cir. 2014) (holding that, for reliance to be inferred, any circumstantial evidence offered by plaintiff must show that some action was taken in reliance on the complained-of act).

## III.    THE COCCA CLAIMS (COUNTS 11-12) SHOULD NOT BE DISMISSED

### A.   The SAC Fails to Plausibly Allege a COCCA "Enterprise"

---

fiduciary duty. *Johnson v. Witkowski*, 573 N.E.2d 513 (Mass. App. 1991, merely cautioned that a fiduciary who wears multiple hats must be "nimble." *Seven G Ranching Company v. Stewart Title & Trust*, 627 P.2d 1088 (Colo. App. 1981), involved a trustee who wore "two hats" concurrently in a single transaction. *Aronoff v. Lenkin Co.*, 618 A.2d 669 (D.C. 1992), found that, unlike here, a fiduciary duty arose by virtue of a principal-agent relationship.

Unable to offer a single valid defense of its COCCA claims, the Association can only repeat the SAC's conclusory allegation that the Association was an "enterprise" "used … as a pawn to perpetrate a pattern of criminal activity." *See* SAC ¶¶ 190-93.  But neither in its brief nor (more importantly) in the SAC does the Association ever explain how Defendants supposedly exerted any control over it, or how they functioned with it, to form a "continuing unit" designed to conduct racketeering activity.  *See Johnson v. Myelin Prods.*, 2013 WL 4551888, at *3 (D. Colo. Aug. 28, 2013).  Instead, the SAC only makes unfounded assumptions and offers none of the "facts [that would be required] to elevate the COCCA allegations above the level of mere speculation." *Henson v. Bank of Am.*, 935 F. Supp. 2d 11268, 1138 (D. Colo. 2013).

The Association's "corporate form" arguments also fail to support the SAC's naked conclusion that "distinct" entities formed an "association-in-fact enterprise." Pl. Br. at 33.  The most that is shown is that Defendants acted in their corporate capacities and in furtherance of their own affairs – allegations that have repeatedly been found insufficient to support a COCCA claim. *See e.g., Carlson v. Town of Mt. Vill.*, 2019 U.S. Dist. LEXIS 48617, at *14-*15 (D. Colo. March 25, 2019) (finding plaintiff had not plausibly alleged that defendant "conducted the affairs of an enterprise rather than his own affairs"); *Reich v. Genzyme Corp.*, 2015 WL 13236347, at *8 (D. Colo. Aug. 14, 2015) (holding that a "corporate-controlled entity cannot be both the person who conducts the affairs of the enterprise and the enterprise itself"); *see also Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1149 (10th Cir. 1998) (finding it insufficient "to allege merely that the RICO person is a parent corporation conducting the affairs of alleged enterprises that are also its subsidiaries and affiliates;" rather, plaintiff "must, at the very least, allege the parent somehow made it easier to commit or conceal the fraud of which the plaintiff complains.").

**B.** **The SAC Fails to Plausibly Allege Any Racketeering Activity**

The Association insists that the SAC provides "highly detailed allegations … of mail or wire fraud." Pl. Br. at 33. In fact, the identified communications represent nothing more than routine transmissions of information. *See* SAC ¶ 200(b)(ii)-(vii). The Association fails to meet its burden to plead how these communications furthered any fraudulent scheme to be predicate acts under COCCA. *Ferraro v. Convercent, Inc.*, 2017 U.S. Dist. LEXIS 172816, at *17-*18 (D. Colo. Oct. 19, 2017) ("although plaintiff provides facts about communications and representations, . . . plaintiff does not explain how each of the particular communications or transactions 'furthered the fraudulent scheme'") (quoting *Henson*, 935 F. Supp. 2d at 1137-38) (emphasis added); *see also Snyder*, 2016 U.S. Dist. LEXIS 5314, at *25 (finding that "the vast majority of these 'specifics,' to the extent they describe mail or wire communications by the Defendants at all . . . merely reference ordinary letters and emails sent"); *People v. Chaussee*, 880 P.2d 749, 761 (1994) (dismissing COCCA claim where acts were unrelated to enterprise activities).[15]

Similarly, the Association cannot show a Computer Crime Statute violation (Pl. Br. at 34), as the alleged SAC facts do not show that Defendants "knowingly access[ed] a computer . . . for the purpose of devising or executing any scheme or artifice to defraud." C.R.S. § 18-5.5-102(1)(b). At most, the allegations merely show that Defendants used computers to perform routine tasks such as drafting documents and sending and receiving emails. For a CCS violation, plaintiff must show that a computer was used to perpetrate the alleged fraud. *See* D. Br. at 32-33.[16]

## IV.   THE UNJUST ENRICHMENT CLAIM (COUNT 14) SHOULD BE DISMISSED

Under Colorado law, "[a] party cannot recover for unjust enrichment by asserting a quasi-

---

[15] The Association claims that, under *Chaussee,* it has met the standards for pleading the continuity required by COCCA. Pl. Br. at 33. But Defendants are not arguing lack of continuity; rather, they argue that the Association does not, and cannot, adequately plead facts linking the listed communications to the conduct of any enterprise. COCCA § 18-17-104(3).

[16] With respect to the allegations concerning a violation of C.R.S. § 18-5-114 (Pl. Br. at 34), the Association has still not identified any false statement in any filed document by any Defendant.

*ACTIVE 48996372v1*

contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Invs., LLC v. Eagle River Water & Sanit. Dist.*, 77 P.3d 814, 816 (Colo. App. 2003). Although the Association claims to find no "tight relationship" between its breach of contract and unjust enrichment claims (Pl. Br. at 35), a side-by-side comparison of the claims confirms that they address the same subject matter.

The Association also argues that it can plead in the alternative and recover on a quasi-contract because it may be unable to recover under its contract claims. Pl. Br. at 35. But the Association would only be able to plead in the alternative if Defendants disputed the existence of enforceable contracts or claimed that the contracts do not address the issues in dispute. *Swan Global Invs. LLC v. Young*, 2019 U.S. Dist. LEXIS 177967, at *28 (D. Colo. Aug. 20, 2019) (permitting plaintiff to plead unjust enrichment claim where defendant disputed existence of enforceable contract and applicable contract terms). Defendants make no such claims. Thus, the Association may not use "[a]lternative pleading to … limit the principle that an express contract precludes an implied contract on the same subject matter." *Interbank*, 77 P.3d at 817; *see also West Ridge Group, LLC v. First Trust Co.*, 414 Fed.Appx. 112, 120 (10th Cir. 2011) (unjust enrichment "is … designed for circumstances in which other remedies are unavailable ... [and] not … as a mere alternative legal theory when the subject is covered by an express contract.").[17]

The Association also asserts that a claim for unjust enrichment is permitted if made alongside a breach of fiduciary duty claim. Pl. Br. at 35. However, the cases are clear that where plaintiff's claims are contract-based (or when the tort claims are contract-based), the equitable

---

[17] The Association's reliance on *Duffield v. MPC Pipelines Inc.*, 2017 WL 731184 (D. Colo. Apr. 28, 2017) (cited in Pl. Br. at 35), is misplaced. In that case, the court permitted the unjust enrichment claim because it was premised on pre-contractual conduct and defendant contended that the express contract was unenforceable.

remedy of unjust enrichment will not be permitted as a quasi-contractual remedy. *See, e.g., Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1260-61 (D. Colo 2014). The cases plaintiff cites are not to the contrary. S*ee L-3 Communs. Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155 (D. Colo. 2015) (holding that the *Interbank* rule applies in the contractual context, and a plaintiff may not seek unjust enrichment on contractual claims); *Harris Grp. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009) (same); or did not involve the simultaneous assertion of quasi-contract and contract claims. *See DCB Constr. Co. v. Century City Dev. Co.*, 965 P.2d 115 (Colo. 1998) (involving contractor's claim for restitution from landlord based on tenant's non-payment); *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Assoc.*, 649 P.2d 1093 (Colo. 1982) (involving cable service provider's claim for unpaid service charges from condominium owners pirating cable service from contracting owners).

## V.   THE CLAIMS AGAINST ILG AND MVWC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

### A.  The Court Lacks Personal Jurisdiction over ILG and MVWC

The Association's attempt to establish personal jurisdiction over ILG and MVWC rests solely on its allegation that, through the mere implementation and existence of the Portfolio Club, those entities "exploited" the Resort, which is located in Colorado.  Pl. Br. at 37.  The Association, however, fails to allege how "defendant's suit-related conduct … create[d] a substantial connection with the forum State" sufficient to warrant jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *accord, International Ass'n of Certified Home Inspectors v. Lesh*, 2018 U.S. Dist. LEXIS 202627, at *7 (D. Colo. Nov. 29, 2018) (conduct related to forum must give rise to claim).  Mere "foresight (or knowledge) that effects would be felt in Colorado" is not enough. *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 917 (10th Cir. 2017) (establishing specific jurisdiction "requires showing more than simply harm suffered by a plaintiff who resides in the forum state").

17

Establishing specific jurisdiction requires plaintiff not only to show that "defendants undertook *intentional actions that were expressly aimed at that forum state*" (*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1077 (10th Cir. 2008) (italics in original)), but also that the forum state itself is the "*focal point of the tort.*" *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (emphasis added).   The Association does not, and cannot, plausibly allege that ILG's actions or inaction with regard to the affiliation of the Portfolio Club with HRC was intentionally focused on Colorado.   The depositing of inventory into the Trust to create the Portfolio Club, or not providing advance notice of that decision to HRC Club members, is not activity focused on Colorado or Colorado property, and therefore is insufficient to establish jurisdiction.   As for MVWC, its alleged involvement in this matter stems exclusively from the supposed contacts other parties had with Colorado before being acquired by MVWC; thus, MVWC cannot be found to have intentionally orchestrated any action in, or directed at, the state.[18]

Moreover, the allegation that MVWC "generally profits" from the Portfolio Club cannot support personal jurisdiction because, even if true, that allegation does not connect MVWC to Colorado specifically.   *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980) (mere accrual of financial benefits *insufficient* to support jurisdiction); *OMI Holdings*, 149 F.3d at 1094 (recognizing "[t]he Supreme Court's mandate that minimum contacts be based on the defendant's affirmative actions which create a substantial connection with the forum state").

---

[18] Any "recent communications" that MVWC may have had with the Association have no jurisdictional significance, as those communications did not give rise to the Association's claims. *See* Pl. Br. at 8; *see also Lesh*, 2018 U.S. Dist. LEXIS 202627, at *6 ("the plaintiff's injuries must arise out of defendant's forum-related activities") (internal quotation marks and citation omitted). What contacts MVWC may have with Colorado after the 2018 ILG acquisition cannot create personal jurisdiction as to events that occurred years earlier.  *See Niemi v. Lasshofer*, 770 F.3d 1331, 1350 (10th Cir. 2014) (defendant "could not have taken action exposing it to personal jurisdiction because it did not exist until a year after the latest events underlying the suit").

Nor can any forum-directed conduct by the Main Defendants be imputed to ILG or MVWC. *See GCIU-Emplr. Ret. Fund v. Coleridge Fine Arts*, 700 Fed. Appx. 865, 869-70 (10th Cir. 2017) (contacts with the forum must be assessed individually; subsidiary's activities cannot subject a nonresident to jurisdiction; and merely acquiring a company that has contacts in the forum is not enough); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (for jurisdiction a "parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity").

Finally, the Association's failure to meet its burden to show minimum contacts with the Colorado forum means that the "reasonableness" portion of the jurisdiction test is not reached. *See Grynberg v. Ivanhoe Energy, Inc.*, 490 Fed. Appx. 86, 100 n.8 (10th Cir. 2012) (failure to establish minimum contacts eliminates need to "consider whether exercising personal jurisdiction over the defendants would be consistent with traditional notions of fair play and substantial justice").

### B.     Jurisdiction Cannot Be Sustained Under an Alter Ego Theory

In urging its alter ego theory of jurisdiction, the Association argues that, because it has had no discovery on that issue, it need only show "the potential presence of at least some of the [alter ego] factors." Pl. Br. at 39 (quoting *Matthys v. Narconon*, 104 F. Supp. 3d 1191, 1203 (D. Colo. 2015)).[19] But the Association pleads none of the required factors, as it does not allege abuse of the corporate form, undercapitalization, commingling of funds, or that the use of an affiliate or subsidiary resulted in an abuse or any fraud. *See Wright v. Cleo Wallace Ctrs.*, 132 F. Supp. 2d 913, 928 (D. Colo. 2000) (listing factors). And, unlike the plaintiffs in *Mathys* who alleged

---

[19] The other cases the Association cites for this point are inapposite. *Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549 (D. Utah Oct. 30, 2007), does not involve corporate relationships but, rather, whether the defendant company was the alter ego of an individual shareholder. In *Chambers v. SD Holdings, LLC*, 2017 WL 6026428 (W.D. Pa. Dec. 5, 2017), a Pennsylvania district court applied the test that Ohio courts use to pierce the corporate veil.

jurisdiction based on a corporate parent's active management of its subsidiary's "daily operations, including conducting inspections of… [facility] centers and creating, licensing, and approving their marketing materials," (104 F. Supp. 3d at 1203), the Association offers only bald and conclusory allegations of dominance and control.  SAC ¶ 27.[20]   Courts routinely dismiss such alter ego claims at the pleading stage where, as here, the allegations are legally insufficient to meet the minimum pleading requirements.  *See, e.g.*, *T-Jat Sys. 2006 v. Expedia, Inc.*, 2017 U.S. Dist. LEXIS 31714, at *7 (D. Del. Mar. 7, 2017) (dismissing alter ego claims where factual allegations included "nothing more than a close relationship and coordination among defendants, including parent operational control of subsidiaries"); *Energy Marine Servs. v. DB Mobility Logistics AG*, 2016 U.S. Dist. LEXIS 7406, at *8 (D. Del. Jan. 22, 2016) (dismissing alter ego claims where allegations amounted only to "naked assertion[s] devoid of further factual enhancement").[21]

Respectfully submitted,

By: _s/ Philip R. Sellinger_
    Philip R. Sellinger
    Roger B. Kaplan

GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07931-0677
Tel:    973.360.7900

---

[20] The Association's allegations of common address (SAC ¶¶ 17, 20-22), majority capital stock ownership (*id.* ¶ 27), legally required corporate references in SEC filings (*id.*), and dual corporate roles (*id.*), are fully consistent with normal stockholder-corporation business relationships in the parent-subsidiary context.  *See Colcord v. Armstrong World Indus.*, 1985 U.S. Dist. LEXIS 19870, at *11 (D. Colo. 1985) (holding that allegations that "cannot be considered in any way inconsistent with the normal stockholder-corporation business relationship … do not amount to the type of domination and control necessary to pierce the corporate veil.").

[21] The Association argues that it is entitled to jurisdictional discovery, Pl. Br. at 39.  Such "discovery should only be permitted when it would resolve factual issues necessary for establishing a basis for personal jurisdiction" (*Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975) and the burden is on plaintiff to "demonstrat[e] a legal entitlement to [such] discovery." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1189 n.11 (10th Cir. 2010).  Here there are no factual issues in need of resolution.

*ACTIVE 48996372v1*

Fax:    973-301.8410
Email:  SellingerP@gtlaw.com
         KaplanR@gtlaw.com

-and-

Naomi G. Beer
GREENBERG TRAURIG, LLP
1200 Seventeenth Street, Suite 2400
Denver, Colorado 80202
Tel:    303.572.6500
Fax:    303.572.6540
Email:  BeerN@gtlaw.com

*Attorneys for Defendants*

*ACTIVE 48996372v1*