# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Gordon P. Gallagher, United States Magistrate Judge

Civil Case No. 19-CV-01870-RM-GPG

G.A. RESORT CONDOMINIUM ASSOCIATION,
INC., a Colorado Nonprofit Corporation,

     Plaintiff,

v.

CHICAGO TITLE TIMESHARE LAND TRUST,
INC., a Florida corporation, as Trustee for HPC
TRUST,
GRAND ASPEN LODGING, LLC, a Delaware
limited liability company,
HPC DEVELOPER, LLC, a Delaware limited
liability company,
HPC OWNERS' ASSOCIATION, INC., a Florida
non-profit,
HV GLOBAL GROUP, INC., a Delaware
corporation, and
HV GLOBAL MANAGEMENT CORPORATION,
a Florida corporation,

     Defendants.

---

## REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

This matter comes before the Court on the Motion to Dismiss the Second Amended

Complaint by Defendants Grand Aspen Lodging, LLC (G.A. Lodging), HV Global Group, Inc.

(HVGG), HV Global Management Corporation (HVGM), Chicago Title Timeshare Land Trust,

1

Inc. (Chicago Title), HPC Developer, LLC (HPC Developer), and HPC Owners' Association, Inc. (HPC Owners) (collectively, the Defendants) (D. 55)[1], Plaintiff's response (D. 86), and Defendants' reply (D. 97). The motion has been referred to this Magistrate Judge. (D. 57).[2] The Court has reviewed the pending motion, response, reply, and all attachments. The Court has also considered the entire case file, the applicable law, and is sufficiently advised in the premises. Oral argument is not necessary. On July 2, 2020, this Court recommended dismissing Defendants ILG, LLC and Marriott Vacations Worldwide Corporation for lack of specific personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) but deferred on making a recommendation on the motion to dismiss. (D. 101). On July 30, 2020, this Court's recommendation was adopted by the District Court. (D. 114). This Court now examines the remaining issues in Defendants' motion to dismiss. Accordingly, this Magistrate Judge respectfully recommends that Defendants' motion be GRANTED for the reasons specifically set forth below.

## I.      FACTS

The Court briefly summarizes the pertinent facts drawn from the Plaintiff's Second Amended Complaint here and will elaborate as necessary in the analysis. (*See* D. 54). While the parties disagree as to many facts, the basic framework of this case is largely undisputed. For

---

[1] "(D. 55)" is an example of the stylistic convention used to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Report and Recommendation.

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. FED. R. CIV. P. 72(b). The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

purposes of reviewing the Defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court accepts "all well-pleaded factual allegations in the . . . complaint . . . as true and viewed in the light most favorable to the nonmoving party." *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This matter arises out of a dispute between the parties regarding the alleged diminution in value of the Plaintiff's fractional interests in the Hyatt Vacation Club Grand Aspen Resort (the Resort), a timeshare resort created in 2005 and located in Aspen, Colorado.  (D. 54, pp. 2, 14; D. 55, p. 2).  The timeshare resort is part of the Hyatt Residence Club (HRC), which consists of approximately sixteen HRC timeshare resorts.  Plaintiff, the Resort's homeowners' association (Association), consists of more than 560 Association members. (D. 54, pp. 2, 14).  Association members own one or more of the 1,060 fractional timeshare interests (i.e., an undivided 1/20 fee ownership interest per fractional) at the Resort, and each interest gave owners, among other things, "the right to one fixed week in a dedicated unit at the Resort and the right to reserve a full float week and a split float week, adding up to about 10 float days."  (D. 54, pp. 14; D. 54-1, pp. 50, 93).

In 2014, ILG acquired "Hyatt Hotels Corporation's subsidiaries engaged in the shared ownership industry, including Hyatt Residence Club, and the Developer's inventory of more than 200 unsold fractionals."  (*Id.*, p. 16).  In 2017, Plaintiff alleges that Defendants created a new points-based program, the Hyatt Residence Club Portfolio Program (Portfolio Club), which would allow Portfolio Club points members to stay at HRC properties, including the Resort.  (D. 54, p. 3).  In June 2017, the remaining unsold Resort interests (approximately 20 percent) were transferred from G.A. Lodging to the Hyatt Residence Club Portfolio Trust (Portfolio Trust).  (*Id.*,

p. 4).  Plaintiff alleges that Defendants then sold points arising from these interests to Portfolio Club points members as "Vacation Ownership Interests."  (*Id.*, p. 4).  Plaintiff alleges that Defendants earned at least $30 million in profits from these point sales to Portfolio Club points members.  (*Id.*).  Moreover, Plaintiff alleges that Owners cannot book stays at the Resort if they do not have points and, even with points, their ability to successfully reserve time at the Resort is restricted.  (*Id.*).  As a result, many Resort members converted their fractional purchases into Portfolio Club points, which has contributed to the Owners having diminished access to other fractionals within the HRC.  (*Id.*).

Defendant Chicago Title is a Florida corporation with its principal place of business in Jacksonville, Florida.  (*Id.*, p. 7).  It functions as the Portfolio Trustee to the HPC Trust that was created in June 2017, which Plaintiff alleges was created "to receive real property from HPC Developer to be converted to points sold in the Portfolio Club."  (*Id.*).

Defendant G.A. Lodging is a Delaware limited liability company with its principal place of business in Miami, Florida.  (*Id.*, p. 8).  G.A. Lodging is the developer of the Resort and was acquired by ILG in 2014.  (*Id.*).

Defendant HPC Developer is a Delaware limited liability company with its principal place of business in Orlando, Florida.  (*Id.*).  Plaintiff alleges that "HPC Developer purchased 414 biennial fractionals at the Hyatt Grand Aspen through a Special Warranty Deed from [G.A. Lodging] (the Developer), and transferred them to the Portfolio Trustee in June 2017, and also created the operating plan for the Portfolio Club."  (*Id.*).

Defendant HPC Owners (labeled by Plaintiff as the Portfolio Association) is a Florida not-for-profit organization incorporated on June 15, 2017, located in Orlando, Florida.  (*Id.*).  Plaintiff alleges that "ILG created the Portfolio Association as the entity responsible for managing and

operating the new Portfolio Club and properties put into the Portfolio Trust for use in that Club [and] the Portfolio Association assigned those duties to [HVGM]." (*Id.*, pp. 8-9).

Defendant HVGG is a Delaware corporation, with its principal place of business in Miami, Florida. (*Id.*, p. 9). Plaintiff alleges that "HVGG independently owns and manages the Hyatt Residence Club and, as of 2017, the HPC Exchange Program, which implements the Portfolio Club at resorts such as Hyatt Grand Aspen." (*Id.*). Plaintiff further alleges that "HVGG was formerly known as Hyatt Residential Group, Inc. which in turn was formerly known as Hyatt Vacation Ownership, Inc." (HVOI). HVOI was a party to agreements relevant to the original purchases of Hyatt Grand Aspen fractionals, such as a contract with the Association in 2005 called the Hyatt Vacation Club Resort Agreement." (*Id.*).

Defendant HVGM is a Florida corporation with its principal place of business in Miami, Florida. (*Id.*). Plaintiff alleges that HVGM is the management company that manages and operates the Resort as well as the Portfolio club. (*Id.*, pp. 9-10).

Plaintiff originally filed this action in Colorado state court, and Defendants removed the action pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446, and 1453. (D. 1, p. 2). A Scheduling Conference was held on December 13, 2019. (D. 79). On July 30, 2020, Defendants ILG, LLC and Marriott Vacations Worldwide Corporation were dismissed for lack of specific personal jurisdiction. (D. 114).

Plaintiff raises the following causes of action in the instant motion against the remaining Defendants: (1) breach of fiduciary duty by HVGM, G.A. Lodging, and HVGG; (2) constructive fraud by HVGM, G.A. Lodging, and HVGG; (3) aiding and abetting the breaches of fiduciary duty and constructive fraud by all Defendants; (4) breach of contract by G.A. Lodging; (5) declaratory relief regarding the implementation of the Portfolio Club against all Defendants; (6) breach of

contract by HVGM; (7) breach of contract by HVGM, G.A. Lodging, and HVGG; (8) tortious interference with contract by all Defendants; (9) breach of implied covenant of good faith and fair dealing by G.A. Lodging as well as its Hyatt alter egos or successors in interest; (10) conspiracy by all Defendants; (11) violation of the Colorado Organized Crime Control Act (COCCA), C.R.S. § 18-17-104(1)-(3) by all Defendants; (12) conspiracy to violate COCCA, C.R.S. § 18-17-104(4) by all Defendants; (13) violation of the Colorado Consumer Protection Act, C.R.S. §§ 6-1-105 and 6-1-703 by all Defendants; (14) unjust enrichment by all Defendants; and (15) a right to accounting against all Defendants.  (D. 54).  Defendants argue that the Second Amended Complaint should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (D. 55).

## II.      LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To state a claim that is plausible on its face, a complaint must "sufficiently allege[] facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  And a plaintiff may not rely on mere labels,

conclusions, or formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555. During this stage of the litigation, the complaint does not need detailed factual allegations, but it must provide more in order to raise "a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has merely alleged but has failed to show "that the pleader is entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

### III.   ANALYSIS

#### A.  Supplemental Authority

Defendants filed a Notice of Supplemental New Authority on April 1, 2020 (D. 98), to which Plaintiff filed a Response (D. 99). Defendants submitted a recent decision from this Court in *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-CV-01301-PAB-GPG, 2020 WL 1322855 (D. Colo. Mar. 20, 2020), arguing that the management agreements from that case and the instant case are identical in all relevant aspects and that the Court held that the management agreement imposed no fiduciary duty on the management company. (D. 98, p. 1). Plaintiff argues that Defendants are attempting to submit a sur-reply and disputes that the management agreement is identical to the agreement in *RCHFU*. (D. 99, p. 2). This Court reminds the parties that "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citation omitted). While this Court appreciates the notification of a related decision, the decision in *RCHFU* does not bear any weight regarding the

issues and facts before the Court in the instant case, especially when the facts of the cases and actions by the parties differ[3] and where the interpretation of a contract is generally restricted to the four corners of the document.  *See, e.g., Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016).  This Court will instead examine the issues in the instant motion independently.

### B.  Contract-based Claims (Causes of Action 4-9)

Interpretation of a contract or breach thereof is a matter of law, which can be reviewed on a motion to dismiss.  *McKinnis v. Fitness Together Franchise Corp.*, No. 10-CV-02308-RPM, 2010 WL 5056666, at *3 (D. Colo. Dec. 6, 2010).  The courts look to the plain language of the contract to ascertain its meaning.  *State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo. 1997); *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003).  And unless there is an ambiguity in the contract, the courts must enforce the contract as it is drafted.  *Allen*, 71 P.3d at 378.  "In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's provisions."  *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) (citing *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748, 750 (Colo. 1978) (en banc)).

Plaintiff, in order to establish breach of contract, must show:  (1) "the existence of a contract"; (2) "performance by the plaintiff or some justification for nonperformance"; (3) "failure to perform the contract by the defendant;" and (4) "resulting damages to the plaintiff."  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (collecting cases).

---

[3] This Court notes that the Aspen Highlands Condominium Association reached a settlement with plaintiffs and was dismissed from the lawsuit as a defendant.  (D. 98-1 p. 11).  That is not the case here, as Plaintiff is the homeowners' association. Furthermore, the Court determined that defendants only had standing to challenge plaintiffs' claims that defendants aided and abetted a breach of a fiduciary duty and constructive fraud claims based on the condominium association's alleged breach of fiduciary duty.  (*Id.*).  That is also not the case here.  Finally, the Court merely concluded that plaintiffs were not entitled to summary judgment on the basis that the management company breached fiduciary duties owed to plaintiffs.  This case analyzes very different issues.

Defendants argue in their motion to dismiss that Plaintiff's "contract-related claims fail because both the contracts and the Governing Documents expressly permit the complained-of conduct." (D. 55, p. 4). Moreover, Defendants argue that because the conduct was expressly permitted, Plaintiff cannot allege that any damages resulted from a breach of contract or that Defendants failed to perform. (D. 55, p. 11). Specifically, Defendants note that section 5.1 of the 2005 Club Rules permits the Developer to arrange for an external exchange. (D. 97, p. 2). Section 5.1 notes:

> In order to increase the range of options available to Club Members, HVOI has arranged for an "External Exchange Program." This program currently consists exclusively of an exchange agreement between HVOI and Interval International, Inc., as the External Exchange Company ("Interval"), under which HVOI is a "corporate member" on behalf of all Club Members. The exchange agreement between Interval and HVOI allows Club Members to exchange to resorts that participate in the Interval exchange network. The existing exchange agreement expires on December 31, 2007, unless earlier terminated in accordance with its terms. Neither Interval nor HVOI is obligated to renew the agreement. Interval, HVOI, and their respective subsidiaries and affiliates are separate and distinct entities. Neither Interval or HVOI, nor any other subsidiary or affiliate of Interval or HVOI, has agreed or will agree to assume, guarantee or otherwise be responsible for any of the obligations, acts or omissions of the other party in connection with this offering. HVOI is not an agent for Interval and no representations or promises made by HVOI, or its agents, are binding on Interval. Interval's responsibility for representations regarding Interval's exchange program, as well as Interval's current or future services are limited to those made in written materials furnished by Interval.

(D. 54-6, p. 112). Furthermore, the Colorado Disclosure Document noted:

> In order to increase the range of options available to HPC Club Owners, HVGG and the Trust Association have entered into the Club to Club Exchange Agreement which provides for an "External Exchange Program" with Hyatt Residence Club. The exchange agreement allows HPC Club Owners to exchange to resorts that participate in the Hyatt Residence Club exchange network. The Club to Club Exchange Agreement continues perpetually, unless earlier terminated in accordance with its terms. The HPC Club and the Hyatt Residence Club are separate vacation ownership plans. The purchase of an interest in the HPC Club should not be based on the availability of inventory in the Hyatt Residence Club. Purchasers of Vacation Ownership Interests are not members of the Hyatt Residence Club.

(D. 54-3, p. 31).   Finally, The Multisite Public Offering Statement detailed that the Club participated in both an internal and external exchange program.  (D. 54-1, pp. 58-62).  Plaintiff contends that the Portfolio Club, i.e., the points-based program, is not authorized by the External Exchange Program but rather is a second timeshare program.  (D. 86, p. 8).  Plaintiff argues that the Portfolio Club is not an exchange program because it is "built primarily on Hyatt Residence club fractionals."  (*Id.*, p. 9).  Defendants counter that "nothing in the quoted language in the Governing Documents on which the Association relies for this argument (the Resort Agreement and the Multisite Public Offering Statement) suggests that the Portfolio Club exchange program is not an 'external exchange' simply because it incorporates Hyatt Residence Club fractional interests." (D. 97, p. 3).  This Court agrees.  The term "External Exchange Program" is defined as "the contractual arrangement between HVOI and an External Exchange Company or Companies under which Club Members may reserve, under certain conditions, the use of accommodations in resorts other than Club Resorts."  (D. 54-1, p. 14).  Plaintiff points to no language in the Governing Documents that would distinguish the Portfolio Club from an authorized exchange program.  The Colorado Disclosure Document clearly indicates that it is a club to club exchange program.  (D. 54-3, p. 31).

Plaintiff alleges that section 6.1 of the Hyatt Vacation Club Rules and Regulations prohibits Defendants from executing the Portfolio Club:

> Use of the accommodations and facilities associated with the Club is limited solely to the personal use, during their reserved period of occupancy, of Club Members, their guests, invitees, exchangers and lessees, and to the number of authorized users permitted to occupy the Unit as may be posted in the Unit or set forth in the site rules and regulations. Purchase of a Timeshare Interest or use of accommodations and facilities associated with the Club for commercial purposes, for contribution to or use in a different timeshare plan or vacation club, or for any purpose other than the personal use described above is expressly prohibited.

(D. 54-1, p. 29).  A Club Member is defined as "owner of record of a Timeshare Interest at any Component Resort, or an owner of record of a Timeshare Interest at an Affiliate Resort who has complied with all of the terms and conditions for membership in the Club as determined by HVOI for that Affiliate Resort."  (*Id.*, p. 12).  And in the preamble, it states that "[e]ach Club Member of the Hyatt Vacation Club shall be governed by and shall comply with the terms and conditions of these Hyatt Vacation Club Rules and Regulations, as amended from time to time."

Analyzing these clauses using their plain meaning, it is clear that the individuals who purchase a Timeshare Interest cannot use their timeshare for commercial purposes.  To restrict G.A. Lodging, who was the developer and not a purchaser of the fractionals, would require the Court to interpret these clauses beyond their plain meaning.  Plaintiff does not cite to any other clauses in the Governing Documents to support this interpretation.  Similarly, the Condominium Rules and Regulations, which limit use of the units for personal use, "apply to all Owners and their families, lessees, employees, agents, invitees and guests with respect to the use of the Units and any other portion of the Condominium."  (D. 54-1, p. 180).  Plaintiff's interpretation of the clauses would render them nonsensical as G.A. Resort would be unable to utilize its 20 percent of unsold fractionals for personal use.

But beyond alleging that there is a breach of contract, Plaintiff must also establish that there are resulting damages.  *Diodosio*, 841 P.2d at 1058.  Plaintiff must establish that the damages are a "proximate consequence of the injury complained of" and cannot be "remote, conjectural, and speculative."  *W. Union Tel. Co. v. Trinidad Bean & Elevator Co.*, 267 P. 1068, 1069 (Colo. 1928).  This Court finds that Plaintiff's allegations that the creation and unveiling of the Portfolio Club damaged Plaintiff's and the Owners' property values too attenuated.  (D. 54, p. 42-43, 46, 48).  Plaintiff first alleges that fees for repairing wear and tear have increased due to short-term stays.

(*Id.*, pp. 37-38).  Plaintiff then alleges that these fees and costs have directly affected the property value while dismissing the notion that market values for many timeshares and properties declined in the past few years.  (*Id.*, pp. 5, 36-38).  Plaintiff fails to establish that any alleged breach of contract was a proximate cause of any damages that are not remote, conjectural, or speculative. Thus, this Court finds that, as an initial matter, Plaintiff failed to establish resulting damages for a breach of contract and recommends that Defendants' motion to dismiss be granted regarding these claims.

1.  <u>Fourth Cause of Action:  Breach of Contract — Public Offering Statement and/or Declarations (Against G.A. Lodging)</u>

Plaintiff alleges that G.A. Lodging is in breach of the Public Offering Statement (POS) that was distributed to each prospective buyer and became a contract once the purchaser executed the standardized purchase contract that was included with the POS.  (D. 54, p. 47).  Specifically, Plaintiff alleges that "Section 6.3 prohibits the partition of timeshare interests, and Section 12.5 prohibited any 'use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the Property by Owners.'" (*Id.*, p. 48).  Plaintiff alleges that "Defendants' transfer of unsold inventory to the Portfolio Trust and imposition of the Portfolio Club breached these provisions of said contract or in the alternative of the unrecorded or recorded Declarations."  (*Id.*).  Section 6.3 of the Declaration states:

> No action for partition of any Unit or Timeshare Interest or to any appurtenance to a Unit or Timeshare Interest shall lie. Notwithstanding such limitation, if any Unit or Timeshare Interest is owned by two (2) or more persons as tenants-in-common or as joint tenants, nothing herein contained shall prohibit a judicial sale of such Unit or Timeshare Interest in lieu of partition as between such cotenants or joint tenants.

(D. 54-6, p. 26).  And section 12.5 notes:

No nuisance shall be allowed upon the Property or within a Unit, nor any use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the Property by the Owners. All parts of the Condominium shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate or any fire hazard allowed to exist. No Owner shall permit any use of a Unit or make or permit any use of the Common Elements that will increase the cost of insurance upon the Property. Every Owner, occupant, tenant, guest and invitee recognizes that the Property includes Units allowing a mix of uses including long term occupancy in Affordable Housing Units, commercial activities in Commercial Units and short term occupancy in Timeshare Units. The Executive Board shall have the authority to regulate activities among the various Unit types in order to preserve harmony and prevent disruption within the Condominium.

(*Id.*, p. 47).

Defendants argue that the "POS, the Declaration, the Resort Agreement, the Multisite Statement, Disclosure Statement, Disclosure Guide, and the form Purchase Agreements signed by each Owner expressly permit the affiliation and use of inventory (including unsold inventory) at the Resort for exchange with existing and new exchange programs." Defendants argue that the fractional interests that G.A. Lodging transferred to the Portfolio Trust were wholly owned by it and were not partitioned. Indeed, section 4.3(a) states:

The Declarant reserves exclusive easement rights in, on, within, over and across the Property for the purpose of marketing, sales, rental and management of Units and Timeshare Interests at this Condominium, Timeshare Interests at other Club Resorts or such other timeshare or multisite timeshare plans developed or marketed by Declarant or its affiliates from time to time, and for the purpose of leasing any Units that have not been sold or conveyed . . . The Declarant shall have the right to utilize any unsold Units and Timeshare Interests on the Property as sales models for the purpose of marketing, sales and rental of Units and Timeshare Interests at this Condominium, Timeshare Interests at other Club Resorts or such other timeshare or multisite timeshare plans developed or marketed by Declarant or its affiliates from time to time.

(*Id.*, p. 20).

Plaintiff does not allege how specifically G.A. Resort is in breach of sections 6.3 and 12.5 by transferring the unsold inventory to the Portfolio Trust, except to argue that, essentially, the

Portfolio Club's operation at the Resort constitutes a nuisance due to excess wear and tear on the units and that "that *Units* and *appurtenances* to the Club cannot be partitioned; membership in the Hyatt Residence Club is an appurtenance to Timeshare Interests." (D. 86, pp. 14-15). However, this Court must "'examin[e] the entire instrument, and not . . . view[ ] clauses or phrases in isolation.' While every relevant provision must be considered and given effect, "a more specific provision controls the effect of general provisions." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quotations omitted). Thus, if a "contractual provision unambiguously resolves the parties' dispute," then this Court's analysis ends. *Id.* Plaintiff does not further explain how the fractional interests can be considered further "partitioned" when the ownership of each unsold fractional was transferred to the Portfolio Trust and did not result in persons as tenants-in-common or as joint tenants. Regardless, even if such fractional interests were partitioned, G.A. Lodging reserved the right to change the size of undivided fractional interests under section 14.4. (D. 54-6, p. 54). Thus, Plaintiff's allegation fails to state a claim for breach of contract, and this Court recommends granting Defendants' motion to dismiss this claim.

        2.   Sixth Cause of Action:  Breach of Contract — Management Agreement (Against HVGM)

Plaintiff alleges that HVGM is in breach of the Management Agreement because HVGM failed to act in its fiduciary capacity "to protect the Association's assets by hiding and facilitating the transfer of the Developer fractionals to the Portfolio Trust." (D. 54, p. 53). Specifically, Plaintiff alleges that HVGM had a duty to disclose any significant changes in reservation and exchange procedures and did not notify Plaintiff or the Owners about the transfer of the fractionals into the trust. (*Id.*). Moreover, Plaintiff alleges that the Management Agreement required HVGM "to maintain the Hyatt Residence Clubs first-class brand standards . . . which duty it directly breached." (*Id.*). Finally, Plaintiff alleges that HVGM breached the Management Agreement

"through its fiduciary breaches" alleged in the first cause of action. (*Id.*) Section 6(m) specifically provides that

> The Management Company shall be responsible for handling all Association business regarding any vacation club (including Hyatt Vacation Resorts Club) and exchange company or other companies affiliated with the Condominium. The Management Company shall use its best efforts to ensure that relationships with such companies are maintained in such a manner as to maximize the benefits available to Owners in its sole discretion. The Management Company will also be responsible for working with such companies to stay abreast of relevant reservation and exchange procedures, Club rules and regulations and for informing the Association, the Board and Owners of any significant changes in these procedures. Services to be performed pursuant to this paragraph shall be performed as required.

(D. 54-7, p. 7). Under section 34, HVGM had an obligation to maintain the Resort "in accordance with 'first-class' standards determined by Management Company and similar to those of other resorts operated by Hyatt Vacation Management Corporation." (*Id.*, p. 13). And under section 7,

> [t]he Management Company shall act in a fiduciary capacity with respect to the proper protection of and the accounting for the Association's assets. In this capacity, the Management Company shall deal at arm's length with all third parties and shall serve the Association's interests at all times; provided, however, that nothing contained herein shall prevent the Management Company from procuring necessary services from a Pritzker affiliate, including, without limitation, the Rosemont Purchasing Company and Hyatt Corporation, on terms and conditions no less favorable to Association than those that would be generally demanded by unaffiliated persons or entities for comparable services, if applicable, or for the sale or lease of comparable goods. This Contract shall not be construed as prohibiting the Management Company, or any firm or corporation or any related person or entity controlled by the Management Company, from conducting or possessing an interest in any other business or activity, including, but not limited to, the ownership, financing, leasing, operation, development, management and brokerage of real property.

(*Id.*, p. 8).

Defendants argue that HVGM did not breach the Management Agreement because it "does not obligate HVGM to provide advance notice that unsold fractional interests will be used in an external exchange program." (D. 55, p. 14). This Court agrees. Plaintiff fails to allege how the transfer of the unsold fractionals to the Portfolio trust equates to HVGM failing to inform Plaintiff

of changes to "relevant reservation and exchange procedures" or how HVGM failed to maintain the Resort at "first-class standards."  In its response, Plaintiff argues that even if advance notice was not required, HVGM was required to disclose "significant changes" in procedure after the fact.  Plaintiff does not cite to the Management Agreement for support of this argument.  But even if the Court adopted Plaintiff's interpretation, it still fails to allege how (1) HVGM facilitated the transfer of the fractionals to the Portfolio Trust when the fractionals were owned by G.A. Lodging, (2) how such transfer in fractional ownerships equates to a change in reservation and exchange procedures that required HVGM to notify Plaintiff, and (3) what facts Plaintiff relies on to establish that HVGM breached the contract or is in breach of its fiduciary duty.

Plaintiff counters that HVGM was required to "protect and account for Plaintiff's assets," and that the increased "wear and tear from the short-term stays" impacted the Resort's "first-class standards."  (D. 86, p. 16).  However, these arguments are unavailing.  Plaintiff does not allege that HVGM failed to make any repairs or left the Resort in a state that was below the "first-class standards."  Indeed, Plaintiff complains that "the Hyatt Grand Aspen receives a fee that is at most a fourth of the amount it takes to clean that unit" and that costs have increased due to wear and tear from one- or two-day stays.  (D. 54, p. 37).  To state a claim for nuisance, Plaintiff needed to establish:

> that the defendant unreasonably interfered with the use and enjoyment of his property. *Miller v. Carnation Co.*, 33 Colo.App. 62, 516 P.2d 661 (1973). Additionally, the interference which occurs must be substantial in nature in that it would be offensive or cause inconvenience or annoyance to a reasonable person in the community. *Northwest Water Corp. v. Pennetta*, 29 Colo.App. 1, 479 P.2d 398 (1970).

> Liability for nuisance may rest upon any one of three types of conduct: an intentional invasion of a person's interest; a negligent invasion of a person's interest; or, conduct so dangerous to life or property and so abnormal or out-of-place in its surroundings as to fall within the principles of strict liability. *Baughman v. Cosler*, 169 Colo. 534, 459 P.2d 294 (1969).

*Lowder v. Tina Marie Homes, Inc.*, 601 P.2d 657, 658 (Colo. App. 1979); *see also Haas v. Lavin*, 625 F.2d 1384, 1389 (10th Cir. 1980).  Plaintiff does not establish that Defendants unreasonably interfered with the use and enjoyment of their property and therefore fail to state a claim for a breach of contract due to nuisance.

While this Court will analyze the tort-based claim of breach of fiduciary duty infra, Plaintiff does not explain how HVGM breached the management agreement and its contractual fiduciary duties when HVGM is not prohibited "from conducting or possessing an interest in any other business or activity, including, but not limited to, the ownership, financing, leasing, operation, development, management and brokerage of real property."  (D. 54-7, p. 8).  Thus, Plaintiff's allegation fails to state a claim for breach of contract, and this Court recommends granting Defendants' motion to dismiss this claim.

3.   Seventh Cause of Action:  Breach of Contract — Resort Agreement (Against HVGM, G.A. Lodging, and HVGG)

Plaintiff alleges that HVGM, G.A. Lodging, and HVGG[4] are in breach of the 2005 Resort Agreement because (1) these parties failed to describe the Resort fully and accurately to the Owners or purchasers, (2) did not give the Owners the Management Agreement or Resort Agreement, and (3) did not tell the Owners about the Portfolio Club or the transfer of the unsold fractionals into the Portfolio Trust.  (D. 54, p. 56).

First, regarding whether the Owners received the Management or Resort Agreement, Plaintiff fails to state a claim because Plaintiff was in possession of such agreements.  First, in 2005, HVGG (at the time, HVOI), G.A. Lodging, HVGM, and the Association entered into the Hyatt Vacation Club Resort Agreement.  (D. 54-6, p. 74).  Similarly, in 2005, the Association

---

[4] Plaintiff alleges that HVGG was previously known as Hyatt Vacation Ownership, Inc. (HVOI) prior to Marriot Vacation Worldwide's acquisition of ILG in 2018.  (D. 54, p. 9).

entered into the Management Contract with HVGM.  (D. 54-7, p. 1).  Therefore, Plaintiff was in receipt of both contracts and, presumably, it too failed to give the Owners a copy.

Regardless, both contracts set out terms and conditions for an exchange system.  First, the Management Contracts noted that "some of the residential units may be committed to a timeshare ownership regime" and that "some or all of the commercial units may be retained by the developer of the Condominium ("Developer") or sold or leased to other entities from time to time." (D. 54-7, p. 1).  And the Resort Agreement noted that:

> HVOI has established a reservation and exchange system and related services known as the Hyatt Vacation Club (the "Club") for the purpose of providing a means by which the owners of Timeshare Interests in the Resort ("Owners") and in any other resort that is affiliated with the Club ("Club Resorts"), reserve the use of accommodations and related facilities of the Resort and the other Club Resorts, and have access to any other benefits which the Club may provide from time to time, all in accordance with and as restricted by the terms of the Club as set forth in this Agreement and the Hyatt Vacation Club Rules and Regulations ("Club Rules").

(D. 54-6, p. 74).

Regarding whether Defendants failed to properly describe the Resort fully and accurately to the Owners or purchasers, this argument is unavailing as Plaintiff fails to allege that the marketing materials and purchase documents were misleading.  Section 4.1(b) and (c) state that, in connection with the Resort, the parties would agree to:

> b. Only deliver advertising and promotional materials, purchase documents and sales scripts approved in advance by HVOI and fully and accurately describe the Club to Owners and prospective purchasers at the Resort. Developer, Association and Management Company shall not in any way misrepresent the Club or the Resort's relationship with HVOI to Owners or prospective purchasers at the Resort. Developer, Association and Management Company shall not amend, summarize, change or modify any HVOI Materials without the prior express written consent of HVOI.
>
> c. Remain informed of new services and benefits provided by HVOI to Owners.

(D. 54-6, p. 80).  And under Section 4.2, HVGG agreed to:

18

a. Fully and accurately describe the Resort to Club Members. HVOI shall not in any way misrepresent the Resort's relationship with HVOI to Club Members.

b. Remain informed of new services and benefits offered at the Resort.

c. Materially comply with all applicable federal, state and local laws, as well as all applicable administrative rules, regulations and orders in the conduct of its business as such conduct may affect the Resort.

(*Id.*).  Because Plaintiff fails to allege that marketing materials and purchase documents were misleading, it fails to state a claim for breach of contract and, therefore, this Court recommends granting Defendants' motion to dismiss this claim.

4.   <u>Ninth Cause of Action:  Breach of the Implied Covenant of Good Faith and Fair Dealing (Against G.A. Lodging and Its Hyatt and ILG Alter Egos or Successors in Interest)</u>

Hyatt Corporation, Hyatt Hotels Corporation, ILG, and Marriott Vacations Worldwide are no longer defendants in this case and Plaintiff has not identified any parties that are alter egos or successors in interest, thus this Court will examine this claim regarding G.A. Lodging.  Plaintiff alleges that G.A. Lodging breached the implied promise and implied covenant of good faith and fair dealing by retaining more than 200 unsold fractionals and then selling them to the HPC developer and transferring them into the Portfolio Trust.  (D. 54, p. 59).  Plaintiff contends that the Declaration attached to the POS contained an implied promise that G.A. Lodging would sell a sufficient number of fractionals to make the Resort viable, i.e. it undermined the essential benefits of the program.  (*Id.*; D. 86, p. 18)).

Colorado law recognizes an implied covenant of good faith and fair dealing in every contract.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (collecting cases).  "The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations."  *Id*.  However, the covenant cannot "contradict terms or conditions for which a party has bargained."  *Id*.   The implied covenant of good faith and fair dealing

generally only applies in situations where parties do not specify essential contractual terms 'such as quantity, price, or time'" and is interpreted narrowly.  *Hoyt v. Marriott Vacations Worldwide Corp.*, No. CIV. 12-3093 DSD/JJK, 2014 WL 509903, at *4 (D. Minn. Feb. 7, 2014) (quoting *Amoco Oil Co.*, 908 P.2d at 498).  "The duty of good faith and fair dealing may be relied upon 'when the manner of performance under a specific contract term allows for discretion on the part of either party.'"  *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (quoting *Amoco Oil Co.*, 908 P.2d at 498).  "Discretion in performance occurs 'when the parties, at formation, defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation."  *Id.*

Here, the POS clearly permitted the Defendants to engage in an External Exchange Program.   (D. 54-1).   Unlike *Reiser v. Marriott Vacations Worldwide Corp.*, No. 216CV00237MCECKD, 2016 WL 1720741, at *5 (E.D. Cal. Apr. 29, 2016), Plaintiff does not present "factual allegations that the conduct of the Defendants unfairly frustrated the agreed upon purposes of the contract and disappointed Plaintiff['s] reasonable expectations."   And Plaintiff does not allege that the parties deferred decisions on the terms of the contract.   Here, 80 percent of the fractionals were sold to the Owners and the remaining 20 percent of the fractionals were transferred to the Portfolio Trust.   The amount of fractionals G.A. Lodging was required to sell is ancillary rather than essential to Plaintiff's claim that Defendants undermined the essential benefits of the program.   Accordingly, this Court recommends granting Defendants' motion to dismiss regarding this claim.

5.   Eighth Cause of Action:  Tortious Interference with Contract (Against All Defendants)

Plaintiff alleges that Defendants tortiously interfered with the contracts that Plaintiff and the Owners had (specifically, Purchase Agreement, the Management Agreement, the Declaration,

and the Resort Agreement) by purchasing the unsold fractionals from G.A. Lodging and then transferring them to the Portfolio Trust.  Plaintiff further alleges that Defendants interfered with the contracts by restricting the Owner's ability to reserve float weeks during the Home Reservation Period.  (D. 54, pp. 57-58).  Defendants argue that this claim should be dismissed against G.A. Lodging, HVGM, and HVGG with respect to their own contracts—the POS and Declaration for G.A. Lodging; the Management Agreement for HVGM; the Resort Agreement for G.A. Lodging, HVGM, and HVGG because a party cannot tortiously interfere with its own contract.  (D. 55, p. 16).  This Court agrees.

In order to establish tortious interference, Plaintiff must show:  (1) "the plaintiff had a contract with another party"; (2) "the defendant knew or should have known of such contract's existence"; (3) "the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff"; and (4) "the defendant's actions caused the plaintiff to incur damages."  *Lutfi v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001) (citation omitted).  Regarding the third element, the interference must be "both intentional and improper." *Amoco Oil Co.*, 908 P.2d at 500.  "Even if the interference is intentional, therefore, liability does not attach unless the court concludes that the actor's conduct is also improper."  *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1118 (Colo. 1990).

"Under Colorado law, injuries sufficient to support a claim for tortious interference with contract include direct pecuniary losses from the breached contract, consequential losses that flow from the interference, and harm to reputation"  *Cypress Advisors, Inc. v. Davis*, No. 16-CV-01935-MSK-MEH, 2019 WL 1242331, at *7 (D. Colo. Mar. 18, 2019) (citing *Westfield Dev. Co.*, 786 P.2d at 1120).  However, a party cannot tortiously interfere with its own contract, it must "intentionally cause[ ] a third person not to enter into a prospective contractual relation with

another." *Id.* at 501; *see also Chambers v. Prowers Cty. Hosp. Dist.*, No. CIFV.A. 07-CV-01736W, 2009 WL 902416, at *15 (D. Colo. Mar. 31, 2009) ("In general, a party cannot intentionally interfere with a contract to which it is a party."). Finally, in order to assert a claim of tortious interference, there must be a breach of contract. "If the contract has been fully performed, then there has been no interference" *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1118 (10th Cir. 2009) (citing *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748, 751 (Colo. 1978)).

As discussed supra, Plaintiff has failed to establish a breach of contract against G.A. Lodging, HVGM, and HVGG. And as previously analyzed, these parties cannot tortiously interfere with their own contracts. Thus, Plaintiff fails to state a claim for tortious interference. And regarding the remaining Defendants (Chicago Title, HPC Developer, and HPC Owners) Plaintiff does not allege that these parties engaged in impermissible conduct, competition, or interference. Plaintiff argues that all the parties aided and abetted HVGM, HVGG, and G.A. Lodging in breaching their fiduciary duties and committing constructive fraud, however, the remaining Defendants cannot be held liable for tortious interference of contract under this theory. *See Amoco Oil Co.*, 908 P.2d at 502 ("Amoco's breach of the covenant of good faith and fair dealing does not translate into liability for tortious interference. These concepts represent separate legal constructs and are intended to remedy different wrongs. Breach of one does not necessarily constitute violation of the other."). Thus, Plaintiff's allegations fail to state a claim for tortious interference of contract, and this Court recommends granting Defendants' motion to dismiss this claim.

### C.  Tort-based Claims (Causes of Action 1-3, 10)

1. Economic Loss Doctrine

Defendants argue that all of Plaintiff's tort claims (1-3 and 10) are barred by the economic

loss doctrine.  Under the economic loss doctrine, "a party suffering only economic loss from the

breach of an express or implied contractual duty may not assert a tort claim for such a breach

absent an independent duty of care under tort law."  *Fid. Nat'l Title Ins. Co. v. Pitkin Cty. Title,*

*Inc.*, 761 F. App'x 802, 806 (10th Cir. 2019) (quoting *A.C. Excavating v. Yacht Club II*

*Homeowners Ass'n, Inc.*, 114 P.3d 862, 865 (Colo. 2005) (en banc)).  "To survive a motion to

dismiss based on the economic loss rule, [a plaintiff] merely has to allege sufficient facts, taken in

the light most favorable to him, that would amount to the violation of a tort duty that is independent

of the contract."  *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d

1003, 1020 (10th Cir. 2018) (quoting *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608

(Colo. 2016)).  "'A breach of a duty which arises under the provisions of a contract between the

parties must be redressed under contract, and a tort action will not lie' . . . If, however, the duty

breached arises 'independently of any contract duties between the parties,' then a tort action

premised on that breach remains viable."  *S K Peightal Engineers, LTD v. Mid Valley Real Estate*

*Sols. V, LLC*, 342 P.3d 868, 872 (Colo. 2015).

Under Colorado law, in order for Plaintiff's claims to survive the motion to dismiss, the

tort claims must arise from breaches of duties that are independent of the contract.  *Town of Alma*

*v. AZCO Const., Inc.*, 10 P.3d 1256, 1265 (Colo. 2000).  "In order for a 'duty to be 'independent'

of a contract, and thus actionable in tort notwithstanding the economic-loss rule,' the duty must

(1) 'arise from a source other than the relevant contract,' and (2) 'the duty must not be a duty also

imposed by the contract.'"  *Swan Glob. Investments, LLC v. Young*, No. 18-CV-03124-CMA-

NRN, 2020 WL 897654, at *5 (D. Colo. Feb. 25, 2020) (quoting *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009)).   The Colorado Supreme Court further clarified that:

> [A]bsent an independent tort duty, a plaintiff is generally barred from suing in tort if (1) the plaintiff seeks redress for breach of a contractual duty that caused only economic losses, (2) the plaintiff is a party to a contract or a third-party beneficiary of a contract as defined above, and (3) that contract defines the duty of care that the defendant allegedly violated or is interrelated with another contract that defines that duty of care.

*S K Peightal Engineers, LTD*, 342 P.3d at 872.   Colorado case law "stresses that it is the source of the duty allegedly breached that determines whether the economic loss rule applies."   *Casey v. Colorado Higher Educ. Ins. Benefits All. Tr.*, 310 P.3d 196, 202 (Colo. App. 2012).   Thus, this Court must examine three factors:  (1) "Is the relief sought in tort the same relief sought for breach of contract?" (2) "Is there an established common law duty of care?" and (3) "Does the tort duty differ from the contractual duty?"   *Id.* (citation omitted).

The Colorado Supreme Court has held that "some special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship" (i.e., attorney-client relationship, physician-patient relationship, insurer-insured relationship) and "certain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim" (i.e., common law fraud claim and negligent misrepresentation).  *Town of Alma*, 10 P.3d at 1263 (collecting cases).   But "'even a duty separately recognized under tort law is not independent if it is also imposed under the parties' contract' because courts assume that sophisticated parties can include the potential cost of breach of contractual duties in contracts they negotiate."  *Casey*, 310 P.3d at 202.

Here, HVGM, as the management company, had clearly defined contractual fiduciary duties.  (D. 54-7, p. 8).  Plaintiff's claim for breach of fiduciary duty against HVGM is clearly barred by the economic loss doctrine.  *Town of Alma*, 10 P.3d at 1262 ("A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie.").  However, absent HVGM, no other Defendant had defined fiduciary duties within the contract and this Court must further analyze the issue.

Plaintiff's complaint focuses on the duty of loyalty and full disclosure owed by G.A. Lodging and HVGG to the Plaintiff due to their control over the Owner's property.  In *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 721 (Colo. App. 2001), the Colorado Court of Appeals held that the economic loss doctrine did not bar a claim of breach of fiduciary duty by the homeowner's association to the developer.  Indeed, the Colorado Court of Appeals determined:

> As set forth in the context of the economic loss rule, a "special relationship[ ] by [its] nature, automatically trigger[s] an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship." *Town of Alma*, 10 P.3d at 1263. The special relationships recognized in Colorado, and they are few, share the same characteristic: each implicates a risk of damages to interests that contract law is not well suited to protect.
>
> Those interests include (1) freedom from physical harm to persons, *see Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993) (physician's duty to exercise professional skill to avoid causing physical harm applies to both patients and non-patient examinees), or to property, *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 316–18 (Colo. 1980) (in repairing boiler, repair person has duty to inspect safety-release valve to prevent explosion); (2) the sense of security enjoyed under an insurance contract, *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo. 1984) (insurance agreement obligates insurer to protect insured's expectation of financial security); and (3) the entitlement to justice within our legal system, *see Town of Alma*, 10 P.3d at 1263; Colo. RPC Preamble and Scope §§ 1, 6 (attorneys, as officers of the court, "hav[e] special responsibility for the quality of justice" pertaining to business and personal conduct, as well as particular client agreements)."

*A Good Time Rental, LLC v. First Am. Title Agency, Inc.*, 259 P.3d 534, 540 (Colo. App. 2011).

Thus, this Court finds that in light of *Colorado Homes, Ltd.* and the interest in the freedom from

harm to property constitutes enough for this Court to find that there may be a special relationship and this Court hesitates to find that Plaintiff's two remaining claims are barred by the economic loss doctrine. *Town of Alma*, 10 P.3d at 1263; *see also RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-CV-01301-PAB-GPG, 2018 WL 1535509, at *8 (D. Colo. Mar. 29, 2018) (finding that plaintiffs' breach of fiduciary duty claim was not barred by the economic loss doctrine). Accordingly, this Court finds that Plaintiff's claims for breach of fiduciary duty by G.A. Lodging and HVGG are not barred by the economic loss doctrine.

Regarding Plaintiff's claim of constructive fraud (second cause of action) and conspiracy (tenth cause of action), however, this Court finds that such claims are barred by the economic loss doctrine. "[A] claim for fraudulent misrepresentation or concealment in connection with the performance of a contract does not necessarily arise independently of the duties set forth in the contract." *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232 (Colo. App. 2012). Here, Plaintiff alleges in its second cause of action, constructive fraud, against HVGM, G.A. Lodging, and HVGG that "[b]y virtue of their non-disclosure of material facts [regarding the Portfolio Club and transfer of unsold fractionals], Defendants were able to take undue advantage of the Plaintiff and the Owners." (D. 54, p. 42). However, Colorado courts have held that "claims of post-contractual fraud related to the performance of the contract are barred by the economic loss rule, particularly where, as here, a plaintiff alleges only economic losses." *Pernick v. Computershare Tr. Co., Inc.*, 136 F. Supp. 3d 1247, 1270 (D. Colo. 2015). Accordingly, this Court finds that Plaintiff's second cause of action is barred by the economic loss doctrine.

Plaintiff alleges in its tenth cause of action (conspiracy) that all Defendants conspired "to operate and run the Association for wrongful financial gain, rather than for the benefit of the homeowners, and to operate and run the Hyatt Residence Club program more generally for their

personal gain."  (D. 54, p. 60).  Again, Colorado courts have determined that "a conspiracy to breach a contract claim cannot be maintained when the . . . parties alleged to have participated in the conspiracy are signatories to the contract . . . [and therefore] the conspiracy claim is barred by the economic loss rule."  *Logixx Automation, Inc. v. Lawrence Michels Family Tr.*, 56 P.3d 1224, 1231 (Colo. App. 2002).  Again, Plaintiff only alleges economic losses.  Accordingly, this Court finds that the tenth cause of action is also barred by the economic loss doctrine.

### 2.   First Cause of Action:  Breach of Fiduciary Duty (Against G.A. Lodging and HVGG)

In order to plead a breach of fiduciary duty, Plaintiff must establish:  (1) "the existence of a fiduciary relationship between plaintiff and defendant"; (2) "defendant's breach of the fiduciary duty"; and (3) "damages as a result of the breach." *F.D.I.C. v. Refco Grp., Ltd.*, 989 F. Supp. 1052, 1080 (D. Colo. 1997).  Plaintiff has the burden of demonstrating that it "incurred damages and that the defendant's breach of fiduciary duty was a cause of the damages sustained."  *Aller v. Law Office of Carole C. Schriefer, P.C.*, 140 P.3d 23, 26 (Colo. App. 2005).

Plaintiff alleges that G.A. Lodging and HVGG owed fiduciary duties to the Owners and Plaintiff, specifically the duties of loyalty and full disclosure.  (D. 54, p. 39).  Plaintiff alleges that G.A. Lodging and HVGG breached their fiduciary duties by:  (1) running the affairs of the Association for their own benefit; (2) making critical, adverse changes to the terms at the Resort to the detriment of Plaintiff and Owners, specifically recording a different version of the Declaration than what was provided to the purchases, implementing the Portfolio Club at the Resort, and revising the Residence Club Rules with new adverse terms; (3) not disclosing these critical changes to the Owners; (4) conspiring with Defendants to retain and transfer the unsold fractionals to the Portfolio Trust; (5) operating the resort to benefit the competing Portfolio Trust, specifically exploiting control over the reservation system, which negatively affected Owners;

(6) interpreted ambiguous documents in their favor; and (7) HVGG agreed to be a program manager for a known competitor without disclosing to Plaintiff.  (*Id*., pp. 39-40).

Defendants argue in their motion to dismiss that Plaintiff fails to establish the existence of a fiduciary relationship between the parties as G.A. Lodging and HVGG did not owe Plaintiff a fiduciary duty.  Specifically, Defendants argue that G.A. Lodging owed no fiduciary duty to Plaintiff when transferring the remaining fractional interests to the Portfolio Trust and that its role as director of the Association did not bleed into its role as Resort Developer.  (D. 55, pp. 24-25). Regarding HVGG, Defendants argue that acting as program manager of the reservation and exchange system does not amount to exercising control over the Resort.  (*Id*., p. 26).

### i.    Existence of Fiduciary Duties

"[A] fiduciary duty arises when one party has a high degree of control over the property or subject matter of another, or when the benefiting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest."  *MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 889 (Colo. App. 2007) (quoting *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992)).

### a.   HVGG

Under the Hyatt Residence Club Rules for 2017, "The Club shall be operated and managed by HVGG pursuant to the terms of the Club Documents. HVGG is expressly authorized to take such actions as it deems necessary or appropriate for the operation of the Club, including, but not limited to, the implementation of all reservation system duties as outlined in these Rules and Regulations."  (D. 54-4, p. 9).  Plaintiff alleges that HVGG is an agent of the Plaintiff under the Resort Agreement and exercised a high degree of control over the property because it managed "the reservations system, points allocation, and exchanges with other Hyatt Residence Clubs, while

also being able to reject management companies." (D. 86, p. 26). Defendants argue that HVGG does not exercise a high degree of control over the Resort. This Court agrees with Defendants. Under the Hyatt Vacation Club Resort Agreement, HVGG (then HVOI)

> has established a reservation and exchange system and related services known as the Hyatt Vacation Club (the "Club") for the purpose of providing a means by which the owners of Timeshare Interests in the Resort ("Owners") and in any other resort that is affiliated with the Club ("Club Resorts"), reserve the use of accommodations and related facilities of the Resort and the other Club Resorts, and have access to any other benefits which the Club may provide from time to time, all in accordance with and as restricted by the terms of the Club as set forth in this Agreement and the Hyatt Vacation Club Rules and Regulations ("Club Rules").

(D. 54-6, p. 74). HVGG runs the reservation and exchange system for multiple Club Resorts and based on Plaintiff's logic, HVGG would have a fiduciary duty to each and every Club Resort for which it manages the reservation system. Plaintiff does not explain how HVGG is an agent of the Plaintiff and points to no provision in the Resort Agreement supporting such a claim. Nor does this Court find that HVGG exercised a high degree of control over the Association or the Resort.

In *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1118-19 (D. Colo. 2010), *aff'd*, 566 F. App'x 681 (10th Cir. 2014), the court found that defendant's request for access to information regarding the plaintiff's efforts to sell a property and act of providing advice regarding management of the property and selling strategies did not " give rise to an inference that the Defendants intended to assume a fiduciary duty to act for the Plaintiff in aiding in the sale of the property." Likewise, HVGG's management of the reservation and exchange system does not give rise to an inference that it intended to assume a fiduciary duty to act on the behalf of the Association. *See Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) ("[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties."). Plaintiff does not plead facts to show that HVGG intended to assume a fiduciary duty, assume a high level of control over the Resort, or that the Association placed a high

level of trust and confidence in HVGG to look out for its best interest.  Rather, what Plaintiff's allegations show is that HVGG was performing its contractual duties to manage the reservation and exchange system across a number of affiliated Clubs.  Therefore, this Court rejects Plaintiff's allegations that fiduciary duties existed based on control of the Resort.

### b.  G.A. Lodging

Plaintiff alleges that G.A. Lodging became a fiduciary through its service on the Board of Directors as well as through its control of the Resort.  (D. 86, p. 27).  Plaintiff also alleges that G.A. Lodging "became a fiduciary through its control" of the Resort because it:

> (i) wielded formal control over the board until 2012, Declaration § 9.7;
> (ii) inserted provisions into the Declaration that gave it perpetual powers, such as the right to amend the document unilaterally while restricting the Plaintiff's and Owners' powers, *see, e.g.*, § 16.2, and power gained by retaining ten commercial units, § 16.1(c);
> (iii) gave itself broad powers over implementing the Hyatt Residence Club program at the Hyatt Grand Aspen, *id.* Art. XVIII; and
> (iv) exercised voting power at the property by retaining and indeed thwarting the sale of 20 percent of the residential fractionals.

(D. 54, p. 29).

Defendants argue that Plaintiff fails to plead facts showing that G.A. Lodging had "control over the Association," and that "the Association had no authority to amend Governing Documents, transfer fractional interests, authorize the establishment of the Portfolio Club, implement the Portfolio Club, or control the reservation system," thus G.A. Lodging's actions cannot constitute a breach of fiduciary duty since these were not within the Association's authority.  Moreover, Defendants argue that G.A. Lodging's position as Association director until 2012 is irrelevant to Plaintiff's claim of breach of fiduciary duty.  (D. 55, pp. 24-25).

Plaintiff alleges that G.A. Lodging did not wield formal control over the board after 2012.  However, Plaintiff's main complaint is that "Defendants imposed the Portfolio Club and all of its

attendant harm on Plaintiff and Owners without any opportunity to object," which occurred approximately five years later. Despite this lack of specificity regarding the timeline and when G.A. Lodging allegedly breached its fiduciary duties in the Second Amended Complaint, the Court will analyze Plaintiff's allegations.

Defendants cite *Summerhouse Condo. Ass'n, Inc. v. Majestic Sav. & Loan Ass'n*, 615 P.2d 71, 73 (Colo. App. 1980), in support of their argument that Colorado courts have found that a developer owes no fiduciary duty to a homeowners' association. However, Colorado courts have been quick to distinguish *Summerhouse*, as the trial court had dismissed the association's complaint for lack of standing on behalf of the unit owners. *See Villa Sierra Condo. Ass'n v. Field Corp.*, 787 P.2d 661, 667 (Colo. App. 1990); *Council of Unit Owners of Sea Colony E. v. Carl M. Freeman Assocs.*, *Inc.*, 531 A.2d 1217, 1219 (Del. Super. Ct. 1987) ("In *Summerhouse* here is no indication that the association was seeking damages for commonly held property, but rather it appears that the association was seeking to represent all owners with common claims rather than common ownership."). Defendants do not argue that Plaintiff lacks standing to bring claims on behalf of the Owners, and thus this Court finds that this case is distinguishable from the instant facts. However, Plaintiff also fails to cite any cases where Colorado courts have found that the developer owes a fiduciary duty to a homeowners' association. And an "ordinary business relationship should not be construed as a fiduciary relationship, absent clear intent by the parties." *Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1245 (10th Cir. 2006).

However, this Court's analysis does not end there. The Restatement of Property recognizes that there can be a fiduciary duty on the part of the developer to the association regarding projects that affect the community. It notes:

> Until the developer relinquishes control of the association to the members, the developer owes the following duties to the association and its members:

> (1) to use reasonable care and prudence in managing and maintaining the common property;
> (2) to establish a sound fiscal basis for the association by imposing and collecting assessments and establishing reserves for the maintenance and replacement of common property;
> (3) to disclose the amount by which the developer is providing or subsidizing services that the association is or will be obligated to provide;
> (4) to maintain records and to account for the financial affairs of the association from its inception;
> (5) to comply with and enforce the terms of the governing documents, including design controls, land-use restrictions, and the payment of assessments;
> (6) to disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining; and
> (7) to disclose all material facts and circumstances affecting the financial condition of the association, including the interest of the developer and the developer's affiliates in any contract, lease, or other agreement entered into by the association.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 6.20 (2000). The comments note that "[t]he developer's relationship to the association is a fiduciary relationship during the period that the developer controls the association" but "does not occupy a fiduciary relationship to the purchaser." *Id*.

The first two allegations (running the affairs of the Association for their own benefit and making critical, adverse changes to the terms at the Resort) do not pertain to projects that affect the community or shared spaces. Plaintiff's first two allegations appear to be related to G.A. Lodging's conduct while G.A. Lodging was a member of the Executive Board (i.e., during or before 2012). However, Plaintiff fails to specify exactly when these alleged wrongs occurred or what constituted "running the affairs of the Association for [G.A. Lodging's] own benefit." According to the Declaration, section 9.7(d):

> Declarant [G.A. Lodging] shall be entitled to appoint and remove the members of the Association's Executive Board and officers of the Association to the fullest extent permitted under CCIOA. As long as Declarant owns any interest in the Condominium the Declarant shall be entitled to appoint a member of the Executive

Board.  Declarant may voluntarily relinquish such power evidenced by a notice recorded in the Records, but, in such event, Declarant may at its option require that specified actions of the Association or the Executive Board as described in the recorded notice, during the period Declarant would otherwise be entitled to appoint and remove directors and officers, be approved by Declarant before they become effective."

(D. 54-1, p. 113).  Based on this language within the Declaration, it appears that G.A. Lodging had the power to take part in running the Association.  Because Plaintiff fails to allege facts of how G.A. Lodging ran the Association for its own benefit, this Court finds that Plaintiff fails to state a claim upon which relief can be granted.  Moreover, Plaintiff alleges that G.A. Lodging recorded a different version of the Declaration than what was provided to purchasers, but Plaintiff fails to allege when this occurred or what the "critical, adverse changes" were.  (D. 54, p. 39).  Regardless, the Purchase Contract and Declaration (recorded in Pitkin County in 2005) permitted G.A. Lodging to amend the Declaration at any time without disclosing this information to Plaintiff.  (D. 54-10, p. 7; D. 54-6, pp. 56-57).  And Plaintiff does not attach a version demonstrating that the Declaration was different from what was recorded in 2005.  Thus, regarding these allegations, this Court finds that Plaintiff failed to state a claim upon which relief could be granted.

The remainder of Plaintiff's claims for breach of fiduciary duty are regarding the creation of the Portfolio Trust and the transfer of the unsold fractionals:  (1) conspiring with Defendants to retain and transfer the unsold fractionals to the Portfolio Trust; (2) operating the resort to benefit the competing Portfolio Trust, specifically exploiting control over the reservation system, which negatively affected Owners; and (3) interpreted ambiguous documents in their favor.  G.A. Lodging transferred the fractionals to the Portfolio Trust in 2017.  According to Plaintiff, G.A. Lodging was no longer in control of the Board after 2012.  According to the Restatement of Property, a developer would owe fiduciary duties to the Association until the developer relinquished control of the association to the members.  According to Plaintiff, this occurred in

2012 and thus Plaintiff fails to state a claim upon which relief can be granted. Accordingly, this Court recommends granting Defendants' motion to dismiss regarding this claim. And because this Court finds that Plaintiff has failed to establish that G.A. Lodging and HVGG owed any fiduciary duties to Plaintiff, it does not need to analyze this issue further.

3. Third Cause of Action:   Aiding & Abetting Breaches of Fiduciary Duty (Against All Defendants)

"The elements of the tort of aiding and abetting a breach of fiduciary duty include: (1) breach by a fiduciary of a duty owed to a plaintiff, (2) a defendant's knowing participation in the breach, and (3) damages." *Nelson v. Elway*, 971 P.2d 245, 249 (Colo. App. 1998) (citing *Holmes v. Young*, 885 P.2d 305 (Colo. App. 1994); RESTATEMENT (SECOND) OF TORTS § 876(b) (1977)). "Liability for aiding or abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and the defendant knowingly and substantially assists the principal violation." *Holmes*, 885 P.2d at 308.

Here, Plaintiff alleges that HVGM, HVGG, and G.A. Lodging aided and abetted the Hyatt, ILG, and Marriott Defendants. (D. 54, p. 45). However, as discussed above, Plaintiff did not establish that Defendants owed any fiduciary duties to the Association, that Defendants breached their fiduciary duties, and Hyatt, ILG, and Marriott are no longer parties to this case because this Court lacked jurisdiction over them or they were dismissed. Accordingly, there is no "principal violation" on which to base this claim. *Holmes,* 885 P.2d at 309; *see also Benton v. Avedon Eng'g, Inc.*, No. 10-CV-01899-RBJ-KLM, 2012 WL 5869126, at *11 (D. Colo. Aug. 15, 2012), *report and recommendation adopted in part*, No. 10-CV-01899-RBJ-KLM, 2012 WL 5866303 (D. Colo.

Nov. 19, 2012). Thus, this Court recommends granting Defendants' motion to dismiss for failure to state a claim.

### D. Statutory Claims (Causes of Action 11-13)

1. Eleventh Cause of Action: Violations of the Colorado Organized Crime Control Act (COCCA), C.R.S. § 18-17-104(1)-(3) (Against All Defendants)

Plaintiff next alleges that Defendants violated the Colorado Organized Crime Control Act (COCCA). Colo. Rev. Stat. Ann. § 18-17-104(1)-(3). Plaintiff alleges that Defendants: (1) "knowingly received, and knowingly used and invested, proceeds from a pattern of racketeering activity in real property—namely, the Hyatt Grand Aspen and the resorts in the Residence Club—and from operating an enterprise"; (2) "the Developer and the Management Company knowingly maintained, both directly and indirectly, an interest in as well as control of an enterprise—the Association—through a pattern of racketeering activity"; and (3) "all Defendants and other members of the COCCA Enterprise knowingly conducted and participated in, directly and or indirectly, the associated-in-fact enterprise through a pattern of racketeering activity when employed by or associated with such enterprise." (D. 54, p. 62). Plaintiff argues that the homeowners' association was an "enterprise" under section 18-17-103(2) and that Defendants "used the Association as a pawn to perpetrate a pattern of criminal activity." (*Id*.). Alternatively, Plaintiff alleges that the Defendants constituted an "associated-in-fact enterprise" because they "knowingly associated in fact" to create the Trust Portfolio and transfer the remaining fractionals into it. (*Id*., p. 63).

Specifically, Plaintiff alleges that the "fraudulent" and "unlawful purposes" constitute a "pattern of racketeering" under section 18-17-103(3), and includes: (1) failing to use good faith efforts to sell the remaining fractionals and transferring them to the Portfolio Trust; (2) abusing their control of the homeowners' association through membership on it and control of HVGM;

(3) abusing their power as program manager of the Residence Club and Portfolio Club and using their control over the reservation system to reserve the most desirable weeks for points members; (4) failing to disclose information to Owners and Plaintiff; (5) failing to expand the Residence Club network and undermining the fractional ownership model by converting Owners of fractional to points owners, limiting access to new clubs, and failing to develop new Residence Club properties; (6) keeping points low to entice Portfolio Club users; (7) changing the terms without the Owners and Plaintiff agreeing to the changes; and (8) profiting through the licensing of the Hyatt name to the Residence Club and Portfolio Club.  (D. 54, pp. 64-65).

Finally, Plaintiff alleges that Defendants committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, by: (1) withholding material about the Portfolio Trust despite Owners emailing Defendants for more information; and (2) sending communications to Owners and Plaintiff to mislead them about the Portfolio Trust, which did not include information regarding changes to the 2017 Club Rules or Portfolio Club.  (*Id.*, pp. 65-67).  Plaintiff also alleges that the Defendants offered a false instrument for recording in violation of section 18-5-114 when G.A. Lodging recorded the Special Warranty Deeds for the sale of the fractionals in 2016, but did not "acknowledge the impending Portfolio Club" and claimed that "grantees were obtaining property 'in accordance with the Declaration of Condominium.'"  (*Id.*, p. 68).  Plaintiff alleges that these acts spanned over fifteen years, beginning in 2005.  (*Id.*).  Defendants argue, primarily, that Plaintiff's COCCA claim fails to allege the existence of an enterprise.

To establish a violation under COCCA, Plaintiff must allege that Defendants:  (1) "joined with one another or third parties to form an 'enterprise'" and (2) "that the enterprise engaged in a "pattern of racketeering activity."  *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1125 (D. Colo. 2010), *aff'd*, 566 F. App'x 681 (10th Cir. 2014) (quoting Colo. Rev. Stat. Ann.

§ 18-17-104(3)).  An enterprise is defined as "any individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities." Colo. Rev. Stat. Ann. § 18-17-103(2).  A pattern of racketeering activity can be established by Plaintiff by "proving at least two acts of racketeering activity, as defined in section 18–17–103(5), that are related to the conduct of the enterprise." *People v. Chaussee*, 880 P.2d 749, 758 (Colo. 1994).  Racketeering activity is defined as any conduct under 18 U.S.C. § 1961(1)(A)-(D), which includes a number of violent felonies as well as federal mail and wire fraud, or violation of specific provisions of Colorado law, which includes violent felonies and theft under Colorado Revised Statute § 18–4–401.  *Tara Woods Ltd. P'ship*, 731 F. Supp. 2d at 1125.  The COCCA was modeled on the federal RICO Act, 18 U.S.C. § 1961, "and is generally interpreted according to the same principles, unless Colorado courts have expressly construed the state statute otherwise."  *Id.* (citing *People v. Hoover*, 165 P.3d 784, 798 (Colo. App. 2006)).

This Court finds that Plaintiff does not plausibly allege the existence of an enterprise pursuant to COCCA.  "An enterprise is 'an entity separate and apart from the pattern [of racketeering] in which it engages,' and its existence is proven 'by evidence of an ongoing organization . . . and by evidence that the various associates function as a continuing unit.'" *Carlson v. Town of Mountain Vill., Colorado*, No. 17-CV-02887-PAB-STV, 2019 WL 1331977, at *5 (D. Colo. Mar. 25, 2019) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "A COCCA enterprise constitutes "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 115 F. Supp. 2d 1210, 1227 (D. Colo. 2000),

*aff'd*, 19 F. App'x 815 (10th Cir. 2001) (citations omitted).  Along with engaging in interstate commerce or activities that affect interstate commerce, the enterprise must "function as a continuing unit with an existence beyond that necessary to commit the predicate acts and have an identity distinct from that of the individual Defendants."  *Id.* (finding that the plaintiffs presented sufficient evidence to establish a prima facie showing that the defendants were engaged in an enterprise under COCCA).

Here, Plaintiff alleges that the "enterprise" is the Association and that it was used as a "pawn to perpetrate a pattern of criminal activity."  (D. 54, pp. 62-63).  But Plaintiff, which is the Association, claims to have been in the dark about Defendants' alleged wrongful acts, thus the Association could not logically be the COCCA enterprise.  And Plaintiff does not allege any facts demonstrating how the Association was used to transfer the remaining fractionals to the Portfolio Trust or how it was used to commit any alleged wrongful behavior listed in the Second Amended Complaint.  Thus, Plaintiff fails to allege the existence of an enterprise under COCCA.

Plaintiff next argues in the alternative that the Defendants themselves constituted an "associated-in-fact enterprise," but this claim also fails to allege the existence of an enterprise under COCCA.  Assuming that Defendants' normal corporate actions could be considered the actions of an enterprise (which is generally not the case), Plaintiff still fails to allege any conduct of an enterprise.  In order to allege conduct, "plaintiff must demonstrate that the defendant conducted the affairs of the enterprise rather than simply conducting the defendant's own affairs." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1249 (10th Cir. 2016).  And a corporation, acting through its subsidiaries, agents, or employees typically cannot be both the "person" and the "enterprise."  *Id.*  Plaintiff fails to allege the existence of an enterprise that is separate and apart from Defendants' regular conduct.  Indeed, Plaintiff must do more than allege mere criminal

conduct, as "[c]riminal actors who participate in a pattern of racketeering activity do not automatically constitute an 'association-in-fact . . . enterprise' by the virtue of engaging in joint conduct." *Johnson v. Myelin Prods.*, No. 13-CV-01443-BNB, 2013 WL 4551888, at *3 (D. Colo. Aug. 28, 2013) (citing *Kearney v. Dimanna*, 195 F. App'x 717, 720 (10th Cir. 2006)). Plaintiff cites *People v. Chaussee*, 880 P.2d 749, 753 (Colo. 1994) for the proposition that to establish a "pattern of racketeering activity" under COCCA, "it is not necessary to prove that the criminal acts meet standards of continuity or of relatedness to one another." However, the Colorado courts have clarified:

> *Chaussee* sets forth the general rule that predicate acts in a pattern of racketeering activity must "protect the integrity of the ongoing enterprise" and be "related to the conduct of the enterprise." *Id.* at 760–61. Acts that merely protect a defendant's personal interests or attempt to "cover his tracks" are not sufficiently related to the conduct of the enterprise for liability under COCCA.

*People v. Randell*, 297 P.3d 989, 1003–04 (Colo. App. 2012). Plaintiff does not allege more than Defendants acting in furtherance of their corporate affairs, in a way to protect their personal interests, or in a way to "cover their tracks." Thus, Plaintiff fails to allege that there is an association-in-fact enterprise among all the Defendants.

But even if Plaintiff had alleged the existence of an association-in-fact enterprise among Defendants, Plaintiff still failed to allege a pattern of racketeering activity. Plaintiff alleges that Defendants committed the following predicate acts: (1) mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; (2) violation of the Colorado computer crime statute, Colorado Revised Statute § 18-5.5-102(1)(b); and (3) filing a false instrument or offering a false document for recording, in violation of Colorado Revised Statute § 18-5-114(1), or alternatively, § 18-5-114(3). (D. 54, pp. 65-68).

Acts that would constitute criminal mail or wire fraud, in violation of 18 U.S.C. §§ 1341 or 1343, can constitute "racketeering activity." *See* 18 U.S.C. § 1961(1) (defining racketeering activity). To plead these predicate acts, Plaintiff must plead facts showing: (1) "Defendants engaged in a scheme to defraud by means of false pretenses"; (2) "Defendants acted with the requisite intent to defraud"; and (3) "the scheme contemplated the use of mail or wire transactions." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1076 (D. Colo. 2012) (citing *Burnett v. Amrein*, 243 F. App'x 393, 395 (10th Cir. 2007)); *see also BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999) ("The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud.") (internal quotation omitted). Under Federal Rule of Civil Procedure 9(b), a party must plead fraud with particularity, thus Plaintiff, when alleging the predicate acts of mail and wire fraud, must "set forth the time, place, and contents of the false representation, the identity of the party making the false statement, and the consequences thereof." *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).

First, Plaintiff alleges that Defendants sent "communications" to the Owners and Plaintiff that were "designed to 'lull' them into believing no fraud was underway" or "issued press releases it knew to be false about the acquisition by ILG not changing Owners' rights." (D. 54, p. 65). These allegations fail on their face to set forth the time, place, and contents of the false representations. For the remainder of the mail and wire fraud claims, Plaintiff fails to allege that the Defendants engaged in a scheme to defraud. Plaintiff alleges that HVGG, the management company, sent emails to Owners that were devoid of information discussing the Portfolio Club or the transfer of the remaining fractionals into the Portfolio Trust by G.A. Lodging. (D. 54, pp. 65-

67).  However, these allegations do not satisfy the pleading requirements set forth in *Twombly*, *Iqbal*, and the particularity requirement imposed by Rule 9(b).  *See L-3 Commc'ns Corp., Inc.*, 863 F. Supp. 2d at 1079-80 ("[T]he Amended Complaint gives no indication that such an omission would have been considered material by Serco, such that it was 'defrauded' by the omission of such information."); *but see Tal*, 453 F.3d at 1266 ("Unlike the other twenty-four wire communications alleged (and the forty-six letters), these three communications not only describe the date, the parties to the communication and the subject matter, but also how they were fraudulent and what they were designed to accomplish.").

First, Plaintiff's allegations are deficient because they cannot show that Defendants acted with the requisite intent to defraud.  Plaintiff attributes the emails from HVGG, the management company, to imply that all the entities were acting together in concert or at the parent corporation's direction to conceal information from the Owners.  This does not satisfy Rule 9(b).  *See L-3 Commc'ns Corp., Inc.*, 863 F. Supp. 2d at 1079 ("[I]t is difficult to envision how, under the allegations contained here, the Defendants engaged in any "scheme to defraud.").  Second, Plaintiff does not allege facts in the Second Amended Complaint that would plausibly demonstrate that the emails sent by HVGG fall into a "scheme to defraud theory" of wire fraud whereby the transmittal of information was meant to deceive or induce detrimental reliance.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991) ("While Bacchus disputes the veracity of the claim . . .  the mere transmittal of the information to the sales representatives was not fraudulent.").  And Plaintiff's citation to *In re ClassicStar Mare Lease Litig.*, No. CIV.A. 06-243-JMH, 2011 WL 3608456, at *9-10 (E.D. Ky. Aug. 15, 2011) is unavailing because while "the law makes no requirement that each defendant involved must have personally made a misrepresentation," it does require Plaintiff to allege that the "defendant[s] participated in a

41

scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further the fraudulent scheme." Accordingly, Plaintiff's first predicate act fails to satisfy the Rule 9(b) pleading threshold.

The second predicate act, where Plaintiff alleges Defendants violated the Colorado computer crime statute (CCS), Colorado Revised Statute § 18-5.5-102(1)(b), is equally deficient. Plaintiff alleges that Defendants "in the course of a fraudulent scheme, used computers to draft documents such as the Special Warranty Deed conveying the Developer fractionals to the HPC Developer, the Contribution Deed from the HPC Developer to the Portfolio Trust, the notice of activation of those fractionals in the Portfolio Club, the revised 2017 Club Rules, and related document; to search the Internet; and to send and receive e-mails about this scheme and these documents." (D. 54, pp. 67-68).

Under CCS, a person commits cybercrime if the person knowingly "[a]ccesses any computer, computer network, or computer system, or any part thereof for the purpose of devising or executing any scheme or artifice to defraud." Colo. Rev. Stat. Ann. § 18-5.5-102(1)(b). "The underlying purpose of section 18–5.5–102(1)(b) . . . is to preserve the use of computers for legitimate ends." *People v. Galang*, 382 P.3d 1241, 1248–49 (Colo. App. 2016). Colorado courts have defined "the term 'access' [to mean it] is at least as broad as the term 'use' in the applicable statute." *People v. Robb*, 215 P.3d 1253, 1260 (Colo. App. 2009) (holding that "the evidence . . . was not sufficient to prove use of a computer, where Robb simply provided information about prospective investors to another person, who then sent out computer-generated materials to those prospects."). Specifically, the Colorado court found persuasive language from Michigan case law that defined the term "access" to require:

> more than merely supplying information which ultimately finds its way into a computer system in the normal course of business. We do not believe, on the basis

> of the language of the statute, that the provision is all encompassing. *The computer must serve as the device by which the fraud is perpetrated, and the defendant must participate in the access of the computer as that term is defined by the statute*. Here, the computer merely played an incidental role in processing [Department] paperwork.

*Robb*, 215 P.3d at 1260 (quoting *People v. Jemison*, 466 N.W.2d 378, 380 (Mich. App. 1991)) (emphasis added).

This Court agrees with Defendants that merely drafting documents or sending and receiving emails is not enough to overcome the pleading requirements of Rule 9(b). "Obviously the statute is dealing with the wrongful purpose to injure, *with which the scheme or artifice must be connected*. . . . If the scheme or artifice in its necessary consequence is one which is calculated to injure another, to deprive him of his property wrongfully, then it is to defraud within the meaning of the statute." *Galang*, 382 P.3d at 1249 (quoting *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902)) (emphasis added). When describing these events in the Second Amended Complaint, Plaintiff again fails to specifically identify "the circumstances constituting the fraud." *Henson*, 935 F. Supp. 2d at 1137 (citing *Broadview Fin., Inc. v. Entech Mgmt. Servs. Corp.*, 859 F. Supp. 444, 449 (D. Colo. 1994)). Thus, Plaintiff's second predicate act fails to satisfy Rule 9(b)'s pleading threshold.

Finally, Plaintiff's third predicate act, which alleges a violation of Colorado Revised Statutes § 18-5-114, is also deficient. Plaintiff alleges that G.A. Lodging "recorded documents relating to the public offering at the Hyatt Grand Aspen, including Special Warranty Deeds for the sale of Hyatt Grand Aspen fractionals in 2016 that did not acknowledge the impending Portfolio Club but instead claimed that grantees were obtaining property 'in accordance with the Declaration of Condominium.'" (D. 54, p. 68). A person commits the offense of offering a false instrument for recording when:

> knowing that a written instrument relating to or affecting real or personal property or directly affecting contractual relationships *contains a material false statement or material false information, and with intent to defraud*, he presents or offers it to a public office or a public employee, with the knowledge or belief that it will be registered, filed, or recorded or become a part of the records of that public office or public employee."

Colo. Rev. Stat. Ann. § 18-5-114(1) (emphasis added). "It is well-established that if the predicates acts underlying a COCCA claim are fraudulent acts, the circumstances must be pled with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Colorado Rules of Civil Procedure." *Henson*, 935 F. Supp. 2d at 1137 (D. Colo. 2013). Plaintiff contends that it satisfies the pleading requirements of Rule 9(b) because it "mentioned the year in which these deeds were recorded, 2016, and the deeds are publicly available and is their document." (D. 86, p. 34). But this argument is unavailing. Plaintiff does not identify any false statements within the recorded documents and has the burden to satisfy the pleading requirements of *Twombly*, *Iqbal*, and Rule 9(b). *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Thus, Plaintiff's third predicate act fails to satisfy Rule 9(b)'s pleading threshold.

Accordingly, Plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins*, 519 F.3d at 1247. This Court, therefore, recommends granting Defendants' motion to dismiss for failure to state a claim.

### 2. Twelfth Cause of Action:  Conspiracy to Violate Colorado Organized Crime Control Act (COCCA), C.R.S. § 18-17-104(4) (Against All Defendants)

"A conspiracy claim under COCCA requires an agreement to a pattern of racketeering activity and an agreement to the statutorily proscribed conduct." *Sender v. Mann*, 423 F. Supp. 2d 1155, 1178 (D. Colo. 2006) (citing *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1479 (D. Colo.

1995)).  "Mere association with conspirators, even with knowledge of their involvement in a crime, is insufficient to prove participation in a conspiracy."  *Brooks*, 891 F. Supp. at 1479 (citing *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)).  Plaintiff does not produce any facts demonstrating that Defendants entered into an agreement to defraud Plaintiff or "run the affairs of the Association for private financial gain rather than for the benefit of the members of the Association."  (D. 54, p. 71).  Thus, this Court recommends granting Defendants' motion to dismiss for failure to state a claim.

### 3. Thirteenth Cause of Action:  Violation of Colorado Consumer Protection Act, C.R.S. §§ 6-1-105 and 6-1-703 (Against All Defendants)

Plaintiff alleges that Defendants violated the Colorado Consumer Protection Act (CCPA) by: (1) marketing the fractional interest as an alternative to traditional timeshares; (2) representing that future owners would be able to enjoy the same benefits and privileges as the original plan had promised; and (3) by failing to warn purchasers of the impending Portfolio Club, which transformed the fractional ownership into a traditional timeshare.  Colo. Rev. Stat. Ann. §§ 6-1-105 and 6-1-703.  However, it appears that Plaintiff has abandoned this claim as it notes that "Plaintiff agrees that the Colorado Consumer Protection Act claim must be replead."  (*See* D. 86, p. 40 n.20).  However, Plaintiff has not moved to file a Third Amended Complaint.  Accordingly, this Court recommends granting Defendants' motion to dismiss for failure to state a claim.

### E.  Equitable Claims and Declaratory Relief (Causes of Action 5, 14, and 15)

### 1. Fifth Cause of Action:  Declaratory Relief Regarding Implementation of the Portfolio Club (Against All Defendants)

Plaintiff seeks declaratory relief under Colorado Revised Statutes §§ 13- 51-105 *et seq.* and Colorado Rule of Civil Procedure 57.  (D. 54, p. 49).  Specifically, Plaintiff requests that Defendants "are estopped from relying on any provisions in the recorded plan that are materially

different [from] what is contained in the Declaration actually distributed to all or most prospective purchasers" because the Declaration that Defendants included in the Offering Plan and given to purchasers was not the same Declaration that was recorded in Pitkin County.  (*Id.*).  Second, Plaintiff seeks judicial declaration that "Defendants' implementation of the Portfolio Club at the Grand Hyatt Aspen and the related transfer of unsold inventory to the Portfolio Trust were ultra vires and must be dismantled."  (*Id*., p. 50).  Third, Plaintiff requests declaratory relief in the form of "all necessary orders required to sever any further contractual or other relationship between Plaintiff and Defendants."  (*Id*. pp. 51-52).  However, as discussed previously, Plaintiff has failed to state a claim upon which relief can be granted.  And this Court "may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."  Colo. Rev. Stat. Ann. § 13-51-110.  Accordingly, this Court recommends granting Defendants' motion to dismiss.

## 2. <u>Fourteenth Cause of Action:  Unjust Enrichment (Against All Defendants)</u>

Plaintiff next alleges a claim for unjust enrichment.  In Colorado, "[t]he claim of unjust enrichment is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another."  *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000)).  "[I]t is an equitable remedy and does not depend on any contract, oral or written."  *Id*.  A party claiming unjust enrichment must prove that (1) "the defendant received a benefit"; (2) "at the plaintiff's expense"; and (3) "under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."  *Id*. (citing *Salzman*, 996 P.2d at 1265-66).  However, a plaintiff generally may not plead a claim for unjust enrichment "when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."  *Bedard v. Martin*, 100 P.3d 584, 592

(Colo. App. 2004) (citing *Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77

P.3d 814, 816 (Colo. App. 2003)).

Plaintiff argues that the instant matter presents an exception because "[n]one of the

contractual provisions Plaintiff alleges were breached have that kind of tight relationship to the

unjust enrichment claim, with unjust enrichment 'expressly covered' by the contract."  (D. 86, p.

35).  However, Plaintiff alleges that Defendants benefitted from:

> (i) the proceeds from the sale of points for unsold fractionals that should have
> remained with the Hyatt Residence Club, including the profits made by certain
> Defendants taking advantage of Hyatt Grand Aspen's [breach of good faith and fair
> dealing]; (ii) the profits gained by exploiting the Hyatt Grant Aspen name while
> undermining the Hyatt Residence Club program itself; (iii) the profits gained by
> unfairly restricting Owners' float week options; (iv) [I]LG's profits from being able
> to sell the fruits of the wrongful conduct to Marriott; (v) and ILG and Marriott
> benefitting from the halo effect of the association of the [Portfolio] Club with the
> Hyatt Grand Aspen.

(D. 54, pp. 74-75).  First, the majority of these claims for unjust enrichment concern parties that

this Court does not have specific jurisdiction over and that were dismissed.  Second, a plaintiff

generally may not plead a claim for unjust enrichment "when an express contract covers the same

subject matter because the express contract precludes any implied-in-law contract." *Bedard*, 100

P.3d at 592.  Plaintiff, in prior claims, identified several contract provisions that covered the same

subject matter as the unjust enrichment claims, therefore, those claims are precluded.  Third,

Plaintiff has failed to state a claim upon which relief could be granted, thus Plaintiff has failed to

allege that Defendants have received a benefit under circumstances making it unjust for them to

retain the benefit without paying for it.  *See Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063,

1084 (D. Colo. 2012) (dismissing unjust enrichment claim as duplicative and improper).

Therefore, this Court recommends granting Defendants' motion to dismiss.

3. <u>Fifteenth Cause of Action:  Accounting (Against All Defendants)</u>

Finally, Plaintiff makes a demand for accounting and for profits "improperly obtained by Defendants."  (D. 54, p. 75).  However, given that Plaintiff has failed to state a claim upon which relief can be granted, Plaintiff has no right to an accounting by Defendants.  *See Goodwin v. Hatch*, No. 16-CV-00751-CMA-KLM, 2018 WL 3454972, at *12 (D. Colo. July 18, 2018), *aff'd*, 781 F. App'x 754 (10th Cir. 2019) ("In light of the Court's dismissal of all of Plaintiff's claims upon which he may have been entitled to damages, relief cannot be granted on Plaintiff's claim for accounting.").  Accordingly, this Court recommends granting Defendants' motion to dismiss.

## IV.    CONCLUSION

For the foregoing reasons, this Magistrate Judge respectfully RECOMMENDS that the Defendants' Motion to Dismiss the Second Amended Complaint be GRANTED and Plaintiff's claims against Defendants be DISMISSED pursuant to Rule 12(b)(6).

It is FURTHER RECOMMENDED that this action be DISMISSED in its entirety.

Dated at Grand Junction, Colorado this September 14, 2020.

_____
Gordon P. Gallagher
United States Magistrate Judge

48